

U.S. Department of Justice

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

MAR   6  2007

Washington, DC 20226

MEMORANDUM FOR THE ATTORNEY GENERAL

THROUGH          THE DEPUTY ATTORNEY GENERAL

FROM:            Michael J. Sullivan
                 Acting Director
                 Bureau of Alcohol, Tobacco, Firearms and Explosives

SUBJECT:         .Visit to Mexico City

At your request, I visited Mexico City from February 13-15, 2007, to meet with senior law enforcement officials and Ambassador Garza to discuss ways ATF can work cooperatively with our Mexican counterparts on the issue of gun trafficking. The meetings were substantive, informative, and productive. This memo provides a brief overview of the meetings and outlines the efforts ATF intends to pursue over the next several months to reduce the flow of illegal guns from the United States to Mexico.

## MEETINGS WITH SENIOR MEXICAN LAW ENFORCEMENT

On the morning of February 14, 2007, ATF met with Secretary of Public Safety Genaro Garcia Luna and his senior officers at SSP headquarters. In the afternoon, we met with Attorney General Eduardo Medina Mora and several of his senior advisors. In both meetings, we discussed the new Administration's efforts to consolidate and modernize their federal law enforcement agencies, and ways to better cooperate on gun trafficking matters.

According to Garcia Luna, he is working to modernize and merge Mexico's federal police agencies: AFI, PFP, Customs and Immigration. The new agency will be called the CFP (Cuerpo Federal Policiaco).

Garcia Luna noted that Mexico is tremendously concerned about increasing numbers of more powerful firearms, ammunition, and other items trafficked from the United States into Mexico. According to Luna, Mexico has recovered 40mm grenades, M-203 grenade launchers, AR-15's, M-16's, and AK-type weapons at crime scenes and from associates of narco-traffickers throughout the country. According to the GOM, most individuals arrested in Mexico in possession of these weapons state that the firearms and explosives were obtained in the United States.

Memorandum for the Attorney General                                    Page 2
Subject: Visit to Mexico City

Attorney General Medina Mora discussed many of the same cases and seizures as Garcia Luna, and presented ATF with a paper outlining Mexico's concerns along with a series of proposals to solve the gun trafficking problem. We have attached a translated version of that paper for your review.

ATF provided an overview of our current activities and assistance in Mexico, and we had an open and frank discussion about United States firearms laws, limitations on information collection, enhanced sharing of firearms trace data, and the obstacles to cooperation we observed with the previous administration. In particular, we discussed the fact that the number of gun trace requests from Mexico has declined substantially in recent years and that this information is valuable to ATF in identifying Federal firearms licensees (FFL) responsible for gun trafficking into Mexico, potential straw purchasers, as well as gun trafficking organizations and routes. Both Medina Mora and Garcia Luna acknowledged that they are working to solve bureaucratic problems (largely involving the Mexican military's involvement in firearms seizures) associated with trace requests, and that they anticipated that the number of trace requests would increase under the new Administration.

We closed both meetings by outlining a series of steps ATF will take to further cooperation and strengthen our partnership to better reduce firearms trafficking in Mexico. Those steps are detailed in the latter half of this memo.

To summarize, Mexico's primary requests were as follows:

- Increase the timing and quality of information sharing, including firearms trace data, evidence of trafficking organizations and routes, and information on Mexican nationals who purchase firearms in the United States;

   Assist Mexico in upgrading its technological capacity to better prevent, detect, and deter firearms and explosives trafficking; and

   Establish a permanent liaison program to exchange information in real time.

## ATF COMMITMENT TO REDUCE FIREARMS TRAFFICKING IN MEXICO

ATF remains firmly committed to assisting Mexico in reducing firearms trafficking from the United States. To that end, ATF offered the following assistance to Medina Mora and Garcia Luna in this area:

- ATF will immediately detail two additional Special Agents to Monterrey, Mexico to provide firearms training (basic firearms examinations and use of eTrace) and assist with on-going firearms trafficking investigations.

Memorandum for the Attorney General                                    Page 3
Subject:  Visit to Mexico City

- ATF will implement eTrace in all 31 states in Mexico to decentralize firearms tracing
  requests.  The system will allow each state to obtain trace data from firearms recovered
  within their geographic jurisdiction and provide all trace data to the Attorney General's
  office.  ATF also intends to implement eTrace at the nine U.S. Consulates in Mexico for
  use by U.S. law enforcement personnel pursuant to a developing Memorandum of
  Understanding (MOU) with the Department of State. .

- ATF will send a team of experts to Mexico City to assess Mexico's K-9 training facility,
  and is working with the State Department's Narcotics Affairs Section to secure $1.2
  million to upgrade the facility and provide enhanced explosives and firearms detection
  training.  ATF also will send forensics personnel from our national laboratory (OST) to
  meet with Mexican PGR laboratory personnel to assess their capacity and recommend
  procedures and technology to improve their forensics capabilities, including firearms
  serial number restoration.

- ATF southwest border special-agents-in-charge are meeting this week in Dallas to
  discuss ways to better cooperate and share information with Mexican federal law
  enforcement officials in on-going firearms trafficking cases, and to centralize ATF's
  enforcement efforts along the border.  ATF-designated border liaisons will contact their
  Mexican counterparts as designated by the Mexican Attorney General to discuss
  cooperative efforts.

- ATF will designate at least two regional counsels to be available to meet with attorneys
  from the Attorney General's Office to share information on each country's firearms laws,
  and to seek innovative solutions on information sharing that respect each country's
  sovereignty and need to comply with our respective Constitutions and statutes.

CONCLUSION

ATF stands committed to assisting the Department and the Government of Mexico in efforts to
reduce firearms trafficking and gun violence in Mexico.  Please let me know if you or your staff
would like further information about any of the matters contained in this memorandum.

Attachment

## ARMS TRAFFICKING FROM THE
## UNITED STATES OF AMERICA TO MEXICO

### PROBLEM:

The ease in which firearms are acquired in the United States of America contributes to the fact that the Mexican border has become a place where violence has been more prevalent than normal. A large number of weapons trafficked to México are legally purchased by Americans or residents through straw purchasers.

Firearms recoveries in Mexican territory have shown that companies importing AK-47, Uzi, Taurus pistols, Heckler & Koch and Sig Sauer, into the US, are manufactured in other countries and imported into the United States by companies established there.

Most of the cases under investigation, results on tracing firearms given by ATF, show American dealers as the sellers of a great number of firearms seized in Mexico, such as Glick Twins Inc., in Pharr, Texas; Texas Gunwerks, in Austin, Texas; Chuk's Gun Shop, in Brownsville, Texas; Riky's Gun & Ammunition in Brownsville, Texas; Danny's Pawn & Sporting Goods in McAllen, Texas; Valley Guns in Harlingen, Texas; Davis, Joe D. in Bethany, Oklahoma; National Gun Store, Inc. in Miami, Florida; PDQ., in Corpus Christi, Texas and Mando's Guns, among others.

There are nearly 100,000 authorized firearms dealers in the United States, including sporting goods stores, Army-Navy stores, super markets such as Wal Mart, pawn shops and street markets. More than 12,700 dealers are located in cities near the United States-Mexico border.

Pawn shops are the most effective way to purchase firearms. It is very common that these kinds of shops have the authorization to sell guns, as they have lots and lots of weapons that are pawned. There are many pawn shops along the United States-Mexico border. In these type shops, you can find any kind of weapon that can be bought on anyone's budget, new or second hand, especially shotguns and rifles.

An analysis of the weapons being seized in Mexico, shows that the main source of guns being trafficked or introduced illegally in to Mexico, are the pawn shops. Second hand weapons sold in pawn shops are almost impossible to trace by the National Tracing Center.

Although it is required that a dealer register the purchase/sale of any kind of weapon that is acquired in a pawn shop as well as to fill out the ATF 4473 form, it is not mandatory to report that transaction to the National Tracing Center, which impacts in a negative way on the tracing process, and ends up with impunity and encourages the arms trafficking.

In some cases, ATF is not capable to tracing firearms that were seized successfully because of the following reasons:

- Serial number missing
- Invalid or incorrect serial number.
- The process indicates that this firearm was transferred to an entity for which there is no federal firearms licensee of record.
- The licensee failed to maintain the records. This may be attributed to the records being lost, stolen, damaged, or illegible.
- Incomplete information
- Firearm was manufactured prior to the federally imposed comprehensive marking and record keeping requirements of the gun control act of 1968 and no further trace is possible.
- Licensee out of business, failing to send all the required information to the NTC.
- Weapon stolen.

In our country, combating criminal organizations involves primarily narco-trafficking, it is noted that the arsenals being utilized have become more powerful, such as:

Anti rocket launcher, AT4, cal 84mm
Anti rocket launcher, M72, cal. 66mm
Grenade launcher, M203, cal. 40mm
Fragmentation grenades.
Barret, cal. 50
FN Herstal, Five-Seven, cal 5.7 x 28mm

There have been very significant seizures in México, in the States of Sonora, Chihuahua, Nuevo Leon, Tamaulipas, Sinaloa, Veracruz, Jalisco, Michoacán. In Central Mexico, mainly in the State of Mexico and the Federal District; in South Mexico, in Guerrero and Chiapas.

These seizures have been related to narco-traffickers, kidnappers, robbers, and car jackers, among others. It is presumed that 80% of the seized weapons come from the United States of America.

Guns seized in Mexico, fulfill any kind of necessities, such as self-defense (kept in houses for protection), as well as for delinquents from organized crime or common criminal organizations.

Information shared by ATF, indicates that Mexican citizens who want to purchase a weapon, go to the southern border towns in the United States, helped by residents or nationals to acquire all the desired guns with any particular feature, which then are trafficked to Mexico: concealed in any hollow space of a vehicle, such as inside the doors, in vehicles with false bottoms, personal or company/fleet vehicles; they use courier, public transportation, luggage, mainly on ground, maritime and railway transportation, as they conceal the weapons inside the containers.

It is important to mention that smuggling weapons into Mexico, can be verified thru the "ant trail" process.

It is obvious that weapons "travel" all around the Mexican territory from north to south and not the other way round, this is reason enough to believe that current cooperation policies have to be re-adjusted among the two countries in order to reach more realistic agreements to stop the arms trafficking, since the impact in violence on the border caused by this fact, affects both Mexico and the United States. Mexican military forces have been utilized recently, which signifies a "red" alert for both countries, because those kinds of weapons are so easily available to terrorists as well as to organized criminal organizations. In fact terrorists can attack even without crossing the border, one of the facts of most concern to the United States in terms of national security. On the other hand, the struggle among the drug cartels for leadership, has resulted in risk to civilian's security, peace and government functions along our borders.

The biggest concern for Mexico is to stop firearms and ammunitions trafficking that are supplying the criminals, since not only powerful guns have been seized, but lately Mexican authorities have seized devices that were not commonly use by them, such as: fragmentation grenades, 40 mm caliber grenades, Barret .50 caliber rifles and most recently the "New Generation" guns: the FN (Fabrique Nationale) Five-Seven, caliber 5.7mm, manufactured in Belgium, but imported to the United States. Bottom line is this is belligerent material, not very common by the way, in hands of organized criminal gangs, which are suppose to be for military use only, nevertheless, we can say that they are easily obtaining them illegally, which is very concerning because of the harmful power they have.

## ACTIONS PROPOSED TO SOLVE THE PROBLEM

Mexico has been persistent in the necessity of taking action to promote and strengthen the binational cooperation to combat firearms trafficking from the United States of America to our country, as well as to investigate, prosecute, identify, detect and detain possible traffickers or "mules", requesting from the United States of America to pay attention in the following issues:

1. Expedite the timely exchange of information, evidence, legal documents and technology.

2. Establish a permanent liaison program to exchange information, verbally and written, even on holidays and after work hours, in real time.

3. Implement procedures, application of new techniques, as well as investigation techniques, handle and preservations of working material and explosives substances.

4. We believe it will contribute substantially to stopping firearms trafficking and all related devices, as well as their elimination, that the United States, in an immediate action implements a program to check on all weapon dealers, at least in the southern border, for them to ensure that the law is upheld to selling/purchasing weapons.

5. To make it mandatory for all the people that have a license to selling guns legally, to keep copies, electronic or paper, of the purchasers including picture and fingerprints; and when it is a multiple purchase to give immediate notice to ATF to track the whereabouts of all those guns.

6. Implement a program in which purchasers are obligated to keep the guns they bought

   United States of America Congress realize all the necessary modifications they considered appropriate to their legislation to set boundaries when it comes to purchase-sale of belligerent devices.

8. On Binational collaboration issues, we request that United States of America, supports Mexico with technology and a weapons and explosives detector, so that as soon as possible, the detectors will be installed in check points at the border, mainly in northern Mexico.

9. Also, that the United States immediately share information involving the purchase of firearms by Mexican foreign nationals that are involved in gun trafficking in order to initiate an investigation, without being of legal harm to both sovereignties and each one of the governments involved, and the possibility of extradition when the case applies.



Bureau of Alcohol, Tobacco, Firearms and Explosives

**ATF** **Testimony**

At The Frontline Against Violent Crime · · · Public Affairs Division — Washington, DC

February 7, 2008
www.atf.gov

## STATEMENT OF WILLIAM HOOVER, ASSISTANT DIRECTOR FOR FIELD OPERATIONS BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES BEFORE THE UNITED STATES HOUSE OF REPRESENTATIVES COMMITTEE ON FOREIGN AFFAIRS SUBCOMMITTEE ON THE WESTERN HEMISPHERE

Chairman Engel, Ranking Member Burton, and distinguished Members of the Subcommittee: I am William Hoover, Assistant Director for Field Operations of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have been an agent with ATF since 1987, and in my current position I oversee the operations of all of the Bureau's field offices, including those along the Southwest Border. It is an honor to appear before you today to discuss ATF's current role in the suppression and interdiction of U.S. sourced firearms illegally trafficked into Mexico. The violence fueled by Mexico's drug cartels poses a serious challenge for both U.S. and Mexican Law Enforcement in that the drug trafficking related violence is threatening the well being and safety of citizens on both sides of the border.

Before I discuss the issue of firearms trafficking along the Southwest border, I want to provide you with background information about ATF. ATF is a law enforcement agency within the Department of Justice dedicated to reducing violent crime, preventing terrorism and protecting our Nation. The men and women of ATF perform the dual responsibilities of enforcing Federal firearms and explosives laws and regulating the firearms and explosives industries. We are committed to working directly, and through partnerships, to investigate and reduce violent crime involving firearms and explosives, acts of arson, and illegal trafficking of alcohol and tobacco products.

ATF has a strategic role in investigating violent crime along the Southwest border. ATF has statutory authorities to address violent crime and firearms trafficking in the region as we have regulatory oversight over Federal Firearms Licensees (FFL), from whom all new guns are purchased.

ATF is engaged in the interdiction and abatement of the flow of U.S sourced firearms into Mexico for use by major drug trafficking organizations (DTO). ATF's expertise and involvement in identifying, disrupting, and dismantling illegal sources of firearms to Mexico is not a new development. We have been engaged in utilizing our crime-fighting expertise, assets, and regulatory inspection authority to stem the flow of U.S. sourced firearms to DTOs. Further, ATF's partnerships and participation in task forces, such as the Organized Crime Drug Enforcement Task Force, enable ATF to gain the benefits of each partner's expertise and specific authorities and engage in real-time communication to effectively and efficiently combat the illicit trafficking of firearms and consequent violent

ATF AR 0008

crime.

ATF has long been committed to investigating and disrupting groups and individuals who utilize firearms trafficking as a means to facilitate the drug trade on both sides of the border through the use of firearms illegally obtained in the U.S. and subsequently smuggled into Mexico. As you know, President Calderon and Attorney General Medina Mora have identified the cartel-related violence as a top priority and recently proclaimed the illegal trafficking of U.S.-sourced firearms the "number one" crime problem affecting the security of Mexico today.

Public safety along the U.S.-Mexico border has deteriorated considerably and Mexico has seen nearly four years of intensified turf battles between the three major DTOs operating within Mexico. Ironically, these battles for control over lucrative narco-corridors into the U.S. from Mexico are the result of intense U.S. and Mexican law enforcement and military counter-narcotics operations and extraditions that commenced in late 2003 targeting the leaders of the most prolific Mexican DTOs. In seeking to gain control of the disputed corridors, namely the Baja/Tijuana, Sonora/Nogales and Nuevo Laredo corridors, DTOs and their enforcers have more aggressively turned to the U.S. as a source of firearms. The weapons are then used against other DTOs, the Mexican Military, Mexican and U.S. law enforcement officials, as well as innocent civilians on both sides of the border.

Intelligence gathered by ATF and other domestic Federal law enforcement entities strongly suggests that the DTOs have tasked their money laundering, distribution and transportation apparatuses, all of which reach across the border into the United States, to acquire firearms for illegal transfer back to Mexico for use in facilitating narco-trafficking and other criminal activities. These DTOs are comprised of loosely affiliated individuals and/or groups used to facilitate all aspects of the illicit drug and gun trade between Mexico and the U.S. We know that these same groups are employed by DTOs to transport narcotics and firearms and to launder narcotics-related proceeds, are highly functional in every major city - on both sides of the border - where the DTOs conduct drug trafficking operations. The major challenge for both U.S. and Mexican law enforcement is to identify, disrupt and to ultimately dismantle these DTO infrastructures as a means to decrease the demand for U.S. sourced firearms.

The increased incidence of firearms trafficking to Mexico (from the U.S.) is influenced by numerous factors, including:

- The strict prohibition and regulation of firearms in Mexico; coupled with the increased enforcement efforts by the Mexican government and the increased demand for firearms by the DTOs;
- A readily accessible source of firearms and ammunition originating in mostly the secondary market such as gun shows, flea markets and private sales;
- Illegal "straw purchases" of firearms from FFLs who are often unwitting participants in these schemes.

In analyzing the data collected through ATF's investigative and regulatory operations that have been focused on the abatement of illegal firearms trafficking to Mexico, there is more than enough evidence to indicate that over 90 percent of the firearms that have

ATF AR 0009

either been recovered in, or interdicted in transport to Mexico, originated from various sources within the United States. An in-depth, comprehensive analysis of firearms trace data over the past three years shows that Texas, Arizona and California are the three most prolific source states, respectively, for firearms illegally trafficked to Mexico. In FY 2007 alone, approximately 1,112 guns which originated in Texas, Arizona and California were submitted for tracing from Mexico. For all other U.S. States in FY 2007, approximately 435 guns were submitted for tracing from Mexico. It should be noted, however, that although the greatest proportion of firearms trafficked to Mexico are originating out of the U.S. States along the Southwest border (namely Texas, Arizona and California), ATF trace data has established that cartels are also acquiring firearms from other States as far east as Florida and as far north and west as Washington State.

Another challenge ATF faces is the DTOs' use of "straw purchasers". The "straw purchaser" is someone who is not prohibited from purchasing firearms but who illegally purchases firearms by posing as the actual buyer when really the guns are being purchased for firearms traffickers employed by the drug cartels. Although "straw purchasing" is a tactic used by cartels to acquire firearms through the U.S. market, straw purchasers and schemes can be exceptionally difficult to identify.

In addition to straw purchases, DTOs understand the ease with which used firearms can be purchased from individuals without records or background checks.

Until recently, the DTO's "weapons of choice" had been .38 caliber handguns. However, recent trace data of firearms seized in Mexico and "Stateside" interdictions of firearms bound for Mexico shows that cartel members and enforcers have now developed a preference for higher quality, more powerful weapons. The most common of these firearms now includes the Colt AR-15 .223 caliber assault rifle, the AK-47 "type/variant" 7.62 caliber assault rifle, FN 5.57 caliber pistols (better known in Mexico as the "Cop Killer". or "Asesino de la Policia"). In conjunction with the dramatic increase in U.S. source firearms that have either been recovered in Mexico, or interdicted prior to reaching Mexico, ATF also routinely seizes small arms and assault rifle ammunition destined for Mexico. ATF has also seized large quantities of .50 caliber ammunition for use in high-caliber weapons.

A recent seizure that occurred in connection with an ATF case in the Phoenix Arizona area culminated in the arrest of 16 individuals, the recovery of 16 "weapons of choice" rifles, 19 handguns, $13,000 in cash, a vehicle, 60 high-capacity magazines for AK-47 variants, and nearly 10,000 rounds of ammunition. In addition to the physical acquisitions, a significant amount of intelligence was gathered on firearms trafficking in Mexico, which will assist ATF in current and future investigations.

Often, ATF is asked what can be done to significantly decrease the number of firearms originating in the U.S. that ultimately make their way into the hands of DTOs in Mexico. ATF has developed and continues to enhance an extremely effective real-time intelligence and evidence sharing network with the Mexican Government. Given current circumstances and increasing volume, however, the system has been overwhelmed on both sides of the border. ATF has found that merely seizing firearms through interdiction without thoroughly investigating the supply and trafficking infrastructure accomplishes little in terms of 'tangibly' affecting the flow of firearms to Mexico. It is imperative to trace each and every

ATF AR 0010

firearm intercepted before it reaches Mexico or to trace the weapon once it is recovered in Mexico

Thus, an essential component of ATF's firearms trafficking investigations is the tracing of firearms seized in both countries. Each seized firearm is entered into the ATF Firearms Tracing System database, which records specific identifying information, i.e., serial number, manufacturer, importer and caliber, for each weapon seized. Using this information, ATF can work backwards from the point of seizure to the first retail sale, to determine the original purchaser information and possibly learn additional pertinent information such as whether other seized guns were purchased at the same time. Using all of this information, ATF is able to reconstruct the flow of weapons along the border, how and where they are being purchased, and who is purchasing them. Without such information, ATF has no way to trace the source of such firearms. Further, without being able to trace these firearms, there is no way to tell whether or not the firearms actually originated within the U.S., nor can we come to know by what means such weapons were procured and transported to Mexico. Firearms tracing is an essential starting point for identifying and eliminating illicit sources of firearms in the U.S.

As such, ATF is working with Mexican officials to increase their current usage of ATF's eTrace system. eTrace provides web based access to ATF's Firearms Tracing System to allow law enforcement both domestically and internationally the ability to trace data from firearms seized in connection with a criminal investigation. eTrace allows law enforcement to access their trace results directly and offers the ability to generate statistical reports to analyze their trace data to determine firearms trafficking trends or patterns. In addition, ATF is developing Memorandums of Understanding with Mexico to provide e Trace training to nine consulates in Mexico. This initiative should increase the amount of trace information Mexico provides to ATF each year.

From FY 2006 to FY 2007, we experienced almost 100 percent increase in the number of trace requests from Mexico. With the deployment of eTrace to the nine consulates and the eventual implementation of Spanish eTrace, these numbers should continue to increase in the coming years.

ATF is also part of the Administration's recently announced "Merida initiative." This initiative is a comprehensive U.S. strategy to address drug smuggling, firearms trafficking, and increasing violence in Mexico and Central America. If the FY 2008 supplemental is enacted, ATF would receive $2 million through the initiative to assist in the expansion of Spanish eTrace to countries in the Central America region. Funding would also be used to deploy an ATF regional advisor to Central American countries to assist them with firearms trafficking issues. As part of the proposed Spanish eTrace expansion, ATF would provide training to Mexican and Central American countries to ensure that the technology is utilized to the greatest extent possible.

ATF's goal is to deploy eTrace software to all thirty-one states within the Republic of Mexico. Without the expanded use of eTrace, Mexico will continue to provide only limited information and intelligence related to firearms seizures in Mexico. Without that information, ATF faces greater challenges in reducing the amount of firearms trafficked across the border.

ATF AR 0011

It is clear that one of the greatest challenges facing law enforcement officials today, both on the border and throughout the country, is the increased incidence of gun-related violence. To address the overwhelming increase of violence and firearms trafficking along the Southwest border ATF has initiated "Project Gunrunner", a comprehensive strategy that incorporates ATF's expertise and resources to attack the problem both domestically and internationally.

Currently, under "Project Gunrunner", ATF has approximately 100 special agents dedicated to investigating firearms trafficking on a full-time basis and 25 Industry Operations Investigators (IOI) responsible for conducting regulatory inspections of FFLs. We are expanding our overall presence at the El Paso Intelligence Center (EPIC) as the central repository and "clearinghouse" for all weapons related intelligence collected and developed not only by all of our ATF field and Mexico offices and attaches, but also by all of the other Federal, State and local law enforcement entities involved in narcotics interdiction and investigation along the U.S./Mexico border.

Our increased staffing levels at EPIC, will allow ATF to increase its intelligence activities with other EPIC law enforcement partners stationed there, including the Federal Bureau of Investigation (FBI), the Drug Enforcement Administration (DEA), Immigration and Customs Enforcement (ICE), Customs and Border Patrol (CBP) and the Texas Department of Public Safety. ATF also works closely with these agencies' task forces which operate along the Southwest border, sharing intelligence, and conducting joint investigations.

ATF is also focusing our limited industry operations resources on and near the border region to identify FFLs who may be involved, directly or indirectly, in supplying firearms to known traffickers. As part of "Project Gunrunner" we will seek to expand inspection and compliance activities to include focused forward traces of firearms that, through historical firearms recovery and trace data have been identified as "weapons of choice" for the cartels and their enforcers.

These inspections will also seek to use firearms tracing and proactive investigative measures to identify and interdict those who pose as legitimate buyers while they are actually straw purchasing firearms for cartel members and associates who otherwise are prohibited from purchasing firearms in the U.S.

ATF is also intensifying our education and liaison efforts with the firearms industry and other law enforcement agencies to reinforce the importance of collaboration to identify and report suspected straw purchasers and other illicit sources of firearms intended for Mexico.

Internationally, we have enjoyed a strong collaborative relationship with Mexican law enforcement and other government agencies in Mexico. Over the last 15 years, ATF has had special agents permanently assigned to the U.S. Embassy in Mexico City. The agents are engaged in full time intelligence sharing with the Mexican Government as a means to gather real time information on significant seizures of firearms that originated from within U.S. Within the past year, ATF assigned additional agents to Monterrey, Mexico. Having agents permanently assigned and working side by side with Mexican law enforcement and military officials, has helped us develop and foster relationships in all corners of Mexico as a way to

ATF AR 0012

provide technical and investigative assistance to police and prosecutors.

In the future ATF will look to assign additional special agents and intelligence research specialists to ATF offices in Mexico, coupled with the deployment of additional agents and analysts to EPIC who will act as liaison partners with/to the other U.S. law enforcement entities operating within the Republic of Mexico. ATF is also looking to establish more pre-identified, specially vetted Mexican police officials that will allow Special Agents from the ATF field offices in U.S. border cities to work directly to exchange timely investigative information regarding seizures of suspected U.S. sourced firearms within the contiguous Mexican border states.

It January of 2008, ATF Acting Director Sullivan announced that an additional twenty-five Special Agents and fifteen IOIs will be permanently assigned to the Southwest border to curb the illegal export of U.S. sourced firearms and ammunition to Mexico.

Since ATF is a relatively small federal law enforcement agency, this accounts for a significant proportion of total available manpower and directly affects our ability to address violent crime in other parts of our country. Nationwide, we have about 2,500 Agents and about 750 inspectors. The FY 2009 budget request provides for 12 new industry operations investigators operations and $0.9 million to increase our staffing levels in the ATF field offices along the U.S./Mexico border.

It is estimated that there are over 6,647 FFLs along the U.S./Mexico Border compared to approximately 35 IOIs and 100 special agents stationed along the border and dedicated to investigating firearms trafficking. It is a major challenge for ATF to adequately identify and disrupt the illegal sources of firearms and ammunition, while participating in the interdiction of shipments firearms and ammunition destined for Mexico. Nevertheless, in FY 2007, we investigated 187 firearms trafficking cases and recommended 465 defendants for prosecution and seized over 1,297 firearms as a result of "Project Gunrunner".

In inviting ATF to appear today, this Committee asked about whether the Inter-American Convention Against the Illicit Manufacturing of and Trafficking in Firearms, Ammunition, Explosives and other related materials (CIFTA) was in compliance with ATF regulations. While ratification is up to the Senate, ATF programs and regulations comply with the primary obligations required under the CIFTA, such as licensing of, manufacture and importation of firearms.

There should be no question that firearms trafficking is a priority for this Bureau and that it will be a priority until this issue is adequately addressed. The expansion of our "Project Gunrunner" will assign additional manpower and investigative resources to our border offices to specifically work to dismantle the criminal infrastructures that exist to procure the "deadly tools of the trade" and enable DTOs to engage in increasingly violent turf battles.

I would like to conclude by again stating that ATF has developed and is actively implementing our "Project Gunrunner" initiative which is modeled upon our border successes over the years, and that is designed to actively disrupt, deter and dismantle the criminal enterprises and infrastructures seeking to ensure a continued and viable supply of U.S. sourced firearms for criminal purposes to Mexico, but which is also designed to address

ATF AR 0013

and eliminate the actual sources of the firearms and ammunition that have become so readily available for criminal purposes in both Mexico and in the U.S.

Although it has proven exceptionally difficult to reduce the demand for U.S. sourced arms in Mexico, ATF will continue to attack the infrastructures and illicit sources fueling the availability and access to firearms by those who seek to further their narco-trafficking activities on both sides of the border.

I would like to thank the Committee for its time and for the honor of allowing me to testify on this subject, and I look forward to any questions you may have. I would ask that my written statement be entered into the record.

### ###

ATF AR 0014



**Violence Policy Center**

1730 Rhode Island Avenue, NW          202.822.8200 voice
Suite 1014             ,                202.822.8205 fax
Washington, DC 20036                   www.vpc.org  web

Statement of Tom Diaz
Senior Policy Analyst
Violence Policy Center

Before the Subcommittee on National Security & Foreign Affairs
Committee on Oversight and Government Reform
U.S. House of Representatives

Hearing on
"Money, Guns, and Drugs:  Are U.S. Inputs Fueling Violence
on the U.S./Mexico Border?"

March 12, 2009

Thank you, Mr. Chairman and members of the subcommittee, for inviting me to present the views of the Violence Policy Center on this important topic.  Founded in 1988, the Violence Policy Center is a national non-profit 501(c)(3) tax-exempt educational organization working to reduce violence in America.

### The U.S. Civilian Gun Market – An Ideal System for Smuggling

It is beyond question that firearms from the U.S. civilian gun market are fueling violence not only on both sides of the U.S./Mexico Border, but in Mexico itself.  If one set out to design a "legal" market conducive to the business of funneling guns to criminals, one would be hard-pressed to come up with a "better" system than the U.S. civilian gun market – short of simply and openly selling guns directly to criminals from manufacturer and importer inventories.

The U.S. gun market not only makes gun trafficking in military-style weapons easy. It practically compels that traffic because of the gun market's loose regulation and the gun industry's ruthless design choices over the last several decades.

### Military-Style Weapons – The Drug Cartels' Weapons of Choice

Military-style weapons heavily marketed by the U.S. civilian gun industry are the drug cartels' weapons of choice.

One need look no further than the testimony of William J. Hoover, Assistant Director, Office of Field Operations, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), before the Western Hemisphere Subcommittee of the U.S. House of Representatives Committee on Foreign Affairs in February 2008 to find confirmation of that fact:

ATF AR 0015

Mexican drug trafficking organizations have aggressively turned to the U.S. as a source of firearms. These weapons are used against other DTOs [Drug Trafficking Organizations], the Mexican military, Mexican and U.S. law enforcement officials, as well as innocent civilians on both sides of the border.  Our comprehensive analysis of firearms trace data over the past three years shows that Texas, Arizona, and California are the three primary source states respectively for U.S.-sourced firearms illegally trafficked into Mexico.  *Recently, the weapons sought by drug trafficking organizations have become increasingly higher quality and more powerful. These include the Barrett .50-caliber rifle, the Colt AR-15 .223-caliber assault rifle, the AK-47 7.62-caliber assault rifle and its variants, and the FN 5.57-caliber pistols better known in Mexico as the cop killer.*[1] [Italics added.]



*Semiautomatic Assault Rifles Seized in Gun-Smuggling Case*

It is no coincidence that the military-style firearms identified by Mr. Hoover as favored by Mexican drug cartels -- and cop-killing criminals in the United States -- are *precisely* the makes and models of firearms that have been carefully designed, manufactured or imported, and heavily marketed over the last 20 years by the U.S. civilian gun industry.  These types of military-style firearms today dominate the U.S. civilian market.

### The Analytical Gap in U.S. Policy

Much U.S. policy attention in response to public safety concerns has been directed at changing *internal* factors in Mexico and other key Latin American states to achieve transparency and effective policing within the rule of law.  Less attention has been given to examining and correcting *external* influences from the United States that are driving much of the violence in Mexico and elsewhere in the

ATF AR 0016

Western Hemisphere. This gap in analytical thinking has sometimes contributed to myopic, piecemeal, and ultimately ineffective policies.

One of the major drivers in Mexico's violence that has been ignored until recently is the illicit flow of weapons to criminal organizations from the U.S. civilian firearms market.

Moreover, to the extent that the problem of gun trafficking has been addressed, the focus has been exclusively on law enforcement measures -- investigating, identifying, and prosecuting gun smugglers. Although aggressive law enforcement measures are an essential part of any effective overall program, an exclusive focus on law enforcement measures overlooks a rich and ultimately more fruitful range of prophylactic measures that can be implemented upstream of the transfers that move firearms from legal to illegal commerce.

### The Role of the U.S. Gun Industry:
### Weak Regulation, Deadly Design and Marketing

"There is a war going on on the border between two cartels," William Newell, Special Agent in Charge of ATF's Phoenix Field Division, was reported to have said in 2007. "What do they need to fight that war? Guns. Where do they get them? From here."[2] This statement of fact is not surprising. The VPC has reported in detail previously that it is entirely possible to outfit an army through the *civilian* commerce in firearms and related accessories in the United States.[3] That is what the Mexican DTOs are doing today. According to ATF Special Agent Tom Mangan, "The cartels are outfitting an army."[4]



*ATF Reports Barrett 50 Caliber Anti-Armor Rifles to be Among Drug Lords' "Weapons of Choice"*

3

ATF AR 0017

Smugglers reportedly move guns into Mexico in a variety of ways, but according to the *Associated Press* "most are driven through ports of entry, stuffed inside spare ties, fastened to undercarriages with zip ties, kept in hidden compartments, or bubble-wrapped and tucked in vehicle panels."[5]   Arizona's Attorney General described this traffic recently as "a 'parade of ants' – it's not any one big dealer, it's lots of individuals."[6]   The dimensions of that traffic are not known, but it appears to be growing.   U.S. and Mexican officials report that, based on ATF tracing data, the cartels get between 90 percent and 95 percent of their firearms from the United States.   Traces by ATF of firearms from Mexico have reportedly increased from 2,100 in 2006 to 3,300 in 2007 and 7,700 in 2008.[7]

Such information illustrates graphically that if one set out to design a system for easily moving military-style firearms from legal civilian commerce to illegal trade through gun smuggling, one could not do better than the existing U.S. civilian firearms market.   The hallmarks of that trade not only make gun-running of the cartels' military-style weapons of choice easy, but very nearly compel this illicit commerce.   Those hallmarks are:

1. Lax laws and regulations governing the firearms industry at the local, state, and federal levels, compounded by weak or ineffective enforcement.

2. The deliberate choice of military-style firearms design – assault weapons, 50 caliber anti-armor sniper rifles, and "vest-busting" handguns – by gun manufacturers and importers.   Heavy industry marketing of these designs has made them the defining products in the U.S. civilian gun market today.

### Lax Law and Regulation, Weak Enforcement

Although the gun lobby often maintains that the firearms industry is heavily regulated, in fact the industry is lightly regulated.   The most important regulatory burdens on the gun industry are largely exercises in paper oversight – pro forma licensing and rare inspections by federal authorities.   Most states do not regulate dealers, and the few that do rarely conduct regular inspections.   Firearms and tobacco products are the only consumer products in the United States that are not subject to federal health and safety regulation.   The sale (transfer) of firearms is subject only to a cursory federal background check under the federal Brady Law – when the sale is made through a federally licensed gun dealer.

One of the most important problems in preventing domestic and foreign gun smuggling alike is that – unlike illegal drugs, for example – firearms are not inherently contraband.   Guns enter into commerce legally and may be legally transferred in a wide variety of ways in a multitude of venues.   The act of transferring a semiautomatic assault rifle – or a dozen – in entirely legal commerce between two law-abiding individuals is almost always indistinguishable from

4

weapons transfers in which one or both of the parties intend to put the gun into the smuggling stream.



*50 Caliber Anti-Armor Sniper Rifles are Widely Available at Gun Shows*

Oversight of firearm transfers quickly dissipates the further down the distribution chain one goes. Many of the ways that guns legally change hands in the United States are wholly unregulated and invisible from public view. These include, for example, sales by non-dealers at gun shows and sales between individuals.



*Individual Sales at Gun Shows are Generally Unregulated*

5

ATF AR 0019

The structure of the gun industry is relatively simple.  Domestic and foreign manufacturers make the firearms.  Domestically manufactured or assembled firearms are distributed by the manufacturers, either through wholesalers (known in the industry as "distributors") or directly to retail gun dealers. Foreign-made firearms are brought into the country through importers and then enter the same channels of commerce.  In theory, imported firearms are required to have a "sporting purpose" under 18 USC §925(d)(3) (a provision of the 1968 Gun Control Act). In practice, however, the "sporting purposes" test is subject to administrative interpretation as to its definition and its application in specific cases.  Under the George W. Bush administration, the sporting purposes test was substantially weakened, allowing the importation of a large number of cheap assault weapons and such "cop-killing" handguns as the FN Five-seveN, known in Mexico as the *mata policia*, or "cop-killer."

Domestic firearm manufacturers, importers, dealers, and ammunition manufacturers are required to obtain a Federal Firearms License (FFL).[8]  This licensing regimen effects the central purpose of the Gun Control Act of 1968, the core federal gun law, of supporting state control of firearms by basically forbidding interstate commerce in guns except through federally licensed dealers.  However, FFLs are issued on a virtually pro forma basis — anyone who is at least 21 years old, has a clean arrest record, nominal business premises, and agrees to follow all applicable laws can get a license good for three years upon paying a fee and submitting a set of fingerprints with an application form.[9]

New and imported firearms thus in theory always move in legal commerce through at least one federally licensed seller through the first retail sale.  The federal Brady Law requires a background check as a prerequisite to any retail sale *through a federally licensed dealer*.  However, once a gun has been sold at retail, it may be resold in the "secondary market" — that is, not through a federally licensed dealer — any number of times using any one of a variety of channels.  Vehicles for these secondary market transfers include classified advertising in newspapers and newsletters, Internet exchanges, and informal sales between individuals at "flea markets" or "gun shows."  None of these secondary market channels require the federal Brady background check, so long as the sale is conducted intrastate and there is no state background check requirement.  Most states do not regulate such sales — although a few, like California, do regulate all firearms transfers.  About 40 percent of all gun transfers are made through this secondary market, according to a 1994 national survey.[10]

The consequences of this weak system are apparent in the fact that domestic gun trafficking is widespread and resistant to such law enforcement efforts as exist. Street gangs and other criminal organizations have demonstrated conclusively over the last 25 years that weak U.S. gun control laws do not prevent their acquiring as

ATF AR 0020

many of the increasingly lethal products of the gun industry as they desire. In spite of episodic efforts by ATF, organized interstate smuggling pipelines continue to move guns from states with virtually nonexistent gun regulations to the few primarily urban centers that have tried to stem the flow of guns.[11]  "States that have high crime gun export rates – i.e., states that are top sources of guns recovered in crimes across state lines – tend to have comparatively weak gun laws."[12]  Local criminals engage in brisk gun traffic in every part of the country, with little effective law enforcement interference.

Some opponents of more effective gun control measures point to the continued trade in illegal firearms as evidence the gun control laws do not work.  "A crook could care less how many laws you have," a border region gun dealer told the *Los Angeles Times* in 2008.[13]  Former Secretary of State Condoleezza Rice was reported by *El Universal* newspaper to have made a similar statement at a meeting with Mexico's Foreign Secretary, Patricia Espinosa.  "I follow the traffic in arms throughout the world, and I have never known traffickers in illegal arms to care much about the law," the paper quoted Rice as saying.[14]  Based on the logic that laws do not deter criminals, the newspaper dryly observed, Mexico should repeal its laws against drug-trafficking.

In fact, the major weakness of U.S. efforts against gun trafficking (and firearms violence in general) is its almost total reliance on after-the-fact law enforcement investigation and prosecution.  Instead of focusing on prophylactic measures to prevent guns from getting into the hands of traffickers, most attention has been paid to trying to apprehend and prosecute traffickers after the damage has been done and the guns are in criminal hands.  If, as noted earlier, traffickers indeed use a "stream of ants" to move guns to Mexico, it would be more effective to focus efforts on making it more difficult for the ants to get the guns in the first place.

Although law enforcement efforts are an important and necessary part of a total package against gun trafficking – and gun violence generally – a more powerful solution would be to complement law enforcement with "upstream" public health and safety measures designed to reduce the opportunity for gun trafficking. Examples of these upstream measures include stopping the production and import of military-style firearms such as semiautomatic assault weapons and 50 caliber anti-armor sniper rifles, and making all transfers of firearms subject to (at a minimum) the current background check to which transfers through federally licensed firearms dealers are subject.

Even if the commerce in firearms in the United States were more tightly regulated along such lines, there remains the major problem of lack of oversight over design – the type of firearms that the gun industry produces and markets.

7

### Design and Marketing of Military-Style Weapons

The U.S. gun industry has been sagging for decades.[15]   Although the industry enjoys brief periods of resurgence, the long-term trend for civilian gun manufacturers continues to be steady decline as fewer Americans choose to own guns and gun ownership becomes more concentrated.[16]   As the gun business publication *Shooting Industry* put it, "more and more guns [are] being purchased by fewer and fewer consumers...."[17]

One reason for the gun industry's long-term slump is the steady decline in hunting, a traditional market for rifles and shotguns.   "Hunters represent an aging demographic," *The Wall Street Journal* summed up.[18]   In addition to demographic stagnation, absorption of rural land by expanding suburbs has decreased the number of places where hunters can hunt.   "Now there are Wal-Marts and shopping centers where I used to hunt," said a Florida hunter.[19]   Changes in society's values and alternative recreational activities for young people have also hurt hunting.   "Instead of waking up at 4 a.m. and going hunting, it's easier for kids to sleep in until 9 and play video games," a California wildlife official observed.[20]

The gun industry's cumulative loss of market ground is reflected in a 2006 study, "Public Attitudes Towards the Regulation of Firearms," released by the National Opinion Research Center (NORC) at the University of Chicago analyzing the prevalence of household firearms. The NORC survey data show that during the period 1972 to 2006, the percentage of American households that reported having any guns in the home dropped nearly 20 percentage points:   from a high of 54 percent in 1977 to 34.5 percent in 2006.[21]

The industry's principal avenue of addressing its stagnant markets has been developing innovative gun designs aimed at stimulating repeat purchases of its products. "I think innovation is critical to the industry," Smith & Wesson's marketing chief said in 2005.[22]   For the gun industry, innovation has translated into introducing increasingly deadly firearms into the civilian market.  The gun industry uses firepower, or lethality, in the same way that the tobacco industry uses nicotine.  Firearm lethality is a means to "hook" gun buyers into coming back into the market again and again as more deadly innovations are rolled out.   As a consequence, the profile of the civilian gun industry today is defined by military-style weaponry.   As the industry publication *The New Firearms Business* put it recently, "the sole bright spot in the industry right now is the tactical end of the market, where AR and AK pattern rifles and high-tech designs, such as FNH USA's PS90 carbine, are in incredibly high demand right now."[23]

8

ATF AR 0022



*Assault Weapons Like FNH USA's PS-90 are Gun Industry's "Sole Bright Spot"*

The VPC has issued multiple reports on these products, focusing in detail on the industry's introduction of:

- high-capacity semiautomatic pistols, which profoundly increased levels of street violence and lethality beginning in the 1980s;

- semiautomatic assault weapons (such as the Kalashnikov-type clones of the AK-47, and AR-15 assault rifles) which play an ongoing role in organized criminal violence;

- 50 caliber armor-piercing sniper rifles capable of piercing armor plate at a distance of a mile and a half; and, most recently,

- handguns with rifle striking power, capable of piercing all but the heaviest police body armor (such weapons are reportedly known as *mata policias* or *asesino de policia*, cop-killers, in Latin America).

The consequences of these several decades of design and marketing are now being seen not only on the streets of Mexico, but on the streets of Miami, Los Angeles, Washington, D.C., and in cities and towns all over the United States.

As the testimony of ATF Assistant Director Hoover quoted earlier underscores, it is precisely these highly lethal, military-style models which have become staples in the illicit traffic in firearms between the United States and Latin America.[24] Observations of ATF agents in the field confirm Hoover's testimony. According to ATF Special Agent Tom Mangan, for example, the Barrett 50 caliber anti-armor sniper rifle has become one of the "guns of choice" of the Mexican drug organizations. Says Mangan, "There's nothing that's going to stop this round."[25] The weapon has been used to assassinate Mexican police and other government

9

ATF AR 0023

officials traveling in armored cars.[26]   Other favored firearms include the FN Five-seveN, a 5.7mm pistol manufactured by the Belgian company FN Herstal, the ammunition for which is capable of piercing body armor.[27]



*FN's Five-seveN Pistol, Developed from the PS-90 Assault Rifle and Designed for Counterterrorism Teams, is Known as the "Cop-Killer" in Mexico*

A large number of the firearms smuggled from the United States into Mexico and elsewhere in Latin America come from the Southwest, the states of which are notoriously lax in gun control laws and law enforcement regulation.  It has been reported that there are more than 6,700 U.S. gun dealers within a short drive of the southern border — more than three dealers for each of the approximately 2,000 miles of the border.[28]

Although officials of the United States and Mexico regularly make public proclamations of alleged progress in stemming this traffic, few informed observers believe that more than a dent has been — or under the present regimen of laws and enforcement can be — made in the violent trade.  It is probably the case, in fact, that ATF's self-interested spoon-feeding of information to the news media is on balance counter-productive, since it conveys the erroneous impression that U.S. federal and state law enforcement officials have the tools to do the job.  In fact, they do not.

It is time for change.  The question is, what can be done?

ATF AR 0024

# Immediate Steps the U.S. Government Can Take

**Measures that Can Be Implemented Without Legislation**

**The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) could immediately begin to strictly enforce the existing ban on the importation of semiautomatic assault weapons.**  ATF can fully exercise its existing statutory authority to exclude from importation all semiautomatic assault rifles as "non-sporting" weapons pursuant to 18 USC §925(d)(3) (a provision of the 1968 Gun Control Act) and also exclude the importation of assault weapon kits and parts sets.  This policy was first implemented in 1989 by the George H.W. Bush administration in response to drug wars and mass shootings in the U.S.  The Clinton administration strengthened the import rules in 1998 in response to efforts by the gun industry to evade the ban, but the policy was essentially abandoned by the George W. Bush administration.  A strict import policy would capture the vast majority of AK-type rifles.

**Expand import restrictions to include other dangerous "non-sporting" firearms.**  The same provisions of existing law could be used by ATF to restrict other "non-sporting" firearms that are currently being imported into the U.S. and trafficked to Mexico including the FN Five-seveN handgun and new AK-type pistols.

**ATF could be more aggressive in identifying and sanctioning Federal Firearms License holders who are the sources of high volumes of guns trafficked to Mexico. For example:**

- **Target border-state dealers for yearly compliance inspections.**  ATF is allowed to conduct one warrantless compliance inspection of each dealer once a year.  It should ensure that dealers found to supply a significant number of guns seized in Mexico are inspected annually.

- **Be more aggressive in revoking the licenses of dealers found to be knowingly supplying Mexican traffickers.**  Although federal law allows a license to be revoked for a single violation – provided ATF can show it was "willful" – ATF usually does not seek revocation unless a dealer has had numerous problems over years of inspections.

- **Require licensees who conduct business at gun shows to notify the Attorney General of such activity.**  ATF has acknowledged that gun shows in border states are a significant source of guns trafficked to Mexico.  The law allows the Attorney General to prescribe the rules for dealers operating at gun shows.  ATF could focus targeted oversight and regulation on FFLs who sell

11

ATF AR 0025

at gun shows in border states and sanction dealers identified as actively supplying those trafficking firearms to drug gangs in Mexico.

**Measures That Would Require Legislation**

**Repeal the current restrictions on release of ATF crime gun trace data ("Tiahrt amendment").**   For several years the legislation making appropriations for the Bureau of Alcohol, Tobacco, Firearms and Explosives has included severe restrictions on the public release of data contained in the crime gun trace database. Previously, the data was publicly available under the Freedom of Information Act (FOIA).   Access to this database is critical to a full understanding of the gun trafficking problem, e.g. most problematic makes/models, source states and dealers, etc.   It is imperative that Congress be convinced to repeal these restrictions in ATF's fiscal year 2010 appropriations.

**Implement an effective federal assault weapons ban.**   The federal ban that expired in 2004 was ineffective in that manufacturers continued to sell assault weapons throughout the term of the ban by making minor cosmetic changes in gun design. For example, the domestically manufactured AR-type rifles that are currently a huge part of the problem in Mexico were sold by manufacturers Bushmaster, Colt, DPMS, and others in "post-ban" configurations that complied with the letter of the 1994 law.   To be effective, a new federal law should be modeled on California's existing comprehensive ban.   Such a bill was introduced last Congress by Representative Carolyn McCarthy (D-NY) as H.R. 1022.   The bill also includes a ban on high-capacity ammunition magazines that would help reduce the lethality of the standard high-capacity pistols that are also a problem in Mexico.

**Implement restrictions on 50 caliber sniper rifles.**   A bill to regulate 50 caliber sniper rifles under the strict licensing, background check, and taxation system of the National Firearms Act was introduced last Congress by Senator Dianne Feinstein (D-CA) (S. 1331).

**Extend the Brady background check system to the "secondary market."**   A long-term policy goal should be to ensure that all firearms transfers are subject to a background check.   Currently, up to 40 percent of firearms transfers occur at gun shows, through classified advertising, or in other private sales.   A first step in this process would be to close the "gun show loophole" that allows private sellers to transfer firearms at gun shows and flea markets without a background check.

ATF AR 0026

[1]  Testimony of William J. Hoover, Assistant Director, Office of Field Operations, Bureau of Alcohol, Tobacco, Firearms and Explosives, U.S. Department of Justice, Hearing of Western Hemisphere Subcommittee of the House Committee on Foreign Affairs on "U.S. Obligations Under The Mérida Initiative," February 7, 2008.

[2]  "Arizona Guns Are Finding Way to Mexico Drug Lords," *The Arizona Republic*, May 25, 2007.

[3]  See, e.g., Violence Policy Center, *Credit Card Armies*, 2002, http://www.vpc.org/graphics/creditcardarmies.pdf.

[4]  "Guns from U.S. equip drug cartels," *Los Angeles Times*, August 10, 2008.

[5]  "Cartels in Mexico's drug war get guns from US," *The Associated Press*, January 27, 2009.

[6]  "U.S. Is a Vast Arms Bazaar for Mexican Cartels," *The New York Times*, February 26, 2009.

[7]  "Cartels in Mexico's drug war get guns from US," *The Associated Press*, January 27, 2009.

[8]  There are nine types of federal firearms licenses: Type 01, DEALER in firearms other than destructive devices; Type 02, PAWNBROKER in firearms other than destructive devices; Type 03, COLLECTOR OF CURIOS AND RELICS; Type 06, MANUFACTURER OF AMMUNITION FOR FIREARMS other than ammunition for destructive devices or armor piercing ammunition; Type 07, MANUFACTURER OF FIREARMS other than destructive devices; Type 08, IMPORTER OF FIREARMS other than destructive devices or AMMUNITION FOR FIREARMS other than destructive devices, or ammunition other than armor piercing ammunition; Type 09, DEALER IN DESTRUCTIVE DEVICES; Type 10, MANUFACTURER OF DESTRUCTIVE DEVICES, AMMUNITION FOR DESTRUCTIVE DEVICES OR ARMOR PIERCING AMMUNITION; and Type 11, IMPORTER OF DESTRUCTIVE DEVICES, AMMUNITION FOR DESTRUCTIVE DEVICES OR ARMOR PIERCING AMMUNITION." Bureau of Alcohol, Tobacco, Firearms and Explosives. "Types of Federal Firearms License." http://atf.gov/firearms/fflc/ffl/ffl_types.htm.

[9]  Department of the Treasury.  Bureau of Alcohol, Tobacco, Firearms and Explosives. "General Questions (A2), Who can get a license?" in *ATF Federal Firearms Regulations Reference Guide*. http://www.atf.gov/pub/fire-explo_pub/2005/p53004/q_and_a.pfd.

[10]  U.S. Department of Justice. National Institute of Justice. *Guns in America:  National Survey on Private Ownership and Use of Firearms* (1997), 6-7.

[11]  For a discussion of gun trafficking within the United States, see Mayors Against Illegal Guns, *The Movement of Illegal Guns in America:  The Link between Gun Laws and Interstate Gun Trafficking*, December 2008.

[12]  Mayors Against Illegal Guns, *The Movement of Illegal Guns in America:  The Link between Gun Laws and Interstate Gun Trafficking*, December 2008, 9.

[13]  "Guns from U.S. equip drug cartels," *Los Angeles Times*, August 10, 2008.

[14]  "Quítenle los rifles al narco," *El Universal* editorial, February 5, 2009, http://www.eluniversal.com.mex/editorials/42828.html.  This quote is translated by the author from the following text: Hace dos meses la entonces secretaria de Estado del país vecino, Condoleezza Rice, dijo frente a la secretaria de Relaciones Exteriores mexicana, Patricia Espinosa: "Yo sigo el tráfico de armas en todo el mundo, y nunca he sabido que a los traficantes de armas ilegales les

ATF AR 0027

importe mucho la ley. Así es que simplemente no acepto la noción de que el levantamiento de la prohibición (a la venta de armas de alto calibre en tiendas estadounidenses) haya conducido a los traficantes de armas a incrementar sus actividades." Haberlo dicho antes. Bajo esa lógica, levantemos también la prohibición al tráfico de drogas.

[15] This section is based on research on the gun industry, its products, and their impact on public health and safety, published by the Violence Policy Center over several decades. For examples, see www.vpc.org. An additional source is Tom Diaz, *Making a Killing: The Business of Guns in America* (New York: The New Press, 1999).

[16] See, e.g., Violence Policy Center, *A Shrinking Minority: The Continuing Decline of Gun Ownership in America*, http://www.vpc.org/studies/gunownership.pdf, 2007.

[17] "Doing Business in the Golden Age of the Consumer," *Shooting Industry*, (February 1997), p. 29.

[18] "Selling Guns to the Gun-Shy," *The Wall Street Journal Online*, July 28, 2005, downloaded on July 29, 2005.

[19] "Summit aims to boost Florida hunting," *Orlando Sentinel*, July 31, 2005, p. C15.

[20] "Growth curbing Inland hunting," *Press Enterprise* (Riverside, CA), September 1, 2005, p. A1.

[21] "Public Attitudes Towards the Regulation of Firearms," Tom W. Smith, NORC/University of Chicago, March 2007.

[22] "Selling Guns to the Gun-Shy," *The Wall Street Journal Online*, July 28, 2005, downloaded on July 29, 2005.

[23] *The New Firearms Business*, November 15, 2008, p.1

[24] For two recent journalistic accounts of this traffic, see "Guns from U.S. equip drug cartels," *Los Angeles Times*, August 10, 2008; James Verini, "Arming the Drug Wars," Conde Nast Portfolio.com, July 2008.

[25] "Smugglers' deadly cargo: Cop-killing guns," CNN.com, March 26, 2008.

[26] "Mexican Drug Gangs' Weapons of Choice," ABCnews.com.

[27] "U.S. Guns Arming Mexican Drug Gangs; Second Amendment to Blame?" ABCnews.com, April 22, 2008.

[28] "Guns from U.S. equip drug cartels," *Los Angeles Times*, August 10, 2008.

ATF AR 0028



**US Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Project Gunrunner: The Southwest Border Initiative

## FIREARMS TRAFFICKING

ATF Publication 3317.6
Revised March 2009

---

## Protect America



Firearm trafficking is the movement of firearms from the legal to illegal marketplace. It is one of the most pressing problems in the firearms industry today. It reaches across U.S. borders, affecting other counties and U.S. citizens living abroad.

Firearms originating in the United States have been used to murder U.S. citizens and foreign officials. Many firearms trafficked out of the country are used in the drug trade, terrorism, and other illegal activities.

In response to the violence on the U.S.-Mexico border, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is committed to denying the tools of the trade to drug trafficking organizations. To be successful, ATF and the firearms industry must work together. Firearms can be prevented from entering illegal commerce.

## Field Divisions

| | | | |
|---|---|---|---|
| Atlanta | (404) 417-2600 | Miami | (305) 597-4800 |
| Baltimore | (443) 965-2000 | Nashville | (615) 565-1400 |
| Boston | (617) 557-1200 | New Orleans | (504) 841-7000 |
| Charlotte | (704) 716-1800 | New York | (718) 650-4000 |
| Chicago | (312) 846-7200 | Newark | (973) 413-1179 |
| Columbus | (614) 827-8400 | Philadelphia | (215) 717-4700 |
| Dallas | (469) 227-4300 | Phoenix | (602) 776-5400 |
| Denver | (303) 844-7540 | San Francisco | (925) 479-7500 |
| Detroit | (313) 202-3400 | Seattle | (206) 389-5800 |
| Houston | (281) 372-2900 | St. Paul | (651) 726-0200 |
| Kansas City | (816) 559-0700 | Tampa | (813) 202-7300 |
| Los Angeles | (818) 265-2500 | Washington | (202) 648-8010 |
| Louisville | (502) 753-3400 | | |

**Web address: http://www.atf.gov**

ATF AR 0029

## Recognize Indicators



Firearms traffickers are increasingly buying high-end firearms, as well as cheap, inexpensive firearms.

Recognizing specific indicators can keep you from being an unwilling participant in firearms trafficking.

There are some common firearms trafficking indicators. The following list provides a guide to identifying possible criminal activity. However, your own instinct is your best tool to identify possible illegal transactions.

### KEY INDICATORS

**Traffickers May:**

- **Want to buy a large number of the same model firearm, or similar firearms.**

- **Choose only tactical type semiautomatic rifles (.223 or 7.62x39) and large frame semi-automatic pistols (.38 Super, 9mm, .45 and 5.7mm)**

- **Order more of the same firearms.**

- **Structure their purchases to avoid ATF reporting requirements.**

- **Attempt to conceal their conversations with each other.**

- **Not haggle or question the price of the firearm. Money is usually not an issue.**

- **Pay in cash (no checks) with the same denomination. They may use credit cards.**

- **Have little or no knowledge of the firearms they are purchasing.**

- **Lack the physical stature to handle the firearm being purchased.**

- **Avoid entering into conversation or be evasive in any questions posed to them.**

## Identify Your Customers

Do your part to keep traffickers and prohibited persons from obtaining firearms. Ensure that customers are properly identified prior to the sale or purchase of a firearm. Law-abiding citizens can purchase firearms; criminals cannot.



All purchasers are required to furnish a valid government-issued picture identification card to verify their identity and address.

Additionally, resident aliens must prove residency in a state continuously for at least 90 days prior to the transfer of a firearm. Make sure all required paperwork is fully completed. As a suggestion, photocopying the purchasers' ID and attaching it to the completed ATF Form 4473 can assist you in recalling a transaction, if necessary. ATF Publication 5300.18 provides additional guidance regarding aliens purchasing firearms and ammunition in the U.S.





## Inform Your Local ATF Office



Report suspicious activity regarding the purchase of firearms to your local ATF office. You can reach ATF toll free at 1-800-ATF-GUNS (1-800-283-4867) or by contacting any of the field divisions listed in this brochure. Your phone call can save lives and stop criminals in their tracks.

ATF and the Nation's industry are powerful allies in reducing gun-related violence on the Southwest border.

United States Government Accountability Office

# GAO

Report to Congressional Requesters

June 2009

# FIREARMS TRAFFICKING

# U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges



**GAO**

Accountability ★ Integrity ★ Reliability

GAO-09-709

ATF AR 0031



**G A O**
Accountability-Integrity-Reliability

# Highlights

Highlights of GAO-09-709, a report to congressional requesters

June 2009

# FIREARMS TRAFFICKING

## U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges

## Why GAO Did This Study

In recent years, violence along the U.S.-Mexico border has escalated dramatically, due largely to the Mexican government's efforts to disrupt Mexican drug trafficking organizations (DTO). U.S. officials note the violence associated with Mexican DTOs poses a serious challenge for U.S. law enforcement, threatening citizens on both sides of the border, and U.S. and Mexican law enforcement officials generally agree many of the firearms used to perpetrate crimes in Mexico are illicitly trafficked from the United States across the Southwest border.

GAO was asked to examine (1) data on the types, sources, and users of these firearms; (2) key challenges confronting U.S. government efforts to combat illicit sales of firearms in the United States and stem the flow of them into Mexico; (3) challenges faced by U.S. agencies collaborating with Mexican authorities to combat the problem of illicit arms; and (4) the U.S. government's strategy for addressing the issue. GAO analyzed program information and firearms data and met with U.S. and Mexican officials on both sides of the border.

### What GAO Recommends

GAO is making recommendations to several departments, including the Departments of State, Homeland Security, and Justice, to improve interagency coordination, data gathering and analysis, and strategic planning. State and DHS agreed with our recommendations. Justice did not comment on our recommendations.

View GAO-09-709 or key components.
For more information, contact Jess T. Ford at (202) 512-4128 or fordj@gao.gov.

## What GAO Found

Available evidence indicates many of the firearms fueling Mexican drug violence originated in the United States, including a growing number of increasingly lethal weapons. While it is impossible to know how many firearms are illegally smuggled into Mexico in a given year, about 87 percent of firearms seized by Mexican authorities and traced in the last 5 years originated in the United States, according to data from Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). According to U.S. and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. Many of these firearms come from gun shops and gun shows in Southwest border states. U.S. and Mexican government and law enforcement officials stated most firearms are intended to support operations of Mexican DTOs, which are also responsible for trafficking arms to Mexico.

The U.S. government faces several significant challenges in combating illicit sales of firearms in the United States and stemming their flow into Mexico. In particular, certain provisions of some federal firearms laws present challenges to U.S. efforts, according to ATF officials. Specifically, officials identified key challenges related to restrictions on collecting and reporting information on firearms purchases, a lack of required background checks for private firearms sales, and limitations on reporting requirements for multiple sales. GAO also found ATF and Department of Homeland Security's (DHS) U.S. Immigration and Customs Enforcement, the primary agencies implementing efforts to address the issue, do not effectively coordinate their efforts, in part because the agencies lack clear roles and responsibilities and have been operating under an outdated interagency agreement. Additionally, agencies generally have not systematically gathered, analyzed, and reported data that could be useful to help plan and assess results of their efforts to address arms trafficking to Mexico.

U.S. law enforcement agencies have provided some assistance to Mexican counterparts in combating arms trafficking, but these efforts face several challenges. U.S. law enforcement assistance to Mexico does not target arms trafficking needs, limiting U.S. agencies' ability to provide technical or operational assistance. In addition, U.S. assistance has been limited due to Mexican officials' incomplete use of ATF's electronic firearms tracing system, an important tool for U.S. arms trafficking investigations. Another significant challenge facing U.S. efforts to assist Mexico is corruption among some Mexican government entities. Mexican federal authorities are implementing anticorruption measures, but government officials acknowledge fully implementing these reforms will take considerable time, and may take years to affect comprehensive change.

The administration's recently released National Southwest Border Counternarcotics Strategy includes, for the first time, a chapter on combating illicit arms trafficking to Mexico. Prior to the new strategy, the U.S. government lacked a strategy to address arms trafficking to Mexico, and various efforts undertaken by individual U.S. agencies were not part of a comprehensive U.S. governmentwide strategy for addressing the problem. At this point, it's not clear whether ONDCP's "implementation plan" for the strategy, which has not been finalized, will include performance indicators and other accountability mechanisms to overcome shortcomings raised in our report.

_____United States Government Accountability Office

ATF AR 0032

# Contents

| **Letter** | | 1 |
|---|---|---|
| | Results in Brief | 3 |
| | Background | 7 |
| | Available Evidence Suggests Most Firearms Recovered in Mexico Come from U.S. Gun Dealers, and Many Support DTOs | 14 |
| | U.S. Efforts to Combat Illicit Sales of Firearms and to Stem the Flow of These Arms across the Southwest Border Face Key Challenges | 24 |
| | U.S. Assistance Limited by a Lack of Targeting Resources at Needs and Concerns over Corruption among Some Mexican Government Officials | 44 |
| | United States Lacks a Comprehensive Strategy to Combat Arms Trafficking to Mexico | 52 |
| | Conclusions | 57 |
| | Recommendations for Executive Action | 59 |
| | Agency Comments and Our Evaluation | 60 |
| **Appendix I** | **Scope and Methodology** | 62 |
| **Appendix II** | **Geographic Distribution of Firearms Seized and Traced** | 65 |
| **Appendix III** | **Comments from the Department of Homeland Security** | 69 |
| **Appendix IV** | **Comments from the Department of State** | 74 |
| **Appendix V** | **GAO Contact and Staff Acknowledgments** | 77 |

ATF AR 0033

## Tables

Table 1: Key ATF and ICE Efforts and Resources to Combat Arms
Trafficking to Mexico                                                    11
Table 2: Ten Firearms Types Most Frequently Recovered in Mexico
and Traced, Fiscal Years 2004 to 2008                             17

## Figures

Figure 1: Drug-War Related Murders in Mexico                            8
Figure 2: U.S. Cities Reporting the Presence of Mexican DTOs,
January 1, 2006, through April 8, 2008                           9
Figure 3: Percentages of Firearms Seized in Mexico and Traced in
Fiscal Years 2004-2008 That Originated in the United
States                                                          15
Figure 4: High-Powered Firearms Seized by the Government of
Mexico in a Single Confrontation with Criminal
Organizations in November 2008                                  18
Figure 5: Top Source States for Firearms Seized in Mexico and
Traced Over the Last 5 Years (Fiscal Years 2004-2008)           20
Figure 6: Map of Primary Trafficking Routes from the United States
into Mexico                                                     23
Figure 7: Southbound Operation Being Conducted at San Ysidro
Border Crossing Between San Diego, California, and
Tijuana, Mexico                                                 36
Figure 8: Firearms Seized in Mexican States in 2008 and Illicit
Firearms Traced to Mexican States (Fiscal Year 2008)           66
Figure 9: Correlation Between the Number of Firearms Seized in
Mexico and the Number of Firearms Traced by ATF, by
Mexican Federal Entity                                          68

ATF AR 0034

## Abbreviations

| | |
|---|---|
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| BEST | Border Enforcement Security Task Force |
| BVIC | Border Violence Intelligence Cell |
| CBP | Customs and Border Protection |
| CENAPI | Centro Nacional de Planeación, Análisis e Información para el Combate a la Delincuencia (Government of Mexico's Planning, Analysis and Information Center for Combating Crime) |
| CRS | Congressional Research Service |
| DDTC | Directorate of Defense Trade Controls |
| DEA | Drug Enforcement Administration |
| DHS | Department of Homeland Security |
| DOD | Department of Defense |
| DOJ | Department of Justice |
| DTO | drug trafficking organization |
| EPIC | El Paso Intelligence Center |
| EOUSA | Executive Office for U.S. Attorneys |
| FFL | federal firearms licensee |
| IBIS | Integrated Ballistics Identification System |
| ICE | Immigration and Customs Enforcement |
| INL | Bureau of International Narcotics and Law Enforcement Affairs |
| IRS | intelligence research specialist |
| MOU | Memorandum of Understanding |
| NAS | Narcotics Affairs Section |
| NTC | National Tracing Center |
| OFAC | Office of Foreign Assets Control |
| ONDCP | Office of National Drug Control Policy |
| PGR | Procuraduría General de República (Government of Mexico's Office of Attorney General) |
| State | Department of State |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

ATF AR 0035



**United States Government Accountability Office**
**Washington, DC 20548**

June 18, 2009

The Honorable Eliot L. Engel
Chairman
The Honorable Connie Mack, IV
Ranking Member
Subcommittee on the Western Hemisphere
Committee on Foreign Affairs
House of Representatives

The Honorable Dan Burton
The Honorable William Delahunt
The Honorable Gabrielle Giffords
The Honorable Gene Green
The Honorable Albio Sires
House of Representatives

In recent years, violence along the U.S.-Mexico border has escalated
dramatically as the administration of President Felipe Calderon has sought
to combat the growing power of Mexican drug trafficking organizations
(DTO) and curb their ability to operate with impunity in certain areas of
Mexico. The Mexican government's efforts to disrupt DTO operations has
put pressure on criminal organizations fighting to maintain control over
lucrative routes they depend on to funnel drugs to the United States, and
arms and cash from the United States into Mexico. In 2008, the number of
individuals killed in violent incidents in Mexico exceeded 6,200, more than
twice as many as in 2007, with around 1,500 killed in the first 3 months of
2009 alone.

As illicitly trafficked firearms have fueled the drug trafficking violence,[1]
Mexican officials have come to regard illicit firearms as the number one
crime problem affecting the country's security, and U.S. officials note the
violence associated with Mexican DTOs poses a serious challenge for U.S.
law enforcement, threatening the safety of citizens on both sides of the
border, particularly given the increased level of criminal activity in the

---

[1] According to U.S. and Mexican government officials, including the Government of Mexico
Attorney General's Office, Mexican law prohibits the commercial sale or purchase of a
firearm; all firearm sales must go through the Government of Mexico. Officials told us that
the application and sales process takes a long time and that the types of firearms that
Mexican citizens are allowed to possess are limited to smaller caliber pistols and rifles.

ATF AR 0036

southwestern United States and concerns that it could grow. According to the Department of Justice's (DOJ) *2009 National Drug Threat Assessment*, Mexican DTOs represent the greatest organized crime threat to the United States, controlling drug distribution in at least 230 U.S. cities, and gaining strength in markets they do not yet control. In response to this growing threat, in March 2009, the Department of Homeland Security (DHS) announced it planned to increase resources on the U.S.-Mexico border, including more personnel and greater use of available technologies, among other elements.

In response to your request that we review U.S. efforts to stem the flow of arms trafficking into Mexico, we examined (1) what data are available on the types, sources, and users of these arms; (2) key challenges that confront U.S. government efforts to combat illicit sales of firearms in the United States and to stem the flow of these arms across the Southwest border into Mexico; (3) challenges faced by U.S. agencies collaborating with Mexican authorities to combat the problem of illicit arms; and (4) the U.S. government's strategy for addressing the issue.

To address these objectives, we reviewed and analyzed program and project status reports, and related information. To obtain a better understanding of the scope and progress of various U.S. agencies' programs related to arms trafficking, we met with cognizant officials from DOJ's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); DHS's Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP); the Department of State (State); and other agency officials supporting U.S. efforts to combat arms trafficking, including the Executive Office for U.S. Attorneys, the Drug Enforcement Administration (DEA), and the Office of National Drug Control Policy (ONDCP). We visited and met with officials from three major Southwest border cities— San Diego, California, and El Paso and Laredo, Texas—and their Mexican counterpart cities to explore the challenges faced by law enforcement officials to stem the flow of arms smuggling across the border. We also traveled to Mexico City and Monterrey, Mexico, to meet with U.S. embassy and consulate officials responsible for implementing programs to combat arms trafficking and Mexican government officials responsible for related activities. We did not review Mexican firearms laws, and to the extent that we comment on these in this report, we relied on secondary sources. We also reviewed ATF, ICE, and CBP data on seizures of southbound firearms and cases involving arms trafficking to Mexico. We determined the data provided to us by various U.S. agencies on these topics were sufficiently reliable to provide an overall indication of the magnitude and nature of the illicit firearms trade. We conducted this performance audit from July 2008

GAO-09-709 Firearms Trafficking

ATF AR 0037

to June 2009, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives. Appendix I contains additional details about our scope and methodology.

## Results in Brief

Available evidence indicates a large proportion of the firearms fueling Mexican drug violence originated in the United States, including a growing number of increasingly lethal weapons. While it is impossible to know how many firearms are illegally trafficked into Mexico in a given year, around 87 percent of firearms seized by Mexican authorities and traced over the past 5 years originated in the United States, according to data from ATF. Around 68 percent of these firearms were manufactured in the United States, and around 19 percent were manufactured in third countries and imported into the United States before being trafficked into Mexico. According to U.S. and Mexican government officials, these firearms have been increasingly more powerful and lethal in recent years. For example, many of these firearms are high-caliber and high-powered, such as AK and AR-15 type semiautomatic rifles. Many of these firearms come from gun shops and gun shows in Southwest border states, such as Texas, California, and Arizona, according to ATF officials and trace data. U.S. and Mexican government and law enforcement officials stated most guns trafficked to Mexico are intended to support operations of Mexican DTOs, which are also responsible for trafficking arms to Mexico.

The U.S. government faces several significant challenges to its efforts to combat illicit sales of firearms in the United States and to stem the flow of these arms across the Southwest border into Mexico. First, certain provisions of some federal firearms laws present challenges to U.S. efforts, according to ATF officials. Specifically, officials identified key challenges related to (1) restrictions on collecting and reporting information on firearms purchases, (2) a lack of required background checks for private firearms sales, and (3) limitations on reporting requirements for multiple sales. Another challenge we found is ATF and ICE, the primary agencies implementing efforts to address this issue, do not consistently and effectively coordinate their efforts, in part because the agencies lack clear roles and responsibilities and have been operating under an outdated interagency agreement. This has resulted in some instances of duplicate initiatives and confusion during operations. Additionally, we found agencies lack systematic analysis and reporting of aggregate data related

ATF AR 0038

to arms trafficking, and they were also unable to provide complete information to us on the results of their efforts to seize firearms destined for Mexico and to investigate and prosecute cases. This type of information could be useful to better understand the nature of the problem, to help plan ways to address it, and to assess progress made.

U.S. law enforcement agencies and State have provided some assistance to Mexican counterparts in combating arms trafficking, but these efforts face several key challenges. U.S. law enforcement agencies have built working relationships with Mexican federal, state, and local law enforcement, as well as the Mexican military, which has given the United States the opportunity to provide Mexican government counterparts with some technical and operational assistance on firearms trafficking. However, U.S. assistance has been hampered by a number of factors. In particular, U.S. law enforcement assistance has been limited and, furthermore, it has not targeted arms trafficking needs. For example, although the Merida Initiative—a U.S. interagency response to transborder crime and security issues affecting the United States, Mexico, and Central America—provides general law enforcement and counternarcotics assistance to Mexico, it does not provide dedicated funding to address the issue of arms trafficking. A number of efforts officials told us could be helpful in combating arms trafficking—such as establishing and supporting a bilateral, multiagency arms trafficking task force— have not been undertaken. In addition, U.S. assistance has been limited due to Mexican government officials' incomplete use to date of ATF's electronic firearms tracing system, known as eTrace, which is an important tool for U.S. arms trafficking investigations in the United States. The ability of Mexican officials to input data into eTrace has been hampered partly because a Spanish language version of eTrace under development for months has still not been deployed across Mexico. Another significant challenge facing U.S. efforts to assist Mexico is concern about corruption among some Mexican government entities. According to Mexican and U.S. government officials, extensive corruption at the federal, state, and local levels of Mexican law enforcement impedes U.S. efforts to develop effective and dependable partnerships with Mexican government entities in combating arms trafficking. Mexican federal authorities are implementing anticorruption measures—including polygraph and psychological testing, background checks, and salary increases— but government officials acknowledge fully implementing these reforms will take considerable time, and may take years to affect comprehensive change.

On June 5, 2009, the Office of National Drug Control Policy (ONDCP) released its 2009 National Southwest Border Counternarcotics Strategy,

ATF AR 0039

which, for the first time, includes a chapter on combating illicit arms trafficking to Mexico. Prior to the new strategy, the U.S. government did not have a strategy that explicitly addressed arms trafficking to Mexico. In the absence of a strategy, individual U.S. agencies have undertaken a variety of activities and projects to combat arms trafficking to Mexico. While these individual agency efforts may serve to combat arms trafficking to Mexico to some degree, they were not part of a comprehensive U.S. governmentwide strategy for addressing the problem. GAO has identified several key elements that should be a part of any strategy, including identifying objectives and funding targeted to meet these objectives; clear roles and responsibilities; and mechanisms to ensure coordination and assess results. We reviewed a copy of the new National Southwest Border Counternarcotics Strategy, which ONDCP officials told us will serve as the basic framework, with an "implementation plan" to follow in late summer of 2009. ONDCP officials told us that this implementation plan will provide detailed guidance to the responsible agencies and have some performance measures for each objective. At this point, it is not clear whether the implementation plan will include performance indicators and other accountability mechanisms to overcome shortcomings raised in our report. In addition, in March 2009, the Secretary of Homeland Security announced a new DHS Southwest border security effort to significantly increase DHS presence and efforts along the Southwest border, including conducting more southbound inspections at ports of entry, among other efforts. However, it is unclear whether the new resources that the administration has recently devoted to the Southwest border will be tied to the new strategy and implementation plan.

To ensure that relevant agencies are better focused on combating illicit arms trafficking to Mexico, we are making recommendations to the ONDCP and three executive departments.

We are recommending that the U.S. Attorney General prepare a report to Congress on approaches to address the challenges law enforcement officials raised in this report regarding constraints on the collection of data that inhibit their ability to conduct timely investigations. Additionally, we recommend that the U.S. Attorney General and the Secretary of Homeland Security finalize the Memorandum of Understanding (MOU) between ATF and ICE and develop processes for periodically monitoring its implementation.

We have several recommendations to improve data gathering and reporting to help identify where efforts should be targeted to combat illicit arms trafficking to Mexico, including that: (1) the U.S. Attorney General

ATF AR 0040

direct ATF to regularly update its reporting on aggregate firearms trafficking data and trends; (2) the U.S. Attorney General and the Secretary of Homeland Security direct ATF and ICE to ensure they share comprehensive data and leverage each other's expertise and analysis on future assessments relevant to southbound weapons smuggling trends; and (3) the U.S. Attorney General and the Secretary of Homeland Security ensure the systematic data gathering and reporting on the results of these efforts, including firearms seizures, investigations, and prosecutions.

We also recommend that the U.S. Attorney General and the Secretary of State work with the Government of Mexico to expedite the dissemination of eTrace in Spanish to relevant Government of Mexico officials, provide these officials proper training on the use of eTrace, and ensure more complete input of information on seized arms into eTrace.

Finally, we recommend that the Office of National Drug Control Policy ensure its implementation plan for the arms trafficking chapter of the 2009 National Southwest Border Counternarcotics Strategy (1) identifies needs and defines objectives for addressing those needs; (2) identifies roles and responsibilities for meeting objectives that leverage the existing expertise of relevant agencies; (3) ensures agencies have guidance for setting funding priorities and providing resources to address those needs; (4) establishes mechanisms to facilitate coordination across agencies; and (5) employs monitoring mechanisms to determine and report on progress and identify needed improvements.

We provided a draft of this report to the Departments of Homeland Security, Justice, and State and to the Office of National Drug Control Policy. DHS and State provided written comments, which are reproduced in appendixes III and IV.

DHS agreed with our recommendations; however, DHS raised questions regarding our interpretations of certain data and the relationship between ICE and ATF. We disagree that our presentation of the data is misleading, and the evidence in the report clearly demonstrates coordination problems between ICE and ATF.

State agreed with our recommendation that the U.S. Attorney General and the Secretary of State work with the Government of Mexico to expedite the dissemination of eTrace in Spanish across Mexico to the relevant Government of Mexico officials, provide these officials the proper training on the use of eTrace, and ensure more complete input of information on seized arms into eTrace. In addition, State added that the agency is funding

ATF AR 0041

a $5 million Forensics Laboratories project with the Government of Mexico's Office of the Attorney General (PGR) for the successful investigation and prosecution of criminal cases.

We also received technical comments from DHS, DOJ, State, and ONDCP, which we have incorporated throughout the report where appropriate.

## Background

Since his inauguration in December 2006, President Felipe Calderon has mobilized the Mexican military and law enforcement in a series of large scale counternarcotics operations throughout the country. These efforts have targeted areas, particularly along the U.S.-Mexican border, where DTOs have exerted most influence. By pursuing and detaining the leaders of these criminal organizations, Mexican authorities have disrupted DTOs' internal power structures and territorial control. The DTOs have countered government pressure with increased violence against law enforcement entities. The government's efforts to disrupt drug trafficking operations also appear to have intensified conflicts among DTOs over access to lucrative trafficking routes to the United States. The result has been an escalation of drug-related assassinations, kidnappings, and other violent crimes. While the majority of the casualties have been individuals involved in the drug trade in some way, victims also include law enforcement officers, journalists, and innocent bystanders. Gun violence in Mexico has increased dramatically in the last 2 years, with the number of drug-related murders more than doubling from around 2,700 in 2007 to over 6,200 in 2008. The drug-related murder rates for the first quarter of 2009 remain high and thus the yearly total for 2009 will likely be close to the 2008 level. See figure 1.

GAO-09-709 Firearms Trafficking

ATF AR 0042

**Figure 1: Drug-War Related Murders in Mexico**



Source: Mexican Federal Government's Planning, Analysis and Information Center for Combating Crime (CENAPI).

Growing criminal activity in Mexico, particularly in communities across the Southwest border, has raised concerns that the violence might spill over to the United States. Since 2006, DOJ's annual *National Drug Threat Assessment* has reported Mexican DTOs and criminal groups are the most influential drug traffickers and the greatest organizational threat to the United States. Law enforcement reporting indicates Mexican DTOs maintain drug distribution networks or supply drugs to distributors in at least 230 U.S. cities. See figure 2. Mexican DTOs control most of the U.S. drug market and are gaining strength in markets they do not yet control. President Obama has expressed concern about the increased level of violence along the border, particularly in Ciudad Juarez and Tijuana, and has called for continued monitoring of the situation to guard against spillover into the United States.

ATF AR 0043

**Figure 2: U.S. Cities Reporting the Presence of Mexican DTOs, January 1, 2006, through April 8, 2008**



Sources: GAO analysis of DOJ's National Drug Threat Assessment 2009; Map Resources (map).

Since the 1970s, the United States has collaborated with Mexican authorities and provided assistance to Mexico to combat transnational crimes associated with drug trafficking, including illicit firearms smuggling. However, counterarms trafficking efforts have been a modest component of broader bilateral law enforcement cooperation. U.S. and Mexican officials also told us that, in the past, the Mexican government considered illicit arms trafficking a problem that originated in the United States and thus needed to be dealt with by U.S. authorities. However, the Mexican government has taken on a greater focus in combating arms trafficking in recent years. For example, Mexico's Secretary of Public

ATF AR 0044

Security noted, "the arms issue ... is a subject that was not considered when discussing drug trafficking, however today it is part of the dialogue we have with our colleagues from the United States." Moreover, Mexican officials told us they now regard illicit firearms as the number one crime problem affecting the country's security, and they are intent on working with their U.S. counterparts to address the threat posed by weapons smuggling.

DOJ's ATF and DHS's ICE are the two primary agencies combating illicit sales and trafficking of firearms across the Southwest border. For over 40 years, ATF has implemented efforts to combat arms trafficking within the United States and from the United States to other countries as part of its mission under the Gun Control Act,[2] and it is the only entity within the U.S. government able to trace firearms recovered in crime in Mexico.[3] ATF also conducts inspections of FFL gun dealers to ensure they comply with applicable federal firearms laws and regulations.[4] Through Project Gunrunner—ATF's key effort to address arms trafficking to Mexico—the agency has conducted investigations to identify and prosecute individuals involved in arms trafficking schemes and has provided training to Mexican law enforcement officials on firearms identification and tracing techniques, among other efforts.[5] According to ICE, for over 30 years, ICE—and previously the U.S. Customs Service—has implemented efforts

---

[2]Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.

[3]ATF is responsible for investigating criminal and regulatory violations of federal firearms laws, among other responsibilities. In carrying out its responsibilities, ATF licenses and regulates federal firearms licensees (FFL) to ensure they comply with applicable laws or regulations. ATF also traces U.S. and foreign manufactured firearms for international, federal, state, and local law enforcement agencies, to link a suspect to a firearm in a criminal investigation or identify a potential trafficker. Firearms tracing is the systematic tracking of the movement of a firearm recovered by law enforcement officials from its first sale by the manufacturer or importer through the distribution chain (wholesaler/retailer) to identify the first retail purchaser. ATF has a paperless firearm trace submission system (eTrace) that is accessible through the Internet, through which users can submit, retrieve, query, and store firearms trace information, as applicable.

[4]According to ATF, as part of the FFL inspection process, when ATF Industry Operations Investigators review FFL records and other information, they check to see that firearms are properly accounted for, and look for firearms trafficking indicators to identify any suspicious purchases, which are referred to ATF criminal investigators for potential investigation.

[5]In April 2009, ATF announced plans to temporarily assign Gunrunner Impact Teams made up of additional personnel and resources to the Southwest border as part of Project Gunrunner, in order to increase investigative leads and intelligence to combat arms trafficking to Mexico.

ATF AR 0045

to enforce U.S. export laws, and ICE agents and other staff address a range of issues, including combating the illicit smuggling of money, people, drugs, and firearms.[6] Examples of ICE's arms trafficking-related activities include its efforts to raise public awareness through the dissemination of posters and brochures to educate FFLs and firearms purchasers about U.S. laws related to firearms and smuggling, as well as ICE's more recent effort to expand seizures of firearms destined for Mexico on the U.S. side of the border.[7] ICE enhanced its efforts on arms trafficking to Mexico through Operation Armas Cruzadas, announced in 2008. Table 1 provides more information on ATF and ICE efforts to combat arms trafficking.[8]

**Table 1: Key ATF and ICE Efforts and Resources to Combat Arms Trafficking to Mexico**

| Agency | Key activities | Estimated funding expenditures (between fiscal years 2004-2008) | Personnel (fiscal year 2008)[a] |
|--------|---------------|--------------------------------------------------------------|-------------------------------|
| ATF | • Through Project Gunrunner, which was initiated following discussions between ATF and the Mexican government in 2005, ATF conducts investigations, develops intelligence, and provides training related to arms trafficking to Mexico in partnership with the Mexican government and other U.S. government agencies.<br>• ATF has said the cornerstone of this initiative is tracing firearms recovered in crime in Mexico, which provides intelligence and investigative leads. | $76.6 million<br>• Funding included Southwest border-related efforts at EPIC, funding for staff in Mexico, and funding that was earmarked for Southwest Border Initiative in the four Southwest border states.<br>• According to ATF, funding does not fully reflect costs for the agency's domestic efforts to investigate cases. | • 550 agents and industry operations investigators in the four Southwest border states[b]<br>• 6 agents and intelligence and other staff assigned to the El Paso Intelligence Center (EPIC)<br>• 3 agents assigned to the U.S. Embassy and a consulate in Mexico |

[6]ICE officials stated ICE's efforts include enforcing laws related to the export of military items and dual-use goods.

[7]According to ICE, other related activities include its efforts to support the State Directorate of Defense Trade Controls (DDTC) in increasing the number of end use verification checks for firearms lawfully exported to Mexican government entities to ensure intended recipients of U.S. munitions are actually in control of those items lawfully exported. As discussed later in this report, a small number of firearms recovered in crime in Mexico to date have been traced back to lawful exports.

[8]U.S. law enforcement agencies conduct their work in Mexico in cooperation with Government of Mexico counterparts under the Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance, Dec. 9, 1987, U.S.-Mexico, S. Treaty Doc. No. 100-13 (1988).

ATF AR 0046

| Agency | Key activities | Estimated funding expenditures (between fiscal years 2004-2008) | Personnel (fiscal year 2008)[a] |
|--------|----------------|-----------------------------------------------------------------|----------------------------------|
| ICE | • In 2008, ICE announced Operation Armas Cruzadas as a bilateral law enforcement and intelligence sharing operation to reduce arms trafficking to Mexico. As part of the operation, in the first few months of 2009 ICE increased efforts to seize firearms destined for Mexico on U.S. side of border, as well as to develop intelligence and investigative leads.<br><br>• ICE also has 10 Border Enforcement Security Task Force (BEST) teams in the four Southwest border states to investigate and prevent illicit smuggling of goods and people out of the United States, including firearms. | $15.2 million<br><br>• According to ICE, this amount included ICE efforts to investigate arms trafficking on the U.S. side of the border, including trafficking to Mexico, as well as other locations, such as Central America. It also included efforts by staff in Mexico in support of arms trafficking investigations and other Southwest border BEST efforts.<br><br>• ICE officials stated the above estimate does not fully reflect ICE's efforts to address the issue due to the way ICE tracks funding expenditures. They noted ICE spent about $1.06 billion for Southwest border activities overall between fiscal years 2004 and 2008, including efforts to address arms trafficking to Mexico. | • 1,934 agents assigned to Southwest border offices<br><br>• 52 intelligence officers and analysts assigned to Southwest border offices, including nine at EPIC<br><br>• 8 agents assigned to the U.S. Embassy and four consulates in Mexico |

Sources: GAO analysis of testimonial and documentary evidence from ATF and ICE.

[a]ATF officials stated that, although ATF personnel focus on firearms issues, which would include arms trafficking to Mexico, responsibilities also include issues such as arson or gangs. ICE officials stated that ICE personnel who address arms trafficking to Mexico are also responsible for a range of other issues, such as the smuggling of drugs, money, or people.

[b]Officials from ATF and ICE stated the focus of U.S. government efforts to address arms trafficking to Mexico has been in the four Southwest border states, though staff in other states may also undertake efforts to address the issue.

Several other U.S. agencies also play a role in stemming the flow of illicit firearms across the Southwest border into Mexico, including the following:

• DHS's CBP is charged with managing, securing, and controlling the nation's borders with a priority mission of keeping terrorists and their weapons out of the United States. It also has a responsibility for securing and facilitating trade and travel while enforcing hundreds of U.S.

ATF AR 0047

regulations, including immigration and drug laws; as such, CBP is involved in intercepting contraband firearms to Mexico.[9]

- DOJ's U.S. Attorneys serve as the nation's principal litigators under the direction of the U.S. Attorney General. U.S. Attorneys handle criminal prosecutions and civil suits in which the United States has an interest, including cases against individuals who violate federal criminal laws related to firearms trafficking. Since each U.S. Attorney exercises wide discretion in the use of resources to further the priorities of local jurisdictions, the caseload distribution related to firearms trafficking varies between districts.

- DOJ's DEA is responsible for the enforcement of U.S. controlled substances laws and regulations and bringing to justice key individuals and organizations involved in the production or distribution of controlled substances appearing in or destined for illicit traffic in the United States. In carrying out its mission, the DEA also coordinates and cooperates with U.S. and Mexican law enforcement officials in efforts to combat criminal violence and thus shares intelligence on DTO activities, including weapons violations.

- State's INL advises the President, Secretary of State, and other U.S. government agencies on policies and programs to combat international narcotics and crime. INL programs support State's strategic goals to reduce the entry of illegal drugs into the United States and to minimize the impact of international crime on the United States and its citizens. INL oversees funding provided to assist Mexico in its fight against organized crime under the Merida Initiative. Merida is a U.S. interagency response to transborder crime and security issues affecting the United States, Mexico, and Central America. The Initiative seeks to strengthen partner countries' capacities to combat organized criminal activities that threaten the security of the region, including arms trafficking.

- DOJ's Criminal Division attorneys serve as DOJ's primary legal experts on firearms related issues and contribute to the nation's prosecutorial efforts from the headquarters level. Criminal Division prosecutors are charged with developing and implementing strategies to attack firearms trafficking networks operating in the United States and abroad. These prosecutors

---

[9]Although CBP has a role in intercepting southbound illicit firearms at the border, southbound inspections of vehicles and persons traveling from the United States to Mexico have generally not been a focus of CBP's efforts. See pages 34-39 in this report for a discussion of CBP's efforts to seize illicit firearms at the Southwest border.

ATF AR 0048

prosecute important firearms related cases, formulate policy, assist and coordinate with local U.S. Attorneys Offices on legal issues and multidistrict cases, and work with numerous domestic and foreign law enforcement agencies to construct effective and coordinated enforcement strategies.

- ONDCP, whose principal purpose is to establish policies, priorities, and objectives for the nation's drug control program, produces a number of publications including a *National Southwest Border Counternarcotics Strategy*, which this year includes a component on combating arms trafficking.

## Available Evidence Suggests Most Firearms Recovered in Mexico Come from U.S. Gun Dealers, and Many Support DTOs

Available evidence indicates many of the firearms fueling Mexican drug violence have come from the United States, including a growing number of increasingly lethal weapons. Many of these firearms came from gun shops and gun shows in Southwest border states, such as Texas, California, and Arizona, according to ATF officials and trace data. U.S. and Mexican government officials stated most guns trafficked into Mexico are facilitated by and support operations of Mexican drug trafficking organizations.

### Available Information Suggests Most Firearms Recovered in Mexico Come from the United States and Are Increasingly More Powerful and Lethal

According to U.S. and Mexican government and law enforcement officials and data from ATF on firearms seized in Mexico and traced from fiscal year 2004 to fiscal year 2008, a large portion of the firearms fueling the Mexican drug trade originated in the United States, including a growing number of increasingly lethal weapons. As is inherently the case with various types of illegal trafficking, such as drug trafficking, the extent of firearms trafficking to Mexico is unknown;[10] however, according to ATF, a large number of guns are seized from criminals by the military and law enforcement in Mexico, and information on many of these guns is submitted to ATF for the purposes of tracing their origins and uncovering

---

[10]While there is no data on the total number of firearms trafficked to Mexico, the Government of Mexico maintains data on the number of firearms seized in Mexico. Information, such as serial numbers, on many of these seized firearms is submitted to ATF's National Tracing Center for tracing. ATF's National Tracing Center attempts to trace the firearms using the information submitted. Between fiscal years 2004-2008, around 52 percent of trace requests from Mexico that were submitted to ATF's National Tracing Center identified the first retail dealer. Furthermore, according to ATF, the identification of the country of manufacturing origin of a firearm does not depend on identifying the first retail dealer but rather on the initial description of the firearm.

ATF AR 0049

how the guns arrived in Mexico.[11] ATF maintains data on the firearms that are seized in Mexico and submitted for a trace, and, from these firearms trace requests, ATF officials told us, they are often able to detect suspicious patterns and trends that can help identify and disrupt arms trafficking networks on both sides of the U.S.-Mexico border.

Using ATF's eTrace data, which currently serves as the best data we found available for analyzing the source and nature of firearms trafficked and seized in Mexico, we determined over 20,000, or 87 percent, of firearms seized by Mexican authorities and traced from fiscal year 2004 to fiscal year 2008 originated in the United States. Figure 3 shows the percentages of firearms seized in Mexico and traced from fiscal year 2004 to fiscal year 2008 that originated in the United States. Over 90 percent of the firearms seized in Mexico and traced over the last 3 years have come from the United States.

**Figure 3: Percentages of Firearms Seized in Mexico and Traced in Fiscal Years 2004-2008 That Originated in the United States**



Source: GAO analysis of ATF data.

---

[11]As noted earlier, U.S. law enforcement agencies conduct their work in Mexico in cooperation with Government of Mexico counterparts under the Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance.

ATF AR 0050

Around 68 percent of these firearms were manufactured in the United States, while around 19 percent were manufactured in third countries and imported into the United States before being trafficked into Mexico. ATF could not determine whether the remaining 13 percent foreign sourced arms had been trafficked into Mexico through the United States, due to incomplete information.

While the eTrace data only represents data from gun trace requests submitted from seizures in Mexico and not all the guns seized, it is currently the only systematic data available, and the conclusions from its use that the majority of firearms seized and traced originated in the United States were consistent with conclusions reached by U.S. and Mexican government and law enforcement officials involved personally in combating arms trafficking to Mexico. In 2008, of the almost 30,000 firearms that the Mexican Attorney General's office said were seized, only around 7,200, or approximately a quarter, were submitted to ATF for tracing. U.S. and Mexican government and law enforcement officials indicated Mexican government officials had not submitted all of the firearms tracing information due to bureaucratic obstacles between the Mexican military and the Mexican Attorney General's Office and lack of a sufficient number of trained staff to use eTrace. For instance, at one point, State officials told us, the Government of Mexico had only one staff person collecting gun information and entering it into eTrace.[12] Further, as ATF pointed out, not all guns seized in the United States are submitted by U.S. entities to ATF for tracing either, due to some of the same type of bureaucratic and resource challenges faced in Mexico. Consistent with the results of eTrace data, U.S. law enforcement officials who had worked on arms trafficking in Mexico and along the U.S.-Mexican border told us their experience and observations corroborated that most of the firearms in Mexico had originated in the United States. Furthermore, U.S. and Mexican government and law enforcement officials also stated this scenario seemed most likely, given the ease of acquiring firearms in the United States; specifically, they told us they saw no reason why the drug cartels would go through the difficulty of acquiring a gun somewhere else in the world and transporting it to Mexico when it is so easy for them to do so from the United States.

---

[12]ATF and Government of Mexico officials told us they have worked to address some of these obstacles, have already increased Mexico's use of eTrace between fiscal year 2004 and fiscal year 2008, and plan to make more extensive use of eTrace by Government of Mexico entities.

ATF AR 0051

**Firearms Seized in Mexico Are Increasingly More Powerful and Lethal**

While existing data does not allow for an analysis of trends of all firearms seized in Mexico, according to U.S. and Mexican government officials, the firearms seized in Mexico have been increasingly more powerful and lethal in recent years.[13] For example, around 25 percent of the firearms seized in Mexico and traced in fiscal year 2008 are high-caliber and high-powered such as AK and AR-15 type semiautomatic rifles, which fire ammunition that can pierce armor often used by Mexican police (see table 2).

**Table 2: Ten Firearms Types Most Frequently Recovered in Mexico and Traced, Fiscal Years 2004 to 2008**

| |
|---|
| 9 mm pistol |
| .38 caliber revolver |
| .22 caliber pistol |
| .380 caliber pistol |
| 7.62 mm AK-type semiautomatic rifle |
| .22 caliber rifle |
| .223 caliber AR-15 type semiautomatic rifle |
| .45 caliber pistol |
| .38 caliber pistol |
| 12 gauge shotgun |

Source: GAO analysis of ATF data.

Moreover, U.S. and Mexican government officials told us they have encountered an increasing number of the higher caliber, high-powered weapons, particularly in the past 2 years in seizures resulting from operations against drug cartels. A video clip of the types of firearms recovered near the Southwest border and in Mexico is available at http://www.gao.gov/media/video/gao-09-709 . In addition, U.S. government officials told us there had been a decrease in some of the smaller, lower-powered guns, such as the .22 caliber pistol and rifle. Mexican and U.S. government officials told us that the guns used by the drug cartels often overpower Mexican police and rival that of the military. See figure 4.[14]

---

[13] While we reviewed data on firearms seized in Mexico and traced from fiscal year 2004 to fiscal year 2008, we could not determine from the data trends on increases in caliber or size of guns, because the year the firearm was traced was not necessarily the year it was seized, the year it was trafficked into Mexico, or the year it was purchased.

[14] ATF has analyzed firearms seizures in Mexico from fiscal year 2005 to fiscal year 2007 and identified the following weapons commonly used by drug traffickers: 9 mm pistols; .38 super pistols; 5.7 mm pistols; .45 caliber pistols; AR-15 type rifles; and AK- type rifles.

ATF AR 0052

**Figure 4: High-Powered Firearms Seized by the Government of Mexico in a Single Confrontation with Criminal Organizations in November 2008**



Source: CENAPI.

In addition, there have been some examples of military grade firearms recovered in Mexico. Some of these recovered firearms, ATF officials noted, were guns commercially available in the United States that were altered to make them more lethal. For instance, AK-type and AR-15 type semiautomatic rifles have been altered to make them fully automatic, like machine guns used by the U.S. and Mexican militaries. Seventy machine guns were submitted for tracing to ATF between fiscal year 2004 and fiscal year 2008, which represents a small percentage, 0.30 percent, of the total number of 23,159.

A small number of the firearms[15] seized in Mexico have been traced back to legal sales of weapons from the United States to Mexico or a third

---

[15]In addition to firearms, some grenades and rocket launchers have been seized by Mexican government agencies that, according to ATF officials, generally had come from stocks in Central American countries that had obtained the weapons from the United States in the 1980s or, since then, through the foreign military sales process.

ATF AR 0053

country, according to ATF.[16] For instance, firearms traced back to the Government of Mexico, from 2004 to 2008, constituted 1.74 percent, or 403 firearms, of the total number of trace requests made during that time. This included 70 .223 caliber AR-15-type semiautomatic rifles and one machine gun. In addition, 39 guns were recovered in 2008 that had been sold legally by the United States to a third party country, including 6 guns each from Germany, Belize, and Guatemala and 1 from El Salvador. These 39 guns included 21 semiautomatic pistols, and nothing larger or more powerful than the Colt 45. According to U.S. law enforcement officials we met with, there have not been any indications of significant trafficking of firearms from U.S. military personnel or U.S. military arsenals. According to ATF data for fiscal years 2004-2008, of the 23,159 guns seized in Mexico and traced, 160 firearms, or 0.70 percent, were found to be U.S. military arms.

## Many Firearms Trafficked into Mexico Come from Gun Shops and Gun Shows in Southwest Border States

From fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states. In particular, about 70 percent of these firearms came from Texas, California, and Arizona. Figure 5 provides data on the top source states for firearms trafficked to Mexico and traced from fiscal year 2004 to fiscal year 2008.

---

[16]The Department of Defense (DOD) provides analytical support to ATF regarding captured weapons that there is reason to suspect may originally have been provided by the U.S. government to another country and then leaked out. Therefore, information provided by ATF would include such DOD analytical support as a subset of that information.

ATF AR 0054

**Figure 5: Top Source States for Firearms Seized in Mexico and Traced Over the Last 5 Years (Fiscal Years 2004-2008)**



Sources: GAO analysis of ATF trace data; Map Resources (map).

Most of the firearms seized in Mexico and successfully traced come from gun shops and pawn shops, according to ATF gun trace data. According to ATF, there are around 6,700 retail gun dealers—gun shops and pawn shops—along the Southwest border of the United States. This represents around 12 percent of the approximately 55,000 retail gun dealers

ATF AR 0055

nationwide. These gun dealers, or FFLs,[17] can operate in gun shops, pawn shops, their own homes,[18] or out of gun shows. From fiscal year 2004 to fiscal year 2008, of those firearms ATF was able to trace back to a retail dealer, around 95 percent were traced back to gun shops and pawn shops—around 71 to 79 percent from gun shops and 15 to 19 percent from pawn shops, according to ATF. In addition to these firearms that are successfully traced back to a retail dealer, some ATF officials told us, based on information from their operations and investigations, many seized guns also come from private sales at gun shows, though it is impossible to know this exact number due to the lack of records kept for such purchases, which is discussed further below.

The illicit purchase of firearms in the United States happens in various ways depending upon where the purchase takes place.

- *Gun shops and pawn shops.* Firearms purchased at gun shops and pawn shops for trafficking to Mexico are usually made by "straw purchasers," according to law enforcement officials. These straw purchasers are individuals with clean records who can be expected to pass the required background check and who are paid by drug cartel representatives or middlemen to purchase certain guns from gun shops. Because the straw purchasers are legitimately qualified to purchase the guns, they can be difficult to identify by gun shop owners and clerks, absent obvious clues that would signify that a straw purchase is happening. For instance, ATF officials were tipped off to straw purchases when older women purchased multiple AK-type semiautomatic rifles, or individuals who seemed to know little about guns made purchases off of a written shopping list. In far fewer cases, ATF officials stated, corrupt gun shop owners or staff facilitate these illicit purchases. ATF officials told us they have not estimated what percentage of firearms trafficked to Mexico result from such illegal actions on the part of the gun shop owners or staff, but ATF has identified gun shop personnel who sold guns they knew would be trafficked to Mexico, as well as instances where gun shop personnel have altered their records

---

[17]18 U.S.C. § 923(a) requires that a person file for and obtain a license from the U.S. Attorney General before he or she can engage in the business of importing, manufacturing, or dealing in firearms.

[18]Under regulation, some part of a private dwelling must be open to the public in order to constitute a business premise as required to obtain federal firearms license. 27 C.F.R. § 481.11.

ATF AR 0056

to mask the disappearance of guns from their inventory after being sold illegally.[19]

- *Gun shows.* According to ATF officials, individuals can use straw purchasers as they would at gun shops to acquire guns from gun shops with booths at gun shows. In addition, individuals can also purchase guns at gun shows from other individuals making sales from their private collections. These private sales require no background checks of the purchaser and require no record be made or kept of the sale. ATF officials told us this prevents their knowing what percentage of the problem of arms trafficking to Mexico comes from these private sales at gun shows.

## Most Guns Trafficked to Mexico Support DTOs, According to U.S. and Mexican Government Officials

U.S. and Mexican government officials stated most guns trafficked into Mexico are facilitated by and support operations of Mexican DTOs.[20] According to ATF officials, once the gun is acquired in the United States, typically a middleman or someone representing the drug cartel will transport or pay another individual to transport the firearm or firearms into Mexico. Firearms are generally trafficked along major U.S. highways and interstates and through border crossings into Mexico. The firearms are normally transported across the border by personal or commercial vehicle because, according to U.S. and Mexican government officials, the drug cartels have found these methods to have a high likelihood of success. (We will discuss the challenges to seizing illicit southbound firearms at the border in the second objective of this report.) Once in Mexico, the firearms are generally deposited in border towns or trafficked along major highways to their destinations. The transporter drops off the firearm or firearms at a set location for pick up and use by members of a

---

[19] A June 2000 Department of the Treasury and ATF report found that FFL traffickers were involved in under 10 percent of ATF trafficking investigations, although FFL traffickers were associated with greater mean numbers of illegally trafficked firearms per investigation (see *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (Washington, D.C.)). ATF has not assessed the extent to which cases of arms trafficking to Mexico involve FFL traffickers.

[20] According to ATF's Project Gunrunner Fact Sheet from September 2008, "Most of the firearms violence in Mexico is perpetrated by drug trafficking organizations (DTOs) who are vying for control of drug trafficking routes to the United States and engaging in turf battles for disputed distribution territories…. DTOs operating in Mexico rely on firearms suppliers to enforce and maintain their illicit narcotics operations. Intelligence indicates these criminal organizations have tasked their money laundering, distribution and transportation infrastructures reaching into the United States to acquire firearms and ammunition. These Mexican DTO infrastructures have become the leading gun trafficking organizations operating in the southwest United States."

ATF AR 0057

drug cartel. Figure 6 displays the primary trafficking routes from the United States into Mexico.

**Figure 6: Map of Primary Trafficking Routes from the United States into Mexico**



Sources: ATF - adapted by GAO; Map Resources (map).

ATF and Mexican government officials told us they have found in Mexican arms trafficking investigations that a small number of firearms illicitly trafficked into Mexico from the United States are for hunters, off-duty police officers, and citizens seeking personal protection. Officials from

ATF AR 0058

ATF, ICE, and the Government of Mexico told us most of the guns seized and traced come from seizures Mexican military or law enforcement make in their war with the drug cartels. Government of Mexico data showed almost 30,000 firearms were seized in Mexico in 2008. Government of Mexico officials told us almost all of them were seized in operations against the drug cartels.

## U.S. Efforts to Combat Illicit Sales of Firearms and to Stem the Flow of These Arms across the Southwest Border Face Key Challenges

U.S. efforts to combat illicit sales of firearms in the United States and to prevent the trafficking of these arms across the Southwest border into Mexico confront several key challenges. First, relevant law enforcement officials we met with noted certain provisions of some federal firearms laws present challenges to their efforts to address arms trafficking. Second, we found poor coordination and a lack of information sharing have hampered the effectiveness of the two key agencies—ATF and ICE—that implement various efforts to address arms trafficking to Mexico. Third, a variety of factors, such as infrastructure limitations and surveillance by drug traffickers at the border, hinder U.S. efforts to detect and seize southbound firearms at U.S.-Mexico border crossings. Finally, agencies lack systematic gathering and recent analyses of firearms trafficking data and trends that could be used to more fully assess the problem and plan efforts, and they were unable to provide complete information to us on the results of their efforts to seize firearms destined for Mexico and to investigate and prosecute cases.

## Some Federal Firearms Laws Present Challenges to U.S. Efforts to Combat Arms Trafficking to Mexico, according to Law Enforcement Officials

U.S. agencies implement efforts to address arms trafficking to Mexico within current applicable federal firearms laws.[21] In enacting federal firearms laws such as the Gun Control Act of 1968, Congress has sought to keep firearms out of the hands of those not legally entitled to possess them and to assist law enforcement in efforts to reduce crime and violence, without placing an unnecessary burden on law-abiding citizens who may acquire, possess, or use firearms for lawful activity.[22]

---

[21]Two major federal statutes regulate the commerce in, and possession of, firearms: National Firearms Act of 1934, 48 Stat. 1236, codified, as amended, at 26 U.S.C. §§ 5801-5872 and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, codified, as amended, at 18 U.S.C. §§ 921-931.

[22]Pub. L. No. 90-618, § 101 and *Huddleston v. U.S.*, 415 U.S. 814, 824 (1974) (interpreting the legislative history of the Gun Control Act of 1968 and reiterating that the principal purpose of the Gun Control Act was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them).

ATF AR 0059

Furthermore, Congress stated that in enacting the Gun Control Act of 1968 that the law was not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.[23] However, ATF officials stated certain provisions of some federal firearms laws present challenges to their efforts to combat arms trafficking to Mexico. For example, they identified key challenges related to (1) restrictions on collecting and reporting information on firearms purchases, (2) a lack of required background checks for private firearms sales, and (3) limitations on reporting requirements for multiple sales.

- *Restrictions on collecting and reporting information on firearms purchases.* FFLs are required by federal law to maintain records of firearm transactions and to provide information on the first retail purchaser of a firearm to ATF in response to a trace request within 24 hours.[24] ATF has stated that information obtained through the firearms trace process is critical to its efforts to identify individuals involved in firearms trafficking schemes and to detect trafficking patterns. In addition, ATF documents and officials noted the trace of a firearm recovered in crime in Mexico often leads to the initiation of an arms trafficking investigation or provides agents with information to assist with an investigation. However, the U.S. government is prohibited by law from maintaining a national registry of firearms.[25] As a result, ATF must take a number of steps to trace a crime gun, including, as applicable, contacting the importer, manufacturer, and wholesaler of the firearm in order to identify the FFL retailer who sold the firearm to the first retail purchaser. Key law enforcement officials stated restrictions on establishing a federal firearms registry lengthen the time and resources required by ATF to complete a crime gun trace and can limit the success of some traces. ATF officials added that information ATF is able to maintain on certain firearms purchases, such as information on some multiple firearms purchases, enables ATF to more quickly trace those firearms if they turn up in crime because the information is already entered into a searchable database.

According to ATF, from fiscal year 2004 to fiscal year 2008, it took the agency an average of about 14 days to complete a trace of a firearm

---

[23]Pub. L. No. 90-618, § 101.

[24]18 U.S.C. §§ 923(g)(1)(A) and (g)(7). FFLs are required by federal law to maintain records of firearm transactions for a period of 20 years. 27 C.F.R. § 478.129.

[25]The Firearms Owners' Protection Act, Pub. L. No. 99-308, §106, 100 Stat. 449 (1986) prohibited the establishment of a federal registry of firearms, firearms owners, and firearms transactions and dispositions.

ATF AR 0060

recovered in Mexico to the first retail purchaser. However, officials stated investigative leads obtained from trace results are most useful within the first few days following a firearm seizure, in part because the sort of conspiracies often associated with firearms trafficking tend to change personnel frequently and, as a result, an individual found to be responsible for the purchase of a particular firearm may no longer have ties to the principal gun trafficker directing the scheme.[26]

DOJ documents and ATF officials also noted secondary firearms— firearms resold following the first retail purchase from an FFL, or "used guns"—are commonly trafficked to Mexico. Federal law permits the private transfer of certain firearms from one unlicensed individual to another in places such as at gun shows, without requiring any record of the transaction be maintained by the unlicensed individuals, an FFL, or other law enforcement authority.[27] Secondhand firearms may also be sold to and purchased from FFL pawnshops.[28] Although pawnshops maintain records of any secondhand firearm transfers,[29] ATF cannot directly trace the firearm from the first retail sale at an FFL to the pawnshop. Through the firearms trace process, ATF can follow the records of a firearm from the manufacturer or importer to the first retail sale at an FFL; however, if the firearm was resold from one individual to another or through a pawnshop, there is a break in the chain of records, and ATF must then consult with the last recorded purchaser of the firearm to determine the continuing disposition of the firearm. As a result, ATF officials stated that, while ATF may be able to trace a firearm to the first retail purchaser, it

---

[26] According to ATF, the primary goal of a straw purchasing conspiracy investigation is to identify the principal firearms trafficker. If the principal trafficker is not caught, that individual can continue to enlist new straw purchasers.

[27] Only individuals who are engaged in the business of importing, manufacturing, or dealing in firearms—those whose principal objectives are livelihood and profit—need to obtain a license (18 U.S.C. §§ 921(21) and 923(a).) In addition, 18 U.S.C. § 923(g)(1)(A) only requires licensed importers, licensed manufacturers, and licensed dealers to maintain records of importation, shipment, receipt, sale, or other disposition of firearms at his or her place of business.

[28] 18 U.S.C. § 921(11) defines a "dealer," in part, as a person who is a pawnbroker. Consequently, the recording requirements of 18 U.S.C. § 923(g)(1)(A) and associated regulations, which apply to licensed firearms dealers, apply to pawnbrokers as well.

[29] As an FFL, a pawnshop is subject to the same records maintenance and reporting requirements as all other FFLs. See 18 U.S.C. § 921(11) (dealer is defined by law as encompassing a person who is a pawnbroker); 18 U.S.C. § 923(a) (requiring dealers to obtain a license to deal in firearms); and 18 U.S.C. § 923(g)(1)(A) (requiring licensed dealers to maintain records).

ATF AR 0061

generally has no knowledge of any secondhand firearms purchases from gun shows or pawnshops—where many traffickers buy guns—without conducting further investigation, which may require significant additional resources and time.

- *Lack of required background checks for private firearms sales.* Federal firearms law prohibits certain persons from possessing or receiving firearms.[30] A 1993 amendment to the Gun Control Act (the Brady Handgun Violence Prevention Act) required background checks be completed for all nonlicensed persons seeking to obtain firearms from FFLs, subject to certain exceptions.[31] These background checks provide an automated search of criminal and noncriminal records to determine a person's eligibility to purchase a firearm. However, private sales of firearms from one individual to another, including private sales at gun shows, are not subject to the background checks requirement and, therefore, do not require the seller to determine whether the purchaser is a felon or other prohibited person, such as an illegal or unlawful alien.[32] DOJ documents and ATF officials stated that, as a result, many firearms trafficked to Mexico may be purchased through these types of transactions by individuals who may want to avoid background checks and records of their firearms purchases.[33]

---

[30]18 U.S.C. §§ 922(g) and (n).

[31]Pub. L. No. 103-159, § 103(i), codified at 18 U.S.C. § 922(t). The Brady Act established the National Instant Criminal Background Check System. In passing the Brady Act, Congress took into consideration the privacy interests of private individuals and specifically required the Attorney General to pass regulations to ensure the privacy and security of the information in the System. Section 922(t)(3) lists exemptions from the background check requirement.

[32]18 U.S.C. § 922(t) prohibits only a licensee from transferring a firearm to a nonlicensee before contacting the national criminal background check system and does not apply to transfers by nonlicensees. According to a 1999 report by the Department of the Treasury and DOJ, this is known as the "gun show loophole." The Gun Control Act requires all persons manufacturing, importing, or selling firearms as a business to be federally licensed, but private transactions between persons "not engaged in the business" are not covered by the Gun Control Act. Nonlicensees are prohibited from transferring firearms to any person who they have reasonable cause to believe is not a resident of the state in which the transaction occurs and from knowingly transferring a firearm to prohibited persons. However, the Brady Act does not apply to private firearm transfers. See Department of the Treasury, DOJ, and ATF, *Gun Shows: Brady Checks and Crime Gun Traces* (Washington, D.C.: January 1999).

[33]The 1999 report by the Department of the Treasury and DOJ provided recommendations to the President to close the "gun show loophole;" however, resulting legislation subsequently proposed in Congress did not become law.

ATF AR 0062

- *Limitations on reporting requirements for multiple sales.* Under the federal multiple sale reporting requirement, an FFL that sells two or more handguns within 5 business days to an individual must report information on the transaction to ATF.[34] The federal reporting requirement was established to cover multiple sales of handguns, following studies showing that handguns sold in multiple sales to the same individual purchaser were frequently used in crime. ATF has identified multiple sales or purchases of firearms by a nonlicensee as a "significant indicator" of firearms trafficking, and officials noted the federal multiple sale reporting requirement helps expedite the time required by ATF to complete a crime gun trace. ATF officials added that information ATF received from FFLs on multiple sales has provided critical leads for some investigations of arms trafficking to Mexico. However, the requirement does not apply to purchases of long guns.[35] As a result, although according to ATF data about 27 percent of firearms recovered in Mexico and traced from fiscal year 2004 to fiscal year 2008 were long guns, ATF does not have information in its multiple sales database on any long guns recovered in crime in Mexico that may have been purchased through a multiple sale. In addition, law enforcement officials noted traffickers are aware of how to avoid the federal reporting requirement by spreading out purchases of handguns at different FFLs. For example, traffickers can effectively purchase two or more guns within 5 business days without having such purchases reported as long as they purchase no more than one gun at any individual FFL.

## Lack of Coordination Hampers ATF and ICE Efforts to Combat Arms Trafficking to Mexico

Some officials we met with from ATF and ICE—the two primary agencies combating arms trafficking to Mexico—noted the agencies have worked well together on various efforts to address the issue; however, we found ATF and ICE have not consistently coordinated their efforts to combat arms trafficking. ATF has stated it aims to address arms trafficking to Mexico in collaboration with domestic and Mexican law enforcement partners, including Mexican government entities, as well as U.S. agencies

---

[34]Since 1975, FFLs have been required by regulation (27 C.F.R. § 478.126a), and subsequently by law (18 U.S.C. § 923(g)(3)(A)), to report all transactions in which an unlicensed person has acquired two or more handguns at one time or during any 5 consecutive business days (called a multiple sale). 18 U.S.C. § 923(g)(3)(A) specifies that a licensee must prepare a report of multiple sales, during 5 consecutive business days, of two or more pistols, or revolvers, or any combination of the two totaling two or more, to an unlicensed individual. According to ATF, the purpose of the requirement was to enable ATF to monitor and deter illegal commerce in handguns by unlicensed persons.

[35]Long guns include shotguns and rifles, the latter of which include firearms such as AK and AR-15 type semiautomatic rifles.

ATF AR 0063

such as ICE and DEA. Specifically, a 2007 ATF document outlining its plan for Project Gunrunner stated ATF would incorporate ICE, CBP, and other participating agencies in joint initiatives, to expand information sharing and coordinated operations. According to ICE, its BEST initiative was largely developed to facilitate cooperation and bring together resources of ICE, CBP, and other U.S. and Mexican law enforcement entities to take a comprehensive approach to address border violence and vulnerabilities. However, an outdated interagency agreement and jurisdictional conflicts have led to instances of poor coordination between the two agencies. Officials from both agencies in Washington and in the field cited examples of inadequate communication on investigations, unwillingness to share information, and dysfunctional operations. As a consequence, it is unclear whether ATF and ICE are optimizing the use of U.S. government resources and minimizing duplication of efforts to address the issue.

ATF and ICE officials we interviewed had differing views of their respective roles and responsibilities for addressing arms trafficking to Mexico. ATF officials stated ATF's relative experience on firearms issues and broad range of relevant authorities under which it operates—including its role in tracing crime guns and regulating the firearms industry—make it the logical U.S. agency to lead efforts to combat arms trafficking to Mexico. For example, ATF enforces provisions of federal firearms laws[36] related to

- prohibited persons in possession of a firearm,[37]

- knowingly giving or selling a firearm to a prohibited person,[38]

- a lawful purchaser acquiring a firearm on behalf of an unlawful purchaser (known as a "straw purchase"),[39]

---

[36]As noted previously, two major federal statutes regulate the commerce in, and possession of, firearms: National Firearms Act of 1934, 48 Stat. 1236, codified as amended at 26 U.S.C. §§ 5801-5872 and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, codified as amended at 18 U.S.C. §§ 921-931.

[37]18 U.S.C. § 922(g); 27 C.F.R. § 478.32.

[38]18 U.S.C. § 922(d); 27 C.F.R. § 478.32.

[39]While straw purchasing is not in itself illegal, it is illegal to intentionally provide false information in connection with the acquisition of a firearm. 18 U.S.C. § 922(a)(6). *See also U.S. v. Moore*, 109 F.3d 1456, 1460-63 (9th Cir. 1997) (explaining the straw man doctrine and applying it to a factual case).

ATF AR 0064

- dealing in firearms without a license, [40] and

- the unlawful interstate transfer of firearms in certain instances. [41]

Although ICE officials acknowledged ATF had more years of experience on firearms issues, they told us they viewed ATF's role as focused on firearms trafficking on the U.S. side of the border, while ICE has the primary role in cases involving firearms smuggled across the U.S. border into Mexico. ICE enforces provisions related to the illegal export or smuggling of goods, including firearms and ammunition, from the United States into Mexico in the Arms Export Control Act of 1976[42] and its implementing regulations, the International Trafficking in Arms Regulations[43]; the USA Patriot Improvement and Reauthorization Act of 2005[44]; and the Export Administration Act[45] and its implementing regulations, Export Administration Regulations;[46] among other authorities.[47]

In the locations we visited during our audit work, officials cited examples of how unclear roles and responsibilities have hindered communication and cooperation during some operations. Examples are as follows:

- Several officials told us they felt the agencies were not taking sufficient advantage of each other's expertise to more effectively carry out operations, such as ATF's expertise in firearms identification and

---

[40]18 U.S.C. §§ 922(a)(1), 923(a).

[41]18 U.S.C § 922.

[42]Pub. L. No. 90-629, 82 Stat. 1320, as amended.

[43]22 C.F.R. parts 120-130.

[44]Pub. L. No. 109-177, 120 Stat. 192 (2006).

[45]50 U.S.C. App. §§ 2401-2420. The Export Administration Act is not permanent legislation. Authority granted under the act lapsed in August 2001. However, Executive Order 13222, Continuation of Export Control Regulations, which was issued in August 2001 and extended most recently by Presidential Notice on July 23, 2008, under the authority provided by the International Emergency Economic Powers Act (50 U.S.C. §§1701 et seq.), continues the controls established under the act and the implementing EAR. *See* 73 *Fed. Reg.* 43603 (July 25, 2008).

[46]15 C.F.R. subchapter C.

[47]ATF and ICE officials noted that they may support each other's efforts to address arms trafficking in areas in which one agency may have primary jurisdiction.

ATF AR 0065

procedures for conducting surveillance at gun shows, and ICE's experience dealing with export violations and combating money laundering and alien smuggling, which ICE officials noted also may be relevant to cases of arms trafficking.

- Information on intelligence related to arms trafficking to Mexico was not being shared by the agencies at the El Paso Intelligence Center (EPIC), which was established to facilitate coordinated intelligence gathering and dissemination among member agencies related to Southwest border efforts to address drug, alien, and weapons smuggling. The 9/11 Commission Report asserted intelligence sharing is critical to combat threats to the United States and that intelligence analysts should utilize all relevant information sources. According to ATF, its "gun desk" at EPIC was established as a conduit or clearinghouse for weapons-related intelligence from federal, state, local, and international law enforcement entities, including weapons seizure information from ICE, CBP, and Mexican authorities. ICE stated its Border Violence Intelligence Cell (BVIC) was established at EPIC to coordinate weapons smuggling investigations and other related efforts with partner agencies and facilitate timely information sharing and analysis. However, ATF officials we met with at EPIC told us that, although they thought it was important for the two agencies' efforts to be integrated at EPIC, they had minimal interaction with BVIC staff. Additionally, senior ICE officials at headquarters told us that, in the past, ATF has taken information shared by ICE and used it to lead its own investigations; as a result, ICE has subsequently been reluctant to share information with ATF at EPIC. Although CBP had a representative assigned to the gun desk during our site visit in January 2009, the ATF official in charge of the gun desk stated ICE did not have a representative at the gun desk as of May 1, 2009. After reviewing a draft of this report, ATF and ICE officials at headquarters noted ICE had requested permission from ATF to assign a representative to the gun desk in the past 6 months, and ATF permitted the assignment at the end of May; they stated an ICE analyst had been assigned to the gun desk as of June 1, 2009, which may contribute to improved coordination between the two agencies at EPIC in the future.

- The agencies have not coordinated and collaborated on some covert operations, potentially compromising the effectiveness of these efforts. For example, ATF officials stated that, in some cases, ICE did not follow standard procedures ATF has established for conducting operations at gun shows. ATF officials told us of one case in which ICE did not coordinate with ATF on an operation at a gun show, which led to an ICE agent unknowingly conducting surveillance on an ATF agent who was pursuing a suspect trafficker. ICE officials stated that, in another case, ATF had

ATF AR 0066

conducted "controlled delivery" covert operations in an attempt to identify organizations receiving illicit weapons in Mexico, without coordinating with ICE. The ICE officials said ATF did not notify them of their operations, including preclearing the controlled export of the weapons, which could have put ATF's operation in conflict with ICE, CBP, or Mexican government law enforcement and raised the risk that weapons smuggled to Mexico as part of the operations would end up in the wrong hands and be used in crime.

- In some cases, ATF and ICE refused to provide required documentation to assist each other in arms trafficking investigations, according to ICE officials. ICE officials stated, in some cases, ATF officials would not provide necessary statements for cases ICE was investigating that involved interstate firearms violations. As a result, the officials said they would not provide a required immigration certificate to ATF for arms trafficking cases ATF was investigating that involved an immigration violation.

- Although ICE established BEST teams to facilitate interagency coordination and an integrated approach to address border issues, ATF and ICE officials indicated ATF has had minimal participation on the BEST teams. ICE officials stated that, as of May 2009, ATF was working with 4 of the 10 Southwest border BEST teams. ATF stated in February 2009 it had not permanently assigned any agents to BEST teams, but some ATF agents had been available on an as-needed or part-time basis to assist with BEST efforts to stop the illegal export of weapons from the U.S. A senior ATF official subsequently told us resource constraints prevented ATF from fully participating in the Southwest border BEST teams, but the official said ATF recently agreed to assign one ATF agent to each of the Southwest border BEST teams that are located where ATF also has a field office.

- ATF, ICE, State, and other relevant officials we met with at the U.S. Embassy in Mexico City agreed on the potential usefulness of creating an interagency, bilateral operational arms trafficking task force to conduct joint operations and investigations including both U.S. and Mexican government officials. However, ATF and ICE could not agree on who would take the lead, or whether they would co-lead, the effort. Senior ICE officials told us ICE preferred not to co-lead an interagency task force with ATF unless ATF could provide an equivalent level of resources, and ATF had relatively fewer resources in Mexico. The officials also said ICE wanted to minimize coordination meetings that would be required with an interagency task force. While a senior ATF official stated ATF and ICE agreed at an April conference in Mexico to create an interagency task

ATF AR 0067

force including both agencies that would be led by the Mexican government, senior ICE officials said the interagency task force would be led by ICE, and ICE is also moving forward with its own plans to create several bilateral taskforces comprising relevant ICE and Mexican officials at key locations in Mexico, without ATF involvement.

ATF and ICE officials acknowledged the need to better coordinate their efforts to leverage their expertise and resources, and to ensure their strategies are mutually reinforcing, particularly given the recent expanded level of effort to address arms trafficking. In our past work, we have found that in an interagency effort where interagency collaboration is essential, it is important that agencies have clear roles and responsibilities and that there be mechanisms to coordinate across agencies.[48] Officials from both agencies stated ATF and ICE are in the process of updating a 1978 MOU that existed between ATF and Customs (before the 2003 creation of ICE), and the agencies are working to improve coordination and cooperation.[49] ATF officials said the new MOU will more clearly define the agencies' statutory jurisdictions and reflect changes in some laws since the previous MOU was created. A draft copy of the MOU we obtained also included some guidelines for coordinating investigations and resolving interagency conflicts. A senior ATF official suggested that, in the future, it would be helpful if ICE and ATF officials in charge of field offices could develop more detailed standard operations procedures for their respective locations, based on the MOU. However, ATF and ICE have not reached formal agreement on the MOU to date, and officials said they have not established other formal coordination mechanisms to facilitate high-level information sharing and integrate strategies for addressing arms trafficking to Mexico.

---

[48]GAO, *Combating Terrorism: Law Enforcement Agencies Lack Directives to Assist Foreign Nations to Identify, Disrupt, and Prosecute Terrorists*, GAO-07-697 (Washington, D.C.: May 25, 2007); GAO, *Results-Oriented Government: Practices That Can Help Enhance and Sustain Collaboration among Federal Agencies*, GAO-06-15 (Washington, D.C.: Oct. 21, 2005); and GAO, *Managing for Results: Enhancing Agency Use of Performance Information for Management Decision Making*, GAO-05-927 (Washington, D.C.: Sept. 9, 2005).

[49]According to the 1978 MOU, the agreement was developed to facilitate more effective use of federal investigative resources and "an open exchange of intelligence and joint enforcement efforts on dual jurisdiction investigations, i.e., investigations in which there are, or may be, violations of statutes within the primary investigative jurisdiction" of each agency.

ATF AR 0068

**Various Factors Limit the Potential to Detect and Seize Southbound Weapons at U.S. Mexican Border**

We conducted site visits to three locations along the U.S.-Mexico border (Laredo/Nuevo Laredo, San Diego/Tijuana, and El Paso/Juarez) and to Monterrey and Mexico City, Mexico, between September 2008 and January 2009. In March 2009, the Secretary of Homeland Security announced a new Southwest border security initiative that will expand screening technology and add personnel and canine teams that can detect weapons and currency for southbound inspections at ports of entry, among other efforts.[50] Although we have not reviewed these new plans, our review of operations found various factors limit the potential for southbound inspections to reduce the flow of arms at the Southwest border.

While ATF and ICE play important roles in investigating cases of arms trafficking to Mexico, CBP is responsible for the ports of entry at the U.S.-Mexico border, and its efforts include intercepting southbound illicit firearms at the border.[51] Although CBP reported that from fiscal year 2005 to fiscal year 2008 some weapons were seized as a result of southbound inspections along the U.S.-Mexico border, in general, such inspections have yielded relatively few seizures. According to agency officials we met with, in general, southbound inspections of vehicles and persons have not been a high priority for the U.S. government and have resulted in relatively few weapons seizures.[52] For example, in fiscal year 2008, CBP reported 35 southbound weapons seizures occurred at 10 of the 25 land ports of entry along the Southwest border, involving a total of 70 weapons.[53] The other 15 ports of entry did not report any southbound weapons seizures.[54]

---

[50]In addition, law enforcement officials stated that they have used, and are planning to expand, license plate reader technology along the Southwest border to combat arms trafficking. CBP has also begun screening 100 percent of outbound railcars at eight rail crossings along the U.S.-Mexico border, although officials noted that most southbound weapons seizures have occurred following inspections of personally owned (noncommercial) vehicles at the official ports of entry and rail screenings have resulted in no weapons seizures to date.

[51]CBP and ICE officials noted that they often work together in efforts to intercept firearms at the border.

[52]Law enforcement officials noted that southbound operations are focused on illicit goods in general, including money, guns, drugs, and people.

[53]CBP noted not all southbound weapons seizures necessarily relate to arms trafficking, such as in instances when an individual is arrested at the border due to an outstanding warrant, and the individual also had a weapon.

[54]Officials also told us few weapons have been seized in between the official ports of entry, although CBP does not maintain data on southbound weapons seized in between the ports of entry.

ATF AR 0069

Efforts to increase southbound weapons seizures at the Southwest border are limited by several factors, including resource and infrastructure limitations, drug traffickers' surveillance capabilities, and the limitations of Mexican government efforts.

- *Resource and infrastructure limitations.* Although CBP officials stated CBP does not track the overall number of southbound inspections conducted at Southwest border crossings, officials stated such inspections have generally been periodic and ad hoc, depending on available resources and local intelligence. For example, at one border crossing we visited, CBP officials stated law enforcement agencies typically conducted about one to two southbound operations per month. Officials noted southbound border crossings generally lack the infrastructure available at northbound crossings for screening vehicles and persons, such as overhead canopies, inspection booths, X-ray units, and other technologies. CBP officials we met with at the San Ysidro border crossing from San Diego to Tijuana, Mexico, noted there are 24 northbound lanes at that crossing, with inspection booths and screening technologies that enable them to process about 110,000 vehicles and pedestrians crossing from Mexico into the United States every day with an average 1-1.5 hour wait per vehicle.[55] However, the officials said there are only 6 southbound lanes, none of which have the inspections infrastructure northbound lanes have, and the majority of vehicles cross into Mexico without stopping on either side of the border. Because of the lack of southbound infrastructure at this border crossing, officials said they use orange cones and concrete barriers to designate inspection areas during southbound operations (see fig. 7).

---

[55]The officials noted about 80 percent of border-crossers are "frequent crossers," meaning that they cross the border in both directions 10 times per month or more.

ATF AR 0070

**Figure 7: Southbound Operation Being Conducted at San Ysidro Border Crossing Between San Diego, California, and Tijuana, Mexico**



Source: GAO.

To increase southbound inspections, law enforcement officials told us significant additional resources for personnel, equipment, and infrastructure along the Southwest border would be required beyond what is already spent conducting northbound screenings. For example, as of March 2009, Laredo, Texas, was the only CBP location along the Southwest border with a permanent team of individuals available to conduct southbound inspections at local border crossings.[55] CBP noted that, under the new security initiative, it plans to conduct more regular southbound operations, in collaboration with other law enforcement entities. However, officials stated some border crossings lack the additional space that would be required to expand southbound infrastructure in order to accommodate primary and secondary screening areas while limiting the impact on traffic. For example, we visited one border crossing in El Paso, Texas, that is adjacent to park land not owned by CBP, which CBP officials said would preclude any efforts to expand southbound infrastructure at that crossing. Officials added that the new Southwest border security initiative will include efforts to survey existing southbound infrastructure to assess needs for functionality and worker

---

[55]CBP officials stated that since March 2009, under the new Southwest border security initiative, CBP has been in the process of reassigning staff in order to have at least one dedicated team available for southbound inspections at each field office along the Southwest border.

GAO-09-709 Firearms Trafficking

ATF AR 0071

safety, but they said any efforts to expand southbound infrastructure under the new security initiative would be long-term, since projects generally take 7-10 years.

- *Drug traffickers' surveillance capabilities.* Law enforcement officials stated they typically only have about 45 minutes to an hour to conduct a southbound inspections operation before drug traffickers conducting surveillance at the border detect the operation and tell potential traffickers to wait for the operation to end before attempting to cross. As a result, officials said inspections are typically conducted during random brief intervals over a certain time period, such as 2 to 3 days.

- *Limited Mexican southbound operations.* Although Mexican customs aims to inspect 10 percent of vehicles crossing into Mexico on the Mexican side of the border, they have generally inspected much less than that to date. U.S. and Mexican officials noted, Mexican customs typically has focused more on inspections of commercial vehicles for illicit goods, which result in the payment of a fine, than on inspections for illicit weapons. Officials said this variance was due to several factors, including Mexico's general lack of capacity for detecting illicit weapons, as well as concerns about corruption and the risks faced by Mexican officials involved in a seizure of illicit firearms. However, the Mexican government is taking some steps to improve inspections, such as enhancing background checks and vetting staff involved in inspections, and putting in place new processes, equipment, and infrastructure to improve the security, efficiency, and effectiveness of inspections.

DHS's new Southwest border security initiative has the potential to mitigate some of the limitations we found with existing border operations. We did not review efforts under the new initiative, and it is too early to tell whether and to what extent these recent efforts may effectively stem the flow of illicit weapons at the U.S.-Mexico border. Additionally, even if southbound operations were significantly expanded along the Southwest border, they might still result in a relatively small percentage of the weapons intended for Mexico being seized. For example, in comparison, even with the level of screening that is currently conducted on vehicles and persons coming into the United States from Mexico, the U.S.

ATF AR 0072

interagency counternarcotics community has noted only a portion of illicit drugs crossing into the United States from Mexico are seized at the border.[57]

## Agencies Lack Complete Data to Help Plan and Assess Results of Efforts to Address Arms Trafficking to Mexico

With the exception of information maintained by ATF on traces of firearms seized in Mexico, in general, U.S. agencies were not able to provide comprehensive data to us related to their efforts to address arms trafficking to Mexico. We found agencies lack recent systematic analysis and reporting of aggregate data related to arms trafficking, which could be used to better understand the nature of the problem and to help plan and assess ways to address it. Additionally, while agencies provided some information on efforts to seize firearms, and initiate and prosecute cases of arms trafficking to Mexico, they were not able to provide complete and accurate information related to results of their efforts to address trafficking to Mexico specifically.[58]

As mentioned previously, ATF maintains some data on firearms that are seized in Mexico and submitted for a trace, which can be used to help characterize arms trafficking patterns and trends.[59] For example, ATF has used this information to identify primary trafficking routes from the United States to Mexico and to identify types of firearms frequently recovered in crime in Mexico. ATF also provided data we requested on the number of traces that were linked to a multiple handgun sale and on

---

[57]The U.S. interagency counternarcotics community includes the Central Intelligence Agency's Crime and Narcotics Center; the Defense Intelligence Agency's Counternarcotics Trafficking Office, Defense's Joint Staff, and the Deputy Assistant Secretary of Defense for Counternarcotics; DHS's ICE, CBP, U.S. Coast Guard, Office of Intelligence and Analysis, Office of Counternarcotics and Enforcement, and the U.S. Interdiction Coordinator; Justice's DEA, Federal Bureau of Investigation, Narcotic and Dangerous Drug Section, National Drug Intelligence Center, and the Organized Crime and Drug Enforcement Task Force; the National Security Agency; ONDCP; State/INL; and the Department of the Treasury's Internal Revenue Service and Office of Foreign Assets Control (OFAC).

[58]We have identified standards for appropriate and effective internal control in government, which can help agencies improve operational processes and identify and address major performance and management challenges, such as the need to comprehensively identify internal and external risks and to monitor activities to compare actual performance to planned or intended results. See GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: November 1999).

[59]Pages 14-24 of this report provide information on types and sources of firearms trafficked from the United States to Mexico, based on analyses of traces of firearms recovered in crime in Mexico.

ATF AR 0073

firearms that had been reported lost or stolen.[60] However, ATF was unable to provide data to us on the number of arms trafficking to Mexico cases involving straw purchasers or unlicensed sellers because the agency does not systematically track this information. ATF was also unable to provide information we requested on the number of traces completed for firearms recovered in Mexico that were linked to FFL gun dealer sales at gun shows from fiscal year 2004 to fiscal year 2008, although the agency began a new effort to track this information in its firearms tracing system in June 2008. Multiple sales, straw purchasers, trafficking by unlicensed sellers, and gun shows have been cited in prior ATF reports and by ATF officials as sources or indicators for firearms trafficking in general and to Mexico in particular.

For example, in 1999 and 2000, the Department of the Treasury and ATF released three reports that included analyses of firearms trafficking trends based on ATF investigations.[61] The reports included information such as primary reasons for initiating firearms trafficking investigations, sources of illegal firearms, types of traffickers identified in investigations, and trafficking violations commonly associated with investigations. Law enforcement agencies and the National Academy of Sciences have stated the type of information related to arms trafficking included in the reports can be used by Congress and implementing agencies to more accurately assess the problem and to help target and prioritize efforts.[62] One of the three reports, released in February 2000, stated it was to be the first in an annual series. However, it has not been updated, and similar analyses and reporting have not been completed since the three reports were released.

---

[60]In fiscal year 2008, 145 of 7,206 (about 2 percent) firearm trace requests submitted by Mexico were linked to a multiple sale. Ten trace requests were submitted for firearms that were found to have been reported lost or stolen from an FFL or an interstate carrier.

[61]Department of the Treasury, Department of Justice, and Bureau of Alcohol, Tobacco, and Firearms, *Gun Shows: Brady Checks and Crime Gun Traces* (Washington, D.C.: January 1999); Department of the Treasury and Bureau of Alcohol, Tobacco, and Firearms, *Commerce in Firearms in the United States* (Washington, D.C.: February 2000); and Department of the Treasury and Bureau of Alcohol, Tobacco, and Firearms, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* (Washington, D.C.: June 2000).

[62]A 2004 report by the National Academy of Sciences highlighted the general lack of data related to firearms and violence and the effectiveness or impact of various gun control policies. The report noted the importance of this type of information to aid policymakers in assessing problems, such as illegal commerce in firearms, and to help determine ways to effectively address firearms-related issues. See National Academy of Sciences, *Firearms and Violence: A Critical Review*, ISBN 978-0-309-09124-4 (2004).

ATF AR 0074

Senior ATF officials stated ATF had not recently compiled reports including an analysis of aggregate data on firearms trafficking due to a provision in their appropriation that was in place from fiscal year 2004 to fiscal year 2007[63] that restricted the sharing of this type of information. The officials stated an update would be useful and, since the appropriations restrictions were relaxed in 2008, ATF was considering such an update in the future, though no funding was requested for this activity in ATF's fiscal year 2010 budget.

ICE officials also acknowledged the importance of compiling this type of information, and they noted that, for the first time in March 2009, ICE, CBP, and DHS intelligence staff had compiled an assessment providing an overview of southbound weapons smuggling trends, such as primary smuggling routes and destination states for firearms in Mexico.[64] The assessment included an analysis of 212 southbound weapons seized by CBP and ICE in the Southwest border states in fiscal year 2007 and fiscal year 2008, as well as data from the Mexican government on firearms seizures in Mexico between 2006 and 2008 and data from ATF on a portion of traces ATF completed for firearms recovered in Mexico in 2007 and 2008. However, the assessment notes that it "does not provide an all inclusive picture of...firearms smuggling" from the United States to Mexico. ICE stated it worked closely with ATF intelligence staff in developing the assessment. Nevertheless, the senior ATF intelligence official cited by ICE as its primary ATF contact for the assessment told us while ATF answered specific questions from ICE, such as regarding ATF's firearms trace process, ATF was not asked to provide comprehensive data and analysis or significant input into the assessment's overall findings and conclusions. In addition, although ICE officials stated that the assessment had been completed in March 2009, senior ATF officials we met with in April, including the Chief of ATF's National Tracing Center, had just received a copy for the first time. We found the assessment only includes a subset of trace statistics we were able to obtain from ATF on firearms recovered in crime in Mexico and traced over the last 5 years. The senior ATF intelligence official told us that it would make sense for future

---

[63]Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, Div. B, 118 Stat. 3, 53; Consolidated Appropriations Act, 2005, Pub. L. No. 118-447, Div. B, 118 Stat. 2809, 2859-60 (2004); Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-108, 119 Stat. 2290, 2295-96 (2005); Continuing Appropriations Resolution, 2007, Pub. L. No. 109-289, Div. B, 120 Stat. 1311 (2006), as amended.

[64]The assessment was labeled for official use only and has not been released to the public.

ATF AR 0075

assessments to be developed jointly, in order to leverage more comprehensive data and analysis available from both agencies; however, he noted that until both agencies improve their interagency coordination, developing a joint assessment was unlikely.

Law enforcement agencies also reported tracking some information related to results of their efforts to address arms trafficking to Mexico to date, such as data on firearms seizures and cases initiated, but they lack complete data on results of their efforts to combat arms trafficking to Mexico specifically and have not systematically reported information on results of their efforts.[65] Examples follow:

- *Firearms seizures.* Law enforcement agencies could not provide complete data on the number of firearms seizures they made involving arms trafficking to Mexico. ATF reported to us it acquired 8,328 firearms in the four Southwest border states (Arizona, California, New Mexico, and Texas) in fiscal year 2008 as evidence in support of criminal investigations (through abandonment, purchase, or seizure), related to its Southwest border enforcement efforts.[66] However, a senior ATF official stated the agency is not able to readily retrieve data on whether a firearm was headed north or south, or, for example, whether an agent determined a firearm was being trafficked to Mexico or was seized for some other

---

[65]Law enforcement officials stated data on firearms seizures, cases initiated, and prosecutions provided by one agency are not necessarily mutually exclusive of data provided by another agency since multiple agencies may track information on the same seizure event or trafficking case.

[66]This figure does not include all firearms acquired by ATF in the above mentioned states in fiscal year 2008; it only includes those firearms identified by ATF as related to its Southwest border enforcement efforts. ATF reported that, of the 8,328 firearms, 559 were abandoned (voluntarily turned over to ATF by the owner for appropriate disposition. According to ATF, an abandonment must be unconditional; the person abandoning the property is not absolving themselves of potential criminal charges in connection with the property); 336 were purchased (generally in undercover scenarios, for evidentiary purposes); 4,040 were seized administratively (administrative forfeiture is a process by which property may be forfeited to the United States by ATF without any judicial action); 307 were seized judicially (judicial forfeiture is an action included as part of a criminal prosecution or an action in a U.S. district court ); 1,448 were seized for evidence (property that is not subject to forfeiture may be seized as evidence where there is probable cause to believe that the evidence will aid in a particular apprehension or conviction); 1,638 were seized as evidence and held in the custody of a cooperating law enforcement agency in a joint investigation with ATF where there was probable cause to believe the evidence would aid in a particular apprehension or conviction (this property, though held by another law enforcement agency, is part of the case in chief being recommended for prosecution by ATF).

ATF AR 0076

reason.[67] In addition, seizures of firearms in other states that may relate to arms trafficking to Mexico are not reflected in the above number.[68] Similarly, ICE reported to us it seized a total of 1,767 firearms in those same states in support of criminal investigations related to its Southwest border enforcement efforts in fiscal year 2008, including 152 firearms designated as having transited through or being destined for Mexico.[69] ICE officials said agents have not consistently indicated in ICE's data tracking system when a seizure relates to Mexico, so the latter number is likely less than the actual number of firearms seized related to Mexico. They added that seizures of firearms in other states that may relate to arms trafficking to Mexico also would not be reflected in the data. Additionally, while CBP reported to us it seized a total of 70 southbound firearms at official land ports of entry along the Southwest border in fiscal year 2008, it noted not all southbound weapons seizures necessarily relate to arms trafficking, such as in instances when an individual is arrested at the border due to an outstanding warrant and the individual also had a weapon.[70]

- *Cases initiated.* Law enforcement agencies could not provide complete data on cases they initiated involving arms trafficking to Mexico. ATF reported to us it initiated 280 cases nationwide related to arms trafficking to Mexico in fiscal year 2008. However, a senior ATF official stated some cases involving weapons that were exported to another country, such as Guatemala, and were later recovered in crime in Mexico would not be included in the above number, because the intermediate location would be recorded as the destination country in ATF's data tracking systems; therefore, the number provided is likely fewer than the actual number of cases. The official also noted ATF's data systems do not capture information on reasons for initiating cases, such as whether a case was initiated based on information provided from a confidential informant or

---

[67]ATF stated an accurate determination of the reason(s) for the acquisition of firearms as evidence can only be obtained by reviewing the investigative reports underlying the acquisition of each individual firearm.

[68]Law enforcement officials stated a majority of firearms trafficked from the United States to Mexico are sourced to the Southwest border states.

[69]An ICE official noted data on ICE firearms seizures include seizures by ICE on the U.S. side of the border, as well as seizures by CBP that were referred to ICE.

[70]CBP Border Patrol also noted that while Border Patrol maintains data on weapons seizures in between the official ports of entry, they are not able to determine from the data whether a weapon was headed north or south or was related to arms trafficking to Mexico without conducting further investigation. Officials noted anecdotal evidence suggests that few weapons intended for Mexico have been seized in between the ports of entry.

ATF AR 0077

based on findings from an FFL inspection.[71] ICE reported to us it initiated 103 cases involving Mexico-related weapons smuggling in fiscal year 2008. However, ICE officials stated some cases that do relate to arms trafficking to Mexico are not included in the data since ICE agents have not consistently indicated whether a case is related to Mexico in ICE's data tracking system.[72] They also noted their data systems do not capture information on specific reasons for initiating cases, such as whether a case was initiated following a highway interdiction on the U.S. side of the border or based on information provided from a confidential informant. However, ICE was able to provide a breakdown to us of cases by referring agency. For example, ICE reported 15 of the cases involving weapons smuggled to Mexico were initiated following a weapons seizure by CBP at an official port of entry, and 16 were initiated following a referral from ATF.

- *Prosecutions.* Agencies were also unable to provide complete data on prosecutions of cases involving arms trafficking to Mexico. Officials from DOJ's Executive Office for U.S. Attorneys (EOUSA) stated their national database for tracking criminal cases does not have a category specific to Mexico arms trafficking cases. They said there is not a simple way to determine which cases involve arms trafficking to Mexico since cases may involve various defendants and charges, and no charges are specific to arms trafficking to Mexico. They added that, to date, most of the cases U.S. Attorneys Offices have prosecuted relating to arms trafficking to Mexico have been referred to U.S. Attorneys by ATF.[73] ATF reported to us it referred 73 cases involving arms trafficking to Mexico for prosecution in

---

[71]A 2004 report by the DOJ Office of the Inspector General found that ATF's FFL inspection program was not fully effective for ensuring that FFLs comply with federal firearms laws because inspections were infrequent and of inconsistent quality, and follow-up inspections and adverse actions had been sporadic (see Report Number I-2004-005, *Inspections of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives* (Washington, D.C). However, ATF has not assessed the extent to which cases of arms trafficking to Mexico involve FFL traffickers.

[72]For example, ICE officials said narcotics, money laundering, or human trafficking cases that also involved arms smuggling may not be reflected in data provided on the initiation and prosecution of cases.

[73]EOUSA officials noted that, for the first time, in 2009, EOUSA is planning to provide training for relevant U.S. officials on prosecutions of southbound weapons smuggling cases.

ATF AR 0078

fiscal year 2008.[74] ATF officials stated although their data systems track the outcome of all cases, including firearms trafficking cases in general, or, as another example, for cases related to Southwest border violence (which may involve arms trafficking as well as other related offenses) they do not readily track the outcome of arms trafficking to Mexico cases specifically. However, based upon further review and analysis, ATF was able to generate some information for us on the outcome of the 73 cases: specifically, as of September 30, 2008, 22 cases were pending a prosecutorial decision, 46 had been accepted for prosecution, and 5 had not been accepted for prosecution. In addition, ATF reported 47 of the cases had been indicted, and 33 had resulted in convictions. While ICE was not able to provide data on the number of cases involving arms trafficking to Mexico that it referred for prosecution, it reported 66 cases involving Mexico-related weapons smuggling had been indicted, and 47 had resulted in convictions in fiscal year 2008. ICE officials noted some narcotics, money laundering, or human trafficking cases may also result in charges related to weapons smuggling that are not reflected in this data. They said compiling more complete and precise data related to prosecutions of cases involving arms trafficking to Mexico would require extensive documentary review and analysis.

## U.S. Assistance Limited by a Lack of Targeting Resources at Needs and Concerns over Corruption among Some Mexican Government Officials

U.S. law enforcement agencies have provided some technical and operational assistance to Mexican counterparts to combat arms trafficking to Mexico. However, these efforts have been limited in scope and hampered by the incomplete use of ATF's eTrace system and a lack of targeting resources at needs. In addition, concerns about corruption among some Mexican government officials limit the United States' ability to establish a full partnership with Mexican government entities in combating illicit arms trafficking to Mexico.

---

[74]ATF reported that, of the 73 cases, DHS participated in some way in 39 of the investigations (for example, an agent, analyst, or attorney from ICE, CBP, Border Patrol, BEST, or another DHS component was a participant or source of information for the investigation). A senior ATF official stated arms trafficking to Mexico cases are not necessarily referred for prosecution in the same year they are initiated. A case may be referred to a U.S. Attorney's Office or in some cases to a state or local prosecutor for prosecution.

ATF AR 0079

Agencies Provide Some Assistance to Mexican Counterparts in Combating Arms Trafficking, but Overall Efforts Are Limited and Not Targeted to Needs

U.S. law enforcement agencies have provided some assistance to Mexican counterparts in combating arms trafficking. As noted previously in this report, U.S. law enforcement agencies conduct their work in Mexico in cooperation with Government of Mexico counterparts under the Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance.[75] ATF agents in Monterrey, for instance, have built working relationships with federal, state, and local law enforcement, as well as the Mexican military, in the Monterrey area. This type of outreach has given the United States the opportunity to provide Mexican government counterparts some technical and operational assistance on firearms trafficking.[76]

- *Technical assistance.* ATF has provided training sessions on firearms identification, developing arms trafficking investigations, and the use of eTrace. For instance,[77] according to ATF, from fiscal years 2007 through 2008, ATF trained 375 law enforcement officials on the use of eTrace, at a cost of just under $10,000. Government of Mexico officials told us the training was extremely helpful in improving the skills of the officers who received it. However, only a small percentage of officers received the training, and more training is needed, Government of Mexico officials told us. In addition, ATF has provided some equipment to Mexican government counterparts, such as providing forensics equipment to the State Crime Lab of Nuevo Leon in Monterrey, Mexico.[78]

---

[75] Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance, Dec. 9, 1987, U.S.-Mexico, S. Treaty Doc. No. 100-13 (1988).

[76] According to DOD, ATF has asked DOD to utilize ongoing military-to-military discussion channels to facilitate ATF conversations with the Mexican military. Should such prospective discussions take place, DOD would be in a supporting and facilitating role, and any results would properly be reported by ATF.

[77] From fiscal year 2007 to fiscal year 2008, ATF provided 12 training sessions on the use of eTrace in Mexico City, Monterrey, Hermosillo, Guadalajara, Tijuana, Ciudad Juarez, Nogales, Matamoros, Nuevo Laredo, and Merida, Mexico.

[78] According to State, it will fund a $5 million Forensics Laboratories project with the Mexican Attorney General's Office for the successful investigation and prosecution of criminal cases. This funding will be used to provide state-of-the-art equipment and training in such areas as collection and preservation of evidence, chemical/biological analysis, computer forensics, and an Integrated Ballistics Identification System (IBIS), which will directly support DOJ and DHS efforts in the disruption of firearms trafficking. IBIS will complement ATF's eTrace by tracing the origin of U.S. sourced firearms recovered from Mexican criminal investigations.

ATF AR 0080

- *Operational assistance*. ATF currently has 3 agents in Mexico, and ICE has 12, though ICE agents are required to work on a wide variety of issues and, at the time of our field work in Mexico, none was exclusively dedicated to arms trafficking issues. In May 2009, ICE officials told us that one ICE agent in Mexico would now be dedicated to arms trafficking. Where they can, these ATF and ICE agents work with their Mexican counterparts to assist at crime scenes and to gain access to firearms information necessary to conduct gun traces. As part of this, ATF has worked with Mexican law enforcement to collect gun data for submission to eTrace. Once they have received the data on the guns through eTrace, ATF's National Tracing Center in West Virginia conducts the gun traces and returns information on their findings to the submitting party. In addition, ATF uses that trace information to launch new investigations or inform existing ones. ATF officials told us these investigations are the means by which ATF shuts down arms trafficking networks.

However, despite these efforts, overall ATF and ICE assistance has been limited, according to Mexican and U.S. government officials. For example, due to ATF's resource limitations, it has provided only a portion of the training ATF officials told us is needed to federal, state, and local law enforcement and to the Mexican military. In addition, though ATF and ICE have provided operational assistance in investigations, and though ATF has assisted in the collection of firearms information for submission to ATF's eTrace when Mexican law enforcement and military seize firearms, ATF and ICE have been significantly limited in what assistance they can provide. For instance, there are several firearms seizures in Mexico every week, but in a country as large as Mexico, neither ATF nor ICE have enough staff in multiple locations to assist with the vast majority of gun seizures that take place.

Also, U.S. assistance has been limited due to the incomplete use to date of eTrace by Mexican government officials.[79] The inputting of firearms information into eTrace provides an important tool for U.S. law enforcement to launch new, or to further existing, arms trafficking investigations in the United States, which can lead to the disruption of networks that traffic arms into Mexico, according to ATF officials. In addition, the data inputted into eTrace currently serves as the best data we found available for analyzing the source and nature of the firearms that are

---

[79]Between fiscal year 2004 and fiscal year 2008, the Government of Mexico submitted more weapons to be traced—from 0 to 1067—with the remaining requests generally entered by ATF agents operating in Mexico.

GAO-09-709  Firearms Trafficking

**ATF AR 0081**

being trafficked and seized in Mexico. However, because Mexican government officials have only entered a portion of the information on firearms seized, the eTrace data only represents data from these gun trace requests, not from all the guns seized. U.S. and Mexican government and law enforcement officials told us Mexican government officials' failure to submit all of the firearms tracing information could be attributed to several factors, including the following:

- Mexican officials only recently began to fully appreciate the long-term value to Mexico of providing gun trace information to ATF;

- the Mexican military serves as the central repository for all seized guns in Mexico, while the Mexican Attorney General's office is responsible for maintaining information on seized firearms, and coordinating access to the guns in order to collect necessary information has presented some challenges, according Mexican government officials;

- the Mexican Attorney General's office is understaffed and has not had sufficient resources to clear the eTrace backlog, according to U.S. and Mexican government officials;

- only some of the Mexican Attorney General's office staff had received ATF-provided training on identification of firearms and on using the eTrace system; and

- eTrace has been provided only in an English language version. Recent trends in submissions of trace requests to ATF's National Tracing Center indicate Mexican government officials have begun to input more information using eTrace. ATF officials attribute this increased use of eTrace by Mexican government officials to the training and outreach the agency has provided over that period of time, and they hope this number will continue to grow as Mexican government officials become more aware of the long-term benefits to Mexico of submitting firearms trace requests, participate in ATF firearms identification and eTrace training,

ATF AR 0082

and devote more resources to gathering the firearms information and entering it into eTrace.[80]

Nonetheless, the ability of Mexican officials to input data into eTrace has been hampered because a Spanish language version of eTrace has still not been deployed across Mexico. In September 2008, ATF and State officials told us eTrace would soon be deployed across Mexico.[81] However, ATF officials told us that to date the eTrace system is still being adapted to include all planned changes—such as the ability to enter more than one last name for a suspect or other party and to enter addresses that are differently configured from those in the United States—and that they were not sure when Spanish eTrace would be deployed across Mexico. U.S. and Government of Mexico officials told us it was important to complete the development of Spanish eTrace and immediately deploy it across Mexico because providing it and the necessary training for it to all relevant parties in Mexico would likely improve Mexican government officials' use of the system.

In addition, according to U.S. law enforcement and embassy officials, no needs assessments regarding arms trafficking were conducted in advance of Merida Initiative funding and, as a result, some needs that have been identified have not been addressed. The United States has recently provided significant funding for assistance to the Government of Mexico under the Merida Initiative; however, the Initiative currently provides general law enforcement and counternarcotics assistance to Mexico but has not focused on arms trafficking. State told us that the initial allocation of assistance was more general in order to enable it to be provided to get the money out for use in Mexico more quickly. Going forward, State told us that with additional time they could potentially develop and seek funding for more specific programs or efforts to assist Mexico in combating arms trafficking. State's Narcotics Affairs Section (NAS) in

---

[80]In addition to incomplete submissions of firearms information into eTrace, ATF officials told us that the time between when a firearm is seized in Mexico and when ATF receives a trace request varies. While ATF receives some requests within a day or so of a firearms seizure, over the last few years, ATF has received other requests to trace "batches" of firearms that were seized over an 18-month period. ATF is working with the Mexican government to improve the trace process, including shortening average time between when a firearm is seized and ATF receives a trace request.

[81]According to State, money from the Department of the Treasury's Asset Forfeiture Funds, not money from State's Merida funding, will be used to develop and deploy the Spanish language version of eTrace.

ATF AR 0083

Mexico City administers Merida Initiative funding for Mexico and had been able to use some of the Initiative's monies in support of ad hoc arms trafficking initiatives conducted by U.S. law enforcement agencies and other U.S. entities at the embassy. However, there were specific needs identified by Mexican and U.S. government officials that were not being met, including the following:

- Mexican government officials we met with consistently stated their agencies needed training from U.S. law enforcement on firearms trafficking. They said ATF had provided some training that was very useful to their agencies, including training on identifying firearms, discovering trafficking trends, or developing firearms trafficking cases and that their agencies did not have their own courses on the issue. However, there had only been a few training sessions and only a small percentage of Mexican government officials to date had received the training. ATF, ICE, and embassy officials agreed more training was needed but said they had minimal resources to devote to address the problem. NAS officials at the embassy told us they were able to take some of the Merida Initiative money for building general capacity and use it to support some training with an arms trafficking application. However, these amounts were small, and the money was not designated in such a way that an arms trafficking curriculum or training program could be developed on a large scale and funded through Merida Initiative monies. Both U.S. and Mexican government officials told us designing and providing a comprehensive training program could be very helpful in boosting Mexican law enforcement capacity to combat arms trafficking.

- Mexican government officials, as well as U.S. law enforcement and embassy officials, told us another currently unmet need was the development of a bilateral, interagency investigative task force for arms trafficking. While the embassy uses a law enforcement working group to share general, nonoperational information on a whole range of law enforcement issues in Mexico, there was no group of U.S. and Mexican law enforcement officials working jointly at an operational and investigative level on combating arms trafficking. Mexican and U.S. government and embassy officials told us that such a task force would include a group of vetted Mexican law enforcement and government officials working jointly with U.S. counterparts in relevant law enforcement agencies, such as ATF, ICE, and others, on identifying, disrupting, and investigating arms trafficking on both the Mexican and U.S.

ATF AR 0084

sides of the border.[82] Such types of vetted units, called Special Investigative Units, work with DEA on counternarcotics operations in Mexico. DEA officials we met with told us that these units are time, energy, and resource intensive, but that they are essential for success in their efforts.[83] However, there is no dedicated money that can be used for establishing and maintaining such a group for combating arms trafficking. NAS officials we met with in Mexico City who were administering funds for the Merida Initiative told us they had been able to provide some funding for various projects that had an arms trafficking application. However, funding a standing bilateral, interagency task force would require significant money that would need to be consistently available year to year. As such, these officials told us that, to date, they had not been able to use Merida Initiative funding to develop and maintain such an arms trafficking task force. In addition, NAS officials said that when the embassy had supported the possibility of creating such a task force, ATF and ICE each insisted on leading such an effort and refused to work under the other's leadership, preferring instead to run their own agency units with the Mexican government. Embassy officials told us they were unsure whether any such units would be created in the future without significant dedicated funding and agreement.

## Concerns about Corruption among Some Mexican Officials Have Hampered U.S. Efforts to Provide Assistance

Since taking office in December 2006, President Calderon has recognized the need to address the problem of organized crime and the corruption it creates throughout Mexican government and society. Calderon's administration has reached out to the United States for cooperation and U.S. assistance in an unprecedented way. However, U.S. assistance to Mexico has been limited due to concerns about corruption among Mexican government entities, according to Mexican and U.S. government officials.

According to Mexican government officials, corruption pervades all levels of Mexican law enforcement—federal, state, and local. For example, some high ranking members of federal law enforcement have been implicated in

---

[82]We found in our past work that in a large-scale, interagency effort, mechanisms to ensure interagency collaboration are essential, and we have identified key elements of collaboration, including defining and articulating common outcomes; agreeing on roles and responsibilities; and establishing compatible policies and procedures. See GAO-06-15.

[83]Direct, operational funding for DEA's vetted units in Mexico totals approximately $2 million per year, excluding the salaries and expenses for the DEA Special Agents who work with the units.

ATF AR 0085

corruption investigations, and some high publicity kidnapping and murder cases have involved corrupt federal law enforcement officials. Furthermore, corruption is more of a problem at the state and local levels than federal, according to U.S. and Mexican government officials. The Mexican military, however, is generally considered to be less vulnerable to corruption than law enforcement, according to U.S. and Mexican government officials. As a result, the Calderon administration has used the military extensively to disrupt drug cartel operations and seize illicit firearms and to assist or replace local law enforcement when they are overwhelmed or deemed corrupt. For example, in late 2008, President Calderon's administration terminated around 500 officers on Tijuana's police force and brought in the military to fill the gap until new officers who had been sufficiently vetted could be hired and trained.

U.S. government and law enforcement officials told us that corruption inhibits their efforts to ensure a capable and reliable partnership with Mexican government entities in combating arms trafficking. For instance, U.S. law enforcement officials we met with along the Southwest border and in Mexico told us they attempt to work with Mexican counterparts in law enforcement, the military, and Attorney General's Office whenever possible. However, incidents of corruption among Mexican officials compel them to be selective about the information they share and with whom they share it. For example, in 2006, the Government of Mexico reported that it had dismissed 945 federal employees and suspended an additional 953, following aggressive investigations into public corruption.

Similarly, CBP officials told us that, on the border, collaboration between Mexican and U.S. counterparts has been limited due to concerns about corruption among Government of Mexico customs officers. In fact, in one major border crossing location, CBP officers told us they had not been in contact with their Mexican customs counterparts and would not know who they could trust if they were. The Mexican military has been brought in to work along the border, due to the corruption within Mexican customs, according to Mexican and U.S. government officials. The Government of Mexico is implementing anticorruption measures, including polygraph and psychological testing, background checks, and salary increases for federal law enforcement and customs officers, and has implemented reforms to provide some vetting for state and local officers as well. However, these efforts are in the early stages and may take years to affect comprehensive change, according to Mexican and U.S. government officials.

ATF AR 0086

## United States Lacks a Comprehensive Strategy to Combat Arms Trafficking to Mexico

While U.S. law enforcement agencies have developed initiatives to address arms trafficking to Mexico, none have been guided by a comprehensive, governmentwide strategy. Strategic plans for ATF and ICE raise the issue of arms trafficking generally or overall smuggling to Mexico, but neither focuses on arms trafficking to Mexico or lays out a comprehensive plan for addressing the problem. In our past work, we have identified key elements that constitute an effective strategy, including identifying needs and objectives and the resources necessary to meet them, as well as establishing mechanisms to monitor progress toward objectives. In June 2009, the administration released its 2009 National Southwest Border Counternarcotics Strategy, which, for the first time, contains a chapter on arms trafficking to Mexico. We reviewed the strategy, and it contains some key elements of a strategy, such as setting objectives, but lacks others, such as performance measures for monitoring progress toward objectives. ONDCP officials said an appendix with an "implementation plan" for the strategy will be added in late summer of 2009 that will have some performance measures for its objectives. However, at this point, it is not clear whether the implementation plan will include performance indicators and other accountability mechanisms to overcome shortcomings raised in our report. In addition, in March 2009, the Secretary of Homeland Security announced a new DHS Southwest border security effort to significantly increase DHS presence and efforts along the Southwest border, including conducting more southbound inspections at ports of entry, among other efforts. However, it is unclear how the new resources that the administration has recently devoted to the Southwest border will be tied to the new strategy and implementation plan.

## Strategic Plans for Agencies Are Not Focused on Arms Trafficking to Mexico

Strategic plans for ATF and ICE raise the issues of arms trafficking in general and overall smuggling to Mexico, but neither plan focuses on arms trafficking to Mexico or lays out a comprehensive plan for how the agencies would address the problem. In addition, the Merida Initiative does not include provisions that would constitute a strategy to combat arms trafficking.

### ATF

ATF's current strategic plan for fiscal years 2004-2009 does not mention arms trafficking to Mexico. The strategic plan lays out the strategic goal to "enforce Federal firearms laws in order to remove violent offenders from our communities and keep firearms out of the hands of those who are prohibited by law from possessing them." As part of this objective, the plan identifies one tactic to "partner with law enforcement agencies and prosecutors at all levels to develop focused strategies that lead to the investigation, arrest, and prosecution of...domestic and international firearms traffickers...and others who attempt to illegally acquire or misuse

ATF AR 0087

firearms." However, the strategic plan neither lays out how ATF will go about implementing the tactic or achieving the goal, nor does it include any performance metrics to measure performance and monitor progress. ATF officials told us that they are currently developing their new fiscal year 2010 strategic plan, which will include more information relevant to arms trafficking to Mexico; however, as ATF's fiscal year 2010 strategic plan was in draft form and subject to change, we could not determine whether the final version will contain key elements, such as needs assessments, clear definition of roles and responsibilities, or metrics to measure progress.

In June 2007, ATF released a document announcing Project Gunrunner, as part of DOJ's Southwest Border Initiative. This document does provide some strategic goals, outcomes, and action items for combating arms trafficking and violence in Mexico and the United States. For example, ATF's strategy regarding DOJ's Southwest Border Initiative is summarized as follows:

"Working with its domestic and international law-enforcement partners, ATF will deny the "tools of the trade" to the firearms-trafficking infrastructure of the criminal organizations operating in Mexico through proactive enforcement of its jurisdictional areas in the affected border States in the domestic front, as well as through assistance and cooperative interaction with the Mexican authorities in their fight to effectively deal with the increase in violent crime."

ATF included certain action items, which provided some specific tasks for ATF to accomplish its strategic goals under Project Gunrunner. Some examples of action items include the following:

- The United States and Mexico establishing a point of contact for each ATF border field division who will meet regularly with the Mexican Attorney General's Office's representative to coordinate investigative and firearms-trafficking issues.

- ATF and other DOJ components, such as DEA, U.S. Marshals Service, and FBI; and DHS components, such as ICE, operating along the border implementing investigative strategies and for developing intelligence relating to trafficking into Mexico.

- The United States and Mexico forming a consultative group of attorneys and law enforcement officials from both countries to address legal issues and policies involving firearms trafficking and enforcement strategies.

ATF AR 0088

- The United States exploring the availability of funding to provide technology and equipment to assist the government of Mexico in upgrading its firearms forensics analysis and tracing capabilities.

While this ATF Project Gunrunner document does contain useful strategic goals and specific action items to achieve those goals, key elements are missing, such as mechanisms that could measure and ensure progress toward these goals.

**ICE**

Similarly, in ICE's interim strategic plan, dated July 2005, there are no specific arms trafficking to Mexico goals or action items, nor are there mechanisms for measuring progress in their efforts. ICE released a fact sheet on its new effort to combat illicit arms trafficking to Mexico—Armas Cruzadas—which did include mission goals:

"The mission of Armas Cruzadas is for U.S. and Mexican government agencies to synchronize bi-lateral law enforcement and intelligence-sharing operations in order to comprehensively identify, disrupt, and dismantle trans-border weapons smuggling networks. The goals include (1) establishing a bilateral program to stop weapons smuggling; (2) coordinating operations; (3) developing intelligence about arms trafficking networks; (4) strengthening interagency cooperation; (5) promoting intelligence information exchange; and (6) implementing points of contact for information exchange."

To meet these goals, ICE detailed some action items, which included

- training stakeholders;

- creating a border violence intelligence cell;

- developing a vetted arms trafficking group;

- implementing a weapons virtual task force;

- reinvigorating the ICE Border Liaison Program; and

- leveraging investigation, interdiction, and intelligence.

While ICE's fact sheet does contain relevant strategic goals and specific action items to achieve those goals, key elements of a strategy are missing as well, such as mechanisms to ensure progress toward the strategic goals.

**U.S. Customs and Border Protection**

In CBP's current strategic plan, there are no goals specific to arms trafficking to Mexico. The primary focus of CBP's plan is on preventing

ATF AR 0089

dangerous people and goods from getting into the United States, and the issue of preventing arms from going across the border into Mexico is not addressed.

In other reports and publications, CBP mentions items it has seized on the border, including drugs, illicit currency, and even prohibited plant materials and animal products, but the agency does not mention illicit firearms. However, CBP officials told us they have an important role to play in combating arms trafficking to Mexico and will continue to increase their efforts to combat arms trafficking with new initiatives, including some in coordination with and support of operations involving ICE and other U.S. law enforcement agencies.

**The Merida Initiative**

The Merida Initiative does not include provisions that would constitute a strategy to combat arms trafficking. While a bill in Congress to authorize the Merida Initiative included a "sense of Congress" that an "effective strategy to combat ... illegal arms flows is a critical part of a United States ... anti-narcotics strategy,"[84] a subsequent appropriations act, which makes reference to Merida, included no details on which agency or agencies should be responsible for developing and implementing such a strategy.[85] And, as mentioned previously in the report, State has not dedicated funding for the Merida Initiative that targets illicit arms trafficking.

The U.S. Embassy in Mexico, where the Merida Initiative funding is administered, also maintains a Mission Performance Plan to guide its efforts each fiscal year. This plan lays out goals of working with Government of Mexico partners on law enforcement issues including transborder issues, such as smuggling of arms. However, there are neither detailed performance measures, nor are there mechanisms to ensure collaboration across agencies on the issue of combating arms trafficking to Mexico.

---

[84]H.R. 6028, 110th Cong. (2008).

[85]Supplemental Appropriations Act, 2008, Pub. L. No. 110-252, § 1406, 122 Stat. 2323, 2339 (tying funding for assistance for Mexico to a requirement for a report by the Secretary of State that the Government of Mexico is establishing a mechanism for regular consultations to make recommendations concerning implementation of the Merida Initiative).

ATF AR 0090

| | |
|---|---|
| **Several Key Elements Are Essential to an Effective Strategy** | We have previously identified several key elements of an effective strategy. These elements include |

- identifying clear objectives

- defining roles and responsibilities for each party to meet those objectives

- ensuring sufficient funding and resources necessary to accomplish objectives

- implementing mechanisms to facilitate coordination across agencies; and

- monitoring progress toward objectives and identifying needed improvements.

We have found that having a strategy with elements such as these has the potential for greatly enhancing agency performance. For example, managers can use performance information to identify problems in existing programs, to try to identify the causes of problems, and to develop corrective actions.

| | |
|---|---|
| **New National Southwest Border Counternarcotics Strategy Includes Chapter on Arms Trafficking, but It Does Not Contain Some Key Elements of an Effective Strategy** | In June 2009, the administration released its 2009 National Southwest Border Counternarcotics Strategy, which, for the first time, contains a chapter on arms trafficking to Mexico. By law,[85] the Office of National Drug Control Policy (ONDCP) is required to issue a new strategy every 2 years. The previous version of this document, from 2007, did not include any strategy to combat illicit arms trafficking to Mexico. According to ONDCP officials, initially, this new version did not include arms trafficking either, but in February, a working group, co-led by ATF and ICE, began working on an arms trafficking piece. |

We reviewed the strategy's chapter on arms trafficking and found that the chapter does contain some key elements of a strategy. For instance, in that chapter, there are some broad objectives and under those, there are several supporting actions on topics such as improving information sharing. Under each supporting action, there is a description of an issue item to be addressed and how, in general, the relevant agencies should

---

[85]Office of National Drug Control Policy Reauthorization Act of 2006, Pub. L. No. 109-469, § 1110, 120 Stat. 3502, 3544

ATF AR 0091

resolve the issue. For example, an issue item under "Facilitate U.S. Government interagency intelligence sharing" states:

"U.S. law enforcement organizations and intelligence agencies operate a variety of intelligence collection and analysis programs which are directly or indirectly related to weapons smuggling. The Department of Defense provides analytical support to some of these programs with regard to captured military weapons and ordnance. In order to provide better operational access and utility to law enforcement agencies, the U.S. Government will capitalize upon the existing law enforcement interagency intelligence center, EPIC, to reinforce rapid information sharing methods for intelligence derived from Federal, State, local and Government of Mexico illicit weapons seizures. Absent statutory limitations, plans should be made to move to a real-time data sharing methodology."

While the arms trafficking chapter of the strategy contains some key elements of a strategy, such as setting objectives, it lacks others, such as providing detailed roles and responsibilities for relevant agencies or performance measures for monitoring progress toward objectives. However, ONDCP officials said an appendix with an "implementation plan" for the strategy will be added in late summer of 2009 that will have more detailed actions for each agency to take, as well as some performance measures for each item under the objectives. Furthermore, ONDCP officials said there will be annual reporting that addresses performance towards the plan's goals within the National Drug Control Strategy's annual reporting to Congress. However, at this point, it is not clear whether the implementation plan will include performance indicators and other accountability mechanisms to overcome shortcomings raised in our report. In addition, in March 2009, the Secretary of Homeland Security announced a new DHS Southwest border security effort to significantly increase DHS presence and efforts along the Southwest border, including conducting more southbound inspections at ports of entry, among other efforts. However, it is unclear how the new resources that the administration has recently devoted to the Southwest border will be tied to the new strategy and implementation plan.

## Conclusions

Combating arms trafficking has become an increasing concern to U.S. and Mexican government and law enforcement officials, as violence in Mexico has soared to historic levels, and U.S. officials have become concerned about the potential for increased violence brought about by Mexican DTOs on the U.S. side of the border. However, while this violence has raised concern, there has not been a coordinated U.S. government effort to combat the illicit arms trafficking to Mexico that U.S. and Mexican government officials agree is fueling much of the drug-related violence.

ATF AR 0092

Agencies such as ATF and ICE have made some efforts to combat illicit arms trafficking, but these efforts are hampered by a number of factors, including the constraints of the legal framework in which law enforcement agencies operate, according to agency officials, and poor coordination among agencies. In addition, agencies have not systematically and consistently gathered and reported certain types of data on firearms trafficking that would be useful to the administration and Congress to better target resources to combat arms trafficking to Mexico. Gaps in this data hamper the investigative capacity of law enforcement agencies. Further, a Spanish language version of ATF's eTrace has been in development for months but has yet to be finalized; the lack of this new version of eTrace has impeded the use of eTrace by Mexican law enforcement officials, which limits data that could be used in investigations on both sides of the border and results in incomplete information on the nature of firearms trafficked and seized in Mexico. Quick deployment of eTrace across Mexico and training of the relevant officials in its use could increase the number of guns submitted to ATF for tracing each year, improving the data on the types and sources of firearms trafficked into Mexico and increasing the information that law enforcement officials have to investigate and build cases.

U.S. and Mexican government officials in locations we visited told us that, while they have undertaken some efforts to combat illicit arms trafficking, they are concerned that without a targeted, comprehensive, and coordinated U.S. government effort, their efforts could fall short. In June 2009, the administration released its 2009 National Southwest Border Counternarcotics Strategy, containing a chapter on arms trafficking to Mexico. We reviewed the strategy's chapter on arms trafficking and found that the chapter does contain some key elements of a strategy, such as setting objectives, but it lacks others, such as providing detailed roles and responsibilities for relevant agencies or performance measures for monitoring progress toward objectives. ONDCP officials said they will develop an implementation plan for the strategy in late summer of 2009 that will have more detailed actions for each agency to take, as well as some performance measures for each item under the objectives. However, at this point, it is not clear whether the implementation plan will include performance indicators and other accountability mechanisms to overcome shortcomings raised in our report. Furthermore, in March 2009, the administration announced more resources for the Southwest border, including more personnel and equipment for conducting southbound inspections. However, it is unclear how the new resources that the administration has recently devoted to the Southwest border will be tied to the new strategy and implementation plan.

ATF AR 0093

The current level of cooperation on law enforcement issues between the United States and Mexico under President Calderon's administration presents a unique opportunity to work jointly to combat illicit arms trafficking. Taking advantage of this opportunity will require a unified, U.S. government approach that brings to bear all the necessary assets to combat illicit arms trafficking.

## Recommendations for Executive Action

We recommend that the U.S. Attorney General prepare a report to Congress on approaches to address the challenges law enforcement officials raised in this report regarding the constraints on the collection of data that inhibit the ability of law enforcement to conduct timely investigations.

To further enhance interagency collaboration in combating arms trafficking to Mexico and to help ensure integrated policy and program direction, we recommend the U.S. Attorney General and the Secretary of Homeland Security finalize the Memorandum of Understanding between ATF and ICE and develop processes for periodically monitoring its implementation and making any needed adjustments.

To help identify where efforts should be targeted to combat illicit arms trafficking to Mexico, we have several recommendations to improve the gathering and reporting of data related to such efforts, including that

- the U.S. Attorney General direct the ATF Director to regularly update ATF's reporting on aggregate firearms trafficking data and trends;

- the U.S. Attorney General and the Secretary of Homeland Security, in light of DHS's recent efforts to assess southbound weapons smuggling trends, direct ATF and ICE to ensure they share comprehensive data and leverage each other's expertise and analysis on future assessments relevant to the issue; and

- the U.S. Attorney General and the Secretary of Homeland Security ensure the systematic gathering and reporting of data related to results of these efforts, including firearms seizures, investigations, and prosecutions.

To improve the scope and completeness of data on firearms trafficked to Mexico and to facilitate investigations to disrupt illicit arms trafficking networks, we recommend that the U.S. Attorney General and the Secretary of State work with the Government of Mexico to expedite the dissemination of eTrace in Spanish across Mexico to the relevant

ATF AR 0094

Government of Mexico officials, provide these officials the proper training on the use of eTrace, and ensure more complete input of information on seized arms into eTrace.

To support the 2009 Southwest Border Counternarcotics Strategy, we recommend the ONDCP Director ensure that the implementation plan for the arms trafficking chapter of this strategy (1) identifies needs and clearly defines objectives for addressing those needs, (2) identifies roles and responsibilities for meeting objectives that leverage the existing expertise of each relevant agency, (3) ensures agencies are provided guidance on setting funding priorities and providing resources to address those needs, (4) establishes mechanisms to facilitate coordination across agencies, and (5) employs monitoring mechanisms to determine and report on progress toward objectives and identifies needed improvements.

## Agency Comments and Our Evaluation

We provided a draft of this report to the Departments of Homeland Security, Justice, and State and to the Office of National Drug Control Policy. DHS and State provided written comments, which are reproduced in appendixes III and IV.

DHS generally agreed with our recommendations; however, DHS raised questions regarding our interpretation of certain data and the relationship between ICE and ATF. We disagree that our presentation of the data is misleading, and the evidence in the report clearly demonstrates coordination problems between ICE and ATF.

State agreed with our recommendation that the U.S. Attorney General and the Secretary of State work with the Government of Mexico to expedite the dissemination of eTrace in Spanish across Mexico to the relevant Government of Mexico officials, provide these officials the proper training on the use of eTrace, and ensure more complete input of information on seized arms into eTrace. In addition, State added that the agency is funding a $5 million Forensics Laboratories project with the Government of Mexico's Office of the Attorney General (PGR) for the successful investigation and prosecution of criminal cases. This funding, State said, will be used to provide state-of-the-art equipment and training, which directly support DOJ and DHS efforts in the disruption of firearms.

DOJ provided no formal departmental comment on the draft of this report. However, ATF and DEA provided technical comments, which we incorporated throughout the report where appropriate.

ATF AR 0095

DHS and ONDCP also provided technical comments on our report, which we incorporated throughout the report where appropriate.

We are sending copies of this report to interested congressional committees and to the Attorney General, the Secretaries of Homeland Security and State, and the Director of the Office of National Drug Control Policy. The report also is available at no charge on the GAO Web site at http://www.gao.gov.

If you or your staff members have any questions about this report, please contact me at (202) 512-4128 or fordj@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. Other GAO contacts and staff acknowledgments are listed in appendix V.

Jess T. Ford
Director, International Affairs and Trade

ATF AR 0096

# Appendix I: Scope and Methodology

To identify data available on types of firearms trafficked to Mexico and the sources of these arms, we consulted U.S. and Mexican government databases, as well as research prepared by nongovernmental entities. We relied primarily on the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) data compiled by its National Tracing Center (NTC) since it contained the most detailed information on the types of illicit firearms seized in Mexico and where they had originated. NTC data on firearms seized in Mexico, however, is not comprehensive. The data is based chiefly on trace information submitted through ATF's eTrace system. As mentioned earlier in this report, over the last 5 years, about one-quarter to one-third of the illicit firearms seized in Mexico had information submitted through eTrace, and not all of these were successfully traced. Notwithstanding its limitations, NTC data was sufficiently reliable to permit an analysis of where the firearms seized in Mexico that could be traced had been manufactured and whether they had been imported into the United States before arriving in Mexico. For those arms that were traced to a retail dealer in the United States before being trafficked to Mexico, NTC data also contained information on the states where they had originated. Based on the trace data and discussions with ATF and other law enforcement officials, we were able to develop an analysis of the type of retail transactions involved in the initial marketing of the firearms in the United States before they were trafficked to Mexico.

NTC trace data also contained information allowing identification of the types of firearms (e.g., caliber and model) that were most commonly seized in Mexico and subsequently traced. We corroborated this information in extensive discussions with U.S. and Mexican law enforcement officials. However, as noted earlier in the report, because firearms seized in Mexico are not always submitted for tracing within the same year they were seized, it was not possible for us to develop data to track trends on the types of firearms trafficked or seized. Similarly, we were unable to obtain quantitative data from U.S. or Mexican government sources on the users of illicit firearms in Mexico. However, there was consensus among U.S. and Mexican law enforcement officials that most illicit firearms seized in Mexico had been in the possession of organized criminal organizations linked to the drug trade. The involvement of criminal organizations involved in drug trafficking in the trafficking of illicit firearms into Mexico was confirmed by law enforcement intelligence sources.

To learn more about trends in illicit firearms seizures in Mexico, we obtained data from the Mexican Federal Government's Planning, Analysis and Information Center for Combating Crime—*Centro Nacional de*

ATF AR 0097

*Planeación, Análisis e Información para el Combate a la Delincuencia*—
(CENAPI) on seizures from 2004 to the first quarter of 2009. To determine
the geographical distribution of firearms seized in Mexico, we obtained
data from CENAPI on seizures by Mexican federal entity—31 states and
the Federal District of Mexico City. We did not assess the reliability of data
provided by CENAPI, but we considered this data generally acceptable to
provide an overall indication of the magnitude and nature of the trends in
arms seizures since 2004.

To identify key challenges confronting U.S. government efforts to combat
illicit sales of firearms in the United States and to stem the flow of these
arms across the Southwest border into Mexico, we interviewed cognizant
officials from the Department of Justice's (DOJ) ATF, Executive Office for
U.S. Attorneys (EOUSA), and the Drug Enforcement Administration
(DEA); the Department of Homeland Security's (DHS) U.S. Immigration
and Customs Enforcement (ICE) and U.S. Customs and Border Protection
(CBP); and the Department of State (State) regarding their relevant efforts.

We reviewed and analyzed DOJ and DHS documents relevant to U.S.
government efforts to address arms trafficking to Mexico, including
funding data provided to us by ATF, CBP, and ICE; the 1978 Memorandum
of Understanding (MOU) between CBP and ATF and a draft version of a
revised MOU between ATF and ICE; data from ATF, CBP, and ICE on
firearms seizures; data from ATF and ICE on efforts to investigate and
prosecute cases involving arms trafficking to Mexico; and agency reports
and assessments related to the issue. We also reviewed relevant prior GAO
reports, Congressional Research Service (CRS) reports and
memorandums, and reports from DOJ's Office of Inspector General related
to ATF's efforts to enforce federal firearms laws. We reviewed provisions
of federal firearms laws that agency officials identified as relevant to U.S.
government efforts to address arms trafficking to Mexico, including the
Gun Control Act of 1968, the National Firearms Act of 1934, and the Arms
Export Control Act of 1976. We did not review Mexican firearms laws and
to the extent that we comment on these in this report, we relied on
secondary sources.

To explore challenges faced by U.S. agencies collaborating with Mexican
authorities to combat illicit arms trafficking, we visited U.S.-Mexico border
crossings at Laredo and El Paso, Texas, and San Diego, California. In these
locations, we interviewed ATF, CBP, DEA, and ICE officials responsible
for overseeing and implementing efforts to stem the flow of illicit arms
trafficking to Mexico and related law enforcement initiatives. We observed
U.S. government efforts to develop and share intelligence related to arms

ATF AR 0098

trafficking to Mexico at the El Paso Intelligence Center. We also conducted fieldwork in Mexico City, Monterrey, Nuevo Laredo, and Tijuana, Mexico. In Mexico, we met with ATF, CBP, DEA, ICE, and State officials working on law enforcement issues at the U.S. embassy and consulates. We interviewed Mexican government officials engaged in efforts to combat arms trafficking from the Attorney General's Office (*Procuraduría General de la República*), including CENAPI; the Ministry of Public Safety (*Secretaria de Seguridad Pública*); the Ministry of Defense (*Secretaría de la Defensa Nacional*); and Customs (*Servicio de Administración Tributaria*). Since we did not conduct fieldwork in a generalizeable sample of locations along the Southwest border and in the interior of Mexico, our observations in these locations are illustrative but may not be representative of all efforts to address the issue.

To assess the U.S. government's strategy for addressing the issue of arms trafficking to Mexico we reviewed strategic planning, internal guidance, policy, and procedures documents for relevant agencies and departments. Following the March 2009 decision to include a chapter on arms trafficking in the Southwest Border Counternarcotics Strategy, we met with Office of National Drug Control Policy (ONDCP) officials to discuss development of this document, and obtained a general overview. ONDCP officials also arranged for one of our team members to review the draft document.

Finally, to assess the reliability of data provided by ATF, CBP, and ICE on funding for efforts to address arms trafficking to Mexico, seizures of southbound firearms, and cases involving arms trafficking to Mexico, we reviewed and discussed the sources of the data with agency officials. We determined the program and project information provided to us were sufficiently reliable to provide an overall indication of the magnitude and nature of the illicit firearms trade and of the completeness of data agencies have related to their efforts to address the issue. Any financial data we reported were for background purposes only.

ATF AR 0099

# Appendix II: Geographic Distribution of Firearms Seized and Traced

Western Hemisphere Subcommittee staff requested that we compare data on firearms seizures in Mexico and ATF firearms trace data to determine if ATF's trace data reflected the geographic distribution of firearms seizures in that country. Our analysis indicates that there is a strong positive correlation between the data we obtained from CENAPI on seizures by Mexican federal entity—that is, 31 states and the Federal District of Mexico City[1]—for calendar year 2008, and ATF's firearms trace data linked to specific Mexican federal entities for fiscal year 2008. Eight of the top 10 Mexican federal entities for firearms seizures in 2008, according to CENAPI data—Baja California, Chihuaha, Guanajuato, Jalisco, Michoacan, Oxaca, Tamaulipas, and the Federal District of Mexico City—also showed up among the top 10 Mexican federal entities where firearms traced by ATF were seized. Figure 8 shows that the Mexican federal entities where most firearms are seized are very similar to those submitting the most firearms trace requests.

---

[1]Mexico City, the capital of Mexico, is not a "state," but rather a unique jurisdiction within the Republic of Mexico known as the "Federal District." It is comparable to the District of Columbia in the United States.

GAO-09-709 Firearms Trafficking

ATF AR 0100

Figure 8: Firearms Seized in Mexican States in 2008 and Illicit Firearms Traced to Mexican States (Fiscal Year 2008)



Sources: (left to right) GAO analysis based on CENAPI data; GAO analysis based on ATF data.

## Methodology

In order to determine the geographic distribution of firearms seized in Mexico, we obtained data from CENAPI on seizures, by Mexican federal entity. According to CENAPI data, a total of 29,824 firearms were seized in Mexico in 2008. In order to ascertain the geographic distribution of firearms seized in Mexico that were traced by ATF, we obtained data from ATF linking firearms traced to the Mexican federal entities where they were seized. In fiscal year 2008, ATF traced 7,198 firearms seized in Mexico. Of these, 6,854 were linked to specific states or the Federal District. However, 344 firearms were traced in fiscal year 2008 that could not be linked to a specific state where they may have been seized. We excluded these from our analysis.

We ranked the Mexican states and Federal District by the number of firearms seized according to the data provided by CENAPI, and we ranked them a second time according to the trace data provided by ATF. We then compared the two sets of data using a correlation analysis. See figure 9 below. The correlation coefficient for the data was 0.85, indicating a strong positive correlation. We also performed a correlation analysis for

ATF AR 0101

the raw data—that is, the number of firearms seized in Mexico, and the number of firearms traced by ATF, by Mexican federal entity. The correlation coefficient for those two sets of data was 0.79. We also examined the ratio of arms seized to arms traced and this ranged from .03 to 1.78. Figure 9 shows a strong positive correlation between the number of firearms seized in Mexico and the number of firearms traced by ATF, by Mexican federal entity.

ATF AR 0102



Figure 9: Correlation Between the Number of Firearms Seized in Mexico and the
Number of Firearms Traced by ATF, by Mexican Federal Entity



Sources: GAO analysis based on data provided by CENAPI and ATF.

ATF AR 0103

# Appendix III: Comments from the Department of Homeland Security

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



U.S. Department of Homeland Security
Washington, DC 20528

## Homeland Security

June 9, 2009

Mr. Jess T. Ford
Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Ford:

RE: Draft Report GAO-09-709, Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges (GAO Job Code 320599)

The Department of Homeland Security (DHS) appreciates the opportunity to review and comment on the U.S. Government Accountability Office's (GAO's) draft report referenced above. The GAO made three recommendations to DHS. The Department agrees with them although Immigration and Customs Enforcement (ICE) officials question some of GAO's assertions.

DHS officials separately question the statistic involving the origination of weapons as currently presented by GAO. GAO asserts that, "Available evidence suggests most firearms recovered in Mexico come from U.S. gun dealers, and many support Drug Trafficking Organizations" and fuel Mexican drug violence. Using the Department of Justice's Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) eTrace data, GAO determined that about 87 percent of firearms seized by Mexican authorities and traced from fiscal years 2004 to 2008 originated in the United States. DHS officials believe that the 87 percent statistic is misleading as the reference should include the number of weapons that could not be traced (i.e., out of approximately 30,000 weapons seized in Mexico, approximately 4,000 could be traced and 87 percent of those – 3,480 – originated in the United States.) Numerous problems with the data collection and sample population render this assertion as unreliable.

See comment 1.

<u>Recommendations</u>

To further enhance interagency collaboration in combating arms trafficking to Mexico and help ensure integrated policy and program direction, GAO recommends that the U.S. Attorney General and the Secretary of Homeland Security finalize the Memorandum of Understanding between ATF and ICE, and develop processes for periodically monitoring its implementation and making any needed adjustments.

www.dhs.gov

ATF AR 0104

2

The DHS, in particular ICE, agrees with the recommendation. In April 2009, ATF and ICE officials met to finalize a draft version of the proposed Memorandum of Understanding (MOU). The draft is awaiting approval and signature by ICE and ATF officials. A revised MOU will update the formal partnership between ATF and ICE relative to each entities investigative efforts and jurisdiction. The proposed MOU articulates the procedures to be followed by each entity in accordance with the authorities vested in each entity by Congress. The mutual goal is to keep the public safe by using those tools given to each entity, either through statute or regulation, which are vital to the effective control of the domestic and international trafficking of munitions.

ICE is committed to working with ATF to more effectively utilize Federal investigative resources and enforce statutes and regulations within each entity's jurisdiction. In situations where respective mission efforts coincide, the MOU will serve to coordinate how each entity will pursue their respective investigations to optimize the use of resources and minimize duplication of efforts.

To help identify where efforts should be targeted to combat illicit arms trafficking to Mexico, GAO made two recommendations to DHS designed to improve the gathering and reporting of data related to these efforts: (1) the U.S. Attorney and the Secretary of Homeland Security, in light of DHS's recent efforts to assess southbound weapons smuggling trends, direct ATF and ICE to coordinate any future assessments relevant to the issue; and (2) the U.S. Attorney and the Secretary of Homeland Security ensure the systematic gathering and reporting of data related to results of these efforts, including firearms seizures, investigations, and prosecutions.

See comment 2.

See comment 3.

ICE agrees with the first recommendation immediately above and will continue to coordinate with ATF on any future assessments, as ICE did most recently in the assessment completed in March 2009. ICE also agrees with the second recommendation to improve the gathering and reporting of specific data. ICE's law enforcement database enables the agency to capture, track, and provide statistical information on all ICE investigations, as well as associate seizures and enforcement actions against individuals linked to criminal behavior. ICE will continue to enhance law enforcement systems and data management activities in furtherance of executive reporting capabilities.

ICE and CBP Comments on the Draft Report Narrative

ICE officials question some of GAO's conclusions regarding ICE's efforts to combat arms trafficking to Mexico and do not believe GAO has sufficient facts to reach certain conclusions.

GAO concludes that ICE and ATF "do not effectively coordinate their efforts, in part because the agencies lack clear rules and responsibilities...additionally, agencies generally have not systematically gathered, analyzed, and reported data that could be useful to help plan and assess results of their efforts to address arms trafficking to Mexico." While GAO finds a few isolated instances in which ICE and ATF have not adequately coordinated investigative activities, coordination actually occurs frequently.

ATF AR 0105

3

ICE presented considerable evidence to the GAO audit team of joint coordination between ICE and ATF and can share this information with the Congressional requesters. Of note, the two entities share actionable information daily through a variety of venues: the gun desk at the El Paso Intelligence Center, the Border Enforcement Security Task Forces, and in field offices.

See comment 4.

The conclusion that the agencies/entities "lack clear roles and responsibilities" is not supported by the excellent working relationship ICE and ATF enjoy. ICE officials believe ATF personnel recognize ICE's statutory authority to enforce anti-smuggling and export control laws long used to prevent the illegal cross-border movement of firearms and other contraband to and from Mexico. Similarly, ICE personnel recognize ATF's role in investigating the illegal smuggling of weapons into the United States and enforcing the Gun Control Act.

See comment 5.

GAO opines in the draft report that ICE "lacks systematic gathering and recent analyses of firearms trafficking data and trends that could be used to more fully assess the problem and plan efforts." GAO however does not identify a single instance in which ICE personnel were unable to pursue an investigation because they were unsure of their ability to enforce the law.

U.S. Customs and Border Protection (CBP) officials had comments on GAO statements related to the DHS component. GAO found that while individual agency efforts may serve to combat arms trafficking to Mexico to some degree, they are not part of a comprehensive U.S. government-wide strategy for addressing the problem. GAO identified several key elements that should be a part of any strategy, including needs assessments, objectives and funding targeted to meet these objectives, clear roles and responsibilities, and mechanisms to ensure coordination and assess results. Specific to CBP, GAO states that CBP's current strategic plan has no goals specific to arms trafficking to Mexico.

See comment 6.

CBP's Strategic Plan is a high level document and as such, does not get into the specifics of which type of contraband nor which country to focus on. The Strategic Plan states that "At the ports of entry, CBP's Office of Field Operations secures the flow of people and goods into and out of the country, while facilitating legitimate travel and trade." The strategic plan was not meant to get into specifics. This section of the draft report is misleading the reader to believe that because a high level document does not mention Mexico or firearms, CBP will not address the threat of firearms exports to Mexico or any other country.

Sincerely,

*Jerald E. Levine*

Jerald E. Levine
Director
Departmental GAO/OIG Liaison Office

ATF AR 0106

The following are GAO's comments on the Department of Homeland
Security's letter dated June 9, 2009.

## GAO Comments

1. We disagree that our use of the 87 percent statistic is misleading. Our
   report clearly states that the number of firearms traced by ATF
   represents a percentage of the overall firearms seized in Mexico. More
   importantly, ATF trace data for each year since 2004 identified that
   most of the firearms seized in Mexico and traced came from the United
   States. Our recommendation to the U.S. Attorney General and the
   Secretary of State to expedite further enhancement of eTrace and
   work with the Government of Mexico to expand its use is designed to
   shed further light on the origin of guns seized in Mexico.

2. We have added additional information to the text of the report to
   clarify ATF's role in DHS's recent assessment. While ICE stated it
   worked closely with ATF intelligence staff in developing the
   assessment, the senior ATF intelligence official ICE cited as its
   primary ATF contact for the assessment told us that ATF provided
   some information to ICE for its assessment, but ATF was not asked to
   provide comprehensive data and analysis or significant input into the
   assessment's overall findings and conclusions. We found the
   assessment only includes a subset of trace statistics we were able to
   obtain from ATF on firearms recovered in crime in Mexico and traced
   over the last 5 years. The senior ATF intelligence official told us that it
   would make sense for future assessments to be developed jointly, in
   order to leverage more comprehensive data and analysis available
   from both agencies; however, he noted that until both agencies
   improve their interagency coordination, developing a joint assessment
   was unlikely.

3. We did not comment in the report on whether any of ICE's databases
   enable the agency to capture, track, and provide statistical information
   on all ICE investigations, as well as associate seizures and
   enforcement actions against individuals linked to criminal behavior.
   However, as we noted in the report, ICE was unable to provide
   comprehensive statistical information specifically on cases involving
   arms trafficking to Mexico.

4. Contrary to DHS's assertion that ICE and ATF enjoy an excellent
   working relationship in their efforts to combat arms trafficking to
   Mexico, ATF, ICE, and State officials we met with along the Southwest
   border, in Mexico, and at headquarters cited problems with ATF and
   ICE working well together. These officials included senior officials at

ATF AR 0107

ICE's Office of International Affairs in Washington, from ICE's Attaché office in Mexico City, and from ICE's office at the U.S. Consulate in Tijuana, Mexico.

5. It was not within the scope of our audit to review specific ICE investigations or their disposition, and we did not comment on this in our report. Our report noted that, in general, ICE was not able to provide comprehensive data to us related to its efforts to address arms trafficking to Mexico. For instance, ICE was not able to provide complete data on the seizure of firearms destined for Mexico, the number of cases it initiated related to arms trafficking to Mexico, or the disposition of cases ICE submitted for prosecution. Also, DHS's recent assessment of southbound weapons smuggling trends, which could be used to better understand the nature of the problem and to help plan and assess ways to address it, notes that it "does not provide an all inclusive picture of...firearms smuggling" from the United States to Mexico. In addition, as we noted in comment 2, it only contains a subset of the data we were able to obtain from ATF relevant to the issue.

6. As noted in the report, GAO has found that one of the key elements that should be part of any strategy is clearly identifying an agency's objectives and establishing mechanisms for determining progress toward those objectives. Neither CBP's strategic plan, nor other CBP reports and publications, make mention of illicit firearms, focusing instead on other CBP efforts screening people and goods entering the United States. However, our report noted that CBP is involved in new Southwest border initiatives announced by DHS to significantly increase DHS presence along the border, including conducting more southbound inspections at ports of entry, among other efforts.

ATF AR 0108

# Appendix IV: Comments from the Department of State

Note: GAO comments supplementing those in the report text appear at the end of this appendix.



**United States Department of State**

*Assistant Secretary for Resource Management and Chief Financial Officer*

*Washington, D.C. 20520*

JUN 0 5 2009

Ms. Jacquelyn Williams-Bridgers
Managing Director
International Affairs and Trade
Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20548-0001

Dear Ms. Williams-Bridgers:

We appreciate the opportunity to review your draft report, "FIREARMS TRAFFICKING: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges," GAO Job Code 320599.

The enclosed Department of State comments are provided for incorporation with this letter as an appendix to the final report.

If you have any questions concerning this response, please contact Ernesto Hernandez, Military Advisor, Bureau of International Narcotics and Law Enforcement Affairs at (202) 647-0198.

Sincerely,

James L. Millette

cc:   GAO – Addison Ricks
      INL – William McGlynn
      State/OIG – Mark Duda

ATF AR 0109

### Department of State Comments on Draft GAO Report

#### FIREARMS TRAFFICKING: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges (GAO- 09-709, GAO Code 320599)

Thank you for allowing the Department of State the opportunity to comment on the draft report, *"Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges."*

#### Recommendation for the Secretary of State:

To improve the scope and completeness of data on firearms trafficked to Mexico and to facilitate investigations to disrupt illicit arms trafficking networks, GAO recommends that the U.S. Attorney General and the Secretary of State work with the Government of Mexico to expedite the dissemination of eTrace in Spanish across Mexico to the relevant Government of Mexico officials, provide these officials the proper training on the use of eTrace, and ensure more complete input of information on seized arms into eTrace.

#### Response:

See comment 1.

The Department of State concurs with GAO's recommendation. The Department is supporting the Department of Justice Alcohol Tobacco and Firearms' (ATF) efforts to develop a Spanish-language version of the Internet-based Firearms Tracing and Analysis (eTrace), and will work with them to help make sure it is quickly disseminated throughout not only Mexico, but also throughout the Spanish-speaking countries. Additionally, the Department is funding a $5 million Forensics Laboratories project with the Office of the Attorney General (PGR) for the successful investigation and prosecution of criminal cases. This funding will be used to provide state-of-the-art equipment and training in such areas as collection and preservation of evidence, chemical/biological analysis, computer forensics, and an Integrated Ballistics Identification System (IBIS) which directly supports Department of Justice (DOJ) and Department of Homeland Security (DHS) efforts in the disruption of firearms. IBIS will complement the ATF's eTrace by tracing the origin of U.S source firearms recovered from Mexican criminal investigations.

ATF AR 0110

Appendix IV: Comments from the Department of State

The following are GAO's comments on the Department of State's letter dated June 5, 2009.

## GAO Comments

1. State agreed with our recommendation that the U.S. Attorney General and the Secretary of State work with the Government of Mexico to expedite the dissemination of eTrace in Spanish across Mexico to the relevant Government of Mexico officials, provide these officials the proper training on the use of eTrace, and ensure more complete input of information on seized arms into eTrace. In addition, State added that the department is funding a $5 million Forensics Laboratories project with the Government of Mexico's Office of the Attorney General (PGR) for the successful investigation and prosecution of criminal cases, and we incorporated this information into the report.

ATF AR 0111

# Appendix V: GAO Contact and Staff Acknowledgments

| GAO Contact | Jess T. Ford (202) 512-4128 or fordj@gao.gov |
|---|---|
| **Staff Acknowledgments** | In addition to the individual named above, Juan Gobel, Assistant Director; Joe Carney; Virginia Chanley; Matt Harris; Elisabeth Helmer; Grace Lui; and J. Addison Ricks provided key contributions to this report. Technical assistance was provided by Joyce Evans, Theresa Perkins, Jena Sinkfield, and Cynthia Taylor. |

ATF AR 0112

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday afternoon, GAO posts on its Web site newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to www.gao.gov and select "E-mail Updates." |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's Web site, http://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: www.gao.gov/fraudnet/fraudnet.htm<br>E-mail: fraudnet@gao.gov<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, DC 20548 |



Please Print on Recycled Paper

ATF AR 0113

DIANNE FEINSTEIN
CALIFORNIA



SELECT COMMITTEE ON INTELLIGENCE - CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510-0504

http://feinstein.senate.gov

June 11, 2009

The Honorable Eric H. Holder, Jr.
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Dear Attorney General Holder:

I am writing today to bring to your attention a loophole in Department of Justice regulations governing the purchase of firearms. Specifically, I am asking that you change the regulation that requires Federal Firearms Licensees (FFLs) to report the sale of multiple pistols and revolvers. The regulations should be changed to require FFLs to report the multiple sales of **all** firearms and destructive devices defined under Chapter 18 of the United States Code § 921, not just pistols and revolvers. In addition, FFLs should be required to report multiple sales of two or more firearms within 30 days, instead of the current five business day period. These regulatory changes would allow the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) to track all firearms purchases at different locations in order to identify when one buyer is making several bulk purchases. This tracking would provide the ATF and local law enforcement with the ability to identify potential gun smugglers and other criminals.

Currently, as written, the regulation allows gun traffickers to buy a handgun every sixth business day and acquire a significant number of handguns for illegal resale without any multiple sale notification to law enforcement. Even with the current requirement that FFLs forward this information to either the state police or local law enforcement agency that has jurisdiction in the area where the sale occurred, the reporting form is not required for any other firearms sales other than handguns.

I do not believe that anyone needs to make multiple firearms purchases without the Federal government or local law enforcement knowing about it. As a former Mayor who saw firsthand what happens when guns fall into the hands of criminals, juveniles, and the mentally ill, I believe that this regulation should be changed. I appreciate your attention to this matter and I look forward to your response.

Sincerely,

Dianne Feinstein
United States Senator

# A BLUEPRINT FOR FEDERAL ACTION ON ILLEGAL GUNS:

## REGULATION, ENFORCEMENT, AND BEST PRACTICES TO COMBAT ILLEGAL GUN TRAFFICKING

RECOMMENDATIONS FROM MAYORS AGAINST ILLEGAL GUNS
AUGUST 2009

© 2009. Mayors Against Illegal Guns.
All Rights Reserved.

ATF AR 0115

# TABLE OF CONTENTS

**Executive Summary** ............................................................................................... 1

**I.   Improving Gun Background Checks** ................................................................. 5

   A. Reporting NICS Rejections to State and Local Law Enforcement Agencies ................... 5

   B. REAL ID and Gun Purchases ................................................................. 6

   C. Electronic Validation of Identification ...................................................... 6

   D. Background Checks for Employees of Gun Dealers ........................................ 7

   E. Dealer Inventory Liquidations in the Wake of License Revocations ........................ 7

   F. Transfers From FFL Inventory to FFLs' Personal Collections ............................. 8

   G. Maintaining Data on Default Proceed Sales ............................................... 9

**II.  Policing Problematic Gun Shows** ................................................................... 11

   A. Gun-Tracing and Tracking Information on Gun Shows .................................... 11

   B. Criminal Enforcement Operations at Problematic Shows ................................. 12

   C. Investigating Problematic Private Sellers ................................................. 12

   D. Residency Checks for Persons Purchasing Firearms at Gun Shows ....................... 13

**III. ATF Resources and Structure** ...................................................................... 14

   A. Mexican Trafficking and Border Resources .............................................. 15

   B. Deputy Chief for Interstate Firearms Trafficking ........................................ 16

   C. Administrative Enforcement and Dealer Inspections ...................................... 16

   D. Administrative Enforcement and Undercover Investigations .............................. 17

   E. Lost and Stolen Guns ..................................................................... 18

   F. Task Force Officers ....................................................................... 20

**IV. More Effective Crime Gun Tracing** ................................................................ 21

   A. Tactical Trace Analysis ................................................................... 21

   B. Dealer Response to Trace Requests ....................................................... 22

   C. Dealer Records of Gun Trace Requests ................................................... 23

   D. Obliteration of Gun Serial Numbers ...................................................... 23

   E. Standardizing the Serial Number System ................................................. 24

ATF AR 0116

**V.  More Effective Partnerships Among Government, Law Enforcement, Community Groups, and Responsible Gun Industry Representatives** ................. 25

    A.  Improving Project Safe Neighborhood and Other Community Engagement Initiatives Focused on Gun Violence ............................................................. 25

    B.  Partnerships with Gun Dealers................................................................................. 26

    C.  Research and Analysis of Gun Trafficking Methods and Patterns...................................... 27

    D.  Gun Safety Locks Requirement................................................................................ 29

**VI.  Enforcement of Existing Laws on Especially Dangerous Firearms** ....................... 30

    A.  Ban on the Importation of Non-sporting Purpose Firearms............................................... 30

    B.  Multiple Purchases of Long Guns Commonly Used in Crimes........................................... 30

    C.  Stinger Pen Guns.................................................................................................. 31

**Endnotes**................................................................................................................ 32

**Appendix A:  Chart of Recommendations** ........................................................................ 39

**Appendix B:  Mayors Against Illegal Guns Federal Legislative Agenda** ...................... 45

**Appendix C:  Sample Background Check Form 4473** ....................................................... 46

ATF AR 0117

# EXECUTIVE SUMMARY

**"We've got to enforce the gun laws that are on the books."**
— Senator Barack Obama, July 12, 2007

**"NRA also supports enforcing the U.S. laws that are already on the books, to harshly punish anyone who engages in smuggling firearms."**
— NRA Executive Director Chris W. Cox, March 12, 2009

**"In the end, the vast majority of Americans – including gun enthusiasts – want to see our laws enforced so that violent offenders are caught and punished."**
—Senator Orrin Hatch, April 29, 2009

**"One good place to start would be to enforce the laws that are on the books right now."**
— House Speaker Nancy Pelosi, February 26, 2009

**"We want to enforce the laws that we have on the books."**
— Attorney General Eric Holder, Congressional testimony, May 14, 2009

For many years, leaders of the gun lobby have urged law enforcement professionals to "enforce the laws on the books." Elected officials of all political stripes have joined that call. While the 450-plus members of Mayors Against Illegal Guns believe that Congress needs to close major gaps in federal laws,[1] we believe with equal strength that the executive branch needs to more effectively enforce existing gun laws. The coalition has identified 40 opportunities in six areas where the Administration could enhance enforcement of existing laws without Congressional action. These recommendations would dramatically improve law enforcement's ability to keep guns out of the hands of criminals – and, in doing so, save innocent lives, including the lives of police officers.

The coalition recommends action involving seven federal agencies: Federal Bureau of Investigation (FBI), Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), Department of Justice (DOJ), Department of Homeland Security (DHS), the White House Office of Management and Budget (OMB), the Consumer Product Safety Commission (CPSC), and the State Department. Specifically, these agencies should implement 40 different recommendations in six areas:

I. IMPROVING GUN BACKGROUND CHECKS:

    1. Notify federal, state, and local law enforcement when someone fails a background check (FBI, ATF);
    2. Prioritize rejected purchases for investigation and prosecution (DOJ, FBI, ATF);
    3. Require secure identification for gun purchases (DHS, OMB);
    4. Electronically verify state-issued identification (FBI);

ATF AR 0118

5. Process background checks for employees of federally licensed dealers at the licensees' request (ATF, FBI);
6. Perform background checks on employees of federally licensed dealers during audit inspections (ATF, FBI);
7. Notify dealers stripped of their licenses that they will continue to be "engaged in the business" if they dispose of inventory in significant quantities for profit (DOJ, ATF);
8. Enforce the requirement that dealers notify ATF whenever they transfer more than one handgun to their personal collections (ATF);
9. Maintain NICS records of default proceed sales to persons on the terrorist watch list for 20 years and all other records of default proceed sales for six months (ATF, FBI).

## II. POLICING PROBLEMATIC GUN SHOWS:

10. Identify which guns were sold at gun shows when tracing crime guns (ATF);
11. Conduct criminal enforcement operations at shows suspected to be major sources of illegally trafficked guns (ATF);
12. Increase enforcement activities to deter sales to prohibited purchasers by unlicensed sellers (ATF);
13. Investigate private sellers at gun shows who appear to be unlawfully engaged in the business (ATF);
14. Conduct comprehensive residency checks on buyers at gun shows known to be major sources of illegal guns (ATF).

## III. SUPPLEMENTING ATF RESOURCES AND IMPROVING ITS STRUCTURE:

15. Increase resources to deter cross-border trafficking to Mexico (DOJ, ATF, DHS, OMB, State Department, Congress);
16. Establish an Interstate Firearms Trafficking Unit run by a Deputy Chief for Interstate Firearms Trafficking (ATF, DOJ, OMB);
17. Increase the number of ATF Inspectors who audit federal firearms licensees (DOJ, ATF, OMB);
18. Enforce license revocations when dealers' administrative appeals are exhausted (ATF);
19. Expand undercover investigations to assess dealer compliance with straw purchasing laws (ATF);
20. Mandate investigation of all incidents involving the theft of 5 or more handguns (ATF);
21. Require federal firearms licensees to report firearm thefts from common carriers and bonded warehouses (ATF);
22. Publish annual reports on lost and stolen guns (DOJ, ATF);
23. Support 250 additional state and local law enforcement officers to be assigned to ATF Task Forces (DOJ, ATF, OMB).

IV. **MORE EFFECTIVE CRIME GUN TRACING:**

24. Create a new Office of Tactical Trace Analysis at the National Tracing Center (ATF, DOJ, OMB);
25. Determine which dealers have a high number of traces compared to their sales volume (ATF);
26. Send a demand letter, conduct an inspection, or require a sworn statement when a federally licensed dealer fails to answer a trace request (ATF);
27. Require dealers to maintain copies of trace requests and their responses (ATF, OMB);
28. Require guns to have a second, hidden serial number (ATF, OMB);
29. Require guns to have tamper-resistant serial numbers (ATF, OMB);
30. Require guns to have standardized serial numbers (ATF, OMB).

V. **MORE EFFECTIVE PARTNERSHIPS AMONG GOVERNMENT, LAW ENFORCEMENT, COMMUNITY GROUPS, AND RESPONSIBLE GUN INDUSTRY REPRESENTATIVES:**

31. Allocate more Project Safe Neighborhood funds to reduce recidivism among gun offenders (DOJ, OMB);
32. Increase support for community programs that generate intelligence about firearms trafficking (DOJ, OMB);
33. Promote Wal-Mart's Responsible Firearms Retailers Partnership as a voluntary program for gun dealers (ATF);
34. Produce updated versions of reports on firearms trafficking (DOJ, ATF);
35. Expand the scope of ATF's trace reports (DOJ, ATF);
36. Fund external research of emerging problems in gun trafficking (DOJ, ATF);
37. Develop industry standards for gun safety locks (CPSC).

VI. **ENFORCEMENT OF EXISTING LAWS ON ESPECIALLY DANGEROUS FIREARMS:**

38. Resume enforcement of the ban on the importation of non-sporting purpose firearms (DHS, ATF, DOJ);
39. Require dealers to report multiple sales of long guns most commonly linked to crime (ATF);
40. Subject purchasers of Stinger Pen Guns to stricter background checks and registration requirements by reclassifying Stinger Pen Guns under the National Firearms Act (ATF).

More than any other federal agency or department, ATF is charged with enforcing federal gun laws. Not surprisingly, the bulk of the recommendations in this memorandum involve ATF. These recommendations should not be read as calling into doubt the dedicated work and sacrifices

ATF AR 0120

of ATF personnel across the country. But, in recent years especially, the hard work of ATF agents in the field has been undermined by congressional restrictions, inadequate resources, and a lack of leadership from federal officials in Washington. We believe that by following this blueprint for executive action, the federal government can dramatically improve efforts to cut down on gun trafficking and reduce associated crime and murder.

What follows is a detailed discussion of each recommendation for more effective enforcement of existing gun laws. Appendix A lists each recommendation with a brief description of how it could be implemented, Appendix B describes the coalition's federal legislative agenda, and Appendix C is a sample background check form 4473.

## A Note on Methodology

Recommendations in this report are based upon discussions with elected officials, policy experts, and current and former federal, state, and local law enforcement officials, including ATF personnel. The recommendations were also guided by a review of reports, studies, court documents, and other material, including (1) hundreds of federal firearms prosecutions; (2) reports from government agencies, including ATF, FBI, and DOJ; (3) gun industry data on firearms production and sales; (4) studies by various experts and academics; and (5) media reports.

ATF AR 0121

# I. IMPROVING GUN BACKGROUND CHECKS

In 1993, Congress passed the Brady Handgun Violence Protection Act, which requires federally licensed firearms dealers (FFLs) to conduct background checks on all prospective firearms purchasers. In the last decade, the National Instant Criminal Background Check System (NICS) has been used to process over 100 million background checks and has blocked more than 700,000 illegal sales.[2] While the NICS system is a major success story, gaps remain that allow criminals and other prohibited purchasers to circumvent the background check requirement.

## A. Reporting NICS Rejections to State and Local Law Enforcement Agencies

**Recommendation 1:  The FBI should inform state and local law enforcement every time NICS reports that a prohibited person has attempted to purchase a firearm and, when appropriate, inform state mental health agencies when NICS rejects a buyer due to mental health.**

**Recommendation 2:  The Justice Department should identify which NICS rejections should be investigated and prosecuted.**

Background:  FBI and ATF do not have adequate guidelines about when and with whom to share information regarding NICS rejections.  In 2007, there were 87,474 attempted purchases blocked by NICS, 60 percent of them by felons.[3]  When persons who are legally prohibited from purchasing guns attempt to do so, federal law enforcement should communicate that red flag to the state and local authorities that may be best positioned to address the threat.  For example, if a prospective purchaser with a domestic violence conviction is rejected in an attempt to buy a gun in Cincinnati, that information may not be of great interest to the Justice Department, FBI, or ATF, but it could be essential information for local police.  Similarly, the FBI does not have guidelines for handling mental health file rejections.  The events at Virginia Tech demonstrated the potential for catastrophe when mentally ill individuals gain access to guns.[4]  Sharing data with state mental health agencies is critically important to public safety – including the safety of the individual with mental health problems seeking to acquire a firearm.

FBI should develop an email or other electronic alert system to report all NICS rejections to law enforcement in the jurisdictions covering both the dealer location and the address associated with a rejected buyer.  In the case of rejections due to mental health, FBI should also share that information with state mental health agencies.

In addition, persons who try to buy guns but fail a NICS check almost certainly will have committed a federal felony by falsely certifying on background check Form 4473[5] that they were not a prohibited purchaser.  Very few of these cases are pursued.  In 2005, FBI referred 67,713 such cases to ATF, but U.S. Attorneys ultimately prosecuted only 135 of them.[6]  The Justice Department should develop a national risk assessment instrument based

ATF AR 0122

on a review of several thousand randomly selected persons rejected by NICS over a five-year period to identify factors most associated with risk of subsequent illegal activity. How many such persons later committed crimes? How many were involved in shootings? What characteristics are the strongest predictors of future crime? Answering these questions would help DOJ prioritize NICS rejections for investigation and prosecution.

## B. REAL ID and Gun Purchases

**Recommendation 3:** **The Department of Homeland Security (DHS) should require REAL ID-compliant identification for all gun purchases after December 1, 2014.**

Background: Bogus identification frustrates both NICS background checks and dealer recordkeeping requirements. In 2000 and 2001, the Government Accountability Office (GAO) attempted to use fake driver's licenses five times in different states to buy guns and succeeded in buying a gun from a licensed dealer in every case.[7] False identification is a particularly significant problem in southwest border states, where foreign nationals are illegally trafficking weapons and ammunition into Mexico. For example, in a recent criminal case, a Mexican citizen purchased firearms at least seven times from federally licensed dealers in Texas, each time falsely reporting that he was a Texas resident and presumably presenting false identification.[8]

One mechanism for verifying identification already exists. In 2005, Congress passed the REAL ID Act to ensure that more secure, tamper-resistant identification could be required for certain critical functions. Federal buildings and airports will start requiring REAL ID on December 1, 2014.[9] DHS should issue regulations clarifying that a NICS check in connection with a gun purchase is an "official purpose" for which the REAL ID Act requires specialized identification.

## C. Electronic Validation of Identification

**Recommendation 4:** **NICS should electronically verify the validity of and the name associated with any state-issued identification number provided on a background check Form 4473.**

Background: In addition to requiring tamper-resistant identification, the federal government should instantly and electronically verify a state-issued ID by checking motor vehicle records. The government has the capacity to do this by integrating motor vehicle data into the NICS system. Currently, FBI only checks the name of the buyer on the Form 4473 against lists of prohibited persons. FBI does not access data maintained by state agencies

ATF AR 0123

to see whether the state driver's license identification number provided on the form 4473 has expired or been reported stolen or whether the name associated with the identification number matches the name provided by the buyer.[10] Where a state identification number is known to be invalid, FBI should deny the sale. In cases where the name associated with the identification number does not match the name provided by the buyer on the 4473, FBI should delay the sale and refer it for further investigation.

### D. Background Checks for Employees of Gun Dealers

**Recommendation 5:** ATF should perform background checks on employees of federal firearms licensees at the licensees' request.

**Recommendation 6:** ATF should perform background checks on gun dealer employees during audit inspections.

Background: Under federal law, it is unlawful for a person prohibited from purchasing or possessing firearms to sell or handle firearms for an FFL. Unfortunately, there is no mechanism available for FFLs to voluntarily screen employees because FBI regulations prohibit FFLs from directly accessing NICS to conduct employee background checks.[11] Under current regulations, however, ATF could process employee checks on dealers' behalf under its authority to access NICS "in connection with a civil or criminal law enforcement activity relating to the Gun Control Act."[12] ATF should inform FFLs that voluntary checks are available and issue a new background check form modeled on Form 4473 to conduct such voluntary checks. In fact, Wal-Mart, the nation's largest gun seller, has already agreed to voluntarily check all employees and has asked ATF to conduct those checks in the NICS system.[13] As of the date of this memorandum, ATF is considering Wal-Mart's request.

In addition, when ATF reviews a dealer's files during an audit inspection, it should determine which employees are selling firearms and check each of those employees in NICS.[14] If ATF finds employees are prohibited purchasers, it should compel stores to dismiss, reassign or, if warranted, refer the employees for prosecution.

### E. Dealer Inventory Liquidations in the Wake of License Revocations

**Recommendation 7:** The Justice Department should notify dealers stripped of their licenses that they will continue to be "engaged in the business" if they dispose of inventory in significant quantities for profit.

ATF AR 0124

Background:  When ATF revokes a gun dealer's license for violating federal firearms laws, it nonetheless has allowed dealers to transfer their firearms inventory into "personal collections" and liquidate them in unregulated "fire-sales" without background checks or full recordkeeping – despite a federal law prohibiting unlicensed individuals from engaging in the business of selling firearms.  In 2006, after a Maryland gun dealer who had lost his license sued ATF, the Justice Department issued a new legal opinion stating that, "when a dealer loses his license he can dispose of his inventory by selling those firearms without being deemed to have engaged in the business in violation of 18 U.S.C. § 922(a)(1)(A). Plaintiff will only run afoul of Section 922(a)(1)(A) *if* he chooses to *purchase and resell* firearms."  The dealer was allowed to transfer more than 700 guns to his personal inventory and continue selling to the public without background checks.[15]

The position adopted by the Department in 2006 is not supported by a common sense reading of federal law.  The test for whether a gun seller requires a license cannot simply be whether the seller currently *has* a license.  Rather, the Justice Department should adopt a legal test based on whether an individual's firearms sales, by virtue of volume and other indicia, constitute being "engaged in the business" – regardless of whether the seller *has* a federal license, *once had* one or *never had* one.  In prosecutions of gun sellers charged with unlawfully selling without a license, the key indicia applied by federal courts to determine whether defendants are "engaged in the business" are sales of substantial numbers of guns[16] for profit.[17]  Other indicia include repeated sales of guns with price tags,[18] of guns in their original packaging,[19] or through advertising or by using professional signs or premises.[20] DOJ should apply these same legal tests to dealers stripped of their licenses.  Preventing continued gun sales to the public need not result in a financial loss to these dealers.  ATF should notify the subject dealer by letter that while continued sales to the public may constitute illegally engaging in the business, selling to other licensed dealers is a "safe harbor" for disposing of inventory.

## F.  Transfers From FFL Inventory to FFLs' Personal Collections

**Recommendation 8: ATF should fully enforce the requirement that dealers notify ATF within five business days whenever they transfer more than one handgun to an unlicensed person, including when dealers transfer more than one handgun to their own personal collections.**

Background:  Even outside the context of license revocations, ATF does not sufficiently monitor transfers of guns from gun dealers' store inventory to their personal gun collections or the subsequent sale of those guns, increasing the risk that some dealers may evade background check and recordkeeping requirements by making off-the-books sales. Generally FFLs must notify ATF whenever they transfer more than one handgun to an

ATF AR 0125

unlicensed person within five business days,[21] but ATF has not enforced this requirement when FFLs transfer handguns from store inventory to their own personal collections. In addition, under federal law, a licensed dealer is required to conduct background checks and maintain records of guns sold from his personal collection if the guns are sold within one year of the dealer transferring the guns from his licensed inventory to his personal collection. This requirement is difficult to enforce because dealers are not required to inform ATF of the date when they transfer guns from their licensed inventory to their personal collections. This loophole is particularly problematic at gun shows because – as observed by former ATF agents and academic researchers – FFLs are more likely to sell simultaneously from licensed inventory and personal collections at gun shows and can easily sell guns "off-the books" without conducting background checks.[22]

ATF should vigorously enforce the multiple handgun reporting requirement and ensure that dealers notify ATF whenever they transfer multiple handguns within five business days to a personal collection. If enforced, these multiple sales reports would identify the make, model, and serial number of each transferred handgun, along with the date of the transfer. This record would alert ATF to suspicious transfers, help to enforce the one-year background check requirement on subsequent sales, and simplify tracing if these guns were recovered in crimes.

In addition, if ATF suspects a dealer, based on tracing and other intelligence, of selling guns from his personal inventory without a background check within one year of their transfer, it should send a new, "Type III" Demand Letter[23] requiring dealers to notify ATF of any transfer into personal inventory by letter, fax, or email within five business days. Such reports should identify the make, model, and serial number of each transferred firearm.

## G. Maintaining Data on Default Proceed Sales

**Recommendation 9**: **ATF should maintain NICS records of default proceed sales to persons on the terrorist watch list for 20 years and all other records of default proceed sales for six months.**

Background: Although the Tiahrt Amendment appropriations riders requires the destruction of NICS records of approved sales within 24 hours, the riders do not apply to records of denials or to default proceed sales, where the background check is incomplete after three days and the sale goes forward. While records of denials have been consistently maintained and preserved by ATF, records of default proceed sales are only kept for 90 days.[24] According to data provided by the FBI, default proceed sales are more than 8 times more likely to be associated with a prohibited purchaser than sales where the purchaser's background check is resolved within three days.[25] Moreover, the 90-day destruction

ATF AR 0126

deadline built into current regulations forces FBI to destroy critical information about terror suspects who purchased guns in the United States by default proceed. The Government Accountability Office recently reported that from 2004 to 2009 terror watch list suspects attempted to buy guns or explosives 963 times and were successful 90% of the time.[26] ATF should promulgate a regulation requiring maintenance of default proceed sales to persons on the terrorist watch list for 20 years and all other records of default sales for six months. Nothing in the appropriations riders would prohibit ATF from requiring maintenance of these records.

ATF AR 0127

# II. POLICING PROBLEMATIC GUN SHOWS

The Justice Department has estimated that over 4,000 gun shows take place annually across America, each attracting an average of between 2,500 and 5,000 visitors.[27] While the vast majority of vendors and customers at gun shows are law-abiding citizens, enforcement gaps have allowed gun shows to be a major locus of supply for crime guns. According to a 2000 federal government study of federal firearms trafficking prosecutions, 30 percent of recovered guns were connected to gun shows.[28] More recently, ATF officials have described gun shows as a major source of firearms illegally trafficked by drug cartels into Mexico.[29]

Despite the scope of problematic practices at gun shows, a 2007 Justice Department's Office of the Inspector General report concluded "ATF does not have a formal gun show enforcement program."[30] In fact, despite the large number of crime guns connected to gun shows, only three percent of active ATF trafficking investigations occurred at gun shows between 2004 and 2006.[31] Yet those investigations yielded 121 arrests resulting in 83 convictions and 5,345 seizures of guns offered for sale or purchased illegally.[32] The Justice Department should adopt administrative and enforcement reforms to prevent gun shows from continuing to be a major source of illegal guns.

## A. Gun Tracing and Tracking Information on Gun Shows

**Recommendation 10: When tracing guns, ATF National Tracing Center (NTC) personnel should be trained to routinely ask the FFL who sold the gun whether the recovered gun was purchased at a gun show and the location of that gun show, and then use the data to identify problematic gun shows.**

Background: In discussions with former ATF agents and officials, it is apparent that ATF does not consistently identify whether traced guns were purchased at gun shows. If an individual buys a gun from an FFL at a gun show, the FFL is required to identify the name and location of that gun show in response to Question 19 on Form 4473. When NTC personnel trace a particular gun, however, they do not routinely ask the FFL in possession of the form whether the recovered gun was purchased at a gun show or the show's location. The failure to include this information in a trace report deprives ATF and local law enforcement of important clues about which gun shows are favorite targets of persons involved in the illegal diversion of firearms. It also does not assist ATF in determining whether – as research has suggested – certain FFLs are more likely to violate background check requirements and participate in straw sales at gun shows than in retail stores, in part because of the competition they face from private sellers.[33] Regional ATF offices should include this data in reports identifying problematic targets for investigation and enforcement.

ATF AR 0128

## B. Criminal Enforcement Operations at Problematic Shows

**Recommendation 11:** ATF field agents should have the discretion to conduct criminal enforcement operations at gun shows when trace data, prosecutions, and witness statements suggest a particular show is a source of crime guns.

Under current practice guidelines, as described by former ATF agents and officials, ATF agents must have a specific person under suspicion to conduct a criminal investigation at a gun show. Because ATF's gun show enforcement activities are focused almost entirely on a few individuals suspected of engaging in illegal activity, criminal activity endemic to some gun shows goes unchecked.

ATF agents should have the discretion to employ criminal investigative techniques when intelligence suggests that a particular show is a site of problematic firearms transfers – even when intelligence does not identify a specific individual for investigation. Law enforcement may become aware from arrest debriefings, analyses of gun traces, and cooperating witnesses that a particular gun show is a hot-bed of illegal activity. In these cases, agents in local field offices should not be restricted from attempting to identify targets by operating undercover and using surveillance equipment at the show.

## C. Investigating Problematic Private Sellers

**Recommendation 12:** ATF should increase enforcement activities to deter sales to prohibited purchasers by unlicensed gun sellers.

**Recommendation 13:** ATF should investigate private sellers at gun shows who appear to be engaged in the business without a license.

Background: While the "gun show loophole"[34] leaves many sales among private parties unregulated, certain private sales are illegal and should be policed. For example, a person, regardless of whether an FFL or an unlicensed seller, may not transfer a handgun to a person she knows or has reason to believe is a federally prohibited purchaser or an out-of-state resident.[35] ATF should develop undercover integrity tests to identify private sellers who sell to prohibited buyers. In such integrity tests, the undercover buyer could indicate to the seller that he can't pass a background check, has a criminal history, or lives in another state.

ATF should also collect intelligence, using trace data, witness interviews, and undercover operations to identify sellers who appear to be "engaged in the business" of selling firearms but nonetheless do so at gun shows without a license. Investigations should examine sales volume and profit as well as document whether problematic gun sellers appear at multiple shows.

ATF AR 0129

## D. Residency Checks for Persons Purchasing Firearms at Gun Shows

**Recommendation 14: At gun shows known for criminal activity, agents should have discretion to compare purchasers' addresses reported on Form 4473 to their state driving records.**

Background: In January 2006, ATF issued a memorandum to special agents in charge (SAIC) throughout the country in response to complaints about ATF's "aggressive and harassing" enforcement techniques at the Richmond International Raceway gun show in Virginia.[36] The revised guidance in part clarified sensible best practices for gun show operations, such as establishing a command center off site, but the memorandum also stifled a legitimate and effective technique employed at the Richmond show. Namely, agents in Richmond conducted residency checks by comparing buyers' residences as reported on Form 4473 to the residence listed in the buyer's driving records. If a buyer's driving records reflected an address other that the one provided on Form 4473, the agents initiated follow-up investigations to see if the sale was illegal. In Richmond, comprehensive residency checks resulted in 24 arrests and 23 convictions for firearms violations, mostly straw purchases.[37]

Under the guidelines issued by ATF after Richmond, an agent must have evidence that a buyer is committing a crime before checking the accuracy of the buyer's reported residence. ATF should issue new guidance to special agents and investigators that allows agents to conduct comprehensive residency checks at shows that are known to be major sources for illegally trafficked guns.[38]

ATF AR 0130

# III. ATF RESOURCES AND STRUCTURE

Additional resources and structural reforms will help ATF achieve what ought to be its top priority – combating illegal gun trafficking.

ATF has 2,500 agents dispersed among 22 field divisions with a mandate to enforce federal laws regulating firearms, alcohol, tobacco, and explosives. Nevertheless, ATF does not have the resources or the organizational structure to succeed in its most critical mission: policing firearms trafficking across state lines and international borders. In recent years, former Acting Director Michael J. Sullivan and other ATF officials have been outspoken about the agency's budget shortfalls, including a more than $70 million budget gap in fiscal year 2007 and a $37 million budget gap in fiscal year 2009.[39] While ATF received an additional $10 million in the American Recovery and Reinvestment Act of 2009 to add resources at the Mexican border, these limited, temporary resources do not cure the systemic underfunding that has plagued ATF. Moreover, during the Bush Administration, ATF's budget experienced far more limited growth than the budgets of other federal law enforcement agencies:

Percent Increase in Salaries and Expenses Appropriations FY2001-FY2008*



*DHS and ICE appropriations cover changes from FY2003-FY2008.

In addition to closing the shortfall in its budget request, ATF needs a ten percent increase in its annual budget – or approximately an additional $103 million – to fund new enforcement efforts, including $39.5 million for interdiction at the southwest border, $53 million to hire personnel needed to meet its FFL inspection goals, $7 million to fund a new Office of Tactical Trace Analysis (OTTA) (discussed in Recommendation 24), and $3 million to fund an Interstate Firearms Trafficking Unit (IFTU).

ATF AR 0131

In addition to increased funding, structural innovations could enhance ATF's ability to conduct comprehensive gun trafficking enforcement. Gun trafficking often involves movement of guns across state lines and international borders. Without a central coordinator, these investigations often fall prey to competition by regional field offices for jurisdiction. In addition, ATF can adopt practice reforms to hold accountable the small cohort of dealers that violate federal firearms laws.

## A. Mexican Trafficking and Border Resources

**Recommendation 15**: ATF should expand Project Gunrunner by increasing the ATF personnel assigned to interdict gun trafficking from the United States to Mexico.

Background: In 2008, more than 6,200 deaths were attributed to the turf war between major Mexican drug cartels over key drug trafficking corridors into the United States.[40] The violence is fueled by a steady stream of high-powered firearms and ammunition trafficked to Mexico from U.S. gun dealers and the U.S. secondary market, including gun shows, flea markets and private sales.[41] ATF has reported that 90 percent of guns recovered and traced from Mexican crime scenes originated from U.S. gun dealers.[42] In 2008, 6,700 guns recovered in Mexico were traced to initial sales in the United States, more than the previous two years combined.[43] The three largest source states for guns recovered in Mexico are Texas (39 percent), California (20 percent), and Arizona (10 percent).[44]

Since February 2009, ATF has deployed 100 additional personnel from its offices around the country, including agents, inspectors, and analysts, to add to the baseline level of 148 ATF special agents along the southwest border.[45] In February, Congress approved an additional $10 million in funding for "Project Gunrunner" in the American Recovery and Reinvestment Act of 2009. This funding will allow ATF to hire 37 permanent personnel to fill vacancies created by its Project Gunrunner redeployments, or to fill new positions in three new field offices and one new satellite office in the Southwest.[46]

The temporary surge in personnel must be sustained, and the small permanent additions made with Recovery Act funding must be expanded to address the persistent problem of southbound firearms trafficking.[47] In addition to the funds provided in the American Recovery and Reinvestment Act, $39.5 million should be allocated annually to ATF to support Project Gunrunner. Specifically, $9.5 million should be dedicated to DOJ, DHS, and State Department efforts to support gun tracing and enforcement operations on the Mexican side of the border; $25 million should be allocated to hire 125 additional, permanent personnel in the Southwest border states and extend the surge deployment at least through 2011;[48] and $5 million should be allocated to allow more ATF personnel to work in joint task forces with U.S. state and local law enforcement agencies on trafficking investigations

ATF AR 0132

and expand ATF training and support operations within Mexico. This allocation of funds is largely consistent with legislation introduced by Representative Rodriguez (D-TX) but provides for $10 million in additional funding for personnel.[49]

## B. Deputy Chief for Interstate Firearms Trafficking

**Recommendation 16:** **ATF should establish an Interstate Firearms Trafficking Unit (IFTU) run by an ATF Deputy Chief to coordinate interstate investigations.**

Background: According to former ATF agents and officials, it is common for investigations targeting illegal firearms violations in source states – like straw purchases – to proceed with little interaction with ATF offices in states where guns related to the investigation are recovered. Likewise, investigations in recovery states – involving unlawful transfers to felons or other "end-user" trafficking cases – will often proceed with little effort to coordinate with ATF offices in source states. Thirty percent of firearms cross state lines before they are recovered in crimes.[50] Without coordination and oversight from law enforcement in both the source and recovery areas, ATF may fail to identify targets for investigation, or an investigation may be compromised by regional ATF offices and joint task forces working at cross-purposes.

The administration should provide an additional $3 million annually to ATF to fund the IFTU and appoint a Deputy Chief of Interstate Firearms Trafficking. The Deputy Chief and the IFTU would identify and designate interstate firearms trafficking corridors and patterns; develop guidelines for initiating investigations; and develop and regulate a system to share intelligence with federal, state, and local law enforcement in the source and affected areas. Specifically, in collaboration with the new Office of Tactical Trace Analysis (discussed in Recommendation 24), the IFTU should issue a monthly report to all regional ATF offices and joint task forces highlighting targeting recommendations and collect from regional offices a monthly summary of trafficking investigations. IFTU should also mandate that Regional Agents in Charge (RAICs) analyze multiple sales reports on a daily basis, review the results of dealer audit inspections, and prioritize dealer audit inspections based on NICS data, trace data, and other intelligence.

## C. Administrative Enforcement and Dealer Inspections

**Recommendation 17:** **ATF should receive an additional $53 million annually to hire more inspectors to meet its target of triennial dealer audits.**

ATF AR 0133

**Recommendation 18**:  ATF should enforce a dealer's license revocation when the dealer's administrative appeals are exhausted.

Background:  In 2007, ATF inspected only 9.3 percent of FFLs – an average rate of one inspection every 11 years[51] – far from ATF's stated goal to inspect every gun dealer at least once every three years.[52] ATF officials estimate the agency needs $53 million to hire 250 additional personnel to meet its inspections goal.

Even when ATF does inspect dealers and finds systemic negligence or malfeasance, it rarely exercises its administrative power to revoke the licenses of dealers that repeatedly violate the law.  In 2007 it revoked only 100 licenses out of 109,000.[53] Furthermore, when ATF does revoke a dealer's license, it will often grant stays to allow the dealer to continue operating while appealing the agency's decision in a United States district court.  For example, ATF allowed Jim's Guns and Whatever in Dayton, Ohio to operate for almost 19 months after ATF revoked its license.[54] Federal law allows ATF to put a license revocation into effect when a dealer's administrative appeal is rejected but before the dealer has exhausted his challenges in federal court.  ATF should enforce revocations when a dealer's administrative appeal is rejected.

## D. Administrative Enforcement and Undercover Investigations

**Recommendation 19**:  ATF inspectors should conduct undercover investigations to assess gun dealer compliance with federal laws and regulations.

Background:  In addition to its criminal jurisdiction, ATF has administrative jurisdiction to inspect dealers and, when necessary and appropriate, initiate an action to revoke a dealer's license.  According to former ATF agents, however, ATF's administrative efforts to monitor FFLs no longer include undercover integrity investigations.  In conjunction with dealer education and oversight, undercover tests and enforcement action can dramatically improve dealers' compliance with law designed to deter straw purchases and other transfers to the illegal market.

After conducting similar integrity tests of dealers known to be top sources of crime guns trafficked to New York City, the City sued 27 federally licensed dealers in five states.  The vast majority of those dealers are now under the oversight of a court-appointed special master and have adopted additional safeguards or the best practices of the Responsible Firearms Retailer Partnership.[55] A study by John Hopkins University concluded that the portion of crime guns from these dealers recovered in New York City with time-to-crime of one year or less has dropped 75 percent since the investigations were announced.[56]

ATF AR 0134

ATF should develop an undercover administrative enforcement program focusing on the handful of dealers that are problematic sources of crime guns. These undercover investigations should simulate straw purchases but could also involve other scenarios, such as customers seeking to make "off-the-books" purchases. Generally, ATF should subject dealers that fail one test to a three-year period of heightened oversight, including additional integrity tests and annual audit inspections. If a dealer fails a second test during the oversight period, ATF should reset the clock on oversight, take sworn statements of store personnel regarding sales of guns recovered in crime within two years of their sale, and issue a new, "Type IV" Demand Letter requiring the dealer to submit monthly reports on the quantity sold of the 10 models of guns most commonly associated with crime gun traces, the serial numbers of those guns, and the names of all employees who handle and sell guns. If a store fails a third integrity test during the oversight period, ATF should initiate a license revocation proceeding – or, where there is evidence of willful misconduct, a criminal investigation.

## E. Lost and Stolen Guns

**Recommendation 20:** **ATF should investigate all incidents involving thefts of five or more guns from dealers or individuals.**

**Recommendation 21:** **ATF should require FFLs to report to the National Crime Information Center (NCIC) thefts of firearms from common carriers and bonded warehouses.**

**Recommendation 22:** **The federal government should report annually on lost and stolen guns.**

Background: According to FBI data, 1.6 million firearms were stolen between 1998 and 2008.[57] Over 150,000 firearms were stolen in 2008 alone, 85 percent of which were never recovered.[58] This figure represents only a portion of firearm thefts because state and local law enforcement agencies are not required to report firearm thefts to the FBI.[59] Theft is one of the major sources of firearms diverted into the illegal market. ATF has reported that almost a fourth of its criminal trafficking investigations involved stolen guns.[60] Specifically, 14 percent involved trafficking in firearms stolen from FFLs, 10 percent involved trafficking in firearms stolen from homes, and 2 percent involved trafficking in firearms stolen from common carriers.[61]

ATF's guidelines only mandate investigation of incidents when they involve the theft of 10 or more handguns *and* either at least one of those guns is recovered in a crime within two years, or a suspect has been identified. As a result, a theft of multiple firearms could

go uninvestigated by ATF for months or years until one of the guns is recovered in a crime or a suspect is identified. ATF should revise its guidelines to mandate investigation of all thefts involving five or more guns.

Gaps in reporting thefts also thwart ATF's investigation of lost and stolen guns. Although FFLs, including dealers, manufacturers, and importers, are required to report missing or stolen guns, common carriers and bonded warehouses hired by FFLs to ship and store firearms are not. ATF should reinterpret its regulations[62] to require all FFLs shipping or receiving firearms to report thefts of guns from common carriers as soon as those FFLs become aware of the missing guns. If a licensed dealer reports a theft from a common carrier, ATF should interview the wholesaler or other FFL that shipped the guns and catalogue the shipper's acquisition and disposition records. In addition, federally licensed manufacturers, dealers, and importers should be required, pursuant to revised regulations, to immediately report thefts from any bonded warehouse or other storage facility they have contracted with to store firearms.

ATF has made available only a small amount of outdated data on lost and stolen guns. To close this gap, the Justice Department should produce an annual report on lost and stolen guns, including the following analyses:

- State-by-state information about the number of dealers with missing guns discovered during audit inspections, the number of dealers inspected, the number and type of guns missing from each dealer, the number and type of guns identified in audit inspections that are later traced in crimes, and the number and type of guns identified as missing in audit inspections and later recovered by other means;
- State-by-state information about guns reported missing by FFLs other than in the course of inspections, including the number of FFLs reporting missing guns, the number of guns missing from each FFL, the number of guns reported missing that are later traced in crimes, and the number of guns identified as missing and later recovered by other means;
- State-by-state information about guns reported missing by individuals and common carriers, including the number of missing gun incidents, the number of missing guns reported for each incident, the number of guns reported missing that are later traced in crimes, and the number of guns identified as missing and later recovered by other means;
- Efforts by federal law enforcement to recover and prosecute gun thefts, in particular thefts involving five or more guns.

ATF AR 0136

## F. Task Force Officers

**Recommendation 23: DOJ should support an additional 250 state and local law enforcement officers to be assigned to ATF Task Forces.**

Background: Across the country, ATF agents work hand in hand with state and local law enforcement in regional Task Forces to combat illegal trafficking. These Task Forces are supplemented by Task Forces Officers (TFOs) – personnel from local or state law enforcement agencies who are temporarily assigned to work with ATF on gun investigations. TFO salaries are typically paid by their home agency, and ATF pays for their overtime, vehicular, and other incidental expenses. TFOs play a key role in trafficking enforcement because they foster cohesive relationships between federal and local agencies, break down communication barriers, and help develop local law enforcement expertise in firearms investigations. ATF should hire an additional 250 TFOs to enhance investigative capacity, particularly relating to interstate and cross-border trafficking and lost and stolen guns.

ATF AR 0137

# IV. MORE EFFECTIVE CRIME GUN TRACING

ATF relies on trace data in 60 percent of all gun trafficking investigations.[63] In 2008, working with state and local law enforcement, ATF traced nearly 250,000 guns recovered in U.S. crimes in an attempt to identify facts about the guns' first retail sale.[64] These traces can be critically important clues to solving gun crimes. And, trace data can identify trafficking patterns across a region and across the nation, helping law enforcement map where guns originate and how they are trafficked to the people who use them in crimes.

Despite the data's enormous potential, ATF does not have the organizational structure or resources to fully realize its power. ATF could more proactively aggregate and analyze trace data to provide targeting recommendations to regional offices. In addition, investigations are stalled at crucial moments because dealers frequently delay or fail to respond to trace requests or because a perpetrator obliterated the gun's unique serial number.

## A. Tactical Trace Analysis

**Recommendation 24**: **ATF should create an Office of Tactical Trace Analysis at the National Tracing Center to proactively analyze trace data and to identify gun traffickers and problematic dealers.**

**Recommendation 25**: **The Office of Tactical Trace Analysis should use a trace-to-NICS-check ratio to determine which dealers have a high volume of crime-gun traces compared to their approximate sales volume.**

Background:  While ATF and its Crime Gun Analysis Branch have used trace data to pinpoint problematic dealers associated with recovered crime guns, to evaluate dealers' compliance with trace requests, and to assist in regional trafficking investigations — these activities are typically reactive in nature, inconsistent in scope, and not regularly shared with ATF field offices, task forces, and state and local law enforcement.

ATF should replace the Crime Gun Analysis Branch with a new Office of Tactical Trace Analysis (OTTA) and charge it with proactively developing investigative leads for regional field offices and task forces. In collaboration with the new Deputy Chief of Interstate Firearms Trafficking, OTTA should issue a monthly report to regional offices and task forces with recommendations on targets for further investigation.[65]

OTTA should also be a resource to state and local law enforcement by offering trainings in the e-Trace local input system and by providing customized analytical support to state and local law enforcement. Additionally, OTTA should produce regular reports that analyze aggregated trace data for policy makers and the public. As discussed in Recommendation 35, ATF released analyses of aggregated trace data in 2007 and 2008 as a result of changes

ATF AR 0138

made to FY 2008 Tiahrt language.  OTTA should continue producing these reports and supplement them with reports on the interstate flow of crime guns, dealer response times to trace requests, and percentages of traced guns originating from the small cohort of dealers with high numbers of traces.

In addition, when analyzing trace data to identify problematic dealers,[66] OTTA should work with FBI to control for sales volume.  In some cases, high numbers of traces may be a by-product of high sales by a dealer.  OTTA could control for this phenomenon by calculating a trace-to-sales ratio.[67]  When available, FBI should use sales volume data gathered during ATF dealer inspections.  Otherwise FBI should use aggregate data on the number of NICS checks conducted by each dealer as a rough proxy for sales when calculating the ratio.[68]

An additional $14 million should be allocated to ATF over two years to integrate the Crime Gun Analysis Branch staff into OTTA, hire additional staff, develop systems to share more data with state and local law enforcement, and undertake more comprehensive reporting and analysis.

## B. Dealer Response to Trace Requests

**Recommendation 26:** **When dealers fail to respond to trace requests, ATF should send demand letters, search FFLs' sales records, and/or require them to provide sworn statements describing when and to whom the gun was transferred.**

Background: Federal law requires FFLs to respond to trace requests "immediately . . . and in no event later than 24 hours,"[69] but trace requests routinely take far longer to complete.  In fact, many traces are not completed at all: in at least 39 percent of trace attempts, ATF is unable to identify the source states or the source dealers.[70]  Even when a dealer is identified, a third of the time a buyer is not.[71]  ATF relies on accurate record-keeping by FFLs to successfully trace guns, and a FFL's failure to keep complete records or comply with ATF requests can make those traces impossible.[72]

ATF can take several different steps when a dealer is unresponsive to trace requests. If a dealer ignores ATF's requests for information about a gun's sale or is unable to provide it, ATF can send "Demand Letter I," which requires dealers to send ATF all firearms transactions records for the prior three years and to continue to submit these reports on a monthly basis until further notice.  In recent years, however, ATF has rarely exercised its power to send demand letters.  In fact, in 2004 ATF did not send a single dealer a Demand Letter I.[73]  ATF can also search the FFL's premises, take a statement from the FFL, or, if necessary, revoke the dealer's license.

ATF AR 0139

Any dealer that cannot respond to a trace of a gun less than five years old should receive a Demand Letter I. If a dealer is unresponsive to several trace requests of guns less than five years old, ATF should send an inspector to search the dealer's records to determine if there is more serious, systemic negligence or malfeasance by the FFL.[74] If a dealer fails to respond to a trace request for a gun used in a homicide, robbery, rape or other violent felony, an ATF agent should visit the dealer and take a sworn statement from the dealer describing his or her complete knowledge of the gun and its transfer. Often the process of reviewing and signing such a statement will jog the dealer's memory and, in some cases, may persuade a reluctant dealer to disclose pertinent information. Finally, chronic or willful failures to respond to such trace requests should provoke license revocations.

## C. Dealer Records of Gun Trace Requests

**Recommendation 27:** **The Justice Department should require FFLs to keep logs of gun trace requests.**

Background: A log of gun traces would help dealers prevent illegal sales by flagging which customers are subjects of repeated trace requests at that store, thereby alerting the seller to a potentially suspect purchaser. Presently, licensed dealers, manufacturers, and importers are not required to maintain such logs.

Pursuant to federal law, however, ATF could promulgate a new regulation requiring FFLs to keep a log of trace requests as record of the gun's "disposition."[75] Through its participation in the Responsible Firearms Retailer Partnership (RFRP), Wal-Mart will voluntarily maintain an electronic log of all the traces relating to its stores. If a customer who has a prior trace at that retailer attempts to purchase a firearm, the sale is electronically flagged. The retailer then has the discretion to proceed with the sale, request more information from the customer, or stop the sale.

## D. Obliteration of Gun Serial Numbers

**Recommendation 28:** **ATF should require a second, hidden serial number on every newly manufactured gun.**

**Recommendation 29:** **In the alternative, ATF should require that serial numbers be placed on steel and not soft metal, require stamped rather than etched marks on the gun surface, and require marks to be 0.0005 deep and 1/8 inch tall.**

Background:   Regulations require gun manufacturers to include unique, identifying information – such as serial numbers – on every gun for the purpose of tracing recovered weapons.  Violent criminals, including the perpetrator of the shootings at Virginia Tech, have attempted to obliterate those marks on thousands of guns recovered in crimes each year in an effort to thwart law enforcement.[76]  In 2001, ATF estimated that between nine and 20 percent of recovered crime guns had their serial numbers removed.[77]  Under current law, serial numbers must be engraved, cast, or stamped at least 0.003 inch deep, and the print of the serial number must be at least 1/16 inch tall.[78]  Although current regulations state that none of the required information may be "susceptible of being readily obliterated, altered, or removed," regulations do not prescribe stamping methods.[79]  Information that is etched or engraved on softer metals or placed in a single location is especially vulnerable to tampering.

ATF should issue a regulation requiring guns to have additional, hidden sets of identifying information.  For example, Massachusetts law requires gun manufacturers to install additional, tamper-resistant serial numbers either inside the gun barrel or visible only in infrared light.[80]  The placement of these second numbers makes it extremely difficult to obliterate all identifying information.  In the alternative, ATF should promulgate a regulation requiring larger or deeper serial numbers, serial numbers placed on steel and not soft metal, or numbers stamped rather than etched on a gun's surface.

## E.  Standardizing the Serial Number System

**Recommendation 30: ATF should require domestic manufacturers to use a standardized system for numbering firearms.**

Background:  Youth Crime Interdiction Initiative's National Crime Gun Trace Report (July 2002) indicated that mistyped or miscopied serial numbers prevented 11 percent of urban traces from being completed – making it the most frequent cause for a failed trace.  Problems inputting, copying, and recognizing importer and manufacturer names undermined another nine percent of traces.[81]  ATF regulations grant manufacturers and importers great discretion in choosing a serial-numbering system, as long as no two guns from the same manufacturer or importer have the same numbers.  This variety contributes to inputting and copying errors by law enforcement and FFLs during the tracing process.

ATF should promulgate a regulation requiring a standard numbering system to reduce these errors.  For example, every serial number could have a three-letter code for the manufacturer or importer and a unique ten-digit number.  Under existing law, ATF has the authority to require a consistent numbering system, which would cut down on inputting and copying errors.[82]

ATF AR 0141

# V. MORE EFFECTIVE PARTNERSHIPS AMONG GOVERNMENT, LAW ENFORCEMENT, COMMUNITY GROUPS, AND RESPONSIBLE GUN INDUSTRY REPRESENTATIVES

In order to combat violent crime, the Justice Department and its subdivisions have formed a variety of partnerships with dealers, the gun industry, academics, and community groups. For example, the federal government's Project Safe Neighborhood (PSN) has spent approximately $2 billion since 2001 to support prosecutors, investigators, training programs, juvenile crime initiatives, gun lock safety kits, community outreach efforts and other gun and gang violence reduction strategies. The Justice Department has also partnered with the gun industry to increase public awareness of straw purchasing and the requirement that dealers offer locks for handguns.

These partnerships should reinforce proven strategies to deter gun crime. In particular, DOJ should invest in programs that effectively reduce recidivism among gun offenders and generate actionable intelligence on gun crimes, develop more rigorous partnerships with gun retailers, and develop industry standards for gun safety locks distributed through Project ChildSafe. Additionally, DOJ should reinvigorate federal studies and reengage outside researchers to better understand gun trafficking and to evaluate intervention strategies.

## A. Improving Project Safe Neighborhood and Other Community Engagement Initiatives Focused on Gun Violence

**Recommendation 31:** The federal government should invest in local efforts to reduce recidivism among gun offenders.

**Recommendation 32:** The federal government should increase support for community programs that generate tips on illegal firearms trafficking.

Background: Since 2001, PSN has been the Department of Justice's umbrella program to reduce gun and gang crime through partnerships among law enforcement and community groups. PSN is modeled in part on gun violence prevention initiatives that achieved promising results during the Clinton Administration.[83] However, effective PSN programs have not been brought to scale, and PSN funds should be used to support efforts to reduce recidivism among gun offenders and efforts to generate actionable intelligence on firearms trafficking.

Recidivism Among Gun Offenders: PSN programs have reduced recidivism among gun offenders through targeted deterrence. For example, Chicago's PSN program holds "Offender Notification Forums" to warn high-risk individuals about ongoing police enforcement efforts and potential penalties for gun crimes and to link them to social services and community support. Researchers found a 37 percent reduction in homicides.[84]

ATF AR 0142

Moreover, individuals who attended Offender Notification Forums were almost 30 percent less likely to return to prison than similar individuals in the same neighborhood.[85] DOJ should bring PSN Offender Notification Forums to scale by funding and evaluating them in other cities.

In New York City, offenders convicted of felony gun possession in 2000 were four times more likely to be arrested for a later homicide than other felons. In response, New York City passed a Gun Offender Registration Act requiring gun felons to maintain contact with police for four years after their release from prison. Washington, D.C.; Baltimore, Maryland; and Utica, New York have all adopted gun offender registries, and other cities are actively considering them. DOJ should use PSN funds to support gun offender registries, which help local police track high-risk individuals and have the potential to deter recidivism among gun offenders.

Generating Tips on Illegal Trafficking:  Over the past few years, law enforcement has confronted an alarming "stop snitching" campaign – a campaign popularized by t-shirts, hats, and high-profile endorsements by rap artists and sports stars.[86] PSN funds should be used to support local programs that generate intelligence by creating trusting relationships among law enforcement and community stakeholders. In cooperation with Boston Mayor Tom Menino and Cleveland Mayor Frank Jackson, Citizens for Safety has developed one successful model for such programs. Citizens for Safety hold workshops called "Traffick Jams," which help police gather tactical intelligence by facilitating discussions among at-risk individuals, law enforcement, and community leaders. According to Citizens for Safety, 60 percent of workshop participants have stayed involved with the organization, and 90 percent have increased their awareness of gun trafficking.

DOJ should also allocate PSN funds to support community programs that generate tips on illegal gun trafficking by offering financial incentives. The gun bounty initiated by Mayor John Peyton of Jacksonville, Florida and Duval County Sheriff John Rutherford in partnership with the non-profit organization Crime Stoppers is one example of such a program. A $1000 reward for anonymous tippers with information leading to the arrest of criminals using an illegal gun has led to 215 arrests.[87] A number of other cities, including New York, Salt Lake City, Newark and West Palm Beach, have similar firearms-focused cash-for-tips programs.[88]

## B. Partnerships with Gun Dealers.

**Recommendation 33:** **ATF should promote the Responsible Firearms Retailer Partnership (RFRP), pioneered by Wal-Mart, as a voluntary program for gun dealers to deter the movement of guns into the illegal market.**

ATF AR 0143

Background:  Since July 2000, ATF's primary partnership with gun dealers has been a program called, "Don't Lie for the Other Guy."  Developed in conjunction with the National Shooting Sports Foundation (NSSF), it combines in-store signage, voluntary training materials, and targeted public service announcements aimed at deterring straw purchases.[89]  According to NSSF, since the program's inception, 30,000 "Don't Lie for the Other Guy," signage kits have been distributed to gun dealers.  While a positive step, ATF should pursue a more comprehensive voluntary gun dealer partnership program aimed at deterring the movement of guns into the illegal market.

One such example would be the Responsible Firearms Retailer Partnership (RFRP), created by Wal-Mart and Mayors Against Illegal Guns in April 2008.  The RFRP 10-point voluntary code includes videotaping the point-of-sale, a "no green light, no sale" policy to eliminate default-proceed sales, employee background checks, and a computerized trace log and alert system.[90]

## C. Research and Analysis on Gun Trafficking Methods and Patterns

**Recommendation 34**: DOJ and ATF should produce updated versions of groundbreaking reports on illegal firearms trafficking.

**Recommendation 35**: ATF should expand the scope of its trace reports.

**Recommendation 36**: DOJ should fund external research of emerging problems in illegal gun trafficking and the results of enforcement efforts.

Background:  From the early 1990s through 2002, the federal government mined data to produce an unprecedented view of gun trafficking patterns and illegal gun markets.  These reports identified criminal networks, shaped policy, and enabled ATF and other law enforcement to narrowly focus enforcement resources.  In recent years, however, the federal government has dramatically reduced its support for such analysis, spurring a growing gap in knowledge about firearms trafficking.

For example, during the Clinton Administration, the Justice Department, ATF, and the Treasury Department regularly released reports, such as *Following the Gun* (2000),[91] *Commerce in Firearms* (2000),[92] *and the Youth Crime Gun Interdiction Reports* (1997-2002).[93]  These reports relied on aggregated trace data, surveys of thousands of federal prosecutions, and data from local law enforcement in more than 40 cities.  Although they helped stakeholders understand the scope of illegal gun trafficking, these reports have not been updated in recent years.  DOJ and ATF should produce new versions.

ATF AR 0144

ATF should also publish more comprehensive trace data reports. The Tiahrt Amendment restrictions first enacted in 2004 created a substantial obstacle to using trace data for in-depth analysis. After Congress amended the Tiahrt trace language in 2007, ATF resumed releasing limited trace data analysis. However, ATF has the authority to produce far more detailed reports, and it should release the following data:

- "Time-to-crime data," i.e. the interval between the sale of the gun and its recovery in crime, especially times to crime by state, for different types of firearms, different types of sales (e.g. multiple sales and single sales), and categories of dealers (e.g. high trace volume and lower trace volume);
- Information organized by source state on the number of guns recovered in other states and the average time-to-crime of guns recovered in other states;
- State-by-state percentages of traced guns originating from the top 1 percent of high-trace dealers;
- Annual state-by-state percentages of dealers not subject to a trace request;
- Percentage of traced guns with serial numbers obliterated;
- How quickly dealers, wholesalers, and manufacturers in different states respond to trace requests (e.g., average response time, percent of dealers that respond within 24 hours); and the percentage of traces for which dealers in different states cannot identify a sales record for a gun traced to a crime;
- Data specific to guns sold by FFLs at gun shows, including time-to-crime of traced guns sold at gun shows, percentage of crime guns sold at gun shows, and total traces for each gun show;
- Top-ten source dealers for traced guns in each state.

Finally, the National Institute of Justice (NIJ) and Bureau of Justice Statistics (BJS) at the Department of Justice should re-engage expert researchers and state and local agencies to evaluate strategies to combat illegal guns and reduce gun violence. Between 1995 and 2003, NIJ distributed $4.7 million in firearms-related research grants.[94] NIJ and BJS also provided grants to research gun crimes and trafficking on a local and regional basis.[95] From 2004 through 2008, however, NIJ support for this research dropped dramatically to approximately $560,000.[96]

The following are research areas ripe for investigation:

- Emerging problems related to illegal guns and local, state, and federal responses to these problem, including the use of toy and colored guns and trafficking along the southwest border;
- How gangs and other violent criminals obtain firearms and where they store them;
- Criminals' acquisitions of firearms based on prisoner interviews (e.g., prices paid, how far did they go to get the gun, how they found supplier);

ATF AR 0145

- Challenges to successful prosecution of gun traffickers and strategies for addressing those challenges;
- The impact of Violent Crime Impact Teams (VCIT) and partnerships among local, state and federal law enforcement agencies on gun violence;
- Which firearms, dealers, sales locations, timing of sales are at greatest risk of being connected to crime.

## D. Gun Safety Locks Requirement

**Recommendation 37:** Consumer Products Safety Commission (CPSC) should evaluate and develop industry standards for locks that meet legal requirements.

Background: For the last decade, Project ChildSafe, a component of PSN, has distributed tens of millions of gun safety locks in partnership with the National Shooting Sports Foundation. More recently, in 2005, Congress passed the Protection of Lawful Commerce in Arms Act (PLCAA),[97] which requires gun dealers to offer every handgun buyer a trigger-lock or other safety locking device.[98] However, PLCAA does not specify standards for evaluating the effectiveness of particular locks. In fact, In 2001, the CPSC issued a recall of 400,000 trigger locks issued to dealers through the Project ChildSafe program.[99] Although CPSC does not have the authority to regulate firearms, it does have jurisdiction to regulate separate trigger-locking devices, and it should develop acceptable standards for these devices.[100]

ATF AR 0146

# VI. ENFORCEMENT OF EXISTING LAWS ON ESPECIALLY DANGEROUS FIREARMS

Some of the longest-standing federal firearms laws regulate the purchase, possession, or import of machine guns and other unusually dangerous weapons.  In recent years, however, the Justice Department has stopped enforcing some of these laws.

## A. Ban on the Importation of Non-Sporting Purpose Firearms

**Recommendation 38**: The federal government should resume enforcement of federal law that bans importing "non-sporting purpose" firearms and ammunition.

Background:  A 2008 Associated Press story indicated that AK-variant military-style rifles traced in crimes within the United States increased from 1,140 in 1993 to 8,547 in 2007.[101] The majority of these weapons are manufactured outside the United States and are subject to the non-sporting purpose import ban pursuant to President George H.W. Bush's 1989 executive order, which prevents the importation of foreign manufactured military-style firearms including AK-variant firearms. The executive order applies to fully manufactured firearms and the "frame, receiver, or barrel" of applicable firearms.[102]  GAO has reported that 29 percent of the guns recovered in crimes in Mexico were imported into the United States – many in violation of the ban – and then sold by licensed dealers in the U.S.[103]  The import ban was tightly enforced until 2001, but as 53 members of Congress wrote to the Attorney General in February 2009, ATF has not enforced this law in recent years.[104]

The federal government should resume enforcing this law.[105]  DOJ and DHS should direct ATF and the Customs and Border Patrol to investigate importers marketing firearms as variants of military weapons that clearly violate the non-sporting purpose ban, including imported firearms marketed as variants of AK-47s.  ATF should also evaluate whether any additional firearms, such as the FN 57, an imported handgun hailed for its capacity to puncture bullet-proof vests, ought to be added to the non-sporting purpose list.

## B. Multiple Purchases of Long Guns Commonly Used in Crimes

**Recommendation 39**:  ATF should identify the long guns most linked to crime and require dealers to report multiple sales of such guns.

Background:  ATF initiates 13 percent of its criminal trafficking investigations based on reviews of multiple handgun sale reports.[106]  Under federal law, licensed dealers are required to send these reports to ATF whenever the same person buys more than one handgun from that dealer within five business days.[107]  If one of these guns is later recovered in a crime, these reports enable more efficient tracing.  But the reporting requirement does not apply

ATF AR 0147

to long gun sales, even though some types of long guns are frequently used in crime. For example, ATF and DEA have found that the favorite weapons of Mexican drug cartels include high-quality .223, 7.62x39 mm, 5.7x28, and .50 caliber rifles.[108] At crime scenes in U.S. cities, 12-gauge shotguns are among the five most frequently recovered types of crime guns.[109]

ATF should use trace data and other intelligence to identify the rifles and shotguns most likely to be used in crime, including by the Mexican cartels. It should issue a new, "Type V" Demand Letter requiring dealers to report multiple sales of suspect long guns if in the prior year they had 15 or more traces[110] or three or more traces of suspect long guns. ATF should periodically review trace data so the list of suspect long guns continues to reflect those most likely to be linked to crime.

## C. Stinger Pen Guns

**Recommendation 40:** **ATF should reclassify the Stinger pen gun, as well as any other pen guns introduced since 2002, as "Any Other Weapons" under the National Firearms Act, thereby subjecting them to strict background check, licensing, and registration requirements.**

Background: In 2002, the Air Force Office of Special Operations at Andrews Air Force Base distributed a bulletin to domestic law enforcement agencies identifying the Stinger Manufacturer Corporation's .22 caliber pen gun as a possible threat to the safety of the law enforcement officers.[111] Despite the danger of these easily-concealed guns, purchasers of the Stinger pen gun are subject only to a NICS check and not the more intense scrutiny faced by purchasers of other pen guns. Most pen guns are classified as Any Other Weapons (AOWs) by the National Firearms Act, which requires their purchasers to be fingerprinted, obtain prior approval from law enforcement to own the gun, submit a photo, and register with the National Firearms Registry. ATF classifies Stinger pen guns as handguns and not as AOWs because, unlike other pen guns, the Stinger must be cocked into the form of a handgun in order to be fired. The fact that the Stinger pen gun must be cocked, however, does not diminish a person's ability to conceal the gun in its "pen" form. In fact, the Air Force Office of Special Operations refers to the Stinger as an "easily concealable firearm." Consequently, ATF should reclassify the Stinger Pen Gun as an AOW to subject its purchasers to the same strict requirements as purchasers of other pen guns.

ATF AR 0148

# ENDNOTES

[1] Mayors Against Illegal Guns endorses legislation that would: repeal the Tiahrt Amendments to give police information they need to enforce existing gun laws, close the gun show loophole to prevent criminals from easily purchasing weapons without a background check, close the terror gap by preventing known terrorists from purchasing firearms, close the gun dealer fire-sales loophole, and require employees of federal firearms licensees to undergo background checks. A description of the Coalition's Federal Legislative Agenda is annexed as Appendix B.

[2] Federal Bureau of Investigation, Website for the National Instant Criminal Background Check System, http://www. fbi.gov/hq/cjisd/nics.htm (last visited June 25, 2009). Not only can NICS handle a large number of transactions, background checks are being processed more efficiently and more quickly than in the past: in 2006, 92 percent of all NICS checks were resolved immediately. That figure was up from 72 percent between November 1998 and December 2001. See Letter from Thomas E. Bush, III, Assistant Director, CJIS Division, The Federal Bureau of Investigations, to The Honorable Michael R. Bloomberg, Mayor of New York City (October 21, 2008) (available at http://www.mayorsagainstillegalguns.org/downloads/pdf/FBI_NICS_Data_response.pdf).

[3] See Letter from Thomas E. Bush, III, supra note 2, at 19, 27.

[4] In the wake of the Virginia Tech massacre, Congress passed legislation to reform state practices and add hundreds of thousands of names that had been missing from the NICS mental health file. See NICS Improvement Amendments Act of 2007, Public Law No. 110-180. By August 2008, the number of names in the mental health file had grown to 585,000 persons from about half that amount at the start of 2007. See Letter from Thomas E. Bush, III, supra note 2, at 25. In just the first eight months of 2008, at least 549 gun sales were blocked because of the buyer's mental health record. Id. at 26.

[5] A sample Form 4473 is annexed as Appendix C. See 27 C.F.R. § 478.124.

[6] Michael Bowling, Ph.D., et al., Background Checks for Firearms Transfers, 2005, Bureau of Justice Statistics Bulletin, at 7-8, NCJ 214256 (Nov. 2006).

[7] U.S. Government Accountability Office, Firearms: Purchases From Federal Firearms Licensees Using Bogus Identification, GAO-01-427NI (March 19, 2001).

[8] United States v. Gandara, No. 08-cr-03355 (W.D. Tex. filed Nov. 6, 2008).

[9] See Public Law No. 109-113. Starting December 1, 2014 federal buildings and airports will require REAL ID from persons born after December 1, 1964. After December 1, 2017, REAL ID will be required regardless of the person's age. See 6 C.F.R. 37. Legislation just introduced in the Senate would extend these deadlines and remove DHS' discretion to add NICS checks as an "official purpose." While this legislation could reduce the costs of Real ID to states, DHS should work with Congress to amend the provisions that would otherwise allow DHS to require Real ID for gun purchases. See PASS ID Act, S.1261.

[10] Identification issued by local governments is sufficient to purchase firearms. FBI may not be able to ascertain the validity of these locally-issued IDs.

[11] Given the epidemic of cases involving guns missing from gun dealer inventories, the lack of background checks for gun store employees ought to be a major concern for federal law enforcement. In 2007, for example, ATF determined there were more than 30,000 guns missing from the inventories of just the 9.3 percent of the nation's gun dealers it inspected. See Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Fact Sheet: 2007 FFL Compliance Inspections, at 2 (2008); William J. Krouse, Congressional Research Service, The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF): Budget and Operations, at 7-8 (2008). Moreover, guns missing from stores have been involved in some of the nation's most notorious mass shootings. ATF found that Bulls-Eye Shooter Supply in Tacoma, Washington lost track of 238 guns over three years, and the two Washington, D.C.-area snipers used one of those guns to kill ten people in 2002. See Mike Carter, Steve Miletech, and Justin Mayo, Errant Gun Dealer, Wary Agents Paved Way for Beltway Sniper Tragedy, The Seattle Times, April 20, 2003; U.S. House of Representatives, Committee on the Judiciary Report to Accompany H.R. 5092, at 214 (2006).

[12] See 28 C.F.R. § 25.6.

[13] Conducting background checks on employees who handle firearms is part of the 10-point code of conduct developed by the Responsible Firearms Retailer Partnership (RFRP) that Wal-Mart created with Mayors Against Illegal Guns. For more information about the RFRP, see http://www.mayorsagainstillegalguns.org/html/partnership/partnership.shtml.

[14] Signatures on the dealer's copies of completed Form 4473 will clearly indicate which employees are selling guns.

ATF AR 0149

[15] Mem. in Support of Mot. Dismiss or in the Alt. to Transfer, Abrams v. Truscott, No. 06-cv-643 (CKK) (D.D.C. filed June 15, 2006).  Similarly, in 2003, ATF revoked the license of Ugur "Mike" Yildiz after finding 500 violations of federal firearms laws in his Chicagoland Bells store. Yildiz was able to transfer the firearms in the store's inventory to his own name, and Canadian law enforcement later traced 25 weapons registered to Yildiz in connection with drug and violent crime investigations.  He was subsequently charged with illegally transporting weapons internationally. Compl., at ¶ 7, United States v. Yildiz, No. 08-cr-480 (N.D. Ill. filed June 18, 2008).

[16] See United States v. Tarr, 589 F.2d 55, 59 (1st Cir. 1978) (establishing "regular course" requirement, which was later written into statute); United States v. Fifty-Two Firearms, 362 F. Supp. 2d 1308, 1315 (M.D. Fla. 2005); Oddo v. Dep't of the Treasury, ATF, 13 M.S.P.R 483, 485 (1982) (applying law prior to the passage of the Firearm Owners Protection Act (FOPA)); United States v. White, 175 Fed. Appx. 941, 942 (9th Cir. 2006) ("between twenty-three and twenty-five firearms"); United States v. Hernandez, 662 F.2d 289, 291 (5th Cir. 1981) (upholding conviction based on buying and reselling 30 guns over four months under pre-FOPA law); United States v. Murphy, 852 F.2d 1, 18-20 (1st Cir. 1988) (applying pre-FOPA law).

[17] See White, 175 Fed. Appx. at 942 (profit around $50 per gun); Murphy, 852 F.2d at 18-20; Hernandez, 662 F.2d at 291; United States v. Reminga, 493 F. Supp. 1351, 1358 (W.D. Mich. 1980) (profit motive, which was required under pre-FOPA caselaw, was satisfied where defendant made money on some transactions, even though he did not make money on others and even though much of his gain resulted from inflation); United States v. 57 Miscellaneous Firearms, 422 F. Supp. 1066, 1070 (W.D. Mo. 1976) (finding profit motive before FOPA).

[18] See 57 Miscellaneous Firearms, 422 F. Supp. 1066 at 1068.

[19] See Oddo, 13 M.S.P.R at 485.

[20] Cf. Fifty-Two Firearms, 362 F. Supp. 2d at 1315 (dealing at flea market over the course of about 14 months); Reminga, 493 F. Supp. at 1358 ("Time, attention, and labor" requirement, which applied under pre-FOPA caselaw, was satisfied where defendant, who had been formally unemployed for over two years, "spent a considerable amount of time at gun shows, gun stores, and other locations where sales of guns occur."); Miscellaneous Firearms, 422 F. Supp. at 1069-70 (six meetings with undercover officers, of which five led to sales, "show[] that defendant's gun selling activity was a business which occupied a substantial portion of his time, and of his labor" as required by pre-FOPA caselaw).

[21] See 18 U.S.C. § 923(g)(3)(A).

[22] See U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Following the Gun: Enforcing Federal Law Against Firearms Traffickers, at 39 (2000) (reporting that a licensed dealer trafficked illegal guns at a gun show by transferring the guns "off-the-book").

[23] ATF can require such reporting by sending "demand letters" to the subject FFLs pursuant to 18 U.S.C. § 923(g)(5) (A) and 27 C.F.R. § 478.126.

[24] See 28 C.F.R. 25.9(b)(1)(ii).

[25] See Letter from Thomas E. Bush, III, supra note 2, at 24.

[26] See U.S. Government Accountability Office, Firearm and Explosives Background Checks Involving Terrorist Watch List Records, GAO-09-125R, at 2, 14 (May 21, 2009) (available at: http://www.gao.gov/docsearch/app_processform.php).

[27] U.S. Department of Justice and Treasury, Gun Shows: Brady Checks and Crime Gun Traces, at 4 (January 1999).

[28] See Following the Gun, supra note 22, at 13 (gun shows were the source of 25,862 out of 84,128 total trafficked firearms connected to the prosecutions examined in the report).

[29] See, e.g., William Newell, Special Agent in Charge, Phoenix Field Division, ATF, Testimony before the U.S. House of Representatives Committee on Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies, March 24, 2009 ("The rising incidences of trafficking U.S.-sourced firearms into Mexico is influenced by a number of factors, including increased demand for firearms by drug trafficking organizations, and the strictly regulated and generally prohibited possession and manufacturing of firearms in Mexico.  Drug traffickers are able to obtain firearms and ammunition more easily in the U.S., including sources in the secondary market such as gun shows and flea markets. Depending on State law, the private sale of firearms at those venues often does not require record keeping or background checks prior to the sale."); U.S. Government Accountability Office, Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges, GAO-09-709 (June 18, 2009) (available at: http://www.gao.gov/new.items/d09709.pdf) (According to DOJ documents and ATF officials, firearms purchased on the secondary market at venues such as gun shows are "commonly trafficked to Mexico.").

ATF AR 0150

[30] U.S. Department of Justice Office of the Inspector General Evaluation and Inspections Division, The Bureau of Alcohol, Tobacco, Firearms and Explosives' Investigative Operations at Gun Shows, at iii-iv (2007) (available at http://www.usdoj.gov/oig/reports/ATF/e0707/final.pdf).

[31] Id. at iv-v.

[32] Id. at 23.

[33] Garen Wintemute, Gun Shows Across a Multistate American Gun Market: Observational Evidence on the Effects of Regulatory Policies, Injury Prevention, 13: 150-156 (2007) (available at http://www.ucdmc.ucdavis.edu/vprp/pdf/gunshowsIPman.pdf) (noting that illegal straw purchases are more frequent in states that do not require background checks on all sales at gun shows).

[34] The so-called "gun show loophole" enables criminals to sidestep background checks if they buy from unlicensed sellers, who often operate at gun shows. Mayors Against Illegal Guns supports H.R. 2324 and S.843 (111th Congress), which would require buyers who purchase guns at gun shows to undergo criminal background checks.

[35] See 18 U.S.C. § 922(d), (a)(5), and (b)(3).

[36] See Investigative Operations at Gun Shows, supra note 30, at 1.

[37] Id. at 36.

[38] This recommendation to conduct residency checks is distinct from Recommendation 4. Recommendation 4 is designed to ascertain whether a buyer's identification is valid. The purpose of this recommendation is to identify buyers who – regardless of the validity of the identification presented – make false statements on their Form 4473 by reporting an address other than where they currently live.

[39] See Budget Delays Force Hiring Freeze at Federal Crime Fighting Agencies, USA Today, Jan. 12, 2007 (available at http://www.usatoday.com/news/washington/2007-01-12-crime-fighting_x.htm); Michael J. Sullivan, Testimony Before the House Committee on Appropriations, Subcommittee on Commerce, Justice, Science & Related Agencies, at 3-4, Apr. 8, 2008.

[40] See Newell Testimony, supra note 29.

[41] As William Hoover, ATF Assistant Director for Field Operations has acknowledged, the United States is a source for Mexican crime guns because it has "a readily accessible source of firearms and ammunition originating in mostly the secondary market." William Hoover, Statement Before the United States House of Representatives Committee on Foreign Affairs Subcommittee on the Western Hemisphere, February 7, 2008 (available at http://foreignaffairs. house.gov/110/hoo020708.htm). The ATF also contends that Mexican drug cartels get two-thirds of their weapons through straw purchases or from unlicensed dealers who are not required to perform background checks or record sales. See Brady McCombs, U.S. Makes it Easier for Gun Traffickers, Arizona Star, June 28, 2009 (available at http://www.azstarnet.com/sn/border/298845).

[42] See Newell Testimony, supra note 29. Likewise, GAO reports that over the past five years, 87 percent of guns recovered in Mexico and successfully traced originated in the U.S., while over the past three years the figure is 90 percent. See U.S. Government Accountability Office, Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges, GAO-09-709 (June 18, 2009) (available at http://www.gao.gov/new.items/d09709.pdf).

[43] See GAO-09-709, supra note 42.

[44] Id.

[45] ATF Press Release, "ATF announces Gun Runner Impact Teams Rollout" (April 28, 2009) (available at http://www.atf.gov/press/2009press/042809atf_announces-grits_rollout.htm); see Newell Testimony, supra note 29, at 4.

[46] See U.S. Department of Justice, ATF Program-Specific Plan for Management of Recovery Act Funds (May 15, 2009) (available at: http://www.usdoj.gov/recovery/pdfs/atf-plan.pdf). Note that some of the funding will also be used to establish two offices at U.S. consulates in Mexico and to purchase armored vehicles.

[47] Surge assignments to the southwest border will expire 120 days from deployment. See "ATF announces Gun Runner Impact Teams Rollout," supra note 45.

[48] If, after 2011, the situation along the Southwest border has improved, ATF should consider redeploying some of these added personnel to other problematic trafficking corridors within the United States.

[49] See H.R. 495 (111th Congress).

[50] See Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, ATF Firearms Trace Data 2007 (2008) (available at http://www.atf.gov/firearms/trace_data/index2007.htm).

[51] William J. Krouse, Congressional Research Service, The Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF): Budget and Operations, at 8 (2008).

ATF AR 0151

[52] Brian Bennett, Turning a Blind Eye to Gun Dealers, Time.com, May 8, 2007 (available at http://www.time.com/time/nation/article/0,8599,1618392,00.html) (reporting that ATF's stated goal is to complete a routine inspection of dealers once every three years).

[53] See Fact Sheet: 2007 FFL Compliance Inspections, supra note 11, at 2.

[54] In a similar case, ATF identified 900 violations of federal law by a Maryland dealer that could not account for a quarter of its inventory. Nevertheless, after revoking the dealer's license, ATF allowed it to operate for over 13 months while its case was pending in federal court. ATF further permitted Valley Gun to take 30 days after it lost in court to wind up its business by delivering any guns it had already agreed to sell. See Mem. in Support of Mot. Dismiss or in the Alt. to Transfer, Abrams v. Truscott, No. 06-cv-643 (CKK), at 3-4 (D.D.C. filed June 15, 2006).

[55] Upon receiving additional information in discovery, New York City voluntarily dismissed the cases against three of the 27 dealers sued.

[56] Daniel Webster Supp'l Expert Report, City of New York v. A-1 Jewelry & Pawn Inc, No. 06-cv-2233, at 1 (E.D.N.Y. filed May 15, 2006).

[57] See Letter from Jerome M. Pender, Acting Assistant Director, CJIS Division, FBI to the Honorable Michael R. Bloomberg, Mayor of New York City (May 27, 2009) (on file with Mayors Against Illegal Guns).

[58] Id.

[59] Id at 1.

[60] See Following the Gun, supra note 22, at 25, tbl. 13; 41 (2000).

[61] See Id. at 13, tbl. 3

[62] See 27 C.F.R. § 478.39.

[63] See Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Youth Crime Gun Interdiction Initiative Crime Gun Trace Reports: National Report, at 53 (2000).

[64] Letter from Kenneth E. Melson, Acting Director, Bureau of Alcohol, Tobacco, Firearms and Explosives to the Honorable John Peyton, Mayor o f Jacksonville, at 3 (May 19, 2009) (on file with Mayors Against Illegal Guns).

[65] ATF and academic researchers have identified several key criteria that indicate problematic dealer practices: number of traces; number of traced guns with a short time span between sale and recovery in crime; number of traced guns with serial number obliterated; number of traces that were not fully completed; number or share of buyers who failed NICS checks; numbers of multiple handgun sales; traces of guns that had sat in the dealer's inventory for over 2 years before their sale; numerous or frequent losses or thefts of guns from the dealer; pawnshops, which tend to have more traces than other dealers; numerous traces concentrated in a particular area of another state; types of guns sold; and location. See G. J. Wintemute, P.J. Cook & M. A. Wright, Risk Factors Among Handgun Retailers for Frequent and Disproportionate Sales of Guns Used in Violent and Firearm Related Crimes, Injury Prevention, 11: 357-363 (2005); Glenn L. Pierce, et al., Characteristics and Dynamics of Crime Gun Markets: Implications for Supply-Side Focused Enforcement Strategies, Final Report to the National Institute for Justice (Sept. 11, 2003); Department of the Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives, Commerce in Firearms in the United States, at 22 (2000). Numerous academics have concluded that ATF could mine its data more effectively.

[66] According to ATF data released in 2000, only 1 percent of gun dealers are the sources of 57 percent of guns recovered in crimes. See Department of Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Commerce in Firearms in the United States, at 2 and 23 (2000). Meanwhile, 85 percent of gun dealers are not associated with a single trace annually. See Id.

[67] Some in the gun industry argue that trace data should not be used to identify problematic dealers because high numbers of traces may be attributable to high sales volume. Researchers have suggested a more mixed picture: while in some cases a high trace volume merely indicates high sales volume, trace volume and sales volume in California (where dealers are required to report sales volume) are typically not closely correlated. See Garen J. Wintemute, "Relationship Between Illegal Use of Handguns and Handgun Sales Volume," Journal of the American Medical Assoc., vol. 284, at 566-7 (August 2, 2000) (available at http://jama.ama-assn.org/cgi/content/full/284/5/566).

[68] While a component of the Tiahrt Amendment appropriations rider prohibits the federal government from maintaining full NICS record data for more than 24 hours, FBI and ATF can maintain and analyze, aggregated NICS check data – including data that identifies the number of checks conducted by particular dealers – as long as the data does not identify the purchaser.

[69] 27 C.F.R. § 478.25(a).

ATF AR 0152

[70] Mayors Against Illegal Guns, The Movement of Illegal Guns in America, at 28 (December 2008) (available at http://www.mayorsagainstillegalguns.org/downloads/pdf/trace_report_final.pdf).

[71] Department of Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Commerce in Firearms in the United States, at 25 (2000).

[72] A dealer's failure to provide trace information is a basis for revoking its license and is a federal felony if done willfully.

[73] The U.S. Department of Justice Office of Inspector General, Inspections by Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, at 10 (2004).

[74] Searches in response to problems with a trace request will not count against the normal limit of one regulatory inspection per dealer per year. See 18 U.S.C. 923(g)(1)(B)(i), (ii)(II), (iii).

[75] The federal statute indicates that ATF can require dealers to keep records of "shipment, receipt, sale, or other disposition of firearms. . . ." 18 U.S.C. § 923(g)(1)(A). Under a common-sense interpretation of the statute, the processing of a trace request is a record of the gun's "disposition."

[76] 66 Fed. Reg. 40596, 40597 (August 3, 2001).

[77] 66 Fed Reg 40596, 40597 (August 3, 2001).

[78] 27 C.F.R. 478.92(a)(1)(i).

[79] See 27 C.F.R. 478.92(a)(1)(ii).

[80] See 940 Mass. Code Regs. 16.01, 16.03, 16.07(1) (2008).

[81] See Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Youth Crime Gun Interdiction Initiative Crime Gun Trace Reports:  National Report, at 68 (2000) (available at http://www.atf.gov/firearms/ycgii/2000/index.htm).

[82] See 18 U.S.C. § 923(i).

[83] For example, the community engagement strategies pioneered by Boston's Operation Ceasefire and refined in Chicago's PSN Program have had a demonstrable effect on gun violence.

[84] Meares, Tracy, Andrew V. Papachristos and Jeffrey Fagan, Homicide and Gun Violence in Chicago: Evaluation and Summary of the Project Safe Neighborhoods Program, at 3-4 (January 2009) (available at http://psnchicago.org/PDFs/2009-PSN-Research-Brief_v2.pdf).

[85] Id.

[86] See, e.g., Jeremy Kahn, Story of a Snitch, The Atlantic (April 2007) (available at http://www.theatlantic.com/doc/200704/stop-snitching).

[87] Jacksonville Sheriff's Office, Gun Bounty Program Results: October 6, 2006 to May 11, 2009 (2009).

[88] See, e.g., Salt Lake City Police Department Website, Tips for Cash, (available at http://www.slcpd.com/getinvolved/tipsforcash.html); $500 Reward Offered In Gun Bounty Program, MSNBC.com, June 20, 2009 (available at http://www.msnbc.msn.com/id/31449755/).

[89] National Shooting Sports Foundation, Fact Sheet: Straw Purchase (2009) (available at http://nssf.org/media/FactSheets/Straw_Purchase.cfm).

[90] The full 10-point code would establish these best practices for firearms retailers: 1) Videotaping the Point of Sale for All Firearms Transactions; 2) Implementing a Computerized Crime Gun Trace Log and Alert System; 3) Completing a Purchaser Declaration for Flagged Sales; 4) Deterring Fake IDs; 5) Maintaining Consistent Visible Signage to Alert Customers; 6) Conducting Employee Background Checks; 7) Conducting Employee Responsibility Training; 8) Conducting Inventory Checking; 9) Ensuring that No Sales are Made Without Background Check Results; and 10) Securing Firearms in Locked Cases.  For more information, please see http://www.mayorsagainstillegalguns.org/html/partnership/partnership.shtml.

[91] U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Following the Gun: Enforcing Federal Law Against Firearms Traffickers (2000).

[92] Department of the Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives, Commerce in Firearms in the United States (2000).

[93] See, e.g., Department of the Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives, Youth Crime Gun Interdiction Initiative Reports (1997-2002).

[94] See U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, List of Awards, Fiscal Years 1995 – 2003 (available at http://www.ojp.usdoj.gov/nij/awards/welcome.htm).  These federally funded reports provided law enforcement and policy-makers unprecedented analysis from the country's top academic experts.  For example, in FY 1997, NIJ provided approximately $500,000 to a group of academic experts to analyze the dynamics

ATF AR 0153

of illegal markets, crime gun trace data and its potential value in identifying violent offenders. See NIJ Awards in Fiscal Year 1997 (available at http://www.ojp.usdoj.gov/nij/awards/1997.htm#firearms_research). This report was published in 2004 and provided law enforcement with unprecedented information to target the diversion of firearms from the legal to the illegal markets. See Pierce, G., Braga, A., Koper, C., et al., The Characteristics and Dynamics of Crime Gun Markets: Implications for a Supply-Side Focused Enforcement Strategy, Justice Quarterly, 21:2, at 391-422 (2004).

[95] For example, in 1994, the New York State Division of Criminal Justice Services, Office of Justice Systems Analysis used federal grants to publish a report that analyzed the use of assault weapons specifically in New York City homicides (Office of Justice Systems Analysis, New York State Division of Criminal Justice Services, Assault Weapons and Homicides in New York City, May 1994). Also in 1994, the Virginia Department of Criminal Justice Services used federal grant money to publish a report on gun crimes, which provided Virginia policy-makers with new information to guide the development of effective policies to reduce gun violence in Virginia (Criminal Justice Research Center, Commonwealth of Virginia, Department of Criminal Justice Services, Guns and Violent Crime January 1994.).

[96] U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, List of Awards, Fiscal Years 2004 – 2008 (available at http://www.ojp.usdoj.gov/nij/awards/welcome.htm).

[97] Public Law No. 109-92. Passed and signed into law in 2005, Congress passed and the President signed into law the PLCAA grants broad immunity to gun manufacturers and gun dealers from civil liability but also requires dealers to offer a locking devise with each handgun purchase.

[98] 18 U.S.C. § 922(z).

[99] Christy McKerney, Defective Gunlock Triggers Recall in Broward, Miami-Dade, The South Florida Sun-Sentinel, August 3, 2001.

[100] In July 2000, the Office of the General Counsel of the CPSC issued an advisory opinion concluding that it had jurisdiction over separate firearm trigger locks.

[101] Associated Press, AK-47-Type Guns Are Turning Up in U.S. More Often, Fox News, March 26, 2008, http://www.foxnews.com/story/0,2933,341988,00.html.

[102] See 18 U.S.C. § 925(d)(3). In 1989, President George H.W. Bush signed an executive order to prevent the importation of firearms and ammunition that are not "generally recognized as particularly suitable for or readily adaptable to sporting purposes" pursuant to the 1968 Gun Control Act. See Exec. Order No. 12,680.

[103] U.S. Government Accountability Office, Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges, GAO-09-709 (June 18, 2009) (available at: http://www.gao.gov/new.items/d09709.pdf). A review of 21 recent criminal cases involving gun trafficking to Mexico revealed that 90 percent of the firearms involved were military-style assault weapons, and "the bulk" were AK-variants or AR-variants. "Indicted: Types of Firearms and Methods of Gun Trafficking from the United States to Mexico as Revealed in U.S. Court Documents," Violence Policy Center, April 2009, available at http://www.vpc.org/studies/indicted.pdf.

[104] Website for U.S. Representative Eliot L. Engle, Rep. Engel Urges President Obama to Enforce Bush 41/ Clinton Restrictions on Imported Assault Weapons, http://engel.house.gov/index.cfm?ContentID=1590&ParentID=7&SectionID=216&SectionTree=7,216&lnk=b&ItemID=1580 (last visited June 24, 2009).

[105] Mayors Against Illegal Guns does not have a position on the question of whether the domestic assault weapons ban, which expired in 2004, should be reinstated or whether new legislation regarding military-style semi-automatic rifles should be adopted. However, this coalition believes the federal government should enforce existing laws on the import of foreign-manufactured military firearms and other especially dangerous firearms.

[106] See U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Following the Gun: Enforcing Federal Law Against Firearms Traffickers, at 9, tbl. 1 (2000) (reporting that a licensed dealer trafficked illegal guns at a gun show by transferring the guns "off-the-book").

[107] See 18 U.S.C. § 923(g)(3)(A); 27 CFR 478.126a.

[108] William Hoover, Assistant Director for Field Operations, ATF, and Anthony P. Placido, Assistant Administrator for Intelligence Division, DEA, Statement before the Senate Committee on the Judiciary Subcommittee on Crime And Drugs Concerning "Law Enforcement Responses to Mexican Drug Cartels," March 17, 2009. ATF has explained that .50 caliber rifles "are prized by the Mexican drug cartels due to their ability to penetrate engine blocks and armored glass." See U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms, and Explosives, 2005

ATF AR 0154

Annual Report, at 17 (2005) (available at http://www.atf.gov/pub/gen_pub/2005annual_report.pdf).

[109] ATF Youth Crime Gun Interdiction Initiative, Crime Gun Trace Reports (2000) - National Report, at 17 tbl. 5 (2002) (available at http://www.atf.gov/firearms/ycgii/2000/cover.pdf).

[110] ATF already utilizes a similar demand letter – "Demand Letter II" – which requires FFLs with 15 or more traces of guns within 3 years of initial purchase to submit information quarterly on previously owned firearms acquired from non-FFLs. In 2004 ATF sent Demand Letter II to 271 dealers. See U.S. Department of Justice Office of Inspector General, Inspections by Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, at 10 (2004).

[111] Department of the Air Force, Air Force Office of Special Investigations, Criminal Information Report (CIR) 02-53: Officer Safety Bulletin – Stinger Pen Guns (2002).

ATF AR 0155

# APPENDIX A

**Recommendations from Mayors Against Illegal Guns: A Blueprint for Implementation**

| No. | Recommendation | Responsible Agency | Method of Implementation | Page |
|-----|----------------|--------------------|--------------------------|------|
| 1 | The FBI should inform state and local law enforcement every time NICS reports that a prohibited person has attempted to purchase a firearm and, when appropriate, inform state mental health agencies when NICS rejects a buyer due to mental health. | The Federal Bureau of Investigations (FBI), Bureau of Alcohol, Tobacco & Firearms (ATF) | Practice Reform | 5 |
| 2 | The Justice Department should identify which NICS rejections should be investigated and prosecuted. | DOJ, FBI, ATF | Practice Reform | 5 |
| 3 | The Department of Homeland Security (DHS) should require REAL ID-compliant identification for all gun purchases after December 1, 2014. | The Department of Homeland Security (DHS), White House Office of Management and Budget (OMB) | Regulation | 6 |
| 4 | NICS should electronically verify the validity of and the name associated with any state-issued identification number provided on a background check Form 4473. | FBI | Practice Reform | 6 |
| 5 | ATF should perform background checks on employees of federal firearms licensees at the licensees' request. | ATF, FBI | Practice Reform | 7 |
| 6 | ATF should perform background checks on gun dealer employees during audit inspections. | ATF, FBI | Practice Reform | 7 |

ATF AR 0156

| No. | Recommendation | Responsible Agency | Method of Implementation | Page |
|-----|----------------|--------------------|--------------------------|------|
| 7 | The Justice Department should notify dealers stripped of their licenses that they will continue to be "engaged in the business" if they dispose of inventory in significant quantities for profit. | DOJ, ATF | Practice Reform | 7 |
| 8 | ATF should fully enforce the requirement that dealers notify ATF within five business days whenever they transfer more than one handgun to an unlicensed person, including when dealers transfer more than one handgun to their own personal collections. | ATF | Practice Reform | 8 |
| 9 | ATF should maintain NICS records of default proceed sales to persons on the terrorist watch list for 20 years and all other records of default proceed sales for six months. | ATF, FBI | Practice Reform | 9 |
| 10 | When tracing guns, ATF National Tracing Center (NTC) personnel should be trained to routinely ask the FFL who sold the gun whether the recovered gun was purchased at a gun show and the location of that gun show, and then use the data to identify problematic gun shows. | ATF | Practice Reform | 11 |
| 11 | ATF field agents should have the discretion to conduct criminal enforcement operations at gun shows when trace data, prosecutions, and witness statements suggest a particular show is a source of crime guns. | ATF | Practice Reform | 12 |

ATF AR 0157

| No. | Recommendation | Responsible Agency | Method of Implementation | Page |
|---|---|---|---|---|
| 12 | ATF should increase enforcement activities to deter sales to prohibited purchasers by unlicensed gun sellers. | ATF | Practice Reform | 12 |
| 13 | ATF should investigate private sellers at gun shows who appear to be engaged in the business without a license. | ATF | Practice Reform | 12 |
| 14 | At gun shows known for criminal activity, agents should have discretion to compare purchasers' addresses reported on Form 4473 to their state driving records. | ATF | Practice Reform | 13 |
| 15 | ATF should expand Project Gunrunner by increasing the ATF personnel assigned to interdict gun trafficking from the United States to Mexico. | DOJ, ATF, DHS, OMB, State Department, Congress | Practice Reform, Increased Funding | 15 |
| 16 | ATF should establish an Interstate Firearms Trafficking Unit (IFTU) run by an ATF Deputy Chief to coordinate interstate investigations. | ATF, DOJ, OMB, Congress | Practice Reform, Increased Funding | 16 |
| 17 | ATF should receive an additional $53 million annually to hire more inspectors to meet its target of triennial dealer audits. | DOJ, ATF, OMB, Congress | Practice Reform, Increased Funding | 16 |
| 18 | ATF should enforce a dealer's license revocation when the dealer's administrative appeals are exhausted. | ATF | Practice Reform | 17 |
| 19 | ATF inspectors should conduct undercover investigations to assess gun dealer compliance with federal laws and regulations. | ATF | Practice Reform | 17 |

ATF AR 0158

| No. | Recommendation | Responsible Agency | Method of Implementation | Page |
|---|---|---|---|---|
| 20 | ATF should investigate all incidents involving thefts of five or more guns from dealers or individuals. | ATF | Practice Reform | 18 |
| 21 | ATF should require FFLs to report to the National Crime Information Center (NCIC) thefts of firearms from common carriers and bonded warehouses. | ATF | Practice Reform | 18 |
| 22 | The federal government should report annually on lost and stolen guns. | DOJ, ATF | Practice Reform | 18 |
| 23 | DOJ should support an additional 250 state and local law enforcement officers to be assigned to ATF Task Forces. | DOJ, ATF, OMB, Congress | Practice Reform, Increased Funding | 20 |
| 24 | ATF should create an Office of Tactical Trace Analysis at the National Tracing Center to proactively analyze trace data and to identify gun traffickers and problematic dealers. | ATF, DOJ, OMB, Congress | Practice Reform, Increased Funding | 21 |
| 25 | The Office of Tactical Trace Analysis should use a trace-to-NICS-check ratio to determine which dealers have a high volume of crime-gun traces compared to their approximate sales volume. | ATF | Practice Reform | 21 |
| 26 | When dealers fail to respond to trace requests, ATF should send demand letters, search FFLs' sales records, and/or require them to provide sworn statements describing when and to whom the gun was transferred. | ATF | Practice Reform | 22 |

*A BLUEPRINT FOR FEDERAL ACTION ON ILLEGAL GUNS*

42

| No. | Recommendation | Responsible Agency | Method of Implementation | Page |
|-----|----------------|--------------------|--------------------------|------|
| 27 | The Justice Department should require FFLs to keep logs of gun trace requests. | ATF, OMB | Regulation | 23 |
| 28 | ATF should require a second, hidden serial number on every newly manufactured gun. | ATF, OMB | Regulation | 23 |
| 29 | In the alternative, ATF should require that serial numbers be placed on steel and not soft metal, require stamped rather than etched marks on the gun surface, and require marks to be 0.0005 deep and 1/8 inch tall. | ATF, OMB | Regulation | 23 |
| 30 | ATF should require domestic manufacturers to use a standardized system for numbering firearms. | ATF, OMB | Regulation | 24 |
| 31 | The federal government should invest in local efforts to reduce recidivism among gun offenders. | DOJ, OMB, Congress | Practice Reform, Increased Funding | 25 |
| 32 | The federal government should increase support for community programs that generate tips on illegal firearms trafficking. | DOJ, OMB | Practice Reform | 25 |
| 33 | ATF should promote the Responsible Firearms Retailer Partnership (RFRP), pioneered by Wal-Mart, as a voluntary program for gun dealers to deter the movement of guns into the illegal market. | ATF | Practice Reform | 26 |
| 34 | DOJ and ATF should produce updated versions of groundbreaking reports on illegal firearms trafficking. | DOJ, ATF | Practice Reform | 27 |

ATF AR 0160

| No. | Recommendation | Responsible Agency | Method of Implementation | Page |
|-----|----------------|--------------------|--------------------------|------|
| 35 | ATF should expand the scope of its trace reports. | DOJ, ATF | Practice Reform | 27 |
| 36 | DOJ should fund external research of emerging problems in illegal gun trafficking and the results of enforcement efforts. | DOJ, ATF | Practice Reform | 27 |
| 37 | Consumer Products Safety Commission (CPSC) should evaluate and develop industry standards for locks that meet legal requirements. | CPSC | Regulation | 29 |
| 38 | The federal government should resume enforcement of federal law that bans importing "non-sporting purpose" firearms and ammunition. | DHS, ATF, DOJ | Practice Reform | 30 |
| 39 | ATF should identify the long guns most linked to crime and require dealers to report multiple sales of such guns. | ATF | Practice Reform | 30 |
| 40 | ATF should reclassify the Stinger pen gun, as well as any other pen guns introduced since 2002, as "Any Other Weapons" under the National Firearms Act, thereby subjecting them to strict background check, licensing, and registration requirements. | ATF | Practice Reform | 31 |

ATF AR 0161

# APPENDIX B

### The Coalition's Federal Legislative Agenda

Mayors Against Illegal Guns has endorsed six pieces of legislation – one relates to access to crime gun trace data and five relate to closing gaps in gun backgrounds checks:

- *Repealing the Tiahrt Amendments* – The Tiahrt Amendments restrict access to crime gun trace data, prevent ATF from requiring gun dealers to provide inventories, and require the destruction of most gun background check records within 24 hours.

- *Closing the Gun Show Loophole* – H.R.2324 and S.843 in the 111th Congress would require buyers who purchase guns at gun shows to undergo criminal background checks.

- *Closing the Terror Gap* – S.1317 and H.R.2159 in the 111th Congress would prevent individuals on the terrorist watch list from purchasing guns.

- *Closing the Gun Dealer Fire Sales Loophole* – H.R.6664 in the 110th Congress would have prevented gun dealers who have been shut down for illegal firearms sales from liquidating their inventories without conducting background checks.

- *Employee Background Checks* – H.R.6676 in the 110th Congress would have required gun dealers to conduct criminal background checks on their employees.

- *Closing Mental Health Gaps in Background Checks* – The NICS Improvement Amendments Act of 2007, which became law on January 8, 2008, authorizes funds to states to maintain and update criminal history and mental health records in NICS, making it harder for prohibited gun buyers to slip through the cracks of the background check system.

ATF AR 0162

# APPENDIX C

OMB No. 1140-0020

U.S. Department of Justice
Bureau of Alcohol, Tobacco, Firearms and Explosives

## Firearms Transaction Record Part I - Over-the-Counter

**WARNING:** You may not receive a firearm if prohibited by Federal or State law. The information you provide will be used to determine whether you are prohibited under law from receiving a firearm. Certain violations of the Gun Control Act, 18 U.S.C. §§ 921 et. seq., are punishable by up to 10 years imprisonment and/or up to a $250,000 fine.

Prepare in original only. All entries must be handwritten in ink. Read the Notices, Instructions, and Definitions on this form. "PLEASE PRINT."

Transferor's Transaction Serial Number *(If any)*

| Section A - Must Be Completed Personally By Transferee (Buyer) |
|---|

1. Transferee's Full Name

| Last Name | First Name | Middle Name *(If no middle name, state "NMN")* |
|---|---|---|
| | | |

2. Current Residence Address (U.S. Postal abbreviations are acceptable. Cannot be a post office box.)

| Number and Street Address | City | County | State | ZIP Code |
|---|---|---|---|---|
| | | | | |

| 3. Place of Birth U.S. City and State -OR- Foreign Country | 4. Height Ft. ___ In. ___ | 5. Weight (Lbs.) | 6. Gender Male ☐ Female ☐ | 7. Birth Date Month Day Year |
|---|---|---|---|---|
| | | | | |

| 8. Social Security Number *(Optional, but will help prevent misidentification)* | 9. Unique Personal Identification Number *(UPIN)* if applicable *(See Instructions for Question 9.)* |
|---|---|
| | |

10. Race (Ethnicity) (Check one or more boxes. See Instructions for Question 10.)

☐ American Indian or Alaska Native ☐ Black or African American ☐ Native Hawaiian or Other Pacific Islander
☐ Hispanic or Latino ☐ Asian ☐ White

11. Answer questions 11.a. *(see exceptions)* through 11.l. *(if applicable)* by checking or marking "yes" or "no" in the boxes to the right of the questions.

| | | Yes | No |
|---|---|---|---|
| a. | Are you the actual transferee/buyer of the firearm(s) listed on this form? **Warning: You are not the actual buyer if you are acquiring the firearm(s) on behalf of another person.** If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you. *(See Instructions for Question 11.a.)* Exception: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b. | ☐ | ☐ |
| b. | Are you under indictment or information in any court for a felony, or any other crime, for which the judge could imprison you for more than one year? *(See Instructions for Question 11.b.)* | ☐ | ☐ |
| c. | Have you ever been convicted in any court of a felony, or any other crime, for which the judge could have imprisoned you for more than one year, even if you received a shorter sentence including probation? *(See Instructions for Question 11.c.)* | ☐ | ☐ |
| d. | Are you a fugitive from justice? | ☐ | ☐ |
| e. | Are you an unlawful user of, or addicted to, marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance? | ☐ | ☐ |
| f. | Have you ever been adjudicated mentally defective *(which includes a determination by a court, board, commission, or other lawful authority that you are a danger to yourself or to others or are incompetent to manage your own affairs)* OR have you ever been committed to a mental institution? *(See Instructions for Question 11.f.)* | ☐ | ☐ |
| g. | Have you been discharged from the Armed Forces under dishonorable conditions? | ☐ | ☐ |
| h. | Are you subject to a court order restraining you from harassing, stalking, or threatening your child or an intimate partner or child of such partner? *(See Instructions for Question 11.h.)* | ☐ | ☐ |
| i. | Have you ever been convicted in any court of a misdemeanor crime of domestic violence? *(See Instructions for Question 11.i.)* | ☐ | ☐ |
| j. | Have you ever renounced your United States citizenship? | ☐ | ☐ |
| k. | Are you an alien illegally in the United States? | ☐ | ☐ |
| l. | Are you a nonimmigrant alien? *(See Instructions for Question 11.l.)* If you answered "no" to this question, do NOT respond to question 12 and proceed to question 13. | ☐ | ☐ |
| 12. | If you are a nonimmigrant alien, do you fall within any of the exceptions set forth in the instructions? (If "yes," the licensee must complete question 20d.) *(See Instructions for Question 12.)* If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. | ☐ | ☐ |

| 13. What is your State of residence (if any)? *(See Instructions for Question 13.)* | 14. What is your country of citizenship? *(List/check more than one, if applicable. If you are a citizen of the United States, proceed to question 16.)* ☐ United States of America ☐ Other *(Specify)* | 15. If you are not a citizen of the United States, what is your U.S.-issued alien number or admission number? |
|---|---|---|
| | | |

Note: Previous Editions Are Obsolete
Page 1 of 6

Transferee (Buyer) Continue to Next Page
STAPLE IF PAGES BECOME SEPARATED

ATF Form 4473 (5300.9) Part I
Revised August 2008

ATF AR 0163

I certify that my answers to Section A are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. I understand that answering "yes" to question 11.a. if I am not the actual buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I understand that a person who answers "yes" to any of the questions 11.b. through 11.k. is prohibited from purchasing or receiving a firearm. I understand that a person who answers "yes" to question 11.l. is prohibited from purchasing or receiving a firearm, unless the person also answers "yes" to question 12. I also understand that making any false oral or written statement, or exhibiting any false or misrepresented identification with respect to this transaction, is a crime punishable as a felony under Federal law, and may also violate State and/or local law. I further understand that the repetitive purchase of firearms for the purpose of resale for livelihood and profit without a Federal firearms license is a violation of law *(See Instructions for Question 16).*

| 16. Transferee's/Buyer's Signature | 17. Certification Date |
|---|---|
|  |  |

| **Section B - Must Be Completed By Transferor (Seller)** ||
|---|---|
| 18. Type of firearm(s) to be transferred *(check or mark all that apply):*<br><br>☐ Handgun  ☐ Long Gun  ☐ Other Firearm *(Frame, Receiver, etc.*<br>     *(rifles or*     *See Instructions for Question 18.)*<br>     *shotguns)* | 19. If sale at a gun show or other qualifying event.<br><br>Name of Event<br><br>City, State |

20a. Identification *(e.g., Virginia Driver's license (VA DL) or other valid government-issued photo identification.) (See Instructions for Question 20.a.)*

| Issuing Authority and Type of Identification | Number on Identification | Expiration Date of Identification *(if any)* |||
|---|---|---|---|---|
|  |  | Month | Day | Year |

20b. Alternate Documentation *(if driver's license or other identification document does not show current residence address)*

| 20c. All Aliens: Type and dates of documents that establish 90-day residency *(e.g., utility bills or lease agreements). (See Instructions for Question 20.c.)* ||
|---|---|
| Type(s) of Document | Date(s) of residence indicated on documents |

20d. Nonimmigrant Aliens Must Provide: Type of documentation showing an exception to the nonimmigrant alien prohibition. *(See Instructions for Question 20.d.)*

| **Questions 21, 22, or 23 Must Be Completed Prior To The Transfer Of The Firearm(s)** *(See Instructions for Questions 21, 22 and 23.)* ||
|---|---|
| 21a. Date the transferor identifying information in Section A was transmitted to NICS or the appropriate State agency: *(Month/Day/Year)*<br><br>Month    Day    Year | 21b. The NICS or State transaction number *(if provided)* was: |
| 21c. The response initially provided by NICS or the appropriate State agency was:<br><br>☐ Proceed     ☐ Delayed<br>☐ Denied        *[The firearm(s) may be transferred on*<br>☐ Cancelled      *_____ (MDI date provided by NICS)*<br>               *if State law permits (optional)]* | 21d. If initial NICS or State response was *"Delayed,"* the following response was received from NICS or the appropriate State agency:<br><br>☐ Proceed  _____ *(date)*<br>☐ Denied  _____ *(date)*<br>☐ Cancelled  _____ *(date)*<br>☐ No resolution was provided within 3 business days. |

21e. *(Complete if applicable.)* After the firearm was transferred, the following response was received from NICS or the appropriate State agency on:
_____ *(date).*  ☐ Proceed  ☐ Denied  ☐ Cancelled

21f. The name and Brady identification number of the NICS examiner *(Optional)*

         *(name)*              *(number)*

22.  ☐  No NICS check was required because the transfer involved only NFA firearm(s). *(See Instructions for Question 22.)*

23.  ☐  No NICS check was required because the buyer has a valid permit from the State where the transfer is to take place, which qualifies as an exemption to NICS *(See Instructions for Question 23.)*

| Issuing State and Permit Type | Date of Issuance *(if any)* | Expiration Date *(if any)* | Permit Number *(if any)* |
|---|---|---|---|
|  |  |  |  |

| **Section C - Must Be Completed Personally By Transferee (Buyer)** ||
|---|---|

If the transfer of the firearm(s) takes place on a different day from the date that the transferee *(buyer)* signed Section A, the transferee must complete Section C immediately prior to the transfer of the firearm(s). *(See Instructions for Question 24 and 25.)*

I certify that my answers to the questions in Section A of this form are still true, correct and complete.

| 24. Transferee's/Buyer's Signature | 25. Recertification Date |
|---|---|
|  |  |

| Page 2 of 6 | Transferor (Seller) Continue to Next Page<br>**STAPLE IF PAGES BECOME SEPARATED** | ATF Form 4473 (5300.9) Part I<br>Revised August 2008 |
|---|---|---|

ATF AR 0164

| 26. Manufacturer and/or Importer *(If the manufacturer and importer are different, the FFL should include both.)* | 27. Model | 28. Serial Number | 29. Type *(pistol, revolver, rifle, shotgun, receiver, frame, etc.) (See instructions for question 29)* | 30. Caliber or Gauge |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Section D - Must Be Completed By Transferor (Seller)**

30a. Total Number of Firearms *(Please handwrite by printing e.g., one, two, three, etc. Do not use numerals.)* | 30b. Is any part of this transaction a Pawn Redemption? ☐ Yes ☐ No

30c. For Use by FFL *(See Instructions for Question 30c.)*

**Complete ATF Form 3310.4 For Multiple Purchases of Handguns Within 5 Consecutive Business Days**

31. Trade/corporate name and address of transferor *(seller)* *(Hand stamp may be used.)* | 32. Federal Firearms License Number *(Must contain at least first three and last five digits of FFL Number X-XX-XXXXX.)* *(Hand stamp may be used.)*

**The Person Transferring The Firearm(s) Must Complete Questions 33-36. For Denied/Cancelled Transactions, The Person Who Completed Section B Must Complete Questions 33-35.**

I certify that my answers in Sections B and D are true, correct, and complete. I have read and understand the Notices, Instructions, and Definitions on ATF Form 4473. On the basis of: (1) the statements in Section A (and Section C if the transfer does not occur on the day Section A was completed); (2) my verification of the identification noted in question 20a (and my reverification at the time of transfer *if the transfer does not occur on the day Section A was completed)*; and (3) the information in the current State Laws and Published Ordinances, it is my belief that it is not unlawful for me to sell, deliver, transport, or otherwise dispose of the firearm(s) listed on this form to the person identified in Section A.

33. Transferor's/Seller's Name *(Please print)* | 34. Transferor's/Seller's Signature | 35. Transferor's/Seller's Title | 36. Date Transferred

### NOTICES, INSTRUCTIONS AND DEFINITIONS

**Purpose of the Form:** The information and certification on this form are designed so that a person licensed under 18 U.S.C. § 923 may determine if he or she may lawfully sell or deliver a firearm to the person identified in Section A, and to alert the buyer of certain restrictions on the receipt and possession of firearms. This form should only be used for sales or transfers where the seller is licensed under 18 U.S.C. § 923. The seller of a firearm must determine the lawfulness of the transaction and maintain proper records of the transaction. Consequently, the seller must be familiar with the provisions of 18 U.S.C. §§ 921-931 and the regulations in 27 CFR Part 478. In determining the lawfulness of the sale or delivery of a long gun *(rifle or shotgun)* to a resident of another State, the seller is presumed to know the applicable State laws and published ordinances in both the seller's State and the buyer's State.

After the seller has completed the firearms transaction, he or she must make the completed, original ATF Form 4473 *(which includes the Notices, General Instructions, and Definitions)*, and any supporting documents, part of his or her permanent records. Such Forms 4473 must be retained for at least 20 years. Filing may be chronological *(by date)*, alphabetical *(by name)*, or numerical *(by transaction serial number)*, as long as all of the seller's completed Forms 4473 are filed in the same manner. FORMS 4473 FOR DENIED/CANCELLED TRANSFERS MUST BE RETAINED: If the transfer of a firearm is denied/cancelled by NICS, or if for any other reason the transfer is not completed after a NICS check is initiated, the licensee must retain the ATF Form 4473 in his or her records for at least 5 years. Forms 4473 with respect to which a sale, delivery, or transfer did not take place shall be separately retained in alphabetical *(by name)* or chronological *(by date of transferee's certification)* order.

If you or the buyer discover that an ATF Form 4473 is incomplete or improperly completed after the firearm has been transferred, and you or the

Page 3 of 6

buyer wish to make a record of your discovery, then photocopy the inaccurate form and make any necessary additions or revisions to the photocopy. You only should make changes to Sections B and D. The buyer should only make changes to Sections A and C. Whoever made the changes should initial and date the changes. The corrected photocopy should be attached to the original Form 4473 and retained as part of your permanent records.

**Over-the-Counter Transaction:** The sale or other disposition of a firearm by a seller to a buyer, at the seller's licensed premises. This includes the sale or other disposition of a rifle or shotgun to a nonresident buyer on such premises.

**State Laws and Published Ordinances:** The publication (ATF P 5300.5) of State firearms laws and local ordinances ATF distributes to licensees.

**Exportation of Firearms:** The State or Commerce Departments may require you to obtain a license prior to export.

#### Section A

**Question 1. Transferee's Full Name:** The buyer must personally complete Section A of this form and certify *(sign)* that the answers are true, correct, and complete. However, if the buyer is unable to read and/or write, the answers *(other than the signatures)* may be completed by another person, excluding the seller. Two persons *(other than the seller)* must then sign as witnesses to the buyer's answers and signature.

When the buyer of a firearm is a corporation, company, association, partnership, or other such business entity, an officer authorized to act on behalf of the business must complete Section A of the form with his or her personal information, sign Section A, and attach a written statement, executed under penalties of perjury, stating: (A) the firearm is being acquired for the use of and will be the property of that business entity and (B) the name and address of that business entity.

ATF Form 4473 (5300.9) Part I
Revised August 2008

If the buyer's name in question 1 is illegible, the seller must print the buyer's name above the name written by the buyer.

**Question 2. Current Residence Address:** U.S. Postal abbreviations are acceptable, (e.g., St., Rd., Dr., Pl., NC, etc.). Address cannot be a post office box. County and Parish are one and the same.

If the buyer is a member of the Armed Forces on active duty acquiring a firearm in the State where his or her permanent duty station is located, but does not reside at his or her permanent duty station, the buyer must list both his or her permanent duty station address and his or her residence address in response to question 2. If you are a U.S. citizen with two States of residence, you should list your current residence address in response to question 2 (e.g., *if you are buying a firearm while staying at your weekend home in State X, you should list your address in State X in response to question 2*).

**Question 9. Unique Personal Identification Number (UPIN):** For purchasers approved to have information maintained about them in the FBI NICS Voluntary Appeal File, NICS will provide them with a Unique Personal Identification Number, which the buyer should record in question 9. The licensee may be asked to provide the UPIN to NICS or the State.

**Question 10. Race (Ethnicity):** Any other race or ethnicity that does not fall within those indicated, should select the closest representation.

**Question 11.a. Actual Transferee/Buyer:** For purposes of this form, you are the actual transferee/buyer if you are purchasing the firearm for yourself or otherwise acquiring the firearm for yourself (e.g., *redeeming the firearm from pawn/retrieving it from consignment, firearm raffle winner*). You are also the actual transferee/buyer if you are legitimately purchasing the firearm as a gift for a third party. ACTUAL TRANSFEREE/BUYER EXAMPLES: Mr. Smith asks Mr. Jones to purchase the firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. Mr. Jones is NOT THE ACTUAL TRANS-FEREE/BUYER of the firearm and must answer "NO" to question 11.a. The licensee may not transfer the firearm to Mr. Jones. However, if Mr. Brown goes to buy a firearm with his own money to give to Mr. Black as a present, Mr. Brown is the actual transferee/buyer of the firearm and should answer "YES" to question 11.a. However, you may not transfer a firearm to any person you know or have reasonable cause to believe is prohibited under 18 U.S.C. § 922(g), (n), or (x). Please note: EXCEPTION: If you are picking up a repaired firearm(s) for another person, you are not required to answer 11.a. and may proceed to question 11.b.

**Question 11.b. - 11.l. Definition of Prohibited Person:** Generally, 18 U.S.C. § 922 prohibits the shipment, transportation, receipt, or possession in or affecting interstate commerce of a firearm by one who: has been convicted of a misdemeanor crime of domestic violence; has been convicted of a felony, or any other crime, punishable by imprisonment for a term exceeding one year *(this does not include State misdemeanors punishable by imprisonment of two years or less)*; is a fugitive from justice; is an unlawful user of, or addicted to, marijuana or any depressant, stimulant, or narcotic drug, or any other controlled substance; has been adjudicated mentally defective or has been committed to a mental institution; has been discharged from the Armed Forces under dishonorable conditions; has renounced his or her U.S. citizenship; is an alien illegally in the United States or a nonimmigrant alien; or is subject to certain restraining orders. Furthermore, section 922 prohibits the shipment, transportation, or receipt in or affecting interstate commerce of a firearm by one who is under indictment or information for a felony, or any other crime, punishable by imprisonment for a term exceeding one year.

**Question 11.b. Under Indictment or Information or Convicted in any Court:** An indictment, information, or conviction in any Federal, State, or local court. An information is a formal accusation of a crime verified by a prosecutor.

*EXCEPTION to 11.c. and 11.i.:* A person who has been convicted of a felony, or any other crime, for which the judge could have imprisoned the person for more than one year, or who has been convicted of a misdemeanor crime of domestic violence, is not prohibited from purchasing, receiving, or possessing a firearm if: (1) under the law of the jurisdiction where the conviction occurred, the person has been pardoned, the conviction has been expunged or set aside, or the person has had their civil rights *(the right to vote, sit on a jury, and hold public office)* taken away and later restored AND (2) the person is not prohibited by the law of the jurisdiction where the conviction occurred from receiving or possessing firearms. Persons subject to this exception should answer "no" to 11.c. or 11.i., as applicable.

Page 4 of 6

**Question 11.f. Adjudicated Mentally Defective:** A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease: (1) is a danger to himself or to others; or (2) lacks the mental capacity to contract or manage his own affairs. This term shall include: (1) a finding of insanity by a court in a criminal case; and (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility.

**Committed to a Mental Institution:** A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution. Please also refer to Question 11.c. for the definition of a prohibited person.

*EXCEPTION to 11. f. NICS Improvement Amendments Act of 2007:* A person who has been adjudicated as a mental defective or committed to a mental institution is not prohibited if: (1) the person was adjudicated or committed by a department or agency of the Federal Government, such as the United States Department of Veteran's Affairs ("VA") (as opposed to a State court, State board, or other lawful State authority); and (2) either: (a) the person's adjudication or commitment for mental incompetency was set-aside or expunged by the adjudicating/committing agency; (b) the person has been fully released or discharged from all mandatory treatment, supervision, or monitoring by the agency; or (c) the person was found by the agency to no longer suffer from the mental health condition that served as the basis of the initial adjudication. Persons who fit this exception should answer "no" to Item 11.f. This exception does not apply to any person who was adjudicated as not guilty by reason of insanity, or based on lack of mental responsibility, or found incompetent to stand trial, in any criminal case or under the Uniform Code of Military Justice.

**Question 11.h. Definition of Restraining Order:** Under 18 U.S.C. § 922, firearms may not be sold to or received by persons subject to a court order that: (A) was issued after a hearing which the person received actual notice of and had an opportunity to participate in; (B) restrains such person from harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. An "intimate partner" of a person is: the spouse or former spouse of the person, the parent of a child of the person, or an individual who cohabitates or cohabitating with the person.

**Question 11.i. Definition of Misdemeanor Crime of Domestic Violence:** A Federal, State, local, or tribal offense that is a misdemeanor under Federal, State, or tribal law and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with, or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim. The term includes all misdemeanors that have as an element the use or attempted use of physical force or the threatened use of a deadly weapon (e.g., assault and battery), if the offense is committed by one of the defined parties. *(See Exception to 11.c. and 11.i.)* A person who has been convicted of a misdemeanor crime of domestic violence also is not prohibited unless: (1) the person was represented by a lawyer or gave up the right to a lawyer; or (2) if the person was entitled to a jury, was tried by a jury, or gave up the right to a jury trial. Persons subject to this exception should answer "no" to 11.i.

**Question 11.L. "Nonimmigrant Alien":** An alien in the United States in a nonimmigrant classification. The definition includes, among others, persons traveling temporarily in the United States for business or pleasure, persons studying in the United States who maintain a residence abroad, and certain foreign workers. The definition does NOT include permanent resident aliens.

**Sale of Firearms to Legal Aliens:** Even if a nonimmigrant alien can establish that he or she has a U.S.-issued alien number or admission number and has resided in a State for at least 90 continuous days immediately prior to the date of

ATF Form 4473 (5300.9) Part 1
Revised August 2008

ATF AR 0166

sale, he or she is prohibited from receiving a firearm unless he or she falls within an exception to the nonimmigrant alien prohibition. *(See Question 11.c. and Exception to 11.l.)* If a nonimmigrant alien claims to fall within one of these exceptions by answering "yes" to question 12, he or she must provide the licensee with documentation of the exception *(e.g., hunting license/permit; waiver)*. If the documentation is a hunting license/permit, the licensee must make sure it has not expired. An expired hunting license/permit does not qualify for the exception. A licensee MUST complete and may attach a copy of the documentation to ATF Form 4473.

**EXCEPTION to 11.l.:** A nonimmigrant alien is not prohibited from purchasing, receiving, or possessing a firearm if the alien: (1) is in possession of a hunting license or permit lawfully issued in the United States; or (2) has received a waiver from the prohibition from the Attorney General of the United States. *(See 18 U.S.C. § 922(y)(2) for additional exceptions.)* Persons subject to one of these exceptions should answer "yes" to questions 11.l. and 12 and provide a copy of the hunting license or letter granting the waiver, which must be recorded in 20.d. If the Transferee (Buyer) answered "yes" to this question, the licensee MUST complete 20.d.

**Question 12. Exceptions to Nonimmigrant Alien Response:** If question 11.l. is answered with a "no" response, then do NOT respond to question 12 and proceed to question 13. If response is "yes," then licensee must complete question 20.d., and may attach a copy.

**Question 13. State of Residence:** The State in which an individual resides. An individual resides in a State if he or she is present in a State with the intention of making a home in that State. If an individual is a member of the Armed Forces on active duty, his or her State of residence also is the State in which his or her permanent duty station is located. An alien who is legally in the United States is a resident of a State only if the alien is residing in the State and has resided in the State continuously for at least 90 days immediately prior to the date of sale or delivery of a firearm.

If you are a U.S. citizen with two States of residence, you should list your current residence address in response to question 2 (*e.g.*, if you are buying a firearm while staying at your weekend home in State X, you should list your address in State X in response to question 2). If you are not a citizen of the United States, you only may have a State of residence if you have resided in a State for at least 90 continuous days immediately prior to the date of this sale.

**Question 16. Certification Definition of Engaged in the Business:** Under 18 U.S.C. § 922 (a)(1), it is unlawful for a person to engage in the business of dealing in firearms without a license. A person is engaged in the business of dealing in firearms if he or she devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms. A license is not required of a person who only makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his or her personal collection of firearms.

**Section B**

**Question 18. Type of Firearm(s):** Check all boxes that apply. "Other" refers to frames, receivers and other firearms that are not either handguns or long guns (rifles or shotguns), such as firearms having a pistol grip that expel a shotgun shell, or National Firearms Act (NFA) firearms.

If a frame or receiver can only be made into a long gun *(rifle or shotgun)*, it is still a frame or receiver not a handgun or long gun. However, they still are "firearms" by definition, and subject to the same GCA limitations as any other firearms. See Section 921(a)(3)(b). 18 U.S.C. Section 923(b)(1) makes it unlawful for a licensee to sell any firearm other than a shotgun or rifle to any person under the age of 21. Since a frame or receiver for a firearm, to include one that can only be made into a long gun, is a "firearm other than a shotgun or rifle," it cannot be transferred to anyone under the age of 21. Also, note that multiple sales forms are not required for frames or receivers of any firearms, or pistol grip firearms, since they are not "pistols or revolvers" under Section 923(g)(3)(a).

**Question 19. Gun Shows:** If sale at gun show or other qualifying event sponsored by a national, State, or local organization, as authorized by

27 CFR § 478.100, the seller must record the name of event and the location *(city and State)* of the sale in question 19.

**Question 20a. Identification:** List issuing authority *(e.g., State, County or Municipality)* and type of identification presented *(e.g., Virginia driver's license (VA DL), or other valid government-issued identification)*.

**Know Your Customer:** Before a licensee may sell or deliver a firearm to a nonlicensee, the licensee must establish the identity, place of residence, and age of the buyer. The buyer must provide a valid government-issued photo identification to the seller that contains the buyer's name, residence address, and date of birth. The licensee must record the type, identification number, and expiration date *(if any)* of the identification in question 20.a. A driver's license or an identification card issued by a State in place of a license is acceptable. Social Security cards are not acceptable because no address, date of birth, or photograph is shown on the cards. A combination of government-issued documents may be provided. For example, if a U.S. citizen has two States of residence and is trying to buy a handgun in State X, he may provide a driver's license *(showing his name, date of birth, and photograph)* issued by State Y and another government-issued document *(such as a tax document)* from State X showing his residence address. If the buyer is a member of the Armed Forces on active duty acquiring a firearm in the State where his or her permanent duty station is located, but his or her driver's license from another State, you should list the buyer's military identification card and official orders showing where his or her permanent duty station is located in response to question 20.a.

**Question 20.b. Alternate Documentation:** Licensees may accept a combination of valid government-issued documents to satisfy the identification document requirements of the law. The required valid government-issued photo identification document bearing the name, photograph, and date of birth of transferee may be supplemented by another valid, government-issued document showing the transferee's residence address. This alternate documentation should be recorded in question 20.b. with issuing authority and type of identification presented. A combination of government-issued documents may be provided. For example, if a U.S. citizen has two States of residence and is trying to buy a handgun in State X, he may provide a driver's license *(showing his name, date of birth, and photograph)* issued by State Y and another government-issued document *(such as a tax document)* from State X showing his residence address.

**Question 20.c. Documentation for All Aliens:**

**Sale of Firearms to Legal Aliens:** A buyer who is not a citizen of the United States must provide additional documentation *(beyond a valid government-issued photo identification that contains the buyer's name, residence address, and date of birth)* to establish that he or she has resided in a State continuously for at least 90 days immediately prior to the date of the sale. *(See Question 13.)* Examples of appropriate documents to establish State residency are utility bills from each of the last 3 months immediately prior to the sale or a lease agreement that demonstrates 90 days of residency immediately prior to the sale. A licensee may attach a copy of the documentation to ATF Form 4473, rather than record the type of documentation in question 20.c. Acceptable documentation to prove 90-day continuous residency must be original documentation *(e.g., utility bills, current bank statements, rent receipts, mortgage payments, lease agreements, personal property tax bills, documents issued by Federal, State, or local government agencies, first-class mail issued by a government agency, insurance policies, or bill with current address or major credit card bill)*.

**Question 20.d. Documentation for Nonimmigrant Aliens:** See instructions for Question 11.l. Types of acceptable documents would include a valid State-issued hunting license or a letter from the U.S. Attorney General granting a waiver.

**Question(s) 21, 22, 23, NICS BACKGROUND CHECKS:** 18 U.S.C. § 922(t) requires that prior to transferring any firearm to an unlicensed person, a licensed importer, manufacturer, or dealer must first contact the National Instant Criminal Background Check System (NICS). NICS will advise the licensee whether the system finds any information that the purchaser is prohibited by law from possessing or receiving a firearm. For purposes of this form, contacts to NICS include contacts to State agencies designated to conduct NICS checks for the Federal Government. WARNING: Any seller who transfers a firearm to any person they know or have reasonable cause to believe is prohibited from receiving or possessing a firearm violates the law, even if the seller has complied with the background check requirements of the Brady law.

ATF Form 4473 (5300.9) Part 1
Revised August 2008

After the buyer has completed Section A of the form and the licensee has completed questions 18-20, and before transferring the firearm, the licensee must contact NICS *(read below for NICS check exceptions.)* However, the licensee should NOT contact NICS and should stop the transaction if: the buyer answers "no" to question 11.a.; the buyer answers "yes" to any question in 11.b.-11.l., unless the buyer only has answered "yes" to question 11.l. and also answers "yes" to question 12; or the buyer is unable to provide the documentation required by question 20.a, b. c. or d.

At the time that NICS is contacted, the licensee must record in question 21.a.-c: the date of contact, the NICS *(or State)* transaction number, and the initial response provided by NICS or the State. The licensee may record the Missing Disposition Information (MDI) date in 21.c. that NICS provides for delayed transactions *(States do not provide this number).* If the licensee receives a *"delayed"* response, before transferring the firearm, the licensee must record in question 21.d. any response later provided by NICS or the State or that no resolution was provided within 3 business days. If the license receives a response from NICS or the State after the firearm has been transferred, he or she must record this information in question 21.c. Note: States acting as points of contact for NICS checks may use terms other than *"proceed,"* *"delayed,"* *"cancelled,"* or *"denied."* In such cases, the licensee should check the box that corresponds to the State's response. Some States may not provide a transaction number for denials. However, if a firearm is transferred within the three business day period, a transaction number is required.

NICS Responses: If NICS provides a *"proceed"* response, the transaction may proceed. If NICS provides a *"cancelled"* response, the seller is prohibited from transferring the firearm to the buyer. If NICS provides a *"denied"* response, the seller is prohibited from transferring the firearm to the buyer. If NICS provides a *"delayed"* response, the seller is prohibited from transferring the firearm unless 3 business days have elapsed and, before the transfer, NICS or the State has not advised the seller that the buyer's receipt or possession of the firearm would be in violation of law. (See 27 CFR § 478.102(a) for an example of how to calculate 3 business days.) If NICS provides a *"delayed"* response. NICS also will provide a Missing Disposition Information (MDI) date that calculates the 3 business days and reflects when the firearm(s) can be transferred under Federal law. States may not provide an MDI date. *Please note State law may impose a waiting period on transferring firearms.*

EXCEPTIONS TO NICS CHECK: A NICS check is not required if the transfer qualifies for any of the exceptions in 27 CFR § 478.102(d). Generally these include: (a) transfers where the buyer has presented the licensee with a permit or license that allows the buyer to possess, acquire, or carry a firearm, and the permit has been recognized by ATF as a valid alternative to the NICS check requirement; (b) transfers of National Firearms Act weapons approved by ATF; or (c) transfers certified by ATF as exempt because compliance with the NICS check requirements is impracticable. See 27 CFR § 478.102(d) for a detailed explanation. If the transfer qualifies for one of these exceptions, the licensee must obtain the documentation required by 27 CFR § 478.131. A firearm must not be transferred to any buyer who fails to provide such documentation.

### Section C

Question 24 and 25. Transfer on a Different Day and Recertification: If the transfer takes place on a different day from the date that the buyer signed Section A, the licensee must again check the photo identification of the buyer at the time of transfer, and the buyer must complete the recertification in Section C at the time of transfer.

### Section D

Immediately prior to transferring the firearm, the seller must complete all of the questions in Section D. In addition to completing this form, the seller must report any multiple sale or other disposition of pistols or revolver on ATF Form 3310.4 (see 27 CFR § 478.126a).

Question(s) 26, 27, 28, 29 and 30, Firearm(s) Description: These blocks should be completed with the firearm(s) information. Firearms manufactured after 1968 should all be marked with a serial number. Should you acquire a firearm that is not marked with a serial number, you may answer question 28 with "NSN" (No Serial Number), "N/A" or "None."

Page 6 of 6

If more than five firearms are involved in a transaction, the information required by Section D, questions 26-30, must be provided for the additional firearms on a separate sheet of paper, which must be attached to the ATF Form 4473 covering the transaction.

Types of firearms include: pistol, revolver, rifle, shotgun, receiver, frame and other firearms that are not either handguns or long guns (rifles or shotguns), such as firearms having a pistol grip that expel a shotgun shell or National Firearms Act (NFA) firearms.

Additional firearms purchases by the same buyer may not be added to the form after the seller has signed and dated it. A buyer who wishes to purchase additional firearms after the seller has signed and dated the form must complete a new ATF Form 4473. The seller must conduct a new NICS check.

Question 30c. This box is for the FFL's use in recording any information he or she finds necessary to conduct business.

Question 32 Federal Firearms License Number: Must contain at least the first three and last five digits of the FFL number, for instance X-XX-XXXXX.

Question 33-35 Transferor/Sellers Information: For "denied" and "cancelled" NICS transactions, the person who completed Section B must complete Section D, questions 33-35.

### Privacy Act Information

Solicitation of this information is authorized under 18 U.S.C. § 923(g). Disclosure of the individual's Social Security number is voluntary. The number may be used to verify the buyer's identity.

### Paperwork Reduction Act Notice

The information required on this form is in accordance with the Paperwork Reduction Act of 1995. The purpose of the information is to determine the eligibility of the transferee to receive firearms under Federal law. The information is subject to inspection by ATF officers and is required by 18 U.S.C. §§ 922 and 923.

The estimated average burden associated with this collection is 30 minutes per respondent or recordkeeper, depending on individual circumstances. Comments about the accuracy of this burden estimate and suggestions for reducing it should be directed to Reports Management Officer, Document Services Section, Bureau of Alcohol, Tobacco, Firearms and Explosives, Washington, DC 20226.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number. Confidentiality is not assured.

ATF Form 4473 (5300.9) Part 1
Revised August 2008

ATF AR 0168