# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **THE NATIONAL SHOOTING SPORTS FOUNDATION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 1:11-cv-01401-RMC** |
| | ) | **(consolidated with 11-cv-1402)** |
| **B. TODD JONES, Acting Director, Bureau of Alcohol, Tobacco, Firearms & Explosives, in his official capacity,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Congress has vested in the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") the duty to investigate criminal and regulatory violations of the federal firearms laws. The principal means by which ATF fulfills this statutory responsibility involves licensing and inspecting federal firearms licensees ("FFLs") to ensure they comply with laws governing the sale, transfer, possession, and transport of firearms.  To that end, the Gun Control Act mandates that FFLs, "when required by letter issued by the Attorney General, . . . submit . . . record information required to be kept by" the Act.  18 U.S.C. § 923(g)(5)(A).  ATF recently exercised its authority under this provision to address an acute law enforcement need: combating the flow of firearms across the Southwest Border into Mexico and the escalation of drug-related violence in that region.  Based on the number of firearms seized in Mexico and successfully traced, ATF has determined that a significant proportion of the weapons relied on by Mexican drug cartels originate in the United States, and are trafficked across the Southwest border.  Furthermore, Mexican drug organizations are increasingly relying on more powerful rifles to control lucrative drug-trafficking routes between the United States and Mexico.  Until recently, however, ATF's ability to detect and slow this flow of firearms into Mexico has been limited by a lack of timely information about multiple sales of such rifles.

On July 12, 2011, ATF exercised its authority under Section 923(g)(5)(A) to issue a demand letter to certain FFLs in four Southwest Border States – the primary source States of firearms trafficked to Mexico.  The letter requires these FFLs to submit to ATF a one-page report whenever they sell or otherwise dispose of two or more semi-automatic rifles meeting certain specifications to a single unlicensed person within a period of five consecutive business days.

Notwithstanding the clear statutory authority underlying ATF's demand letter, the narrow subset of FFLs affected by the requirement, and the critical law enforcement need for the requested information, Plaintiffs brought this action to enjoin ATF from obtaining the information sought by the letter.  Taking an unduly narrow view of the power vested by Congress in the agency, Plaintiffs claim that ATF lacks statutory authority to obtain records that FFLs are required by statute to keep.  In three separate decisions, however, the Fourth and Ninth Circuits have considered challenges to demand letters issued pursuant to Section 923(g)(5)(A), and have unanimously rejected statutory challenges to ATF's authority that are fundamentally indistinguishable from the contentions Plaintiffs raise here.  Because ATF acted well within its statutory authority in issuing the demand letter, the Court should enter summary judgment for Defendant.

**STATUTORY AND REGULATORY BACKGROUND**

### A.      Licensing and Recordkeeping Requirements

The Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 et seq., regulates the manufacture, importation and sale of firearms by requiring any person engaged in the business of manufacturing, importing, or dealing in firearms to be licensed by the Attorney General.  18 U.S.C. §§ 922(a)(1), 923(a).  See Huddleston v. United States, 415 U.S. 814, 824 (1974) (stating that "commerce in firearms is channeled through federally licensed importers, manufacturers, and dealers," and that "[t]he principal agent of federal enforcement [of the GCA] is the dealer.").  The federally-licensed dealer must create and maintain records of all firearms transactions, including the name, age, and place of residence of individual firearms purchasers.  18 U.S.C.

§§ 922(b)(5), 923(g).[1]

ATF is the only Federal agency authorized to license and inspect firearms dealers to ensure they comply with laws governing the sale, transfer, possession, and transport of firearms. See 28 U.S.C. § 599A; 28 C.F.R. § 0.131.  Because complete and accurate records of firearms purchases are a critical law enforcement tool for tracing guns used in crime, Congress authorized ATF to inspect the records and inventories of firearms and ammunition kept by licensed dealers, manufacturers, and importers to verify that records are maintained in accordance with applicable requirements and to ensure that licensees comply with federal laws governing the sale, transfer, possession, and transport of firearms.  See 18 U.S.C. § 923(g)(1); 28 C.F.R. § 0.131.[2]  Congress also required licensees to submit certain reports and information, 18 U.S.C. § 923(g), and authorized the Secretary of the Treasury to prescribe such rules and regulations as necessary to carry out the provisions of the GCA.  18 U.S.C. § 926.[3]

---

[1] Licensees fall into various categories including: dealers in firearms other than destructive devices (Type 01); pawnbrokers in firearms other than destructive devices (Type 02); manufacturers in ammunition for firearms (Type 06); manufacturers of firearms other than destructive devices (Type 07); importers of firearms other than destructive devices (Type 08); dealers in destructive devices (Type 09); manufacturers in destructive devices (Type 10); and importers in destructive devices (Type 11).  ATF's regulations provide particulars about the records to be kept by each licensee category.  See, e.g., 27 C.F.R. §§ 478.124(c)(1), 478.124(e), 478.125(e).

[2] The Homeland Security Act of 2002 divided the Bureau of Alcohol, Tobacco and Firearms into two separate agencies, the Bureau of Alcohol, Tobacco, Firearms and Explosives within the Department of Justice, and the Tax and Trade Bureau within the Department of the Treasury.  Homeland Security Act of 2002, Pub. L. No. 107-296, § 1111, 116 Stat. 2135, 2274.  The Act transferred the Bureau's authority under the Gun Control Act to the new ATF in the Department of Justice.  Id. The Act also amended the Gun Control Act by replacing references to the Secretary of the Treasury with references to the Attorney General.  Id. § 1112.

[3] The Secretary of the Treasury delegated the authority to enforce federal firearms laws to ATF.  Treasury Dep't Order No. 221, 37 Fed. Reg. 11,696 (June 10, 1972).  After the Homeland

In December 1968, the Treasury Department issued regulations implementing the GCA and establishing the framework for requesting and obtaining information from FFLs.  33 Fed. Reg. 18,555, 18,571 (Dec. 14, 1968).[4]  One regulation provided, in relevant part:

> Each licensee shall, when required by letter issued by the Assistant Regional Commissioner, and until notified to the contrary in writing by such officer, submit on Form 4483, Report of Firearms Transactions, for the periods and at the times specified in the letter issued by the Assistant Regional Commissioner, all record information required by this subpart, or such lesser record information as the Assistant Regional Commissioner in his letter may specify.

33 Fed. Reg. at 18,571.  The regulation is currently codified at 27 C.F.R. § 478.126.[5]

The Firearms Owners' Protection Act of 1986 ("FOPA"), Pub. L. No. 99-308, 100 Stat. 449, amended the Gun Control Act in various respects.  "FOPA was intended to reduce the regulatory burden on law-abiding firearms owners without incapacitating [ATF's] ability to

_____

Security Act of 2002 transferred ATF to the Department of Justice, the Attorney General continued that delegation.  28 C.F.R. § 0.130(a)(1).

[4] The regulations prescribed to implement 18 U.S.C. § 923(g)(1)(A) are codified at 27 C.F.R. part 478 subpart H.  As relevant here, before selling or otherwise disposing of any rifle to a non-FFL, an FFL must record certain information on a firearms transaction record, Form 4473 (a copy of which is attached as Ex. 1).  See 27 C.F.R. § 478.124(a).  The record information required to be kept for each rifle sale includes the date of sale; the model, serial number, and caliber of the rifle; its manufacturer and/or importer; the buyer's full name, address, sex, race, date of birth, and country of citizenship; the buyer's identification number and the type of identification provided; the name of the person actually transferring the firearm; and a certification that the buyer is the actual buyer or transferee of the firearm he or she is purchasing.  See id. § 478.124(c)(1) - (c)(5); Ex. 1.  The FFL must retain each Form 4473 in alphabetical order (by name of buyer), chronological order (by date of sale or other disposition), or numerical order (by transaction serial number).  27 C.F.R. § 478.124(b).

[5] The regulation previously appeared at 27 C.F.R. § 178.126.  After enactment of the Homeland Security Act of 2002, the Departments of the Treasury and Justice re-designated 27 C.F.R. part 178 as 27 C.F.R. part 478.  68 Fed. Reg. 3744, 3750 (Jan. 24, 2003).  27 C.F.R. § 478.126(a) uses the term Director of Industry Operations instead of the term Assistant Regional Commissioner, but is otherwise identical in all material respects to the provision promulgated in 1968.

combat violations of the firearms laws." RSM, Inc. v. Buckles, 254 F.3d 61, 64 (4th Cir. 2001).

Three provisions of FOPA are of particular relevance to this case.  One provision, 18 U.S.C.

§ 923(g)(5), essentially codified ATF's demand letter regulation, 27 C.F.R. § 478.126, and states:

> Each licensee shall, when required by letter issued by the Secretary, and until notified to the contrary in writing by the Secretary, submit on a form specified by the Secretary, for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the Secretary in such letter may specify.

18 U.S.C. § 923(g)(5)(A).[6]

In addition, FOPA added 18 U.S.C. § 926(a) to the GCA, which limited the Secretary's

ability to prescribe regulations creating a registry of firearms.  RSM, 254 F.3d at 65.  Section

926(a) provides, in relevant part:

> No . . . rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act [May 19, 1986] may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.  Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.

18 U.S.C. § 926(a).

FOPA also codified a 1975 ATF regulation requiring FFLs to report the "sale or other

disposition of two or more pistols or revolvers [to the same person] at one time, or during any

five consecutive business days."  40 Fed. Reg. 19,201 (May 2, 1975); 27 C.F.R. § 478.126(a).

Pursuant to 18 U.S.C. § 923(g)(3)(A), "[e]ach licensee shall prepare a report of multiple sales or

---

[6] As explained in footnote 2, this statute as originally enacted referred to the Secretary of the Treasury, a reference replaced with reference to the Attorney General in 2002.  In all other respects, the statute is the same as it was when enacted in 1986.

other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any

five consecutive business days, two or more pistols, or revolvers, or any combination of pistols

and revolvers totaling two or more, to an unlicensed person."

Nine years after FOPA was enacted, Congress passed 18 U.S.C. § 923(g)(7), which

mandates that FFLs "respond immediately to, and in no event later than 24 hours after the receipt

of, a request by the [Attorney General] for information contained in the records required to be

kept by this chapter, as may be required to determine the disposition of one or more firearms in

the course of a bona fide criminal investigation."

Since fiscal year 1979, Congress has included an additional restriction in annual

appropriations legislation governing the Department of the Treasury and Department of Justice.

For example, the appropriations legislation for the current fiscal year contains a provision that

prohibits the expenditure of appropriated funds "in connection with consolidating or centralizing,

within the Department of Justice, the records, or any portion thereof, of acquisition and

disposition of firearms maintained by Federal firearms licensees."  Consolidated Appropriations

Act of 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3128 (2009).[7]  Analyzing an identical

appropriations rider in connection with a lawsuit challenging ATF's authority to issue another

demand letter under 18 U.S.C. § 923(g)(5)(A), the Fourth Circuit noted that the rider was "first

passed in response to a proposed [ATF] regulation which would have required all FFLs to submit

a quarterly report of all of their firearm dispositions.  Congress was alarmed by [ATF's] attempt

to secure the records of all FFLs nationally and the accompanying invasion of lawful firearm

_____

[7] The Department of Defense and Full-Year Continuing Appropriations Act of 2011,
Pub. L. No. 112-10, 125 Stat. 38, 102-03 (2011), provided that the Consolidated Appropriations
Act of 2010 would remain in effect until September 30, 2011.

owners' privacy."  RSM, 254 F.3d at 67 (citation omitted).

**B.     ATF's Prior Demand Letters**

ATF exercised its authority under 18 U.S.C. § 923(g)(5)(A) to issue its first demand letter

in February 2000 to FFLs who had failed to respond to a firearms trace request on at least one

occasion; had failed to respond to a trace request within 24 hours on three or more occasions; or

had provided incorrect information in response to a trace request.  Declaration of Arthur Herbert,

Assistant Director, Enforcement Programs and Services, ATF ("Herbert Decl.") ¶ 13 (attached as

Ex. 2).  The FFLs who received the demand letters were required to send to ATF all of their

acquisition and disposition records for the preceding three years and to continue to send the

records on a monthly basis until otherwise notified.  Id.  Once an FFL began to respond as

required to trace requests, it was no longer required to submit records.  Id.

That same year, ATF issued a second type of demand letter, this time to FFLs who had

ten or more firearms traced to them with a relatively short (i.e., three years or less), "time to

crime."[8]  Herbert Decl. ¶ 15.  The FFLs who received this letter were required to submit

information regarding used or secondhand firearms obtained from non-licensees on a quarterly

basis until otherwise informed.  Id.  This information enabled ATF to trace any used guns sold by

the FFL.  Without this information, ATF was unable to link the secondhand firearms to the dealer

and more recent purchaser.  Id.

