# EXHIBIT
# 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL SHOOTING SPORTS FOUNDATION, INC.,<br><br>Plaintiff,<br><br>v.<br><br>B. TODD JONES, Acting Director,<br>BUREAU OF ALCOHOL, TOBACCO,<br>FIREARMS & EXPLOSIVES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 11-1401 (RMC)
(consolidated with 11-1402 (RMC)

## DECLARATION OF ARTHUR HERBERT

I, Arthur Herbert, pursuant to 28 U.S.C. § 1746(2), do hereby declare and state as follows:

1.      I am the Assistant Director of Enforcement Programs and Services ("EPS") at the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF").  In that capacity, I oversee the development and delivery of programmatic policy guidance and technical support relative to firearms and explosives industry issues.  This declaration is based on my personal knowledge as well as knowledge made available to me in the course of my duties as the Assistant Director of EPS.

ATF's Regulatory Authority and General Responsibilities

2.      Among other things, ATF is responsible for administering and enforcing the Gun Control Act of 1968 ("GCA"), 18 U.S.C. §§ 921 et seq.  See 28 U.S.C. § 599A.  The GCA

regulates the manufacture, importation and sale of firearms by requiring all persons engaged in the business of dealing, importing, and manufacturing firearms and ammunition to be licensed by the Attorney General.  18 U.S.C. § 923.  Different license categories exist: dealers in firearms other than destructive devices (Type 01), pawnbrokers in firearms other than destructive devices (Type 02), manufacturers in ammunition for firearms (Type 06), manufacturers of firearms other than destructive devices (Type 07), importers of firearms other than destructive devices (Type 08), dealers in destructive devices (Type 09), manufacturers in destructive devices (Type 10), and importers in destructive devices (Type 11).

3.      ATF is the only Federal agency authorized to license and inspect firearms dealers to ensure they comply with laws governing the sale, transfer, possession, and transport of firearms.  See 28 U.S.C. § 599A; 28 C.F.R. § 0.131.

4.      ATF is also responsible for tracing firearms by researching manufacturer, importer, and dealer data to identify the original non-licensed purchasers of firearms that have been used in a crime, in relation to a crime, or suspected to have been used in a crime, and that are later recovered by law enforcement officials.  See 28 U.S.C. § 599A; 28 C.F.R. § 0.131.

5.      "Tracing" refers to tracking the movement of a firearm involved in a crime from its first sale by the manufacturer or importer through the distribution chain to the non-licensed purchaser.  Firearms trace information is used for purposes that include: to link a suspect to a firearm in a criminal investigation; to identify potential traffickers; and to detect patterns in the sources and kinds of firearms that are used in crime.

6.     When a firearm is recovered by law enforcement officials and a trace request is made, specific identifying information is entered into the ATF Firearms Tracing System. The firearm's identifying information may include a description of the firearm (serial number, caliber, make, model), a crime code, recovery location, person found in possession of the firearm (if any), and his or her associates (if known).

7.     Using this identifying information (e.g., serial number), ATF determines the firearm's entry point into U.S. commerce and its path through the distribution chain, in order to determine information about the non-licensed purchaser and possibly learn additional pertinent information, such as whether other firearms were purchased at the same time by the non-licensed purchaser, and whether the firearm, recovery location, purchaser, possessor, associates, or retail dealer are associated with other trace results. Firearms tracing is an essential starting point for identifying and eliminating illicit sources and distribution chains of firearms in the United States.

8.     Federal firearms licensees ("FFLs") are required to keep certain records regarding the acquisition and disposition of firearms. See 18 U.S.C. § 923(g)(1)(A). Included among these records is a Firearms Transaction Record, ATF Form 4473, which must be completed on each occasion a licensee transfers a firearm to a non-licensee. 27 C.F.R. § 478.124. Form 4473 must contain the transferee's name, address, date and place of birth, country of citizenship, and a certification by the transferee that he or she is not prohibited from receiving or possessing the firearm(s) to be transferred. Also required are the firearm's manufacturer, type, model, gauge or caliber, and its serial number. Using Form 4473, the FFL is able to identify the firearm's purchaser. These records are maintained by the FFL

until the FFL goes out of business.  These records are not routinely provided to ATF, but must be available for review on inspection.