Both the Fourth and Ninth Circuits have upheld ATF's authority to issue demand letters

pursuant to 18 U.S.C. § 923(g)(5)(A).  See RSM, 254 F.3d at 61; Blaustein & Reich, Inc. v.

---

[8] As discussed further below, "time to crime" refers to the amount of time that elapses
between a firearm's first retail sale and its recovery at a crime scene.  Herbert Decl. ¶ 15.

Buckles, 365 F.3d 281, 287 (4th Cir. 2004); J & G Sales Ltd. v. Truscott, 473 F.3d 1043 (9th Cir.

2007).  No additional types of demand letters were issued prior to July 12, 2011.

**GENERAL BACKGROUND**

The illicit trafficking of drugs and firearms across the Southwest Border has contributed

to an escalation of violence in Mexico, and the Mexican drug cartels responsible for that violence

present a significant organized crime threat to the United States.  See Herbert Decl. ¶¶ 18-21

(noting that Mexican drug trafficking organizations ("DTOs") represent a significant organized

crime threat).  The cartels "use violence to control lucrative drug trafficking corridors along the

Southwest border, through which drugs flow north into the United States, while guns and cash

flow south to Mexico."  Administrative Record ("A.R.") at 250.  ATF has determined that

Mexican DTOs depend on a "constant supply of firearms to defend their territory, eliminate

rivals, and challenge the government."  Herbert Decl. ¶ 22.

Based on the number of firearms seized in Mexico and successfully traced by ATF to

non-licensed purchasers, the U.S. Government Accountability Office ("GAO") has concluded

that "a large proportion of the firearms fueling Mexican drug violence originated in the United

States."  A.R. at 38; see also Herbert Decl. ¶¶ 30, 33, 34.[9]  Specifically, based on ATF trace data,

"the top four source locations by state for all firearms recovered in Mexico that were submitted

for tracing and successfully traced to non-licensed purchasers between December 1, 2006 and

---

[9] According to ATF's eTrace reports, over 20,000 firearms seized by Mexican authorities
and traced from fiscal year 2004 to fiscal year 2008 originated in the United States.  A.R. at 50-
51.  Though ATF's eTrace data only represent data from gun trace *requests* submitted from
seizures in Mexico rather than all guns seized, they are the only systematic data available and
they reflect the "conclusions reached by U.S. and Mexican government and law enforcement
officials involved in combating arms trafficking in Mexico."  A.R. at 51.

August 31, 2010, were Texas, Arizona, California, and New Mexico." Herbert Decl. ¶ 34; A.R. at 250 (noting that in 2009, FFLs in the Southwest border states were primary sources of guns used by Mexican drug cartels); see also A.R. at 55 ("From fiscal year 2004 to fiscal year 2008, most of the firearms seized in Mexico and traced came from U.S. Southwest border states.  In particular, about 70 percent of these firearms came from Texas, California, and Arizona.").

Given that many of the firearms used by Mexican DTOs originate in the United States, President Obama and President Felipe Calderon of Mexico recognized in a joint statement that both countries "share responsibility for defeating and dismantling the illicit criminal networks that traffic drugs into the United States, and illegal weapons and illicit revenues into Mexico, and that these transnational networks are associated with much of the crime and violence occurring in Mexico today."  Joint Statement from President Barack Obama and President Felipe Calderon (May 19, 2010), *available at* http://www.whitehouse.gov/the-press-office/joint-statement-president-barack-obama-and-president-felipe-calder-n.  As recently as August 26, 2011, President Calderon publicly condemned the United States for failing to do more to curb the smuggling of weapons into Mexico:

> Part of the tragedy that Mexicans are living has to do with the fact that we are alongside the biggest consumer of drugs in the world, and at the same time, the biggest vendor of weapons in the world, which pays billions of dollars every year to the criminals who supply them with narcotics.
>
> These . . . dollars end up arming and organizing the criminals, and places them in their service and against the citizens.
>
> This is why it is my duty, also, to make a call to the society, the Congress, and the government of the United States . . . .

We are neighbors, we are allies, we are friends, but you, too, share responsibility.[10]

**A.     Firearms Violence in Mexico and Increasing Use of Rifles by Mexican Drug Cartels**

Mexican DTOs are largely responsible for transporting illegal drugs into the United States and are engaged in drug trafficking in every region of the country.  Herbert Decl. ¶¶ 18, 20, 21; A.R. at 287.  For the past several years, the Justice Department's annual National Drug Threat Assessment has cited Mexican DTOs and criminal groups as a major organized crime threat to the United States.  See U.S. Dep't of Justice, Nat'l Drug Intelligence Center, National Drug Threat Assessment 2010, at 2 ("Mexican DTOs continue to represent the single greatest drug trafficking threat to the United States.").[11]

When President Calderon took office in 2006, he set out to disrupt the cartels' trafficking operations and weaken their power.  Herbert Decl. ¶ 23.  To that end, the Mexican government authorized several large-scale counternarcotics operations along the U.S.-Mexico border, the region in which DTOs have exerted the most influence.  A.R. at 42.  DTOs have responded to these operations with increasingly violent strikes against law enforcement authorities, and the operations have intensified conflicts among DTOs over access to trafficking routes to the United States.  Herbert Decl. ¶ 23; A.R. at 42.  "The result has been an escalation of drug-related assassinations, kidnappings, and other violent crimes."  A.R. at 42; Herbert Decl. ¶ 28 (documenting nearly 30,000 deaths between December 2006 and July 2010, including 9,635

---

[10] "Calderon Calls On U.S. Society to Curb Its Drug Use," Los Angeles Times Blog, La Plaza, *available at* http://latimesblogs.latimes.com/laplaza/2011/08/mexico-drug-war-obama-calderon-reaction-twitter-society-casino-attack.html.

[11] *Available at* www.justice.gov/ndic/pubs38/38661/38661p.pdf.

murders in 2009 alone); A.R. at 42, 238; Colby Goodman & Michel Marizco, U.S. Firearms

Trafficking to Mexico: New Data and Insights Illuminate Key Trends and Challenges, Woodrow

Wilson Int'l Center for Scholars (Sept. 2010) at 31 ("Wilson Ctr. Report") (noting that by

September 2010, an estimated 28,000 drug-related killings had occurred).

     In fact, Mexican drug cartels have recently begun to arm themselves with more powerful

rifles in order to facilitate their drug trafficking operations.  Herbert Decl. ¶ 35.  These rifles

include the "AR type/variant .223 caliber rifle and the AK type/variant 7.62 caliber rifle."  Id.

According to data regarding firearms recovered in Mexico and submitted to ATF for tracing,

from FY 2004 through FY 2009, the percentage of crime guns recovered in Mexico that were

long guns increased each year from 20 percent in FY 2004 to 48 percent in FY 2009.  Herbert

Decl. ¶ 37; A.R. at 287; see also A.R. at 52 ("According to U.S. and Mexican government

officials, these firearms have been increasingly more powerful and lethal in recent years. . . .

[A]round 25 percent of the firearms seized in Mexico and traced in fiscal year 2008 [we]re high-

caliber and high-powered such as AK and AR-15 type semiautomatic rifles, which fire

ammunition that can pierce armor often used by Mexican police.").  In addition, from FY 2008

through FY 2010, 5796 rifles greater than a .22 caliber were traced from Mexico to an initial

purchaser in the United States.  Of these recovered weapons, 4566 came from Texas (2450),

Arizona (1260), California (742), and New Mexico (110).  Herbert Decl. ¶ 36.  Armed with more

powerful rifles, DTOs "are achieving parity in terms of firepower with the Mexican army and

law enforcement."  Vivian S. Chu & William Krouse, Gun Trafficking and the Southwest

Border, Congressional Research Service Report for Congress at 1 (Sept. 21, 2009).

### B.      ATF's Tracing Efforts and Trafficking Patterns

Principal among ATF's responsibilities is the tracing of firearms recovered during a law

enforcement investigation in order to link suspects to the firearms used to commit a crime.[12]

Herbert Decl. ¶ 4; A.R. at 262.  Tracing information is used by law enforcement for purposes that

include: "(1) to link a suspect to a firearm in a criminal investigation; (2) to identify potential

traffickers; and (3) to detect patterns in the sources and kinds of firearms that are used in crime."

Herbert Decl. ¶ 5.  When a firearm is recovered by law enforcement officials, specific identifying

information relating to the firearm (including its serial number, caliber, make, and model) is

entered into the ATF Firearms Tracing System.  Other information entered includes a crime code,

the location where the firearm was recovered, and the person found in possession of the firearm

and his or her associates (if known).  Herbert Decl. ¶ 6; see also A.R. at 48.  ATF typically uses

this identifying information to contact the firearm's manufacturer and determine where the gun

was originally sold.  Herbert Decl. ¶¶ 7, 40.  ATF will then examine the retail dealer's transaction

records to glean information about the original purchaser as well as "whether other firearms were

purchased at the same time by the non-licensed purchaser, and whether the firearm, recovery

location, purchaser, possessor, associates, or retail dealer are associated with other trace results."

Herbert Decl. ¶ 7.  Accordingly, "[f]irearms tracing is an essential starting point for identifying

and eliminating illicit sources and distribution chains of firearms in the United States."  Id.

Based on tracing data obtained to date, ATF has learned that Mexican DTOs, like other

criminal networks, often pay an individual with a clean record to purchase certain firearms for

---

[12] Firearms tracing refers to "the tracking of the movement of a firearm involved in a
crime from its first sale by the manufacturer or importer through the distribution chain to the
non-licensed purchaser."  Herbert Decl. ¶ 5.

trafficking to Mexico.  Herbert Decl. ¶ 32.  These "straw purchasers," as they are known to law enforcement, significantly impede ATF's tracing efforts because the purchasers are legitimately qualified to buy firearms and are also "difficult to identify by gun shop owners and clerks, absent obvious clues that would signify that a straw purchase is happening."  A.R. at 56-57; see also Herbert Decl. ¶ 32.  Moreover, prior to the reporting requirement at issue here, FFLs were not required to inform ATF when an individual purchased a large quantity of high-powered rifles.  See Wilson Ctr. Report at 30 ("Outside of situations in which ATF . . . officials inspect a gun store or when a gun store tips off U.S. authorities . . . in most states authorities are not notified if an individual is buying dozens of military-style assault rifles . . . a key indicator of firearms trafficking.").  Once a firearm is illegally purchased by a straw purchaser in the United States, someone representing the drug cartel will transport or pay another individual to transport the firearm into Mexico.  Herbert Decl. ¶ 32; A.R. at 57.  The proliferation of straw purchasing schemes – which are difficult to identify and prosecute – has contributed to an increase in firearms trafficking to Mexico.  Herbert Decl. ¶ 30.

### C.      Multiple Sales Reporting of Handguns and Rifles Greater Than .22 Caliber

As noted above, in 1975, ATF began requiring the reporting of the "sale or other disposition of two or more pistols or revolvers [to the same person] at one time, or during any five consecutive business days."  40 Fed. Reg. 19,201 (May 2, 1975).  The purpose of the reporting requirement was "to enable ATF to monitor and deter illegal interstate commerce in pistols and revolvers by unlicensed persons."  Id.  As explained previously, Congress codified this requirement in 1986 as part of FOPA, see 18 U.S.C. § 923(g)(3)(A).  Therefore, for the past 36 years, FFLs have been required to provide to ATF information on multiple sales of pistols and

revolvers to a single unlicensed person within five consecutive business days.[13]   ATF uses

multiple sales reports "to begin law enforcement investigations earlier by providing an indicator

of possible firearms trafficking," to "potentially intercept weapons before they are used in a

crime, including being smuggled across the border," and to "enable law enforcement to trace

firearms associated with a crime more quickly."   Herbert Decl. ¶ 39.

   Multiple sales reports are entered into ATF's Firearms Tracing System at the end of the

day on which they are received, and made available to all ATF field divisions.   Herbert Decl.

¶ 41.   After recovering a firearm from a crime scene, ATF will check the firearm's identifying

information, such as the serial number, against data in its records of multiple sales.   Id.   If the

serial number on the recovered weapon matches one in the tracing system, ATF can quickly

identify the dealer from whom the firearm was purchased as well as the purchaser of the firearm.