9.      After an FFL ceases operation, it is required to submit its records to ATF within 30 days.  See 18 U.S.C. § 923(g)(4).  In addition, FFLs are required to report the theft or loss of firearms to ATF within 48 hours of their knowledge of such theft or loss, see 18 U.S.C. § 923(g)(6), and are required to respond to a firearms trace request made by ATF within 24 hours, see 18 U.S.C. § 923(g)(7).

10.     In 1975, ATF issued a regulation requiring FFLs to report the "sale or other disposition of two or more pistols or revolvers at one time, or during any five consecutive business days."  Reporting Multiple Sales or Other Disposition of Pistols and Revolvers, 40 Fed. Reg. 19201 (May 2, 1975) (codified at 27 C.F.R. § 478.126a).  The purpose of the reporting requirement was "to enable ATF to monitor and deter illegal interstate commerce in pistols and revolvers by unlicensed persons."  Id.  Congress codified this requirement in 1986 as part of the Firearms Owners' Protection Act, 100 Stat. 449.  See 18 U.S.C. § 923(g)(3)(A).

11.     Therefore, for the past 36 years, FFLs have been required to provide information on multiple sales of pistols and revolvers.  As explained in greater detail below, this multiple sales reporting requirement for handguns has proven to be a valuable source of timely and actionable investigative leads for detecting firearms trafficking.

12.     The GCA requires that "[e]ach licensee shall, when required by letter issued by the Attorney General … submit on a form specified by the Attorney General . . . all record information required to be kept by this chapter or such lesser record information as the Attorney General in such letter may specify."  18 U.S.C. § 923(g)(5)(A).

13.     In 2000, ATF exercised its authority under 18 U.S.C. § 923(g)(5)(A) to issue demand letters (Demand Letter 1) to FFLs who had failed to respond to a firearms trace request on at least one occasion, failed to respond to a trace request within 24 hours on three or more occasions, or provided incorrect information in response to a request.  The demand letters required these FFLs to send to ATF their acquisition and disposition records for the preceding three years and to continue to send the records on a monthly basis until otherwise notified.  Once an FFL began to respond as required to trace requests, ATF suspended this record submission requirement for that FFL.  In part because of the successful response to Demand Letter 1, currently no FFLs are subject to the requirements this demand letter.

14.     This demand letter was challenged in litigation and upheld.  <u>RSM, Inc. v. Buckles</u>, 254 F.3d 61 (4th Cir. 2001).

15.     Also in 2000, ATF issued demand letters (Demand Letter 2) to FFLs who had ten or more firearms traced to them with a relatively short "time to crime" (three years or less). "Time to crime" refers to the length of time that elapses between a firearm's sale to a non-licensed purchaser and the time it is recovered at a crime scene.  The FFLs who received this letter were required to submit information regarding used or secondhand firearms obtained from non-licensees for the previous year and to continue to send these records on a quarterly basis until otherwise informed.  This information enabled ATF to trace any used guns sold by the FFL.  With this information, ATF was able to link the used firearm to the dealer and could trace the firearm to the more recent commercial transaction between licensed dealer and non-licensee.

16.     This demand letter was also challenged in litigation and upheld.  J & G Sales Ltd.

v. Truscott, 473 F.3d 1043 (9th Cir. 2007); Blaustein & Reich, Inc. v. Buckles, 365 F.3d 281

(4th Cir. 2004).

17.     When applicable, ATF continues to issue Demand Letter 2 to FFLs.  As of July

2011, approximately 800 FFLs are operating under Demand Letter 2's requirements.  No

other types of demand letters were issued prior to July 12, 2011.

### Illegal Trafficking of Firearms Along the Southwest Border

18.     The illicit trafficking of drugs and firearms across the Southwest Border is an

ongoing threat to the United States.   Drug trafficking organizations (DTOs) supply a

significant quantity of cocaine destined for the United States.  These organizations also

control the southbound flow of weapons.  Office of National Drug Control Policy, National

Southwest Border Counternarcotics Strategy 1 (2011).

19.     Violence in Mexico continues to escalate, and combating arms trafficking is an

important priority of U.S. law enforcement.