Id.   In the absence of multiple sales reports with which to cross-reference a firearm's serial

number, however, ATF must contact the manufacturer(s) or importer, then the wholesaler (if

applicable), and then the retail dealer to identify the purchaser.   Id. ¶¶ 40-41.   This process takes

an average of ten to twelve days to complete and may be delayed or made impossible "if the

firearm has an obliterated or tampered-with serial number, is missing importer markings, the

particular FFL has gone out of business and neglected to send their records to ATF, the FFL has

lost or destroyed the Form 4473, or the Form 4473 contains incorrect information, such as a

transposed serial number."   Id. ¶ 40.   Thus, multiple sales reports enable ATF investigators to

---

   [13] As an example of the usefulness of such data, multiple sales reports for handguns
revealed that an individual had purchased 82 handguns from FFLs in San Diego County between
September 2004 and September 2006.   Herbert Decl. ¶ 45.   The purchaser, when questioned,
admitted he had sold all of the firearms and later confessed to trafficking at least 70 firearms to
an individual in Tijuana, Mexico.   Id.

quickly identify the purchaser of a "crime gun" without having to contact every entity in the firearm's distribution chain to complete a trace.  Id. ¶¶ 40-41.

ATF also uses multiple sales reports to verify gun dealers' records, to detect unlawful activity, and to generate investigative leads regarding straw purchasers and trafficking patterns. A.R. at 285.  Multiple sales reports have proven useful because the purchase of "a large number of the same model of firearm or similar model[s] of firearm[s]" at one time is a "key indicator" of trafficking.  Herbert Decl. ¶ 42; see also A.R. at 74 ("Multiple sales . . . have been cited in prior ATF reports and by ATF officials as sources or indicators for firearms trafficking in general and to Mexico in particular.").  In many cases, "the most useful intelligence for detecting firearms trafficking is information on the gun purchasers themselves – including the number and types of guns bought, the age and gender of the buyers, and background information indicating whether the buyers had the financial means to buy the guns."  A.R. at 285.

Before ATF issued a demand letter requiring FFLs in the Southwest Border States to report multiple sales of certain rifles, "there was a major gap in multiple sales reporting." Herbert Decl. ¶ 46 (noting that from January 1, 2009 through December 22, 2010, certain semi-automatic rifles traced from Mexico to FFLs in the four Southwest Border States were frequently bought by individuals who made additional purchases); A.R. at 285 ("Because long guns have become Mexican cartels' weapons of choice, multiple sales reporting [of handguns] has become less viable as a source of intelligence to disrupt the illegal flow of weapons to Mexico.").

ATF's 36 years of experience using multiple sales reports for handguns indicates that the data generated from multiple sales reports for semi-automatic rifles greater than .22 caliber and capable of accepting detachable magazines will be similarly useful.  Because these types of rifles

are increasingly being used by Mexican DTOs, multiple sales reports of such rifles will better enable law enforcement to identify suspected firearms traffickers and intercept their operations *before* these firearms cross the border. Herbert Decl. ¶ 50 (noting that reports are used to detect suspicious activity and would provide leads for investigations of gun trafficking "that may otherwise not begin until the firearms appear at crime scenes"). Records of multiple sales may also assist prosecutors in proving that an individual intentionally bought a firearm to transport it to Mexico. A.R. at 194-202, 634-646.

In addition, these reports are expected to provide timely intelligence on secondhand sales of the specified rifles. Herbert Decl. ¶ 51. "Secondhand sales" refers to the resale, pawning, or consignment of qualifying rifles that were previously sold by a licensee to an unlicensed individual. Id. Presently, and with limited exceptions, rifles sold in secondhand sales cannot be traced from the original manufacturer to the secondhand purchaser. Id. The new multiple sales reporting requirement, however, applies to both new and used rifles that are sold to a nonlicensed purchaser; therefore, retail dealers and pawnbrokers are required to report multiple sales of used or secondhand firearms. Id. Multiple sales reports of secondhand rifles allow ATF to trace those firearms from retail dealers and pawnbrokers to the most recent (or more recent) purchaser. Id.

### D.     The July 12, 2011 Demand Letter

Recognizing that "reporting multiple sales of handguns has proven to be a valuable source of timely and actionable investigative leads," Herbert Decl. ¶ 42, the Justice Department's Inspector General recommended that ATF and the Department of Justice "explore options for seeking a requirement for reporting multiple sales of long guns." A.R. at 288, 289. The GAO

-16-

also noted that "limitations on reporting requirements for multiple sales" were a "significant

challenge" for ATF in combating the trafficking of arms across the Southwest Border, and

recommended that this issue be "address[ed] by the agency." A.R. at 39-40, 42. The demand

letter challenged in this suit represents a carefully focused attempt to address some of the

problems associated with Mexican drug trafficking by requiring federally-licensed dealers and

pawnbrokers operating in Texas, Arizona, New Mexico, and California to report multiple sales to

the same unlicensed person of semi-automatic rifles with a caliber greater than .22 that are

capable of accepting a detachable magazine.[14]  Herbert Decl. ¶ 48, A.R. at 775-776.  The dealer

must complete a one-page Report of Multiple Sales or Other Disposition of Rifles (Form

3310.12, A.R. at 777-779) (a copy of which is attached as Ex. 3), and send this report to ATF's

National Tracing Center by the close of business on the day that a reportable multiple sale occurs.

 Herbert Decl. ¶¶ 48, 57; A.R. at 775-776.

        Prior to issuing this demand letter, in December 2010, ATF publicly announced that it

would submit a proposed information collection request to the Office of Management and Budget

for approval.  60-Day Emergency Notice of Information Collection Under Review: Report of

Multiple Sale or Other Disposition of Certain Rifles, 75 Fed. Reg. 79,021 (Dec. 17, 2010), A.R.

at 554.  The agency explained that it planned to require FFLs to report multiple sales or other

dispositions whenever the licensee sells or otherwise disposes of two or more rifles to an

unlicensed individual within any five consecutive business days with the following

_____

        [14] ATF limited its collection of multiple sales reports to these four States because of their
proximity to Mexico and because these States have been shown to be significant sources of
firearms recovered in Mexico.  Herbert Decl. ¶ 53.  Moreover, the GCA uses State boundaries as
legal dividing lines.  Id.

characteristics: (a) semi-automatic; (b) a caliber greater than .22; and (c) the ability to accept a

detachable magazine.  Id.  ATF requested public comments for 60 days concerning the proposed

information collection.  Id.  The proposed notice did not limit the information collection request

by geographic region.  See id.  By the end of the comment period, the agency had received

12,680 public comments.[15]  ATF filed a second 30-day request for public comments in April

2011, and received over 18,800 pages of comments in response.  See 76 Fed. Reg. at 24058, A.R.

at 732.[16]  The Department of Justice announced the multiple sales reporting requirement on July

11, 2011.[17]  Approximately two weeks later, ATF sent a letter to FFLs in the four Southwest

Border States officially informing them of the reporting requirement.  A.R. at 775-776.  The

requirement went into effect on August 14, 2011.

## PROCEDURAL BACKGROUND

On August 3, 2011, Plaintiff National Shooting Sports Foundation ("NSSF") filed a

complaint challenging ATF's authority to issue this demand letter.  Compl. [Doc. No. 1] ("NSSF

Compl.").  That same day, Plaintiffs J & G Sales, Ltd. and Foothills Firearms LLC (collectively

"J & G Sales") filed a similar complaint challenging the same agency action.  Compl., Civil

Action No. 1:11-cv-1402, Docket No. 1 ("J & G Compl.").[18]  On August 15, 2011, Defendant

---

[15] *Available at* http://www.atf.gov/about/foia/atf-submissions-for-public-comment.html.

[16] *Available at*
http://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201105-1140-001.

[17] *Available at* http://www.justice.gov/opa/pr/2011/July/11-dag-900.html.

[18] Counsel for Plaintiffs J & G Sales and Foothills Firearms LLC also filed two virtually
identical complaints in the District of New Mexico and the Western District of Texas on behalf
of other FFLs that had received the demand letter at issue in this case.  See Ron Peterson
Firearms LLC v. Jones, Case No. 1:11cv678 (D.N.M.); 10 Ring Precision, Inc. v. Jones, Case

filed a motion to consolidate the two actions before this Court.  The Court granted Defendant's

motion on August 18, 2011 after determining that "that there are common issues of law and fact

that necessitate the consolidation."  Order Consolidating Cases [Doc. No. 10].

       Shortly thereafter, on August 22, 2011, NSSF filed a motion for preliminary injunction to

enjoin Defendant and his officers, agents, and employees from enforcing this multiple sales

reporting requirement and to order them to destroy the information received pursuant to this

requirement.  NSSF Mem. in Supp. of Mot. for Prelim. Inj. [Doc. No. 11-1] ("NSSF Mot.").

NSSF requested that its motion be heard by the Court on an expedited basis [Doc. No. 13].

J & G Sales filed a similar motion for preliminary injunction on August 26, 2011, and also

requested a hearing on an expedited basis.  J & G Sales Mot. for Prelim. Inj. [Doc. No. 16] ("J &

G Mot.").  Defendant opposed an expedited briefing schedule on Plaintiffs' motions for

preliminary injunction and proposed instead an expedited briefing schedule on the merits.  Def.

Mot. for Extension of Time [Doc. No. 12].  In the alternative, Defendant requested an extension

of time in which to respond to Plaintiffs' motions for preliminary injunction.  Id.  The parties

presented legal arguments on Plaintiffs' requests for preliminary injunction at a hearing on

September 1, 2011.  At this hearing, the parties also presented their views on expediting these

cases.  On September 2, 2011, the Court issued an order denying Plaintiffs' motions for

preliminary injunction, finding that their alleged economic losses were neither "great" nor

"serious," and therefore did "not rise to the level of irreparable injury."  Order on Prelim. Inj. and

Schedule [Doc. No. 21] at 6-7.  The Court concluded, however, that expedited consideration of

---

No. 5:11cv663 (W.D. Tex.).  Defendant has moved to transfer venue of the New Mexico and
Texas cases to this Court, and those motions are currently pending.

the merits would be appropriate and set an expedited briefing schedule under which briefing on

the merits will be completed by October 21, 2011. Id. at 7.  Defendant filed the Administrative

Record in this case on September 12, 2011.

## ARGUMENT

I.      **ATF ACTED WITHIN ITS STATUTORY AUTHORITY IN ISSUING THE
        DEMAND LETTER.**

        Plaintiffs allege that ATF lacks the authority to issue the demand letter, and that several

legal provisions prohibit ATF from requiring FFLs in four States to report multiple sales of

specified rifles.  Plaintiffs' claims are meritless and have been repeatedly rejected in analogous

contexts.  In three separate decisions, the Fourth and Ninth Circuits have considered similar

challenges to demand letters issued pursuant to 18 U.S.C. § 923(g)(5)(A) and have unanimously

rejected statutory arguments that are fundamentally indistinguishable from the contentions

Plaintiffs raise here.  The Court should therefore enter summary judgment for Defendant.

        A.      **The Prior Demand Letter Cases**

        1.      **RSM v. Buckles, 254 F.3d 61 (4th Cir. 2001)**

        In 2000, ATF exercised its authority under 18 U.S.C. § 923(g)(5)(A) to issue its first

demand letter (Demand Letter 1) to FFLs who had failed to respond to a firearms trace request on

at least one occasion, failed to respond to a trace request within 24 hours on three or more

occasions, or provided incorrect information in response to a request.  Herbert Decl. ¶ 13.

Demand Letter 1 required these FFLs to submit information concerning all of their firearms

purchases and sales for the preceding three years, and on a monthly basis thereafter.  RSM, 254

F.3d at 63.  The information requested included a description of the firearms including the

models, serial numbers, and types, as well as the purchasers' names, addresses, and FFL

numbers.  Id.

The Fourth Circuit unanimously upheld ATF's issuance of Demand Letter 1.  It

concluded that ATF has authority under 18 U.S.C. § 923(g)(5)(A) to send demand letters to

FFLs, so long as the letters are tailored to facilitate ATF's exercise of a statutory power, RSM,

254 F.3d at 67, and so long as the letters do not represent a "ruse to avoid" Congress's

"prohibition against the creation of a national firearms registry."  Id. at 68.  The Fourth Circuit

held that demand letters issued pursuant to Section 923(g)(5)(A) are creatures of statute, not only

of regulation, and are therefore not subject to limitations on new regulatory requirements

contained in 18 U.S.C. § 926(a).  Id. at 66.  The court also made clear that ATF's authority was

not limited to instances in which it is conducting a bona fide criminal investigation.  Id.  In

addition, the Fourth Circuit rejected the contention that an appropriations rider applicable to the

creation of a national firearms registry precluded the issuance of limited demand letters under

Section 923(g)(5)(A).  Id. at 67-68.  It noted that "[w]hen it passed FOPA, Congress clearly

envisioned some sort of collection of firearms records, so long as it was incidental to some other

statutory function specifically delegated to" the agency:

> For example, some small collection of records occurs when FFLs comply with 18
> U.S.C. § 923(g)(3)(A) by forwarding to [ATF] reports of multiple firearms sales
> to an unlicensed individual. . . . In such [a case], the collection of information is
> directly tied to [ATF's] statutory tracing function.  It is a very far cry from the
> creation of a national firearms directory.