20.     In addition, Mexican DTOs currently are engaged in drug trafficking in every

region of the United States.

21.     Mexican DTOs represent a significant organized crime threat to the United States,

according to the 2009 and 2010 National Drug Threat Assessments issued by the Department

of Justice, National Drug Intelligence Center.

22.     Mexican DTOs rely on a constant supply of firearms to defend their territory,

eliminate rivals, and challenge the government.

23.     With the election of President Felipe Calderon in 2006, the government of

Mexico targeted DTOs in an attempt to disrupt their trafficking operations and weaken their

power.  This resulted in intensified turf battles between the DTOs and caused greater violence against law enforcement and civilians.  DTOs look to the United States as a source of firearms to arm themselves.

24.     In 2006, ATF implemented Project Gunrunner, part of the Department of Justice's Southwest Border Initiative, as a comprehensive strategy to reduce firearms- and explosives-related violent crime associated with Mexican criminal organizations.  Project Gunrunner seeks to prevent Mexican DTOs from unlawfully acquiring and trafficking firearms by investigating individuals responsible for firearms trafficking along the Southwest Border; coordinating with United States and Mexican law enforcement along the border in firearms cases and violent crime; training United States and Mexican law enforcement officials to identify firearms traffickers; providing outreach education to firearms dealers; and tracing all guns recovered to identify firearms traffickers, trends, patterns and networks.

25.     The cornerstone of Project Gunrunner is intelligence-based firearms trafficking investigations.  These investigations involve the collection of information from a variety of sources including FFL records, ballistic and forensic analysis, and data from firearms tracing.  ATF considers any investigation of firearms-related violent crime associated with Mexican DTOs to constitute part of Project Gunrunner.

26.     As part of Project Gunrunner, ATF has informed the FFL community as to what types of behavior may be indicative of firearms trafficking and has requested that FFLs alert ATF as to any suspicious activity.  See Project Gunrunner: The Southwest Border Initiative, ATF Publication 3317.6 (March 2009).

27.     ATF's primary geographic focus for Project Gunrunner is in the four ATF field divisions that border Mexico and are headquartered in Dallas, Houston, Los Angeles, and Phoenix.

28.     Despite ATF's efforts, the Department of Justice's Office of the Inspector General has found that violence associated with organized crime and drug trafficking in Mexico has intensified, resulting in tens of thousands of deaths.  Between December 2006 and July 2010, nearly 30,000 deaths were reported, including 9635 murders in 2009 alone.  The number of homicides in Mexico continues to rise.  See Office of the Inspector General, Review of ATF's Project Gunrunner 1 (Nov. 2010) (hereinafter OIG Report)

29.     Firearms trafficking to Mexico continues, further fueling violence by DTOs. Firearms originating in the United States and trafficked to Mexico have contributed in large part to this ongoing crisis.  As recently as August 5, 2011, the entire police force of Ascension, Mexico—a border city across from El Paso, Texas—resigned after a number of attacks that resulted in the deaths of the police chief and five officers.  Mexico Town's Police Force Quits After Attack, Associated Press (Aug. 5, 2011).  The mass resignation left 13,000 people without local police protection.  Id.  Less than two weeks prior to the resignations, a 19-day government offensive in northern Mexico against the Zetas drug cartel resulted in the shooting deaths of 30 alleged criminals and one soldier.  Id.

30.     Firearms trafficking to Mexico from the United States is influenced by a number of factors, including: the strict prohibition and regulation of firearms in Mexico; increased enforcement efforts by the Mexican government; the illegal straw purchases of firearms from FFLs, who are often not aware of these schemes; and a readily accessible source of firearms

and ammunition in the United States secondary market (e.g., sales from unlicensed sellers at gun shows, flea markets, and other private-seller transactions).