Id. at 68.  The Court thus sustained the statutory validity of the Bureau's letter, explaining that it

was "directly tied to ATF's statutory tracing function."  Id.

### 2.    Blaustein & Reich, Inc. v. Buckles, 365 F.3d 281 (4th Cir. 2004)

In 2000, ATF issued a second type of demand letter (Demand Letter 2) to FFLs who had

ten or more firearms traced to them with a relatively short "time to crime" (three years or less).

Herbert Decl. ¶ 15.  Demand Letter 2 directed these FFLs to submit quarterly reports regarding

used or secondhand firearms obtained from non-FFLs, identifying the manufacturer/importer and

model of each firearm, its caliber or gauge, and its serial number.  Id.; Blaustein & Reich v.

Buckles, 220 F. Supp. 2d 535, 538 (E.D. Va. 2002).

The Eastern District of Virginia entered summary judgment for ATF on an FFL's

challenge to Demand Letter 2, and the Fourth Circuit unanimously affirmed this decision.  The

Fourth Circuit concluded that 18 U.S.C. § 923(g)(5)(A) granted ATF "broad authority to seek, by

demand letter, all record information that FFLs are required to maintain," Blaustein & Reich, 365

F.3d at 286, and that therefore, the agency had acted within its statutory authority when it issued

Demand Letter 2.  Id. at 287.   The court also held that ATF "is not restricted to issuing demand

letters in connection with a criminal investigation or to noncompliant FFLs."  Id. at 287-88.  The

Fourth Circuit further clarified that the limitation in 18 U.S.C. § 926(a) does not apply to ATF's

demand letter authority, id. at 288, 289-90, and that the appropriations rider at issue did not

prohibit the agency from issuing Demand Letter 2.  Id. at 288-89.

### 3.      J & G Sales Ltd. v. Truscott, 473 F.3d 1043 (9th Cir. 2007)

In a unanimous decision authored by former Supreme Court Justice Sandra Day

O'Connor, the Ninth Circuit also upheld the issuance of Demand Letter 2 against a similar

challenge raised by a plaintiff in the present action.  J & G Sales, 473 F.3d 1043.  The court

concluded that the plain text of 18 U.S.C. § 923(g)(5)(A) authorized ATF to issue Demand Letter

2.  Id. at 1048.  It also explained that ATF's interpretation of that provision did not conflict with

or nullify other provisions of Section 923, and that the statute's text was clear even when read in

the broader context of those provisions.  Id. at 1049-50.  The Ninth Circuit further held that 18

U.S.C. § 926's provision barring new rules and regulations did not apply to ATF's authority to

issue demand letters under 18 U.S.C. § 923(g)(5)(A) because Section 923(g)(5)(A) is a statute,

and not a rule or regulation.  Id. at 1051.

**B.      18 U.S.C. § 923(g)(5)(A) Provides ATF with the Statutory Authority to Issue the Demand Letter.**

This case is, in large part, one of statutory construction of provisions of the GCA.  When

reviewing an agency's construction of a statute it is charged with administering, a court must

determine whether "Congress has directly spoken to the precise question at issue."  Chevron,

U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984).  "If the intent of

Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

effect to the unambiguously expressed intent of Congress."  Id. at 842-43; see also Desert Palace,

Inc. v. Costa, 539 U.S. 90, 98 (2003) (when a court is called upon to construe a statute, "the

starting point for [its] analysis is the statutory text.  And where  . . .  the words of the statute are

unambiguous, the judicial inquiry is complete.") (internal citations and punctuation omitted).

In issuing the demand letter here, ATF relied on its authority under Section 923(g)(5)(A)

of the GCA.  That section specifies in no uncertain terms that:

> *Each licensee shall, when required by letter* issued by the Attorney General, and
> until notified to the contrary in writing by the Attorney General, *submit* on a form
> specified by the Attorney General, for periods and at the times specified in such
> letter, *all record information required to be kept by this chapter or such lesser
> record information* as the Attorney General in such letter may specify.

18 U.S.C. § 923(g)(5)(A) (emphasis added).  This statutory language gives ATF "broad authority

to seek, by demand letter, all record information that FFLs are required to maintain" under the

GCA.  Blaustein & Reich, 365 F.3d at 286.

-23-

There is no dispute that FFLs are required to maintain the information ATF seeks in its demand letter. The GCA requires licensees to maintain records of "receipt, sale, or other disposition of firearms . . . as [ATF] may by regulations prescribe." 18 U.S.C. § 923(g)(1)(A). Included among these records is a Firearms Transaction Record, ATF Form 4473, that must be completed any time a licensee transfers a firearm to a non-licensee. 27 C.F.R. § 478.124. Form 4473 must contain the transferee's name, address, date and place of birth, country of citizenship, and a certification by the transferee that he or she is the buyer of the firearm, and is not prohibited from receiving or possessing the firearm(s) to be transferred. See id. Also required is the firearm's manufacturer, type, model, gauge or caliber, and its serial number. See id. Thus, it is clear that ATF's letter seeks from FFLs "information required to be kept" by the GCA. 18 U.S.C. § 923(g)(5)(A).

As evidenced by the statute's plain language, ATF's interpretation of Section 923(g)(5)(A) to permit the issuance of the demand letter challenged in this case is fully consistent with the statute. Defendant "required by letter" dated July 12, 2011, federal "licensee[s]" residing in the four Southwest Border States to "submit on a form specified" by Defendant "such lesser record information" as the letter specified. See Demand Letter, A.R. at 775-776. The thrust of Plaintiffs' argument is that an FFL should be allowed to ignore such a letter, despite the clear grant of authority conferred by the unambiguous language used by Congress in Section 923(g)(5)(A). Because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992), Section 923(g)(5)(A) must be read to mean what it says. Plaintiffs' argument to

-24-

the contrary is meritless.[19]

Thus, both the Fourth and Ninth Circuits have upheld a previous demand letter issued under the section Plaintiffs purport to interpret in this action.  See J & G Sales, 473 F.3d at 1048 ("[T]here can be no question that § 923(g)(5)(A) authorizes the Bureau to issue the disputed demand letter"); Blaustein & Reich, 365 F.3d at 287 ("Section 923(g)(5)(A) expressly requires an FFL to produce record information when the Bureau issues a demand letter seeking it."). Here, as in Blaustein & Reich, "[t]he Bureau's demand letter requests only a portion of the information that [plaintiff] is required to maintain" and therefore, "the Bureau acted within its statutory authority under 18 U.S.C. § 923(g)(5)(A) when it issued the demand letter in question." 365 F.3d at 287.  And as noted in J & G Sales, "the Bureau sent the demand letter at issue to a small fraction of FFLs and sought only a limited subset of information from FFLs regarding a limited subset of firearms."  473 F.3d at 1049.  Thus, "[w]hatever the boundaries of the Bureau's authority, the demand letter at issue falls safely within them."  Id.

In sum, Section 923(g)(5)(A) gives ATF "broad authority to seek, by demand letter, all record information that FFLs are required to maintain," Blaustein & Reich, 365 F.3d at 286, including the information requested by the demand letter at issue here.  As both the Fourth and Ninth Circuits have recognized, Plaintiffs' arguments to the contrary ignore the plain text of the

---

[19] In its preliminary injunction motion, NSSF selectively quoted from a report by the U.S. Department of Justice's Inspector General to suggest that in responding to a recommendation in that Report, ATF questioned its own authority to issue the present demand letter.  NSSF Mot. at 17 n.11.  In fact, ATF was responding to the Inspector General's recommendation that ATF impose a multiple-sale reporting requirement on all FFLs for all long guns.  See A.R. at 285-289. The targeted information request that is the subject of the demand letter is made to FFLs in only four States, and seeks information relating to the multiple sales of particular types of rifles.  The issuance of such a letter lies well within ATF's authority under Section 923(g)(5)(A).

statute, and contravene basic principles of statutory construction.

C.    **ATF May Collect Firearms Record Data to Help It Investigate Straw Purchases Consistent With Section 923(g)(1)(A) of the GCA.**

Notwithstanding ATF's express statutory authority to issue letters to FFLs requiring them to provide the agency with firearms record information, 18 U.S.C. § 923(g)(5)(A), Plaintiffs contend that ATF's demand letter is unlawful under Section 923(g)(1)(A).  See NSSF Compl. ¶¶ 14, 22, 28; NSSF Mot. at 12-17; J & G Compl. ¶ 31; J & G Mot. at 5-7.  This argument is unavailing.  Section 923(g)(1)(A) provides, in relevant part:

> Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe.  Such importers, manufacturers, and dealers shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, *except as expressly required by this section* [i.e., by 18 U.S.C. § 923].

18 U.S.C. § 923(g)(1)(A) (emphasis added).  The provision of 18 U.S.C. § 923 that "expressly require[s]" dealers to "submit to the Attorney General reports and information with respect to such records and the contents thereof" is Section 923(g)(5)(A), which "expressly require[s]" that FFLs, upon receipt of a demand letter from the Attorney General, "shall . . . submit . . . all record information required to be kept by this chapter or such lesser record information as the Attorney General in such letter may specify."  Thus, contrary to Plaintiffs' representation, issuance of the demand letter is entirely consistent with the requirement of Section 923(g)(1)(A).

Despite the expansive language of Section 923(g)(5)(A), Plaintiffs contend that Section 923(g)(1)(A) precludes ATF from seeking information via demand letter unless Section 923 specifically imposes an independent obligation on the part of licensees to disclose that information to ATF.  See NSSF Mot. at 16; J & G Mot. at 6-7.  The Fourth and Ninth Circuits

-26-

correctly rejected this very argument.  Like Plaintiffs here, the plaintiff in Blaustein & Reich

argued that Section 923(g)(1)(A) "limits the Bureau's authority to issue demand letters."  365

F.3d at 287.  The Fourth Circuit rejected this argument, explaining that the contention Plaintiffs

make here – that ATF may demand information only when an FFL has an independent obligation

to report it – "ignores the plain language of § 923(g)(1)(A)."  Blaustein & Reich, 365 F.3d at 287.

While that provision states that an FFL need not report information "except as expressly required

by this section," Section 923(g)(5)(A) is itself "an express requirement that is provided for in §

923(g)(1)(A)."  Id. at 287-88 n.14; see id. at 287.  Similarly, Plaintiff J & G Sales, in its

challenge to Demand Letter 2, contended – as it does again in the instant case – "that the

Bureau's understanding of § 923(g)(5)(A) cannot be reconciled with § 923(g)(1)(A)."  J & G

Sales, 473 F.3d at 1049.  In fact, as the Ninth Circuit explained, the two sections were easily

reconcilable:

> It is certainly true that § 923(g)(1)(A) limits the Bureau's ability to procure
> information from FFLs to the express requirements of § 923, but it does not
> eviscerate the content of § 923(g)(5)(A).  As the Fourth Circuit noted in Blaustein
> & Reich, "Section 923(g)(5)(A) contains a condition precedent.  It requires an
> FFL to submit record information to the Bureau but only if the Bureau issues a
> demand letter requesting it.  This condition precedent does not negate the fact that
> § 923(g)(5)(A) contains an *express requirement* that is provided for in
> § 923(g)(1)(A)."

Id. (quoting Blaustein & Reich, 365 F.3d at 287 n.14) (emphasis in original).[20]

---

[20] Contrary to NSSF's contention, see NSSF Mot. at 15, these statements were not "dicta"
because the Fourth and Ninth Circuits were expressly addressing the respective plaintiffs'
challenges to the demand letters at issue in those cases on the grounds that Section 923(g)(1)(A)
allegedly limited ATF's authority to issue demand letters under Section 925(g)(5)(A).  Moreover,
although NSSF apparently seeks to distinguish the demand letter at issue here from that in
Blaustein & Reich and J & G Sales on the grounds that the latter sought "information [FFLs] had
already chronologically recorded in their permanently bound record under § 923(g)(2)," id. at 14-
15, nothing suggests that the courts considered this fact pertinent, because neither decision

Although Plaintiffs contend that ATF's interpretation of Section 923(g)(1)(A) consigns that provision to the status of mere surplusage, in fact, it is Plaintiffs who are trying to "eviscerate the content of § 923(g)(5)(A)" by reading it out of existence.  Id.  Congress's intent in enacting Section 923(g)(5)(A) could not have been clearer: it was expressly requiring licensees to provide, upon a specific request by ATF in a demand letter sent to the licensee, record information that FFLs are already required by law to maintain.  This requirement does not render Section 923(g)(1)(A) mere surplusage.  Rather, that provision confirms that except as expressly required by Section 923 – one of the requirements of which is provided in Section 923(g)(5)(A) – FFLs are not required to submit record information.  Because Congress's intent is clear, as revealed by an examination of the statutory language, under Chevron, the Court's inquiry is at an end.[21]

Plaintiffs' remaining arguments are similarly misplaced.  First, NSSF places undue reliance on the Fourth Circuit's decision in RSM, NSSF Mot. at 13-14, given that the Fourth Circuit later clarified that "Section 923(g)(5)(a) expressly requires an FFL to produce record information when the Bureau issues a demand letter seeking it," and rejected the contention that Section 923(g)(1)(A) limits ATF's authority to issue demand letters.  Blaustein & Reich, 365 F.3d at 287.  In any event, the demand letter here withstands scrutiny even under the standard articulated in RSM.  In that case, the Fourth Circuit concluded that ATF has authority under Section 923(g)(5)(A) to send letters to FFLs as long as the letters are tailored to facilitate the

_____

mentions it as a basis for its holding.