31.     Members of drug trafficking organizations may violate a number of Federal firearms laws when they obtain and smuggle weapons to Mexico.  Straw purchasers violate Federal law by making false statements on the Firearms Transaction Record, ATF Form 4473, which requires buyers to certify that they are the actual buyer or transferee of the firearm they are purchasing.  This violates 18 U.S.C. §§ 922(a)(6) and 924(a)(1)(A), which prohibit making false statements to FFLs in connection with attempting to acquire or acquiring firearms.  Additionally, under 18 U.S.C. § 922(g), certain categories of "prohibited persons" violate Federal law by obtaining weapons they are not allowed to possess because, for example, they have felony convictions or are illegal or nonimmigrant aliens.  If a straw purchaser does not reside in the United States, his or her purchase of a firearm violates 18 U.S.C. § 922(a)(9), which prohibits any person "who does not reside in any State" from receiving any firearms unless such receipt is for lawful sporting purposes.  Finally, when individuals deal in firearms through the repetitive purchase and resale of firearms as a regular course of trade or business without a Federal firearms license, they violate 18 U.S.C. § 922(a)(1)(A), which prohibits "engag[ing] in the business of importing, manufacturing, or dealing in firearms" without a valid license.

32.     Examples of straw purchasing schemes include individuals with clean records who are expected to pass the required background check and who are paid by drug cartel members to purchase certain firearms.  Because the straw purchasers are legitimately qualified to purchase the guns, they are often difficult for FFLs and law enforcement to

identify.  Once a firearm is acquired in the United States, someone representing the drug cartel can transport the firearm or firearms into Mexico, or pay another individual to do so.

33.      As a result of these combined straw purchasing/trafficking schemes, as of April 28, 2011, of a total of 21,313 firearms recovered in Mexico in 2009 and traced by ATF, 10,945 were manufactured in the United States and 3268 were imported into the United States.  In addition, as of April 28, 2011, of a total of 7971 firearms recovered in Mexico in 2010 and traced by ATF, 4186 were manufactured in the United States and 2105 were imported into the United States.

34.      According to ATF trace data from the ATF Firearms Tracing System, the top four source locations by state for all firearms recovered in Mexico that were submitted for tracing and successfully traced to non-licensed purchasers between December 1, 2006 and August 31, 2010, were Texas, Arizona, California and New Mexico.

**Mexican DTOs' Increased Preference for Certain Long Guns**

35.      According to ATF trace data, DTOs have increasingly turned to specific semiautomatic rifles.  See also United States Government Accountability Office, Firearms Trafficking 3 (June 2009) (hereinafter GAO Report).   Among these rifles are the AR "type/variant" .223 caliber rifle and the AK "type/variant" 7.62 caliber rifle.

36.      According to ATF trace data, from FY 2008 through FY 2010, 5796 rifles greater than .22 caliber were traced from Mexico to an identified first retail purchaser in the U.S.  Of these, 4566 came from Texas (2450), Arizona (1260), California (742), and New Mexico (110).

37.     From FY 2004 to FY 2009 the percentage of crime guns recovered in Mexico submitted to ATF for tracing that were long guns increased from 20 percent to 48 percent. See OIG Report at 38.

38.     In 2010, the 7.62 caliber and .223 caliber were the most common calibers of rifles recovered in Mexico and submitted for tracing, with a time to crime of less than three years.

**The Utility of Multiple Sales Reporting**

39.     Multiple sales reports are used to begin law enforcement investigations earlier by providing an indicator of possible firearms trafficking.  These reports help law enforcement potentially intercept weapons before they are used in crime, including being smuggled across the border.  Multiple sales reports also enable law enforcement to trace firearms associated with crime more quickly.

40.     Without multiple sales reporting, when a trace request is received, ATF generally must contact the manufacturer(s) or importer, then the wholesaler, and then the retailer, who then provides information about to whom the firearm was sold.  ATF then provides this information to the requesting law enforcement agency.  The majority of traces take ten to twelve days on average to complete.  In addition, a trace may be delayed or made impossible if the firearm has an obliterated or tampered-with serial number, is missing importer markings, the particular FFL has gone out of business and neglected to send their records to ATF, the FFL has lost or destroyed the Form 4473, or the Form 4473 contains incorrect information, such as a transposed serial number.

41.     Multiple sales reports are entered into ATF's Firearms Tracing System at the end of the day on which they are received and made available to all ATF field divisions.  When a firearm is traced, it is checked against these reports.  A match expedites tracing because ATF

does not need to contact all active FFLs in the distribution chain (e.g., manufacturers and distributors), but instead only needs to contact the retail dealer.