[21] Moreover, even if a statute's language is not clear, courts defer to the agency's statutory interpretation as long as it represents "a permissible construction of the statute."  Chevron, 467 U.S. at 843.

agency's exercise of a statutory power, 254 F.3d at 67, and as long as the letters are not a "ruse to avoid" Congress's "prohibition against the creation of a national firearms registry." Id. at 68. Because the request was a "far cry from the creation of a national firearms directory," and because the information was directly tied to ATF's statutory duty to assist law enforcement agencies conduct criminal investigations by performing traces (just as the current demand letter is), the Court held that the agency had acted well within its statutory authority. Id. at 68.[22]

The demand letter at issue here is tailored to facilitate ATF's exercise of two statutory powers. First, it is tied to ATF's power to assist Federal, State, and local law enforcement by conducting firearms traces. See Herbert Decl. ¶¶ 40-41 (explaining how multiple-sales reports will help ATF complete trace requests more quickly); id. ¶ 51 (explaining that with limited exceptions, firearms sold via secondhand sales cannot be traced to the purchasers who acquire the firearms after they re-enter the commercial market, and multiple-sales reports that include secondhand sales of qualifying rifles by retail dealers will allow ATF to trace those firearms from retail dealers and pawnbrokers to these purchasers); see also Gun Control Act of 1968, Pub. L. No. 90-618, § 101, 82 Stat. 1213, 1213 (1968) (stating that the purpose of the GCA "is to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence"); 18 U.S.C. § 923(g)(7) (requiring FFLs to respond to trace requests within 24 hours); RSM, 254 F.3d at 63 (noting ATF's statutory tracing power).

Second, as the demand letter itself explains, the requested information is sought "[t]o

---

[22] NSSF incorrectly quotes RSM as determining that ATF possessed the authority to issue the demand letter in question because the letter was tailored to "ATF's power under . . . § 923(g)(7) to require licensees to respond to trace requests within 24 hours." NSSF Mot. at 13-14 (citing RSM, 254 F.3d at 69). This "quotation" is nowhere to be found in the RSM decision.

assist [the agency's] efforts in investigating and combating the illegal movement of firearms

along and across the Southwest border." <u>See</u> Demand Letter, A.R. at 775-776.  Congress has

vested the agency with the duty to "investigat[e] . . . criminal and regulatory violations of the

Federal firearms . . . laws." 28 U.S.C. § 599A(b)(1).  Members of drug trafficking organizations

may violate a number of federal firearms laws when they obtain and smuggle weapons to

Mexico.  Herbert Decl. ¶ 31.  These include: (1) 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(A) –

prohibiting making false statements to FFLs in connection with a firearms purchase – which are

typically violated by straw purchasers; (2) 18 U.S.C. §§ 922(g)(1) and (g)(5), which prohibit the

possession of firearms by persons with felony convictions or by illegal or nonimmigrant aliens;

(3) 18 U.S.C. § 922(a)(1)(A), which prohibits "engag[ing] in the business of importing,

manufacturing, or dealing in firearms" without a federal firearms license; and (4) 18 U.S.C.

§ 922(a)(9), which prohibits any person "who does not reside in any State" from receiving any

firearms unless such receipt is for lawful sporting purposes.  <u>See id.</u>  The information generated

by the demand letter will be "used to detect activity that gives ATF timely leads for the

investigation of gun trafficking" and "may lead to the initiation of a gun trafficking investigation

that may otherwise not begin until the firearms appear at crime scenes."  Herbert Decl.  ¶ 50.

Thus, demand letters seeking limited information about the multiple sales of particular rifles bear

a "direct relationship to [ATF's] explicit statutory duties" to trace firearms recovered during

criminal investigations, and to investigate violations of federal firearms laws.  <u>RSM</u>, 254 F.3d at

68.

   Moreover, like the letter at issue in <u>RSM</u>, the demand letter here cannot be construed as a

ruse to create a firearms registry.  The letter that is the focus of this lawsuit was sent to a group of

FFLs in only four States that make up approximately 15.7% of Type 01 and Type 02 FFLs

nationwide.[23]   As explained above, these four States were chosen because evidence shows them

to be major source States for crime guns seized in Mexico and traced to FFLs.   And by contrast

with the demand letter at issue in RSM, which required dealers to provide information they were

already required to maintain regarding *all* of their firearms purchases and sales for the preceding

three years, and on a monthly basis thereafter, 254 F.3d at 63, the amount of information sought

by the demand letter involved here is much smaller.   The letter involved in this case just asks

FFLs in those four States to provide information regarding sales of a particular type of firearm

(semi-automatic rifles capable of accepting a detachable magazine, and with a caliber greater

than .22), made in a particular way (sales of two or more to the same unlicensed person), within a

prescribed time frame (five consecutive business days).   The demand letter is thus limited in

geographic scope, affects only a small minority of FFLs, and applies only to a specific type of

sale of a specific type of rifle made within a set time period.   Moreover, ATF will only retain the

information it collects for a limited period of time; the agency will purge all purchaser

information after two years unless the information is associated with a trace.   Herbert Decl. ¶ 67.

Because this is a "far cry from the creation of a national firearms directory," 254 F.3d at 68, even

if the RSM standard were applicable here, the demand letter satisfies that standard.

_____

[23]   This number is obtained by dividing the approximate number of FFLs to whom the
demand letter was sent (8707) by the approximate total number of FFLs with Type 01 and 02
licenses nationwide (55,566), which yields 15.7%.   See Herbert Decl. ¶ 56.   Moreover, the
demand letter was sent to only 7.1% of the approximate total number of FFLs nationwide
(122,597).   See id.

     It should be noted that the Fourth Circuit in RSM characterized the multiple sales reporting
requirement for *all* handguns for the entire country as representing only a "small collection of
records" that represented "a very far cry from the creation of a national firearms directory."
RSM, 254 F.3d at 68.

NSSF also reads RSM as holding that ATF is authorized to send demand letters only to dealers who have demonstrated "prior non-compliance with a required reporting obligation" or who "have been identified as involved or . . . possibly involved in . . . illegal cross border trafficking in firearms."  NSSF Mot. at 14.  That is incorrect.  In RSM, the court expressly declined "to delineate the precise scope of [ATF's] authority to issue letters," emphasizing instead that a letter linked to "a specific grant of positive statutory authority" such as ATF's tracing responsibilities that did not threaten to create a firearms registry plainly fell within the scope of the statute.  RSM, 254 F.3d at 67, 69; see also Blaustein & Reich, Inc. v. Buckles, 220 F. Supp. 2d 535, 543 n.8 (E.D. Va. 2002) ("Plaintiff sought to distinguish RSM because the gun dealer in that case was in violation of the GCA while the gun dealer in the case at bar is in compliance with the law.  The Court believes the Plaintiff reads RSM too narrowly.  Many, if not all, of the principles regarding the scope of the ATF's § 923(g)(5)(A) authority set forth by the Fourth Circuit in RSM would apply to FFLs whether they are in or out of compliance with the GCA."), aff'd, 365 F.3d 281 (4th Cir. 2004).

In sum, the demand letter does not violate Section 923(g)(1)(A).

**D.      The Fact That Section 923(g)(3)(A) Also Requires FFLs to Report Multiple Handgun Sales Does Not Limit ATF's Authority Under Section 923(g)(5)(A).**

Plaintiffs also contend that ATF's authority to issue demand letters is limited by Section 923(g)(3)(A) of the GCA.  See NSSF Compl. ¶ 18; NSSF Mot. at 11, 13, 14; J & G Compl. ¶ 32; J & G Mot. at 7-9.  That statute provides, in relevant part: "Each licensee shall prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person."  18 U.S.C.

§ 923(g)(3)(A).  That provision imposes an independent duty on FFLs to submit this information

to ATF without a request.  The mere fact that Congress imposed a specific duty on *all* FFLs to

provide one category of information *without being requested* by ATF to do so (namely,

information about multiple sales of handguns) does not limit ATF's ability to obtain a different

category of information (here, information about multiple sales of certain rifles) from a subset of

FFLs under its independent demand letter authority.  The two provisions are complementary, not

conflicting.

      Just as Plaintiffs do here, Plaintiff J & G Sales contended in its earlier lawsuit that "[i]f

§ 923(g)(5) is accorded the reading that the Bureau urges," Section 923(g)(3)(A) "would be

rendered superfluous."  <u>J & G Sales</u>, 473 F.3d at 1050.  The Ninth Circuit correctly rejected this

argument:

> Simply because some provisions of § 923 impose specific duties upon FFLs to
> respond to certain requests within a specified time frame and to provide record
> information sua sponte does not mean that the Bureau is prohibited from seeking
> further FFL record information by demand letter.  Nothing in the statute suggests
> that the Bureau's authority extends only to the statutory authority that J & G
> agrees to recognize.  And we decline J & G's invitation to so limit that authority.

<u>Id.</u>  Thus, the mere fact that one provision of Section 923 imposes a specific duty on FFLs to

provide record information *sua sponte* – namely, information regarding multiple sales of

handguns within a specified time period – in no way means that ATF is prohibited from seeking

additional record information by demand letter.

      The Fourth Circuit rejected a very similar argument in <u>Blaustein & Reich</u>.  In that case,

the plaintiff argued that because Section 923(g)(7) requires FFLs to provide record information

within twenty-four hours when requested by ATF in the course of a criminal investigation, the

agency could not seek record information if it was not making the request in the course of a

-33-

criminal investigation.  The court explained that because Section 923(g)(7) "does not expressly

limit the Bureau's authority to demand information," that provision "does not limit the Bureau's

authority to issue demand letters like the one" at issue in that case.  365 F.3d at 287 n.13.

Against these clear holdings, NSSF cites only snippets of three decisions arising from

very different factual circumstances, the conclusions of which are limited to those circumstances.

NSSF Mot. at 13.  First, the bankruptcy statute at issue in In re Griffith, 206 F.3d 1389 (11th Cir.

2000) (en banc), paralleled the text of four tax statutes but omitted a key phrase.  See id. at 1394.

The Eleventh Circuit explained that in a prior case, "[a]pplying the canons of interpretation that

Congress is presumed to know the content of existing, relevant law, and that '[w]here Congress

knows how to say something but chooses not to, its silence is controlling,' [it] held that Congress

must have consciously chosen not to include the language 'or the payment thereof'" in the

bankruptcy statute.  Id. (internal citations omitted).  That is not the situation here.  There is no

separate statute that parallels the text of Section 923(g)(3)(A) and that includes language that

Congress omitted in passing Section 923(g)(3)(A).  Griffith is thus irrelevant.

Second, in American Methyl Corp. v. EPA, 749 F.2d 826 (D.C. Cir. 1984), one provision

of the Clean Air Act prohibited certain new automobile fuels but expressly granted the

Environmental Protection Agency ("EPA") the power to waive this prohibition under prescribed

conditions.  Id. at 828-29.  A second provision imposed substantive and procedural requirements

for the EPA to satisfy before controlling or prohibiting new fuels.  Id. at 830 & n.20.  The EPA

granted a waiver under the first provision, then later threatened to revoke the waiver, claiming it

had "inherent authority" to do so; if the waiver had been revoked, the new fuel would have been

prohibited.  Id. at 830.  The D.C. Circuit held that, given the existence of the second provision,

the EPA could not invoke its "inherent authority" and prohibit the new fuel without meeting the substantive and procedural requirements prescribed by Congress.  See id. at 835-36 ("[W]hen Congress has provided a mechanism capable of rectifying mistaken actions, . . . it is not reasonable to infer authority to reconsider agency action. . . . [W]hile Congress may have wanted the Administrator to correct his mistakes, it provided a mechanism sufficient to this task in" the second provision).  Here, by contrast, there is no such "second provision" imposing substantive or procedural requirements on the agency when it acts in a particular manner, and the agency is not claiming to act under its inherent authority in order to bypass any such provision.  Rather, it has issued the demand letter under its express statutory authority provided by Section 923(g)(5)(A), which does not bypass any particular "mechanism" provided by Congress requiring the agency to act in a certain way when it performs a certain task.  Thus, American Methyl Corp. is also irrelevant.