42.     As noted above, the existing multiple sales reporting requirement for handguns has proven to be a valuable source of timely and actionable investigative leads for detecting firearms trafficking and prosecuting traffickers.  This is because key indicators of trafficking include buying a large number of the same or similar model of firearm.  See ATF Publication 3317.6.  A short "time to crime" is also an indication of trafficking.  Investigators commonly review multiple sales reports each day in conjunction with firearms trace data, analyzing the data for repeat purchasers and recoveries in crimes as well as other information that may disclose trafficking patterns.

43.     ATF's 36 years of experience with multiple sales reports for handguns confirms that the data generated by such reports, either by itself or in conjunction with crime gun trace data, provides useful investigative leads that may help identify potential firearms trafficking.

44.     From FY 2008 through FY 2010, the number of cases initiated involving the multiple sales of handguns totaled 1452.  These cases involved an estimated number of 41,772 firearms trafficked and 10,629 recovered.   In FY 2010, multiple sales reports were associated with 10,153 crime gun traces nationally.

45.     The following are examples of useful leads generated by multiple sales report data:  (a) Multiple sales reports showed an individual had purchased 82 handguns from FFLs in San Diego County between September 2004 and September 2006.  When questioned, the purchaser admitted he sold all of the firearms.  In 2010, the purchaser pleaded guilty to dealing in firearms without a license and confessed that he had trafficked at least 70 firearms to an individual in Tijuana, Mexico.

(b)  In 2009, multiple sales reports provided to ATF's San Diego field office indicated that an unlicensed San Diego resident obtained a significant number of handguns through multiple purchases in Arizona.  Further investigation led to a search warrant for the individual's residence and a number of firearms were discovered.  Ultimately, two suspects and a third accomplice were prosecuted and convicted for violations of the GCA.

(c)  In 2010, multiple sales reports provided to ATF's McAllen, Texas field office led an agent to query the ATF's Firearms Tracing System, which revealed that the same purchaser had four recent multiple sales purchases.  During an attempt to purchase more firearms, ATF agents approached the purchaser who admitted he had purchased the firearms for another individual.  The straw purchaser was convicted of violating the GCA and sentenced to 37 months' imprisonment.

## Multiple Sales Reporting of Certain Rifles

46.     Before ATF required FFLs in the Southwest Border states to report multiple sales of certain rifles, there was a major gap in multiple sales reporting.  ATF trace data found that from January 1, 2009 through December 22, 2010, certain semiautomatic rifles traced from Mexico to FFLs in the four Southwest Border states were bought by individuals who had additional purchases more frequently than those involving other locations.  Because there is no requirement that FFLs report multiple sales of rifles, there is no completely satisfactory way to estimate the number of these types of semiautomatic rifles that are sold in multiple purchases.

47.     Both the Justice Department's Office of the Inspector General and the Government Accountability Office noted that the reporting of multiple sales of long guns

would be beneficial to trafficking investigations and recommended that ATF require such reporting. OIG Report at 40; GAO Report at 3.

48.     To further address the problem of illegal firearms trafficking into Mexico and the gap in its tracing intelligence, ATF issued letters on July 12, 2011, which required that FFLs in Arizona, California, New Mexico, and Texas submit a Report of Multiple Sales when they sell or otherwise dispose of two or more semiautomatic rifles with certain characteristics to the same individual within five business days.

49.     Prior to issuing the letters announcing the rifle multiple sales reporting requirement, ATF requested comments from the public regarding this collection of information. Notice, 75 Fed. Reg. 79021 (Dec. 17, 2010). A total of 12,680 comments were received. An additional 30-day comment period began in April 2011. Notice, 76 Fed. Reg. 24058 (April 29, 2011). Over 18,800 pages of comments were received.

50.     FFL reports providing timely information about their multiple sales of these rifles will be sent immediately to Federal law enforcement officials. These reports are used to detect activity that gives ATF timely leads for the investigation of gun trafficking. For example, a multiple sales report may lead to the initiation of a gun trafficking investigation that may otherwise not begin until the firearms appear at crime scenes.