Third, and finally, Independent Insurance Agents of America v. Hawke, 211 F.3d 638 (D.C. Cir. 2000), stands for a very different principle than that invoked by NSSF.  Congress passed a law giving national banks "the power to exercise all such incidental powers as shall be necessary to carry on the business of banking," and decades later, passed a second law providing that "[i]n addition to the powers now vested by law" in national banks, they may sell insurance "in any place the population of which does not exceed five thousand."  Id. at 640, 641.  Before Hawke, two Courts of Appeals had specifically rejected the argument that national banks could sell insurance in locales of greater than five thousand persons, pursuant to the first law.  Id. at 641-42.  The D.C. Circuit followed the two Courts of Appeals, explaining that "[i]n context, because [the second law] only confers the authority to sell insurance on banks in smaller locales,

and because national banks only have the powers granted to them by statute, [the second law] strongly confirms the view that the more general grant in [the first law] did not include broad insurance powers." Id. at 644; see also id. ("Why would Congress have passed [the second law] to confer insurance authority to some national banks if all national banks already had that power pursuant to [the first law]?  It would have been completely useless.").

This case presents almost a reverse-mirror-image of Hawke.  Here, two Courts of Appeals have *rejected* the very arguments now advanced by NSSF.  One of those courts expressly stated that in passing the law at issue here, "Congress gave the Bureau *broad authority* to seek, by demand letter, all record information that FFLs are required to maintain."  Blaustein & Reich, 365 F.3d at 286.  Most importantly, however, unlike in Hawke, here the automatic reporting requirement of Section 923(g)(3)(A) is not a "completely useless" addition to the authority bestowed by Congress under Section 923(g)(5)(A).  Rather, as explained above, Section 923(g)(3)(A) specifies the circumstances under which certain record information – reports of multiple sales of handguns – must be reported by *all* FFLs *automatically*.  That requirement is not inconsistent with or redundant of the agency's authority under Section 923(g)(5)(A) to obtain additional record information from a subset of FFLs when such information is specifically sought by demand letter.

As the D.C. Circuit has explained, "[w]hatever its usefulness in other circumstances," the canon of *expressio unius est exclusio alterius* – the expression of one is the exclusion of others – "has little force in the administrative setting."  Texas Rural Legal Aid v. Legal Servs. Corp., 940 F.2d 685, 694 (D.C. Cir. 1991) (citing cases).  As in that case, here, "the *expressio* canon is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue" under the

-36-

first step of Chevron.  Id.; see also Clinchfield Coal Co. v. Fed. Mine Safety & Health Review

Comm'n, 895 F.2d 773, 779 (D.C. Cir. 1990) ("The difficulty with the [*expressio unius*] doctrine –

and the reason it is not consistently applied – is that it disregards several other plausible

explanations for an omission.  The drafter (here Congress) may simply not have been focussing on

the point in the second context; and, where an agency is empowered to administer the statute,

Congress may have meant that in the second context the choice should be up to the agency.")

(internal citations omitted).  Moreover,

> an equally pertinent canon of interpretation states that a congressional decision to
> prohibit certain activities does *not* imply an intent to disable the relevant
> administrative body from taking similar action with respect to activities that pose a
> similar danger . . . .  Indeed, a congressional prohibition of particular conduct may
> actually support the view that the administrative entity can exercise its authority to
> eliminate a similar danger.

Texas Rural Legal Aid, 940 F.2d at 694 (emphasis in original) (citations omitted).  The inverse

also applies: simply because Congress deemed certain information – reports of multiple handgun

sales – so important in 1986 that it codified ATF's eleven-year-old requirement for FFLs to report

them automatically does not restrict the agency's ability to exercise its demand letter authority

under another provision of the same Act to obtain similar information about rifles deemed

important in more recent years.

Similarly, J & G Sales' reliance on Christensen v. Harris County, 529 U.S. 576, 583 (2000),

is completely misplaced.  J & G Mot. at 9.  In Christensen, a Texas county required its employees

to schedule time off in order to reduce their accrued compensatory time.  529 U.S. at 578.  A group

of employees filed suit, claiming that this requirement violated a provision of the Fair Labor

Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), which stated that "an employer must honor an

employee's request to use compensatory time within a 'reasonable period,' so long as the use of the

compensatory time would not 'unduly disrupt' the employer's operations." Id. at 580.  The

employees "rel[ied] upon the canon *expressio unius est exclusio alterius*, contending that the

express grant of control to employees to use compensatory time . . . implies that all other methods

of spending compensatory time are precluded." Id. at 582-83 (footnote omitted).

The Court rejected this argument.  While "accept[ing] the proposition that 'when a statute

limits a thing to be done in a particular mode, it includes a negative of any other mode,'" it

explained that "that canon does not resolve this case in [the employees'] favor":

> The "thing to be done" as defined by [the statutory provision] is not the expenditure
> of compensatory time . . . .  Instead, [it] is more properly read as a minimal
> guarantee that an employee will be able to make some use of compensatory time
> when he requests to use it.  As such, the proper *expressio unius* inference is that an
> employer may not, at least in the absence of an agreement, deny an employee's
> request to use compensatory time for a reason other than that provided in [that
> provision].

Id. at 583 (citation omitted).  Consequently, "[t]he canon's application *simply does not prohibit* an

employer from telling an employee to take the benefits of compensatory time by scheduling time

off work with full pay." Id. at 583 (emphasis added).  Indeed, the Court explained, the statutory

provision at issue "says nothing about restricting an employer's efforts to *require* employees to use

compensatory time.  Because the statute is silent on this issue, and because Harris County's policy

is entirely compatible with [the provision], petitioners cannot . . . prove that Harris County has

violated [FLSA].")  Id. at 585 (emphasis in original).

Christensen thus supports Defendant's interpretation of Section 923(g)(3)(A).  The "thing

to be done" as defined by that provision is the *automatic* submission of reports of multiple sales of

handguns by *all* FFLs.  The proper *expressio unius* inference is that other information is not

required to be submitted automatically by all FFLs nationwide.  But Section 923(g)(3)(A) says

nothing about restricting ATF's demand letter authority under Section 923(g)(5)(A).

Consequently, because Section 923(g)(3)(A) is silent on that issue, it does not prohibit the use of

that authority to obtain the information sought here.

In short, the Court should decline Plaintiffs' invitation to ignore the statutory authority

contained in Section 923(g)(5)(A) that expressly permits ATF to seek the type of record

information sought by this demand letter, simply because another provision of the statute imposes

other reporting duties directly on FFLs.

### E.      Section 926(a) of the GCA Does Not Apply to ATF's Demand Letter Authority.

Section 926(a) of the GCA provides that no ATF rule or regulation

> prescribed after the date of the enactment of the Firearms Owners' Protection Act
> [May 19, 1986] may require that records required to be maintained under this
> chapter or any portion of the contents of such records, be recorded at or transferred
> to a facility owned, managed, or controlled by the United States or any State or any
> political subdivision thereof, nor that any system of registration of firearms,
> firearms owners, or firearms transactions or dispositions be established.

Plaintiffs contend that this provision prohibits ATF from issuing the demand letter at issue

here.  NSSF Compl. ¶¶ 15, 23, 28; NSSF Mot. at 17-18; J & G Compl. ¶¶ 32; J & G Mot. at 9.

Plaintiffs are incorrect because nothing about the demand letter involves a post-FOPA rule or

regulation.  The prohibition in Section 926(a) applies only to *rules or regulations* prescribed *after*

the enactment of FOPA.  As both the Fourth and Ninth Circuits have held, that provision has no

bearing on ATF's demand letter authority, for two reasons.

First, the provision restricts ATF's authority to promulgate *rules* or *regulations*.  But ATF's

authority to issue demand letters derives from *statute*, not only from ATF's regulations.  As

explained above, Section 923(g)(5)(A) authorizes ATF to issue demand letters.  And Section

926(a) has no bearing on ATF's exercise of that statutory authority.  As the Fourth Circuit

explained: "Section 926(a) clearly does not (nor could it) limit Congress from enacting a statutory provision such as § 923(g)(5)(A) that requires FFLs to report their record information when directed by a demand letter issued by the Bureau." Blaustein & Reich, 365 F.3d at 290. Thus, "the limitation in § 926(a) does not apply to the Bureau's regulatory demand letter authority." Id. Similarly, the Ninth Circuit held:

> By the very terms of the statute, . . . § 926(a) cannot be understood to limit the Bureau's authority to issue demand letters under either § 923(g)(5)(A) or 27 C.F.R. § 478.126(a). Section 926(a) has no bearing on § 923(g)(5)(A) because the former provision pertains only to "rule[s]" and "regulation[s]" and the latter is a statute, not a rule or regulation. . . . Thus, *§ 926(a)'s provision barring new rules and regulations is plainly inapposite* to the discussion at hand.

J & G Sales, 473 F.3d at 1051 (internal citations omitted) (emphasis added). The fact that Section 923(g)(5)(A) authorized ATF to send the demand letter here thus forecloses Plaintiffs from invoking Section 926(a).

Second, even if ATF had issued the demand letter only under its regulatory authority, the letter would not violate Section 926(a). "The Bureau's regulation authorizing it to issue demand letters, found at 27 C.F.R. § 478.126, was promulgated in 1968. 33 Fed. Reg. 18,555 (Dec. 14, 1968)." Blaustein & Reich, 365 F.3d at 288. And it is "clear from the plain language of [Section 926(a)] that its limitations do not apply to rules or regulations that were prescribed by a federal agency before the enactment of FOPA in 1986." Id.; accord RSM, 254 F.3d at 66. Moreover, "[t]he 'new rule' prohibition in 18 U.S.C. § 926 was enacted in 1986 in the same legislation that codified the ATF 'demand letter' authority in § 923(g)(5)(A)," and "[i]t is illogical to think that Congress in 1986 conferred on ATF the statutory authority to issue demand letters while, in the same legislation, Congress barred ATF from using it." Blaustein & Reich, 220 F. Supp. 2d at 543. The Fourth and Ninth Circuits have both held that the demand letters at issue in those cases were

not "rules" for purposes of Section 926(a), and Plaintiffs provide no principled basis on which to

distinguish the demand letter at issue here.  Consequently, Section 926(a) does not apply to ATF's

exercise of its regulatory demand letter authority, and Plaintiffs' attempt to expand the scope of

Section 926(a) beyond its text should be rejected.

### F.    The Demand Letter Does Not Violate an ATF Appropriations Rider That Restricts the Consolidation of Records.

Since 1978, Congress has included a provision in ATF's annual appropriations legislation

that prohibits the agency from spending money "in connection with consolidating or centralizing,

within the Department of Justice, the records, or any portion thereof, of acquisition and disposition

of firearms maintained by Federal firearms licensees."  Consolidated Appropriations Act of 2010,

Pub. L. No. 111-117, 123 Stat. 3034, 3128 (2009).[24]  Plaintiffs contend that this appropriations

rider prohibits ATF from issuing the demand letter at issue in this case.  NSSF Mot. at 18; J & G

Compl. ¶ 37; J & G Mot. at 19-20.  It does not.

The appropriations rider was "first passed in response to a proposed [ATF] regulation that

would have required *all* FFLs to submit a quarterly report of *all* of their firearms dispositions."

RSM, 254 F.3d at 67 (emphasis added).  Like Plaintiffs here, the plaintiffs in RSM "propose[d]

that the appropriations rider . . . be read broadly to serve as an absolute prohibition against any

collection of firearms records."  Id.  The Fourth Circuit rejected this proposal because it would

render several provisions of FOPA inoperative: "When it passed FOPA, Congress clearly

envisioned *some sort of collection of firearms records*, so long as it was *incidental to some other*

*statutory function* specifically delegated to [ATF]."  Id. at 68 (emphasis added).  The Fourth

---

[24] As noted above, see supra p. 6, this is the citation for the restriction as most recently enacted.