51.     In addition to the timely information the multiple sales forms will provide, these reports will include multiple sales of secondhand rifles because the reporting requirement does not differentiate between new and used rifles. "Secondhand" sales refer to the sale of qualifying rifles that re-enter the commercial market and are subsequently resold, pawned, or consigned through a dealer or pawnbroker. With limited exceptions, firearms sold as secondhand sales cannot be traced to the purchasers who acquire the firearms after their re-

entry into the commercial market because the trace will only uncover the first non-licensed purchaser, even if the firearm has been resold several times.  Multiple sales reports that include secondhand sales of qualifying rifles by retail dealers will allow ATF to trace those firearms from retail dealers and pawnbrokers to the most recent, or more recent, purchaser.

52.     By obtaining information about these multiple sales, ATF increases the opportunity of uncovering and disrupting trafficking schemes before the firearms make their way into Mexico, as opposed to after the fact at crime scenes.

53.     This collection of information is limited to four states—Arizona, California, New Mexico and Texas—because of their proximity to Mexico and because these states have been shown to be significant sources of firearms recovered in Mexico.  ATF decided to collect this information on a statewide basis because the Gun Control Act uses state boundaries as important legal dividing lines.  There are significant differences in state laws regarding where an individual may purchase a firearm.  18 U.S.C. § 921 et seq.

54.     This collection of information is also limited to certain kinds of long guns—semi automatic, with a caliber greater than .22 (including .223/5.56 caliber), and with the ability to accept a detachable magazine—because these firearms are being increasingly utilized by Mexican DTOs.   A "semiautomatic rifle" is any repeating rifle that uses a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round; it requires a separate pull of the trigger to fire each cartridge.  "Caliber" refers to the approximate internal diameter of a rifle barrel in relation to the extension of the projectile used in it; caliber is typically measured in inches (e.g., .223) or millimeters (e.g., 7.62).

55.     In addition, this collection of information is limited to certain types of Federal firearms licensees.  This collection is limited to dealers and pawnbrokers in firearms only

(i.e., those possessing Type 01 and Type 02 licenses) because they account for the vast majority of sales to retail purchasers.

56.     As of July 2011, the number of affected FFLs in the four states is approximately 8707.  The total number of FFLs with Type 01 and 02 licenses in the U.S. is approximately 55,566.  The total number of FFLs nationwide is approximately 122,597.  It is important to note that the FFL population fluctuates, as some FFLs go out of business and/or as new licenses are granted.

## Estimated Time and Expense of Compliance with
## Multiple Sales Reporting Requirements for Certain Rifles

57.     The Report of Multiple Sale or Other Disposition of Certain Rifles (ATF Form 3310.12) consists of one page of questions.

58.     In fiscal year 2010, 36,148 reports of multiple sales of handguns were submitted by 2509 FFLs in the four Southwest Border states.  Because the rifles subject to the reporting requirement—(a) semi-automatic; (b) a caliber greater than .22 (including .223/5.56 caliber); and (c) the ability to accept a detachable magazine—represent only a fraction of the long gun category, ATF estimates that it will receive approximately 18,074 reports of multiple sales, or half of the total multiple sales reports for handguns in the four Southwest Border states. ATF considers this a fair and likely over-inclusive estimate of the number of multiple sales reports of rifles it will receive annually.  More handguns than long guns are sold in the United States and shotguns are excluded from the reporting requirements.

59.     Between August 14, 2011 and September 15, 2011, ATF received 334 reports of multiple sales of rifles from FFLs in the four affected States, corresponding to 803 total firearms (45 from Arizona, corresponding to 106 firearms; 67 from California, corresponding

to 169 firearms; 10 from New Mexico, corresponding to 25 firearms; and 212 from Texas, corresponding to 503 firearms).

60.     Based on its 36 years of experience with FFLs reporting multiple sales of handguns, ATF estimates that each report will take 12 minutes to complete.  If ATF receives 18,074 reports from 2509 licensees, <u>see</u> Paragraph 58 above, the total burden is 3615 hours. The estimated annual burden per respondent is 1 hour and 26 minutes (that is, a total of 3615 total burden hours incurred by 2509 licensees).