Circuit then expressly noted that the scope of the automatic reporting requirement of Section

923(g)(3)(A) – requiring FFLs to send to ATF information showing sales or other dispositions of

two or more pistols and/or revolvers during any five consecutive business days – fully complies

with the appropriations rider:

> For example, *some small collection of records occurs* when FFLs comply with 18
> U.S.C. § 923(g)(3)(A) by *forwarding to* [*ATF*] *reports of multiple firearms sales to
> an unlicensed individual*. . . . In such [a case], the collection of information is
> directly tied to [ATF's] statutory tracing function.  *It is a very far cry from the
> creation of a national firearms directory*.

RSM, 254 F.3d at 68 (emphasis added).

The automatic reporting requirement of Section 923(g)(3)(A) applies to *all* FFLs and

requires them to report purchases of *all* handguns to the same unlicensed person within five

consecutive business days.  It is thus considerably broader in scope than the demand letter here,

which applies only to FFLs in four States, and applies to multiple purchases of specified types of

rifles, rather than all rifles.  The Fourth Circuit in RSM expressly stated that this statutory

collection of information on multiple sales of handguns constitutes only a "small collection of

records" that does not run afoul of the appropriations rider.  Moreover, as in RSM, the demand

letter at issue here is directly tied to ATF's tracing authority under the GCA, as well as its

additional statutory authority to investigate criminal and regulatory violations of Federal firearms

laws.  This narrow collection of information regarding multiple sales of specified rifles thus

represents a "very far cry" from the establishment of a national firearms directory, and does not

violate the appropriations rider.

Similarly, the Fourth Circuit in Blaustein & Reich "also conclude[d] that the annual

appropriations riders do not prohibit the Bureau from issuing the demand letter in [that] case."  365

F.3d at 288.  Like Plaintiffs, the plaintiff in <u>Blaustein & Reich</u> "contend[ed] that the Bureau's demand letter violates the rider because it effectively consolidates and centralizes records."  <u>Id.</u> The Fourth Circuit rejected that argument, explaining: "Taken to its logical end, [this] argument would require us to strike down a demand letter requiring just one FFL to report to the Bureau 'any portion' of record information as to one firearm."  <u>Id.</u> at 288-89.  As the Fourth Circuit explained, however, the rider only prohibits spending funds "in relation to consolidating or centralizing records that FFLs are required to maintain.  The plain meaning of consolidating or centralizing does not prohibit the *mere collection of some limited information*.  Both consolidating and centralizing connote a large-scale enterprise relating to a substantial amount of information."  <u>Id.</u> at 289 (emphasis added) (footnote omitted).  Because the demand letter at issue in that case was sent only to a small minority of FFLs and requested only a portion of the record information statutorily required to be maintained, it did "not constitute consolidating or centralizing record information." <u>Id.</u> (footnote omitted).[25]

The information sought by the demand letter does not even remotely compare to the scope of the proposed rule that prompted Congress's concern in enacting the appropriations rider.  The letter that is the focus of this lawsuit was sent to a group of FFLs in only four States that make up approximately 15.7% of Type 01 and Type 02 FFLs nationwide.  Indeed, unlike the demand letter at issue in <u>RSM</u>, which required dealers to provide information concerning *all* firearms purchases and sales for the preceding three years, and on a monthly basis thereafter, including "a description

---

[25] As here, in <u>RSM</u>, <u>Blaustein & Reich</u>, and <u>J & G Sales</u>, the information collected by the demand letters was sent to ATF's National Tracing Center, where – with the exception of the purchaser name in Demand Letter 1 – it was entered into an electronic database.  <u>See</u> <u>RSM</u>, 254 F.3d at 63, 68-69; <u>Blaustein & Reich</u>, 365 F.3d at 284-85; <u>J & G Sales</u>, 473 F.3d at 1047.

of the firearms including the models, serial numbers, and types, as well as the purchasers' names, addresses, and federal firearms license numbers," 254 F.3d at 63, the amount of information sought by the demand letter involved here is relatively small.  The letter involved in this case just asks FFLs to identify, on a prospective basis, information relating to multiple sales of particular rifles made during any five consecutive business days.  Moreover, as noted above, purchaser information will be purged after two years unless the information is associated with a trace.  See Herbert Decl. ¶ 67.    Furthermore, as explained above, just like the demand letters that were analyzed and held to be lawful in RSM and Blaustein & Reich, the letter in this case bears a direct relationship to ATF's statutory responsibility to assist law enforcement agencies in tracing guns (as well as its additional statutory duty to investigate criminal violations of federal firearms laws).  In RSM, the Fourth Circuit held that the government is authorized to collect information from FFLs who have not fully complied with their obligations in connection with trace requests notwithstanding the appropriations rider, because such data collection helps ATF respond to trace requests.  RSM, 254 F.3d at 68.  Significantly, the Fourth Circuit did not limit its reasoning to situations involving wrongdoing on the part of a dealer.  Thus, the court noted that the appropriations rider does not prevent FFLs from having to provide the agency with reports of multiple handgun sales to unlicensed individuals in accordance with 18 U.S.C. § 923(g)(3)(A), and FFLs that are going out of business from having to send their records to the government under 18 U.S.C. § 923(g)(4).  RSM, 254 F.3d at 68.

As in RSM, here, ATF has implemented a focused and limited effort to collect data about a fraction of the rifle sales that occur, in order to further an acute law enforcement need.  The demand letter explains that this information is sought "[t]o assist [the agency's] efforts in

investigating and combating the illegal movement of firearms along and across the Southwest

border." See Demand Letter, A.R. at 775-776.  Consequently, "because the demand letter was sent

in order to assist ATF in fulfilling its statutory responsibility to assist law enforcement and to fight

crime and violence, and in light of the limited reach of the letter, the appropriations restriction has

no greater impact on the legitimacy of the demand letter at issue in this case than it did on the letter

discussed in RSM."  Blaustein & Reich, 220 F. Supp. 2d at 546.

  Accordingly, the demand letter does not violate the terms of the appropriations rider.

**G.  Section 923(g)(5)(A) Is Not Limited by Sections 923(g)(1)(B) or 923(g)(7).**

  J & G Sales invokes two statutory provisions – Sections 923(g)(1)(B) and 923(g)(7) – in

support of its contention that ATF is authorized to issue demand letters only for the purpose of

obtaining records in the course of a specific criminal investigation.  J & G Compl. ¶ 32; J & G

Mot. at 6.  That contention is meritless, as both the Fourth and Ninth Circuits have held.  Section

923(g)(1)(B) provides, in relevant part:

> The Attorney General may inspect or examine the inventory and records of a
> licensed importer, licensed manufacturer, or licensed dealer without . . . reasonable
> cause or warrant . . . (i) in the course of a reasonable inquiry during the course of a
> criminal investigation of a person or persons other than the licensee; . . . or (iii)
> when such inspection or examination may be required for determining the
> disposition of one or more particular firearms in the course of a bona fide criminal
> investigation.

Section 923(g)(1)(B) addresses the circumstances under which ATF officials may physically gain

entry to an FFL's premises in order to conduct a warrantless, on-site inspection of an FFL's

inventory and records.  This provision does not mention ATF's demand letter authority, and does

not purport to limit the agency's separate and independent authority under Section 923(g)(5)(A) to

issue demand letters.

The fact that ATF has the authority to seek the same information by demand letter that it could obtain by entering and inspecting an FFL's premises does not vitiate Section 923(g)(1)(B)'s restrictions on ATF's authority to enter an FFL's premises, as J & G Sales contends. Both the Fourth and Ninth Circuits have thus rejected the argument advanced here by J & G Sales. As the Fourth Circuit explained, the issuance of a demand letter "does not involve the entry of [ATF] agents onto an FFL's premises. Rather, it requires FFLs to send certain information contained in their records to [ATF]." RSM, 254 F.3d at 66. This is a distinction that makes a difference, as the Ninth Circuit made clear: "Section 923(g)(1)(B) governs when Bureau officials may physically gain entry onto an FFL's premises in order to inspect record information. When the Bureau merely sends a demand letter requesting certain limited information, no physical intrusion whatsoever occurs. This is a *difference that matters*." J & G Sales, 473 F.3d at 1050 (emphasis added).[26]

Indeed, the argument J & G Sales advances in this case – that "§ 923(g)(1)(B) is the only part of § 923 that defines when the Bureau can seek information from FFLs" – fails because it "ignores the plain language of § 923(g)(1)(A), which protects FFLs from reporting requirements 'except as expressly required by this section.' Section 923(g)(5)(A) expressly requires an FFL to produce record information when the Bureau issues a demand letter seeking it." Blaustein & Reich, 365 F.3d at 287. Accordingly, the Fourth Circuit "h[e]ld that the Bureau, when acting pursuant to § 923(g)(5)(A), is not restricted to issuing demand letters in connection with a criminal investigation or to noncompliant FFLs." Id. at 287-88.

Similarly, the demand letter does not run afoul of Section 923(g)(7). That provision states

---

[26] For the same reason, the fact that Section 923(g)(1)(A) includes specific circumstances under which ATF may enter an FFL's premises and inspect its records *with* a warrant, see J & G Mot. at 6, is irrelevant to the interpretation of Section 923(g)(5)(A).

in relevant part: "Each [FFL] shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Attorney General for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation." Section 923(g)(7) governs the conduct of *FFLs*; the provision "does not purport either to address or restrict [ATF's] section 923(g)(5)(A) authority to issue letters." RSM, 254 F.3d at 66. Rather, "it establishes the duties of FFLs when they receive a trace request." Id. Just as in RSM and Blaustein & Reich, ATF expressly issued its demand letter pursuant to Section 923(g)(5)(A), and not as a trace request governed by Section 923(g)(7). Therefore, because "the demand letter in this case does not relate to a trace being conducted in the course of a criminal investigation and does not require [FFLs] to produce any information within twenty-four hours," Section 923(g)(7) "does not limit the Bureau's authority to issue demand letters like [this] one." Blaustein & Reich, 365 F.3d at 287 n.13; see also Blaustein & Reich, 220 F. Supp. 2d at 543 ("18 U.S.C. § 923(g)(7) bears no relation to ATF's power to issue demand letters pursuant to 18 U.S.C. § 923(g)(5)(A).").

And as the Ninth Circuit made clear, Section 923(g)(7) "serves quite [a] distinct purpose[] from the demand letter," in that it "imposes speedy reporting requirements on FFLs in the context of criminal investigations, and neither explicitly nor implicitly serves to limit the Bureau's power under § 923(g)(5)(A)." J & G Sales, 473 F.3d at 1050. As in that case, "[r]ather than the Bureau attempting to transform [Sections 923(g)(1)(b) and (g)(7)] into nullities, it is J & G who seeks to strip § 923(g)(5)(A) of its independent meaning." Id. The Court should decline J & G Sales'

second invitation to a Court to read Section 923(g)(5)(A) out of existence.[27]

**H.     Because Plaintiffs Fail to Demonstrate That Any of the Relevant Statutory Provisions Are Ambiguous, Resort to Legislative History Is Unnecessary.**

In their preliminary injunction motions, Plaintiffs rely heavily on legislative history to interpret various provisions of Section 923 and the appropriations rider.  See NSSF Mot. at 5 & n.4, J & G Mot. at 7 & n.6, 11-16.  Because Plaintiffs fail to demonstrate that the statutory texts at issue are ambiguous, resort to legislative history is unnecessary.  See Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 808 n.3 (1989) ("Legislative history is irrelevant to the interpretation of an unambiguous statute.") (citation omitted); Gen. Elec. Co. v. EPA, 360 F.3d 188, 191 (D.C. Cir. 2004) ("[W]hen the statutory text is straightforward, there is no need to resort to legislative history."); accord Tax Analysts v. IRS, 350 F.3d 100, 104 (D.C. Cir. 2003); AT&T Corp. v. FCC,

---

[27] In its preliminary injunction motion, J & G Sales also argued that the demand letter violated Section 923(g)(4).  J & G Sales Mot. at 8.  Initially, because neither NSSF's nor J & G Sales' complaints even mention Section 923(g)(4), J & G Sales cannot seek to raise a claim based on this provision.  See Gonzales v. Holder, 763 F. Supp. 2d 145, 149 n.1 (D.D.C. 2011) ("The Court will not address plaintiff's apparent attempt to add a new claim [in an opposition brief to a motion to dismiss] because it does not appear in the complaint."); Morgan v. Vilsack, 715 F. Supp. 2d 168, 184 (D.D.C. 2010) (declining to consider claim not pleaded in complaint and raised for the first time in cross-motion for summary judgment).