61.     Based on Bureau of Labor Statistics research, ATF estimates the average wage for a firearms sales clerk to be $11.00 per hour.  Accordingly, ATF estimates the total annual burden on all responding licensees to be $39,762.80.  By dividing the multiple sales of the handgun responders (2509) by the total annual cost burden, ATF estimates the average cost per licensee per year to be $15.85.

62.     In addition, a number of licensees will experience a minimal burden; the reporting requirement is dependent on customers actually purchasing multiple long guns with the named characteristics within a set time period.  If no multiple sales occur within a five-day period, no report is necessary.

63.     The information to be collected is not new information; licensees have long been required to record the transfers of all firearms, including long guns, on ATF Form 4473.  <u>See</u> 27 C.F.R. § 478.124.

64.     The record information required to be kept for each rifle sale includes the date of transfer; the model, serial number, and caliber of the rifle; its manufacturer and/or importer; the transferee's full name, address, sex, race, date of birth and country of citizenship; and a

certification that the transferee is not prohibited from possessing or receiving firearms and is the actual buyer of the firearm.  27 C.F.R. § 48.124(c)(1)-(5).

65.     Pursuant to longstanding regulation, FFLs must retain each Form 4473 in alphabetical order (by name of buyer), chronological order (by date of sale or other disposition), or numerical order (by transaction serial number).  27 C.F.R. § 478.124(b).

66.     Based on inspection results and interaction with FFLs, ATF is aware that some licensees use commercial software that automatically identifies multiple sales and completes the form required.  Those FFLs who do not use software systems to identify and report multiple sales typically keep the Forms 4473 in a temporary folder by date, and then manually review the forms from the last five business days to determine if a purchaser bought two or more handguns during that period.  Once the five business day period has passed for a particular batch of Forms 4473, the FFLs transfer them to a permanent file.

67.     When ATF receives a new Form 3310.12 (Report of Multiple Sale or Other Disposition of Certain Rifles), it makes a digital copy of the form and enters the content into the Firearms Tracing System database.  It then destroys the original. Only ATF employees and contractors at the National Licensing Center have access to the database.  Purchaser information will be purged from the database after two years unless associated with a trace.

68.      When ATF receives a trace request from a law enforcement entity and enters it into the Firearms Tracing System, the system will determine if it is a match with information contained in a multiple sales report.

69.     The information reported to ATF pursuant to this collection is prohibited from disclosure by the Privacy Act, 5 U.S.C. § 552a, and the Tiahrt Amendments to federal appropriations bills, Pub. L. No. 111-117 (codified as Note to 18 U.S.C. § 923).  This data

may only be disclosed if it will not compromise an investigation or undercover operation and then only to Federal, State, and local law enforcement officials with a bona fide law enforcement need for the information, for example, in relation to an ongoing criminal investigation.

70.     The reporting requirement does not prohibit any licensee from selling the long guns in question, nor does it prohibit any purchaser not otherwise prohibited from purchasing these firearms.

71.     There are no immediate sanctions for violating the reporting requirement.  Failure to report multiple sales may be a factor in an adverse administrative action in the future, such as a license revocation or denial of renewal of a license.  However, before any such revocation or denial would occur, the licensee is entitled to receive notice, participate in an administrative hearing, and if necessary, appeal an unfavorable decision to a federal district court for *de novo* review.  18 U.S.C. § 923(f).

## Conclusion

72.     The reporting requirement is intended to inhibit the illegal flow of semiautomatic weapons into Mexico from the United States, making it more costly and inconvenient for the DTOs to acquire these firearms from FFLs in the United States and thus hindering their ability to engage in violence against Mexican and United States law enforcement and civilians.

73.     Preventing the collection of this information will hinder law enforcement's efforts to reduce violence along the Southwest Border and will likely result in more rifles being trafficked to Mexico and more lives being lost.  Based on the number of firearms recovered in Mexico and submitted for tracing, in the first half of calendar year 2011 (as of August 4,

2011), every two weeks, an average of 227 firearms recovered in Mexico are able to be

traced to a final retail purchaser in the United States.

I declare under penalty of perjury that the foregoing is true and correct. Executed this

**23** day of September, 2011.


Arthur Herbert
Assistant Director
Enforcement Programs and Services
Bureau of Alcohol, Tobacco, Firearms and
Explosives