In any event, however, the demand letter does not violate Section 923(g)(4).  That provision states, in relevant part: "Where a firearms or ammunition business is discontinued and succeeded by a new licensee, the records required to be kept by this chapter shall appropriately reflect such facts and shall be delivered to the successor.  Where discontinuance of the business is absolute, such records shall be delivered within thirty days after the business discontinuance to the Attorney General."  As the Ninth Circuit held, ATF's demand letter authority does not render this provision superfluous.  See J & G Sales, 473 F.3d at 1050 ("Simply because some provisions of § 923 impose specific duties upon FFLs to respond to certain requests within a specified time frame . . . does not mean that the Bureau is prohibited from seeking further FFL record information by demand letter.  Nothing in the statute suggests that the Bureau's authority extends only to the statutory provisions that J & G agrees to recognize.  And we decline J & G's invitation to so limit that authority.").

323 F.3d 1081, 1087 (D.C. Cir. 2003).[28]

Like Plaintiffs here, the plaintiff in <u>Blaustein & Reich</u> "included in its briefs considerable discussion of the legislative history of § 923(g)(5)(A) and § 926(a), which it claims shows that Congress intended to limit the use of demand letters to criminal investigations and to noncompliant FFLs."  365 F.3d at 288 n.15.  The Fourth Circuit declared such discussion of legislative history to be unnecessary: "Because we find the statute unambiguous on its face, we do not resort to legislative history to determine what Congress intended its enactments to mean" but instead "derive the meaning of the enactment solely from the plain meaning of the words Congress used." <u>Id.</u> (citation omitted); <u>see also Blaustein & Reich</u>, 220 F. Supp. 2d at 542 n.6 ("The plain language of § 923(g)(5)(A) . . . unambiguously commands that 'each licensee' is subject to ATF's demand letter authority.  The legislative history offered by the Plaintiff, therefore, will not be considered by the Court.") (citation omitted).

J & G Sales also contends that although the statutory text itself is not ambiguous, "the interplay of the various provisions . . . could be viewed as rendering Congress' will ambiguous."

---

[28] Given this clear guidance, J & G's reliance on <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120 (2000), is misplaced.  J & G Mot. at 4, 7.  First, <u>Brown & Williamson</u> turned on the second prong of the <u>Chevron</u> test; as explained above, this case involves the application of <u>Chevron</u>'s first prong.  Additionally, this case is not remotely analogous to <u>Brown & Williamson</u>.  Unlike in that case, where the FDA was found to lack authority to regulate tobacco products under the Federal Food, Drug, and Cosmetic Act, here, ATF has been delegated statutory responsibilities with respect to firearms.  And there is no unambiguous congressional directive in this case that forecloses ATF from sending demand letters.  To the contrary, there is a statutory provision, 18 U.S.C. § 923(g)(5)(A), that expressly *authorizes* ATF to "require[] by letter" that an FFL submit firearms records to ATF.  No other statutory provision strips ATF of that authority, as was the case in <u>Brown & Williamson</u> regarding FDA's authority to regulate tobacco products.

J & G Mot. at 10.[29]  J & G Sales similarly "challenge[d] the Bureau's plain reading of

§ 923(g)(5)(A)" before the Ninth Circuit "by insisting that this demand letter provision must be

read within § 923's broader statutory context," J & G Sales, 473 F.3d at 1048, and the Ninth

Circuit correctly rejected this very argument: "Because we find that – even after considering

§ 923(g)(5)(A) in its broader context – the statute is clear, we need not address J & G's exhaustive

discussion of 18 U.S.C. § 923's legislative history." Id. at 1050 (citing Ratzlaf v. United States,

510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that

is clear.")).

     "In a case such as this, where the statutory text does not admit of serious ambiguity, and

where firmly established case law is absolutely clear on the meaning of the statute, legislative

history is, at best, secondary, and, at worst, irrelevant." Cole v. Burns Int'l Sec. Servs.

105 F.3d 1465, 1472 (D.C. Cir. 1997).  Because the statutory texts at issue are clear, resort to

---

     [29] The cases cited by J & G Sales to support this contention are inapposite here.  Robinson v. Shell Oil Co., 519 U.S. 337 (1997), examined whether the single word "employees" as used in Title VII's anti-retaliatory provision was ambiguous and could be construed to include former employees.  Id. at 339.  The Court concluded that the term "employees" was ambiguous after noting that neither the provision nor Title VII's definition of "employee" contained any temporal qualifier that would make plain that the term referred only to current employees, and a number of other provisions in Title VII used the term to mean something more inclusive or different than "current employee."  Id. at 341-42.  Here, by contrast, Plaintiffs fail to identify any relevant statutory word or phrase defined or used elsewhere in the statute as possessing a different meaning than its plain text would indicate.  Bell Atlantic Telephone Companies v. FCC, 131 F.3d 1044 (D.C. Cir. 1997), turned on the construction of "a poorly drafted section of the Telecommunications Act of 1996," id. at 1045, individual phrases of which the D.C. Circuit identified as giving rise to several independent sources of ambiguity.  Id. at 1047-48.  Plaintiffs have identified no such source of ambiguity here.  Finally, Natural Resources Defense Council v. Browner, 57 F.3d 1122 (D.C. Cir. 1995), actually cuts against Plaintiffs' position.  The D.C. Circuit noted that "[w]here the terms of a statute are unambiguous, judicial inquiry into the intent of the drafters is generally unnecessary."  Id. at 1127.  Because the statute at issue here is unambiguous on its face, such an inquiry is similarly unnecessary.

legislative history is unnecessary, and the Court should reject Plaintiffs' attempts to introduce

ambiguity where none exists by looking to legislative history.[30]

*       *       *       *       *

In sum, Plaintiffs' claims of statutory violation are entirely unfounded.  The Court should

therefore enter summary judgment for Defendant.[31]

---

[30] In any event, the legislative history does not support Plaintiffs' position.  The GCA was
enacted to "keep firearms out of the hands of those not legally entitled to possess them," and to
assist State and local law enforcement efforts to combat crime.  See S. Rep. No. 90-1501, at 22
(1968).  It was designed to make State firearms laws more effective by channeling interstate
commerce in firearms through federally-licensed firearms dealers.  Id.  Congress anticipated that
complete and accurate records of firearms purchases would be an effective tool in assisting State
and local law enforcement authorities to trace the ownership of guns used in crime.  See id. at 25
(1968).  Consistent with that framework, ATF issued regulations implementing the GCA,
including the regulation that is presently codified at 18 U.S.C. § 923(g)(5)(A), giving the agency
the statutory authority to obtain information kept in FFLs' records by issuing a demand letter
seeking that information.
    The legislative history Plaintiffs cite establishes, at most, that Congress intended to
prohibit ATF from creating a national firearms registry.  But as explained above, the challenged
demand letter does not create a national firearms registry.  Additionally, as noted above, Section
923(g)(3)(A) requires all FFLs to send to ATF information regarding sales or other dispositions
of two or more handguns to an unlicensed person during any five consecutive business days.
And Section 923(g)(4) provides that when an FFL discontinues its business, it must submit all of
its records to ATF, which are retained in the National Tracing Center.  The NTC microfilms and
indexes these records to facilitate firearms tracing requests.  Notably, the Government
Accountability Office ("GAO") examined the legislative history of 18 U.S.C. § 926 and the
applicable appropriations rider, and determined that although the records provided to ATF under
Sections 923(g)(3)(A) and (g)(4) contained purchaser information, both of these systems of
records fully complied with Section 926(a) and the appropriations riders.  See GAO, Federal
Firearms Licensee Data: ATF's Compliance with Statutory Restrictions (1996), at 3-6, 14-17, 52-
58, available at http://www.gao.gov/products/GGD-96-174.  As explained above, the automatic
reporting requirement of Section 923(g)(3)(A) is far broader in scope than the demand letter here.
Accordingly, legislative history does not support Plaintiffs' statutory arguments.

[31] Because Plaintiffs have failed to demonstrate success on the merits, their request for
permanent injunctive relief fails.  See Nichols v. Truscott, 424 F. Supp. 2d 124, 143 (D.D.C.
2006) (citing Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs, 145 F.3d 1399, 1408-09 (D.C.
Cir. 1998) ("Actual success on the merits is naturally a prerequisite to permanent injunctive
relief.").  Even if they could succeed on the merits, Plaintiffs cannot demonstrate that the other

-51-

## II.   PLAINTIFFS ARE NOT ENTITLED TO A WRIT OF MANDAMUS BECAUSE PLAINTIFFS FAIL TO ESTABLISH THE EXISTENCE OF A CLEAR, NON-DISCRETIONARY DUTY TO PLAINTIFFS.

NSSF purports to "seek[] a writ of mandamus to compel an officer or employee of the United States to perform a duty owed to the plaintiff." NSSF Compl. ¶ 4. However, NSSF fails to identify any specific "duty" owed to it by Defendant, and fundamentally fails to satisfy the prerequisites for exercise of mandamus jurisdiction.

The remedy of mandamus is "one of the most potent weapons in the judicial arsenal." Cheney v. U.S. Dist. Court, 542 U.S. 367, 380 (2004) (internal punctuation omitted). A "drastic" remedy, it is "to be invoked only in extraordinary circumstances." Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002) (internal citations omitted). In order for this Court to properly exercise its mandamus jurisdiction, NSSF must show: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff." Id.[32] "The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." Id. Moreover, "[e]ven when the legal requirements for mandamus

_____

factors warrant a broad injunction in this case. See id. ("In determining whether to enter a permanent injunction, the Court considers a modified iteration of the factors it utilizes in assessing preliminary injunctions: (1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction.") (citation omitted).

[32] The Mandamus Act gives federal courts jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. The remedy is similar to the mandamus relief available to compel judicial action under the All Writs Act, 28 U.S.C. § 1651, and courts employ the principles behind the two statutes interchangeably. In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005). While the requirements for mandamus relief are jurisdictional, the question of whether mandamus jurisdiction exists frequently merges with the merits of whether a writ of mandamus should issue. Id.; see also Swan v. Clinton, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996).

jurisdiction have been satisfied, . . . a court may grant relief only when it finds compelling equitable grounds." In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005) (internal quotation omitted); see also In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005) (noting that mandamus is a "drastic" remedy and "hardly ever granted").

NSSF's request for a writ of mandamus is baseless, as it has failed to identify any "plainly prescribed" "ministerial duty" owed by Defendant, a prerequisite to this Court's exercise of mandamus jurisdiction. Consol. Edison Co. of New York v. Ashcroft, 286 F.3d 600, 605 (D.C. Cir. 2002). The Court of Appeals has made clear that the extraordinary remedy of "mandamus is inappropriate except where a public official has violated a 'ministerial' duty." Id. (internal alterations and citations omitted). "Such a duty must be so plainly prescribed as to be free from doubt and equivalent to a positive command." Id. (citation omitted). "Where the duty is not thus plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus." Id.

"A ministerial duty is one that admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." Swan v. Clinton, 100 F.3d 973, 977 (D.C. Cir. 1996) (citation omitted). "Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level." Id. (internal alterations and citations omitted). "The distinction between discretionary and ministerial duties is . . . critical . . . because the courts do not have authority under the mandamus statute to order *any* government official to perform a discretionary duty." Id. (citations omitted; emphasis in original).

NSSF has not identified any plainly prescribed ministerial duty owed by Defendant.  On the contrary, NSSF asks this Court to order Defendant to "refrain from mandating compliance with" the demand letter that Defendant necessarily exercised discretion in issuing.  See NSSF Compl., Prayer for Relief.  There is no dispute that issuance of the demand letter was a "policy decision" involving "judgment" and "planning," Swan, 100 F.3d at 977, as well as the interpretation of a statute (the GCA).  Cf. Consol. Edison Co., 286 F.3d at 605.  Accordingly, there is no basis for the extraordinary and drastic remedy of mandamus in this case.

## CONCLUSION

For the reasons set forth above, the Court should enter summary judgment for Defendant.

Dated: September 23, 2011                    Respectfully submitted,


                                             TONY WEST
                                             Assistant Attorney General

                                             RONALD MACHEN
                                             United States Attorney

                                             ____/s/ Daniel Riess_____
                                             SANDRA M. SCHRAIBMAN
                                             Assistant Director
                                             (D.C. Bar No. 188599)
                                             DANIEL RIESS (Texas Bar)
                                             JESSICA LEINWAND (New York Bar)
                                             LESLEY FARBY (D.C. Bar No. 495625)
                                             Trial Attorneys
                                             U.S. Department of Justice
                                             Civil Division, Rm. 6122
                                             20 Massachusetts Avenue, NW
                                             Washington, D.C. 20530
                                             Telephone: (202) 353-3098
                                             Fax: (202) 616-8460
                                             Email: Daniel.Riess@usdoj.gov
                                             *Attorneys for Defendant*

-54-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 23rd day of September, 2011, I caused the foregoing document to be served via electronic case filing.

/s/ Daniel Riess
Daniel Riess