# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NATIONAL SHOOTING SPORTS
FOUNDATION, INC.,

      Plaintiff,

      v.

B. TODD JONES, Acting Director,
Bureau of Alcohol, Tobacco, Firearms &
Explosives, in his official capacity,

      Defendant.

Civil Action No. 1:11-cv-01401 (RMC)
(consolidated with  1:11-cv-01402)

## BRIEF AMICUS CURIAE OF THE BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Michael D. Schissel
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022-4690
Telephone: 212.715.1000
Facsimile: 212.715.1399

Steven G. Reade
Aarash A. Haghighat
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004-1206
Telephone: 202.942.5000
Facsimile: 202.942.5999

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye St. NW, Suite 1100
Washington, D.C. 20005
Telephone: 202.289.7319
Facsimile: 202.371.9615

*Counsel for The Brady Center to Prevent Gun Violence*

September 27, 2011

## TABLE OF CONTENTS

STATEMENT OF INTEREST ...................................................................................................1

INTRODUCTION ....................................................................................................................2

RELEVANT FACTS ...............................................................................................................7

     A.    Long Gun Trafficking From the U.S. to Mexico ......................................................7

     B.    Role of "Straw Purchasers" in Trafficking Long Guns into Mexico ......................9

     C.    National Security Implications of Trafficking Long Guns into Mexico ...............11

ARGUMENT .......................................................................................................................14

I.     ATF HAS BROAD STATUTORY AUTHORITY UNDER 18 U.S.C. §
923(g)(5)(A) TO ISSUE DEMAND LETTERS ................................................................14

II.    THE DEMAND LETTER IS NARROWLY TAILORED TO COMBATING
FIREARMS TRAFFICKING IN A SPECIFIC GEOGRAPHIC AREA ..........................15

     A.    The Demand Letter Only Applies to FFLs in the Four Border States ..................17

     B.    The Demand Letter Only Applies to a Select Subset of Rifles ............................18

     C.    The Demand Letter Only Requires Reporting of Multiple Sales .........................19

     D.    The Demand Letter Only Applies to Prospective Sales ........................................20

     E.    The Demand Letter Will Improve Detection of Firearms Trafficking in
Real Time ............................................................................................................20

CONCLUSION ....................................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Blaustein & Reich, Inc. v. Buckles*,
    365 F.3d 281 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005)..............5, 14, 15, 16, 17, 20

*City of New York v. A-1 Jewelry & Pawn, Inc.*,
    501 F. Supp. 2d 369 (E.D.N.Y. 2007) .................................................................................21

*District of Columbia v. Heller*,
    128 S. Ct. 2783 (2008)........................................................................................................1

*J & G Sales Ltd. v. Truscott*,
    473 F.3d 1043 (9th Cir. 2007), *cert denied*, 552 U.S. 887 (2007)....................5, 14, 15, 16, 17

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010)........................................................................................................1

*RSM, Inc. v. Buckles*,
    254 F.3d 61 (4th Cir. 2001) .............................................................................................5, 17

*United States v. Hayes*,
    129 S. Ct. 1079 (2010)........................................................................................................1

STATUTES

1986 Firearms Owners Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986).......................15

18 U.S.C. § 923.........................................................................................................................16

18 U.S.C. § 923(g)(1)(A)..............................................................................................14, 15, 16

18 U.S.C. § 923(g)(5)(A) ...................................................................2, 5, 6, 7, 14, 15, 16, 17, 21

18 U.S.C. § 926.........................................................................................................................16

Consolidated Appropriations Act, 2010, Pub.L. 111-117, 123 Stat. 3034, 3128 (2009)..............16

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (1968)..........................................14

Homeland Security Act of 2002, Pub. L. No. 107-296, § 1112(f)(6), 116 Stat. 2135, 2276
    (2002)................................................................................................................................14

Violence Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, §
    110105, 108 Stat. 1796 (repealed on Sep. 13, 2004) .................................................................3

## OTHER AUTHORITIES

27 C.F.R. § 178.126(a)..............................................................................................14

27 C.F.R. § 478.121(a)..............................................................................................14

27 C.F.R. § 478.125(e)...........................................................................................6, 14

28 C.F.R. § 0.130(a)(1)..............................................................................................14

A Report by Mayors Against Illegal Guns, *Issue Brief: The Movement of Illegal Guns Across the U.S.-Mexico Border* (Sep. 2010)..............................................6, 18

Brian J. Siebel, *Assault Weapons: "Mass Produced Mayhem,"* Brady Ctr. to Prevent Gun Violence (Oct. 2008)....................................................................................1

Brian J. Siebel and Elizabeth S. Haile, *Shady Dealings: Illegal Gun Trafficking From Licensed Gun Dealers*, Brady Ctr. to Prevent Gun Violence (Jan. 2007) .................1

Brian J. Siebel et al., *On Target: The Impact of the 1994 Federal Assault Weapon Act*, Brady Ctr. to Prevent Gun Violence (Mar. 2004)....................................................1

Colby Goodman & Michel Marizco, *U.S. Firearms Trafficking to Mexico: New Data and Insights Illuminate Key Trends and Challenges* (Woodrow Wilson Int'l Ctr. for Scholars, Working Paper Sep. 2010) ................................................................11, 13

David Luhnow & José de Cordoba, *The Perilous State of Mexico*, WALL ST. J., Feb. 21, 2009, at A1.................................................................................................2, 4, 13

Douglas Farah, Money Laundering and Bulk Cash Smuggling: Challenges for the Merida Initiative, in Shared Responsibility: U.S.-Mexico Policy Options for Confronting Organized Crime (Eric L. Olson et al. eds 2010) ..........................................4, 9, 10

*Flow of Guns to Mexico Endangers Texas Safety*, HOUSTON CHRONICLE, Nov. 30, 2008 ............7

Guillermo Contreras, *Six Straw Buyers Plead Guilty in Gun-Smuggling Case*, June 7, 2011, SAN ANTONIO EXPRESS NEWS...................................................................10

Interview with Janet Napolitano, Mark Hosenball & Dan Ephron, *Q&A - The Mexican Problem*, NEWSWEEK, May 14, 2009.....................................................................12

Jonathan Lowy et al., *Exporting Gun Violence: How Our Weak Gun Laws Arm Criminals in Mexico and America*, Brady Ctr. to Prevent Gun Violence (Mar. 2009) .............................1

Kevin Johnson, *ATF Takes Aim at Deep 'Iron River of Guns'*, USA TODAY, Mar. 18, 2009....................................................................................................................3, 8

Letter from Charles Houser, Chief, National Tracing Center to Federal Firearms Licensee (July 12, 2011) ...........................................................................................5

Letter from Dianne Feinstein, United States Senator, to Kenneth Melson, Acting
Director, ATF (May 27, 2011)..........................................................................11, 12

Letter from Kenneth Melson, Acting Director, ATF to Dianne Feinstein, United States
Senator (June 9, 2011) ...............................................................................................8

Lise Olsen, *Killer of Americans South of Border Rarely Caught*, HOUSTON CHRONICLE,
Feb. 7, 2009..............................................................................................................13

Manual Roig-Franzia, *U.S. Guns Behind Drug Cartel Killings In Mexico*, WASHINGTON
POST, Nov. 6, 2007 .....................................................................................................9

Mary B. Sheridan, *Mexico's Calderon Tells Congress He Needs U.S. Help in Fighting
Drug Wars*, WASHINGTON POST, May 21, 2010 ........................................................8

Notice of Comment Results, ATF (Feb. 25, 2011)......................................................17

Oliver Pickup, *Mexican Drug War Troops Replace 'Corrupt' Police in State that Borders
Texas*, June 27, 2011, DAILY MAIL UK ...................................................................12

Paul Helmke, Brady Center Comments in Support of Reporting Rule (Feb. 15, 2011)...................1

Proposed Collection Comments Requested: Report of Multiple Sale or Other Disposition
of Certain Rifles, 76 Fed. Reg. 24058 (Apr. 29, 2011)............................................18

Randal C. Archibold, *U.S. Moves Against Top Mexican Drug Cartel*, N.Y. TIMES, Feb.
26, 2009, at A18........................................................................................................2

Sam Quinones and Richard A. Serrano, *Mexico's Drug War Spills Across the Border*,
L.A. TIMES , Nov. 16, 2008 .....................................................................................13

Thomas Pickering, The Brookings Inst., Remarks at Rethinking U.S.-Latin American
Relations: A Hemispheric Partnership for a Turbulent World (Nov. 24, 2008).......................3

Tim Johnson, *Mexico Rethinks Drug War Strategy as Death Toll Soars*, MCCLATCHY
NEWSPAPERS, Aug. 13, 2010 ...................................................................................12

U.S. Dep't of Justice, Office of the Inspector General, Evaluations and Inspections Div.,
*Review of ATF's Project Gunrunner* (Nov. 2010)...................................3, 4, 6, 8, 9, 18, 19, 20

U.S. Gvt. Accountability Office, *Firearms Trafficking: U.S. Efforts to Combat Arms
Trafficking to Mexico Face Planning and Coordination Challenges* (June 2009)...............3, 8

United States Joint Forces Command, The Joint Operating Environment - Part III: The
Contextual World (2008) ......................................................................................2, 12

Pursuant to the concurrently filed motion for leave, The Brady Center to Prevent Gun Violence (the "Brady Center") respectfully submits this brief in support of the Defendant's motion for summary judgment.

## STATEMENT OF INTEREST

The Brady Center is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous *amicus curiae* briefs in cases involving both state and federal gun laws.  *See, e.g., McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); *United States v. Hayes*, 129 S. Ct. 1079, 1087 (2010) (citing amicus brief of the Brady Center); *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).  The Brady Center brings a broad and deep perspective on issues of critical importance to the instant action, including the regulation of firearms trafficking and assault weapons.[1]  Indeed, the Brady Center recently filed comments in support of the reporting requirement at issue here,[2] and authored a major report in 2009 examining how certain gaps in federal gun laws have contributed to the proliferation of gun violence by Mexican drug cartels.[3]

---

[1] *See, e.g.*, Brian J. Siebel, *Assault Weapons: "Mass Produced Mayhem*," Brady Ctr. to Prevent Gun Violence (Oct. 2008), *available at* http://www.bradycenter.org/xshare/pdf/reports/mass-produced-mayhem.pdf; Brian J. Siebel and Elizabeth S. Haile, *Shady Dealings: Illegal Gun Trafficking From Licensed Gun Dealers*, Brady Ctr. to Prevent Gun Violence (Jan. 2007), *available at* http://www.bradycenter.org/xshare/pdf/reports/shady-dealings.pdf; Brian J. Siebel et al., *On Target: The Impact of the 1994 Federal Assault Weapon Act*, Brady Ctr. to Prevent Gun Violence (Mar. 2004), *available at* http://www.bradycenter.org/xshare/pdf/reports/on_target.pdf.
[2] Paul Helmke, Brady Center Comments in Support of Reporting Rule (Feb. 15, 2011), *available at*  http://www.bradycenter.org/xshare/pdf/reports/BradyCenterLetterinSupport02152011.pdf.

[3] *See* Jonathan Lowy et al., *Exporting Gun Violence: How Our Weak Gun Laws Arm Criminals in Mexico and America*, Brady Ctr. to Prevent Gun Violence (Mar. 2009), *available at* www.bradycenter.org/xshare/pdf/reports/exporting-gun-violence.pdf.

Based on this expertise, the Brady Center is uniquely situated to present this Court with facts, including statistical information, that demonstrate how the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has narrowly tailored its new, critically important, mandatory reporting requirement for high-powered assault rifles to the pressing law enforcement challenges presented by Mexican drug cartels. The Brady Center believes that such information will assist this Court's consideration of ATF's authority to issue the challenged demand letter under 18 U.S.C. § 923(g)(5)(A).

## INTRODUCTION

Mexico is currently besieged by a savage struggle among drug cartels for control over the lucrative drug trade to the United States. The conflict has claimed thousands of lives, paralyzed entire cities with fear, and undermined stability at all levels of the Mexican government. Mexico's security situation has so deteriorated that the United States Joint Forces Command recently identified Mexico as one of just two nations that are particularly vulnerable to a swift and catastrophic collapse.[4] Beyond the tremendous suffering wrought by drug trafficking organizations, the violence in Mexico threatens to destabilize neighboring Central American nations and bring drug-fueled bloodshed to the doorsteps of many American cities in southwest border states.[5]

---

[4] United States Joint Forces Command, The Joint Operating Environment - Part III: The Contextual World 34, 36 (2008), *available at* http://www.jfcom.mil/newslink/storyarchive/2008/JOE2008.pdf.

[5] *See* Randal C. Archibold, *U.S. Moves Against Top Mexican Drug Cartel*, N.Y. TIMES, Feb. 26, 2009, at A18, *available at* http://www.nytimes.com/2009/02/26/us/26raids.html; David Luhnow & José de Cordoba, *The Perilous State of Mexico*, WALL ST. J., Feb. 21, 2009, at A1, *available at* http://online.wsj.com/article/SB123518102536038463.html.

The devastating violence and instability pervading Mexican life today has been fueled by another illicit trade:  the trafficking of high-powered firearms and military-style weaponry from the United States to Mexico.  Estimates suggest that nearly 2,000 guns flow into Mexico from the United States each day,[6] with 70 percent of the firearms seized and traced in Mexico coming from gun shops and gun shows in just three states — Texas, California, and Arizona.[7] Approximately 6,700 gun shops and pawn shops selling firearms — 12% of the entire nation's retail gun sellers — operate along the Southwest border.[8]  Semi-automatic assault rifles, such as the AK-47 and AR-15 rifles, have increasingly become "weapons of choice" for Mexico's largest drug syndicates.[9]  Since the Federal Assault Weapons Ban expired in 2004,[10] the share of assault rifles recovered at Mexican crime scenes has more than doubled from 20 percent of all crime guns in 2004 to 48 percent in 2009.[11]  Emboldened by the firepower these military-style

---

[6] Kevin Johnson, *ATF Takes Aim at Deep 'Iron River of Guns'*, USA TODAY, Mar. 18, 2009, *available at* http://www.usatoday.com/news/nation/2009-03-18-cartelguns_N.htm; Thomas Pickering, The Brookings Inst., Remarks at Rethinking U.S.-Latin American Relations: A Hemispheric Partnership for a Turbulent World 28 (Nov. 24, 2008), *available* at http://www.brookings.edu/events/2008/1124_latin_america.aspx (transcript).

[7] U.S. Gvt. Accountability Office, *Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges* 19 (June 2009), *available at* http://www.gao.gov/new.items/d09709.pdf.

[8] *Id.*

[9] *See* U.S. Dep't of Justice, Office of the Inspector General, Evaluations and Inspections Div., *Review of ATF's Project Gunrunner* 36 (Nov. 2010), at http://www.justice.gov/oig/reports/ATF/e1101.pdf.

[10] Violence Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110105, 108 Stat. 1796 (repealed on Sep. 13, 2004) (imposing a prohibition on the manufacture for civil use of certain semi-automatic "assault weapons," such as AR-15s and AK-47s).

[11] *See*  U.S. Dep't of Justice, *supra* note 9, at 38.

assault weapons provide, Mexican drug organizations are believed to now wield more influence than the actual authorities in as many as 200 Mexico counties.[12]

      To amass fearsome arsenals of military-style weapons, Mexican drug cartels rely heavily on straw purchasers who buy, in bulk, semi-automatic assault rifles from gun dealers and gun shows in southwest border states.[13] Regrettably, even as cartels have exploited the nearly limitless supply of semi-automatic assault rifles in border state gun shops to transform the scale and composition of their weaponry, sales of these rifles to straw purchasers remain largely shielded from law enforcement scrutiny.[14] Indeed, over the past decade, drug cartels have successfully acquired, by proxy, mass quantities of high-firepower semi-automatic assault rifles from gun dealers and pawn shops without triggering any reporting obligations to ATF. The absence of any automatic notification mechanism for sales of these military-style assault rifles has increasingly left ATF agents without the type of timely, well developed, actionable intelligence they need to interrupt firearms trafficking schemes in real time.[15] Far too often, in fact, ATF agents only learn of potential trafficking activity after the smuggled firearm is seized from a Mexican crime scene and traced to the United States.[16]

---

[12] Luhnow, *supra* note 5.

[13] Douglas Farah, Money Laundering and Bulk Cash Smuggling: Challenges for the Merida Initiative, in Shared Responsibility: U.S.-Mexico Policy Options for Confronting Organized Crime 181, 200 (Eric L. Olson et al. eds. 2010), *available at* http://www.wilsoncenter.org/publication/shared-responsibility.

[14] *See* U.S. Dep't of Justice, *supra* n. 9, at 34-35.

[15] *See id*. at 34-35, 73-80.

[16] *See id.* at 73-80 (describing how the ATF's increased reliance on tracing has failed to produce timely and actionable intelligence).

In an effort to address this dangerous intelligence vacuum, ATF recently sent a letter ("Demand Letter") to federal firearms licensee ("FFL") dealers in Arizona, California, New Mexico, and Texas requiring prompt reporting of multiple sales of certain semi-automatic assault rifles.[17]   ATF's authority to issue the Demand Letter is rooted in the plain language of 18 U.S.C. § 923(g)(5)(A).  As both the Fourth and Ninth Circuit Courts of Appeals have already recognized,[18] that section expressly authorizes ATF to request all firearm transaction records that FFL dealers are otherwise obliged to maintain under federal law.  *See* 18 U.S.C. § 923(g)(5)(A) ("Each licensee shall, when required by letter issued by [ATF] . . . submit on a form specified by [ATF] . . . all record information required to be kept by this chapter . . ..").

Contrary to Plaintiffs' allegations, ATF's express statutory authority under section 923(g)(5)(A) is not, and cannot be, eviscerated by related statutory provisions.[19]   Indeed, as sister appellate courts have found, ATF's demand letter authority empowers the Bureau to issue temporary, narrowly-tailored requests to address specific law enforcement needs.[20]   Pursuant to this Congressional authorization, ATF may respond swiftly to changing gun trafficking patterns by pursuing, via demand letter, crucial intelligence regarding bulk sales of high-firepower rifles.

---

[17] Letter from Charles Houser, Chief, National Tracing Center to Federal Firearms Licensee (July 12, 2011).  The Demand Letter targets "semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber)." *See id.*

[18] *See J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045 n.1 (9th Cir. 2007), *cert denied*, 552 U.S. 887 (2007) (upholding the ATF's authority to issue demand letters under section 923(g)(5)(A)); *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 284 n.3 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005) (same); *RSM, Inc. v. Buckles*, 254 F.3d 61, 63, 67-68 (4th Cir. 2001) (same).

[19] *See J & G Sales Ltd.*, 473 F.3d at 1049.

[20] *See id.*; *Blaustein & Reich, Inc.*, 365 F.3d at 286-87.

In the instant action, consistent with past demand letters issued by ATF, the Bureau's request is narrowly tailored to FFL dealers in four southwest border states that collectively sell 76.1 percent of all United States-sourced guns recovered at Mexican crime scenes and traced by law enforcement.[21]   Additionally, to ensure the Demand Letter narrowly reaches only the type of military-style weapons that Mexican cartels covet, ATF targeted only long guns that boast all of the following characteristics:  (1) a semi-automatic action; (2) a caliber greater than .22 (including .223 and 5.56 caliber); and (3) the ability to accept a detachable magazine.  Informed by data suggesting that cartels tend to acquire long guns through bulk purchases,[22] ATF further tailored its request to apply only to sales involving two or more of these rifles.  Finally, ATF also limited the scope of the Demand Letter by seeking purely prospective sales reports.  This limitation reflects ATF's goal of generating current and actionable intelligence.

In the face of section 923(g)(5)(A)'s express statutory language, the considered judgment of sister federal courts, and the Demand Letter's narrow tailoring, Plaintiffs nevertheless persist in arguing that ATF is powerless to use demand letters to respond to the escalating gun trafficking crisis along the Mexican border with the United States.  According to Plaintiffs, ATF must be kept in the dark as cartels use straw buyers to buy scores of semi-automatic assault rifles for use in their reign of crime and terror.  Indeed, even though dealers are already obligated to document each sale in their Acquisition and Disposition records,[23] Plaintiffs claim that ATF has no authority to access this record information in a timely manner.  In effect, Plaintiffs take the

---

[21] A Report by Mayors Against Illegal Guns, *Issue Brief: The Movement of Illegal Guns Across the U.S.-Mexico* Border 2 (Sep. 2010), *available at* http://www.mayorsagainstillegalguns.org/downloads/pdf/issue_brief_mexico_2010.pdf.

[22] U.S. Dep't of Justice, *supra* note 9, at 38-39.

[23] *See* 27 C.F.R. § 478.125(e).

position that life-saving law enforcement leads must sit gathering dust in gun dealer files, ready to be accessed only to solve a violent gun crime *after* it has shattered families, terrorized communities, and led to the destabilization of our southern neighbor.

Plaintiffs' position is wrong as a matter of law and dangerous as a matter of policy.  By issuing a circumscribed request that is narrowly tailored to combating Mexican firearms trafficking, ATF's Demand Letter falls safely within the scope of its statutory authority under section 923(g)(5)(A) and should be upheld.  Accordingly, we respectfully request that Defendant's Motion for Summary Judgment be granted.

## RELEVANT FACTS

A fulsome understanding of the factual circumstances in which ATF issued the Demand Letter demonstrates that it is narrowly tailored to combating the illegal trafficking of one type of weapon (high-firepower rifles) and in a narrow geographical area (the four states bordering Mexico).

### A.    Long Gun Trafficking From the U.S. to Mexico

The former Ambassador to Mexico under President George W. Bush, Tony Garza, explained in a 2008 speech that "[Mexico] would not be the center of cartel activity or [be] experiencing this level of violence, were the United States not the largest consumer of illegal drugs and the main supplier of weapons to the cartels."[24]  Since then, gun trafficking from the United States to Mexico has continued unabated.  The available evidence indicates that most of

---

[24] *Flow of Guns to Mexico Endangers Texas Safety*, HOUSTON CHRONICLE, Nov. 30, 2008, *available at* http://www.chron.com/opinion/outlook/article/Border-war-Flow-of-guns-to-Mexico-endangers-1768101.php.

the high-caliber and high-power semi-automatic firearms used by Mexican drug syndicates originate in the United States.[25]

As mentioned above, about 2,000 guns cross the United States' border into Mexico every day.[26] Data collected through Mexican firearm seizures and United States prosecutions confirm the sheer magnitude of the problem.  For example, in May 2010, Mexican President Felipe Calderon told a joint session of Congress that a significant majority of the 75,000 firearms seized by Mexican authorities and traced in the last three years originated in the United States.[27] Similarly, a June 2009 Government Accountability Office report identified the United States as the country of origin for a large proportion of the guns recovered by Mexican authorities and traced between 2004 and 2008.[28]  More recently, in a June 9, 2011 letter to Senator Dianne Feinstein, then ATF Acting Director Kenneth Melson revealed that 20,504 of the 29,284 firearms recovered by Mexico authorities and traced in 2009 and 2010 alone were initially sold in the United States.[29]

The alarming growth in firearms entering Mexico from the United States has been accompanied by an equally troubling shift from trafficking in handguns to trafficking in more

---

[25] *See* U.S. Dep't of Justice, *supra* note at 9, at 19.

[26] *See* Johnson, *supra* note 6.

[27] Mary B. Sheridan, *Mexico's Calderon Tells Congress He Needs U.S. Help in Fighting Drug Wars*, WASHINGTON POST, May 21, 2010, *available* at http://www.washingtonpost.com/wp-dyn/content/article/2010/05/20/AR2010052002911.html.

[28] See United States Gvt. Accountability Office, *supra* note 7, at 18.

[29] Letter from Kenneth Melson, Acting Director, ATF to Dianne Feinstein, United States Senator (June 9, 2011) ("Melson Letter"), *available at* http://feinstein.senate.gov/public/index.cfm?Fuseaction=Files.View&FileStore_id=beaff893-63c1-4941-9903-67a0dc739b9d.

powerful military style-weaponry.  Since the expiration of the Assault Weapons Ban in 2004, semi-automatic long guns, such as AK-47 and AR-15 rifles, have become the "weapons of choice" for Mexican drug cartels.[30]  Indeed, the share of powerful long guns recovered at Mexican crime scenes has steadily increased from 20 percent of all crime guns in 2004 to 48 percent in 2009.[31]  By contrast, handguns represent a steadily decreasing portion of traced crime guns seized in Mexico, dropping from 79 percent in 2004 to 50 percent in 2009.[32]  This shift towards more powerful weapons has led an ATF spokesman to remark that Mexican drug criminals now boast the "same firepower here on the border that our soldiers are facing in Iraq and Afghanistan."[33]

### B.    Role of "Straw Purchasers" in Trafficking Long Guns into Mexico

To circumvent Mexico's strict gun laws, drug cartels often rely on intricate networks of straw purchasers and intermediaries to acquire firearms in the United States and transport them to Mexico.  In most cases, Mexican drug syndicates enlist United States-based gun brokers to oversee the acquisition and transport of firearms across the border.[34]  To minimize the risk of detection, brokers in turn hire low-level straw purchasers who actually execute bulk purchases of firearms from various FFL dealers in southwest borders states.[35]  By relying on straw purchasers

---

[30] U.S. Dep't of Justice, *supra* note at 9, at 36.

[31] *See id.* at 38.

[32] *See id.*

[33] Manual Roig-Franzia, *U.S. Guns Behind Drug Cartel Killings In Mexico*, WASHINGTON POST, Nov. 6, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/10/28/AR2007102801654.html.

[34] *Farah*, *supra* note 13, at 200.

[35] *Id.*

with no criminal history, drug cartels are able to acquire numerous high-powered firearms

without triggering any red flags that will invite law enforcement scrutiny.[36]  In more

sophisticated schemes geared towards concealing the identity of traffickers, a managing broker

delegates the responsibility for hiring and coordinating the activities of straw purchasers to

subordinate brokers.[37]  Because gun dealers have been under no obligation to report to ATF even

highly suspicious bulk sales of military-style rifles, these straw purchasers are able to repeatedly

buy assault rifles in large quantities without detection by law enforcement.

　　　　Recent prosecutions have highlighted the important role straw purchasers play in firearms

trafficking networks.  For example, in June 2011, six straw purchasers pled guilty to acquiring at

least 50 high-powered weapons for a gun smuggling cell coordinated by a broker named Marino

Castro.[38]  According to ATF agents, one juvenile, Keith Edwards, purchased 15 AK-47 rifles for

trafficking to Mexico.[39]  Regrettably, for every trafficking network that is penetrated, law

enforcement remains in the dark about many more straw buyers who execute similar bulk

purchases.

---

[36] *Id.*

[37] *Id.*

[38] Guillermo Contreras, *Six Straw Buyers Plead Guilty in Gun-Smuggling Case*, June 7, 2011, SAN ANTONIO EXPRESS NEWS, *available at*
http://www.mysanantonio.com/news/local_news/article/Six-straw-buyers-plead-guilty-in-gun-smuggling-1414045.php

[39] *Id.*

### C.      National Security Implications of Trafficking Long Guns into Mexico

Mexican drug cartels have a long history of using firearms to establish and maintain

hegemony over drug trafficking routes and entrance points into the United States.[40]   Once rare

occurrences, Mexican drug cartels now regularly engage in open gunfights with rival drug

organizations, law enforcement officials, soldiers, and the general public.[41]   Even more brazenly,

drug organizations are currently pursuing a strategy of targeted assassinations against anyone

who dares to challenge their influence, including high level Mexican law enforcement officials,

politicians, and journalists.[42]   During one particularly notorious two-day period in 2009, drug

cartels assassinated the acting director of the Federal Preventive Police, the chief of staff for the

Federal Preventive Police, and a director of a federal organized crime unit.[43]

The outbreak of drug-fueled gun violence has taken a devastating toll on the Mexican

population.  Over the last decade, Mexico's homicide rate has increased 700%.[44]   Since

December 2006 alone, the Mexican government estimates that 34,612 people have been killed at

the hands of organized crime.[45]   The victims of the violence include 916 municipal police, 698

---

[40] *See* Colby Goodman & Michel Marizco, *U.S. Firearms Trafficking to Mexico: New Data and Insights Illuminate Key Trends and Challenges* 6-7 (Woodrow Wilson Int'l Ctr. for Scholars, Working Paper Sep. 2010).

[41] *See id. at* 6-9.

[42] *See id.*

[43] *See id.* at 7.

[44] *See id.*

[45] Letter from Dianne Feinstein, United States Senator, to Kenneth Melson, Acting Director, ATF (May 27, 2011) ("Feinstein Letter to Melson"), *available at* http://feinstein.senate.gov/public/index.cfm?Fuseaction=Files.View&FileStore_id=beaff893-63c1-4941-9903-67a0dc739b9d.

state police, and 464 federal agents.[46]  In fact, despite President Calderon's deployment of nearly

45,000 soldiers to provinces dominated by drug cartels,[47] drug-related killings in Mexico reached

their highest levels in 2010.[48]

Mexico's growing instability poses a tremendous national security challenge for the

United States.  Indeed, Homeland Security Secretary Janet Napolitano has cautioned that

"remote as it may be . . .[,] there is a possibility of [Mexico] becoming a narcostate."[49]  These

dire warnings have been echoed by the United States Joint Forces Command, which identifies

Mexico and Pakistan as two nations that "[i]n terms of worst case scenarios [for American

interests] . . . bear consideration for a rapid and sudden collapse."[50]  As the Command explained

in a 2008 report, "[T]he [Mexican] government, its politicians, policy and judicial infrastructure

are all under sustained assault and pressure by criminal gangs and drug cartels.  How that

internal conflict turns out over the next several years will have a major impact on the stability of

the Mexican state."[51]  Thus far, the initial trends are hardly reassuring.  Mexican academic

---

[46] Tim Johnson, *Mexico Rethinks Drug War Strategy as Death Toll Soars*, MCCLATCHY NEWSPAPERS, Aug. 13, 2010, *available at* http://www.mcclatchydc.com/2010/08/12/99089/mexico-rethinks-drug-strategy.html.

[47] Oliver Pickup, *Mexican Drug War Troops Replace 'Corrupt' Police in State that Borders Texas*, June 27, 2011, DAILY MAIL UK, *available at* http://www.dailymail.co.uk/news/article-2008556/Mexican-troops-replace-police-Tamaulipas-state-borders-Texas.html.

[48] Feinstein Letter to Melson, *supra* note 45.

[49] Interview with Janet Napolitano, Mark Hosenball & Dan Ephron, *Q&A - The Mexican Problem*, NEWSWEEK, May 14, 2009, *available at* http://www.thedailybeast.com/newsweek/2009/03/13/the-mexican-problem.html.

[50] United States Joint Forces Command, *supra* note 4, at 36.

[51] *Id.*

Edgardo Buscaglia estimates that Mexican drug cartels now wield more influence than the actual authorities in as many as 200 Mexico counties.[52]

Even if Mexico avoids becoming a failed state, the ongoing gun violence remains a significant threat to the safety and security of all Americans.  According to a 2009 *Houston Chronicle* investigation, the escalating drug violence claimed the lives of more than 200 United States citizens in Mexico between 2004 and 2008.[53]  More recently, a United States Consulate employee, her husband, and the husband of another employee were assassinated in the border town of Cuidad Juarez.[54]  Closer to home, drug-fueled violence has claimed the lives of 14 United States Custom and Border Patrol agents since 2006, and led to a trail of murders, kidnapping, and other crimes in at least 195 American cities.[55]

---

[52] Luhnow, *supra* note 5.

[53] Lise Olsen, *Killer of Americans South of Border Rarely Caught*, HOUSTON CHRONICLE, Feb. 7, 2009, *available at* http://www.chron.com/news/nation-world/article/Killers-of-Americans-south-of-border-rarely-caught-1741056.php.

[54] *See* Goodman, *supra* note 40, at 8.

[55] Sam Quinones and Richard A. Serrano, *Mexico's Drug War Spills Across the Border*, L.A. TIMES, Nov. 16, 2008 (discussing drug smuggling operations responsible for kidnapping a six-year old boy in Las Vegas and torturing an Atlanta resident), *available at* http://www.latimes.com/news/nationworld/world/latinamerica/la-na-cartels16-2008nov16,0,464574.story.

**ARGUMENT**

Contrary to Plaintiff's allegations, ATF's narrowly-tailored Demand Letter falls safely within the scope of the ATF's statutory authority under section 923(g)(5)(A).

## I.   ATF HAS BROAD STATUTORY AUTHORITY UNDER 18 U.S.C. § 923(g)(5)(A) TO ISSUE DEMAND LETTERS

The Gun Control Act ("GCA") of 1968 requires FFL dealers to create and maintain detailed records relating to the firearms they import, receive, or sell. *See* Pub. L. No. 90-618, 82 Stat. 1213 (1968) (codified as amended at 18 U.S.C. § 923(g)(1)(A)); 27 C.F.R. § 478.121(a). For a firearm sale, licensees must record and preserve the name and address of the purchaser, the date of sale, the name of the gun manufacturer or importer, and the model, serial number, type, and caliber or gauge of the gun. 27 C.F.R. § 478.125(e).  Because the federal government does not keep records of gun sales, these dealer records are crucial to law enforcement's ability to trace crime guns and solve crimes.

Although mandatory records are typically stored on the premises of the FFL, ATF has long enjoyed "broad authority to seek, by demand letter, all record information that [licensees] are required to maintain" under the GCA.[56]  *See Blaustein*, 65 F.3d at 286; 27 C.F.R. § 178.126(a) (requiring FFLs to comply with request letters for record information).  As part of the

---

[56] Although the GCA originally granted firearm licensing authority to the Secretary of the Treasury, the Secretary delegated this authority to ATF.  As part of the Homeland Security Act of 2002, Congress transferred the licensing authority to the Department of Justice. Pub. L. No. 107-296, § 1112(f)(6), 116 State. 2135, 2276 (2002).  The Attorney General of the United States subsequently delegated the licensing authority to the Bureau. 28 C.F.R. § 0.130(a)(1); *see, e.g.*, *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1045 n.1 (9th Cir. 2007), *cert denied*, 552 U.S. 887 (2007) (inserting "Bureau" for "Attorney General" in a quotation of 18 U.S.C. § 923(g)(5)(A)); *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 284 n.3 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005).  ATF's Acting Director has delegated the authority to collect records to the Chief of the National Tracing Center.  For sake of simplicity, we refer to ATF as the governmental agency empowered by Congress to perform the relevant functions in this case.

1986 Firearm Owners Protection Act ("FOPA"),[57] Congress codified this authority in 18 U.S.C. § 923(g)(5)(A):

> Each licensee shall, *when required by letter* issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, *all record information required to be kept by this chapter* or such lesser record information as the Attorney General in such letter may specify.

(emphasis added).  Since FOPA's passage in 1986, ATF has periodically exercised its authority under section 923(g)(5)(A) to obtain records that serve pressing law enforcement objectives.  In 2003, for example, to fill a void in ATF's firearm tracing capabilities, the Bureau demanded records relating to secondhand firearms from select FFL dealers that had been linked to a disproportionally large number of crime guns.[58]

## II.    THE DEMAND LETTER IS NARROWLY TAILORED TO COMBATING FIREARMS TRAFFICKING IN A SPECIFIC GEOGRAPHIC AREA

The GCA broadly demands that all FFL dealers collect and maintain records relating to any type of firearm transaction, including the sale of long guns.  Accordingly, the plain language of section 923(g)(5)(A) provides express authority to issue the disputed Demand Letter.  *See J & G Sales Ltd.*, 473 F.3d at 1043 ("Read in isolation, there can be no question that [section] 923(g)(5)(A) authorizes the Bureau to issue the disputed demand letter.").

Plaintiffs, however, assert two arguments to challenge ATF's authority to issue the Demand Letter.  First, Plaintiffs allege that, under the "except as expressly required" language of section 923(g)(1)(A), the affirmative authorizations to collect information under subsections (g)(2), (g)(3), (g)(4), (g)(6), and (g)(7) should be read as limiting the scope of ATF's authority to

---

[57] Pub. L. No. 99-308, 100 Stat. 449 (1986) (codified as amended at 18 U.S.C. § 921 et seq.).

[58] *See J & G Sales Ltd.*, 473 F.3d at 1046 (affirming ATF's authority to demand records relating to secondhand firearms); *Blaustein*, 365 F.3d at 285 (same).

issue demand letters.  Plaintiffs' Mot. for Prelim. Injunc. at 16, Dkt. No. 11.  Second, Plaintiffs

suggest that any collection of firearm records is prohibited by an appropriations rider that

precludes the expenditure of funds "in connection with consolidating or centralizing" firearm

records maintained by FFL dealers. *Id.* at 18; *see* The Consolidated Appropriations Act, 2010,

Pub. L. 111-117, div. B, tit. 2, 123 Stat. 3034, 3128 (2009).  Neither argument has any merit and

should be rejected.

Both arguments are simply reformulations of the same misguided critiques of section 923

that have already been considered and rejected by both the Fourth and Ninth Circuit Courts of

Appeals.  *See J & G Sales Ltd.*, 473 F.3d at 1048-51 (rejecting licensee argument that the ATF's

demand letter authority under section 923(g)(5)(A) must be restricted to active criminal

investigations to harmonize with the rest of section 923, section 926, and the appropriations

rider); *Blaustein*, 365 F.3d at 284-90 (same).  As retired Justice Sandra Day O'Connor explained

in *J & G Sales Ltd. v. Truscott*, narrow positive grants of authority under section 923 do not

eviscerate the ATF's express authorization to issue demand letters. 473 F.3d at 1049-50.  Instead,

the other related provisions and the appropriations rider merely stand as reminders that section

923(g)(5)(A) cannot be used as a limitless, backdoor tool for establishing a national firearm

registry.  *See id.* at 1049.

Accordingly, when evaluating the statutory authorization for an ATF demand letter,

courts have looked to whether the request takes a narrowly-tailored approach towards addressing

a specific law enforcement need or merely attempts to surreptitiously create an unauthorized

national registry of firearms.  *See id.* at 1048-51 (upholding ATF's authority to issue demand

letters relating to secondhand gun information because of the Bureau's "narrowly-tailored"

approach); *Blaustein*, 365 F.3d at 287-90 (same).  Factors relevant to this analysis include the

type and volume of information requested, the number of FFLs affected, the subset of firearms involved, and the relative value of the information. *See J & G Sales Ltd.*, 473 F.3d at 1049.  In *J & G Sales Ltd.*, for example, the Ninth Circuit Court of Appeals upheld ATF's authority to issue a letter demanding certain records on secondhand firearms because the request only affected 0.6 percent of FFL dealers, focused on secondhand gun acquisitions, and filled a void in ATF's firearm tracing capabilities. 473 F.3d at 1047; *see also Blaustein*, 365 F.3d at 286-90 (approving a similar demand letter).  Similarly, in *RSM, Inc. v. Buckles*, the Fourth Circuit Court of Appeals approved an ATF demand letter that sought monthly reports of all purchases and sales from a limited subset of FFL dealers that had failed to cooperate with past trace requests. *See* 254 F.3d 61, 63, 67-68 (4th Cir. 2001).

Here, consistent with *J & G Sales Ltd.*, *Blaustein*, and *RSM*, the ATF's new reporting requirement for the multiple sales of certain semi-automatic rifles falls safely within the Bureau's authority under section 923(g)(5)(A), as it is narrowly tailored towards assisting ATF agents in combating illegal gun trafficking schemes from the four border states into Mexico and reducing related cross-border violence.[59]

## A.      The Demand Letter Only Applies to FFLs in the Four Border States

To minimize the burden imposed on FFLs nationwide, the Demand Letter pertains only to licensed dealers in Texas, Arizona, California, and New Mexico.  These four southwest border states stand out as the predominant suppliers of firearms to Mexican drug cartels.  Indeed, between 2006 and 2009, Texas, Arizona, and California consistently ranked as the top three

---

[59] Notice of Comment Results, ATF (Feb. 25, 2011), *available at* http://www.atf.gov/firearms/industry/051711-comment-analysis-60-day-notice.pdf.

suppliers of United States-sourced guns recovered at Mexican crime scenes.[60]  New Mexico, the

fourth state affected by the Demand Letter, exports the second highest number of crime guns per

capita in the country.[61]  In 2009, 76.1 percent of all United States-sourced guns traced and

recovered at Mexican crime scenes were originally sold in one of these four states.[62]  By

focusing on FFL dealers in Texas, Arizona, California, and New Mexico, ATF has narrowly

tailored its collection efforts to licensees whose multiple sales reports are most likely to provide

valuable real time intelligence on Mexican gun trafficking networks.

   Additionally, it is important to recognize that the Demand Letter only applies to FFL

dealers who sell or otherwise dispose of two or more covered rifles to an unlicensed person.

Based on the proportion of dealers who submit analogous handgun sales reports in Texas,

Arizona, California, and New Mexico, ATF estimates that fewer than 30 percent of all licensees

in these four states will be affected by the new reporting requirement for rifles.[63]

##     B.   The Demand Letter Only Applies to a Select Subset of Rifles

   Since the expiration of the Assault Weapons Ban in 2004, semi-automatic long guns,

such as AK-47 and AR-15 rifles, have become the "weapons of choice" for Mexican drug

cartels.[64]  Indeed, the share of long guns recovered at Mexican crime scenes has steadily

---

[60] *See* A Report by Mayors Against Illegal Guns, *supra* note 21, at 2.

[61] *See id.* at 3. Only Arizona exports guns at a higher rate than New Mexico. *See id.*

[62] *See id.* at 2.

[63] Proposed Collection Comments Requested: Report of Multiple Sale or Other Disposition of Certain Rifles, 76 Fed. Reg. 24058 (Apr. 29, 2011), *available at* http://edocket.access.gpo.gov/2011/pdf/2011-10355.pdf.

[64] U.S. Dep't of Justice, *supra* note 9, at 36.

increased from 20 percent of all crime guns in 2004 to 48 percent in 2009.[65]  Drug cartels have

leveraged the firepower these military-style rifles provide to extend and expand their influence

throughout Mexico.  To target the trafficking of only these most dangerous weapons, ATF has

confined the new reporting requirement to rifles with the following characteristics: (1) a semi-

automatic action; (2) a caliber greater than .22 (including .223 and 5.56 caliber); and (3) the

ability to accept a detachable magazine.

>          **C.      The Demand Letter Only Requires Reporting of Multiple Sales**

ATF's request does not apply to every sale of a qualifying rifle.  Instead, to more closely

reflect the purchasing habits of Mexican drug cartels, the Demand Letter only requires reporting

of multiples sales of certain rifles within a five day period.

As previously discussed above, Mexican drug syndicates frequently rely on straw buyers

and intermediaries to purchase long guns in multiple sales from FFL dealers.  A recent ATF

investigation of the Gulf Cartel in Mexico has helped to underscore the important role bulk

purchasing plays in gun trafficking schemes.[66]  Resembling other Mexican drug organizations,

the Gulf Cartel collaborated with a United States-based firearms trafficking ring to buy 251 long

guns between March 13, 2006 and June 5, 2007.[67]  Of the 251 long guns purchased, all but one

were acquired through multiple sales.[68]  Indeed, in one day, a single straw purchaser in the

firearms trafficking ring acquired fourteen long guns from a sole FFL dealer.[69]

---

[65] *See id.* at 38.

[66] *See id.* at 38-39.

[67] *See id.*

[68] *See id*.

[69] *See id.*

### D.     The Demand Letter Only Applies to Prospective Sales

The ATF further narrowed the scope of its request by only targeting reports of sales occurring on or after August 14, 2011.  By foregoing potential leads that a retrospective review may have generated, the Demand Letter reaffirmed ATF's commitment to pursuing only timely intelligence.

### E.     The Demand Letter Will Improve Detection of Firearms Trafficking in Real Time

ATF's demand for reports of multiple sales of certain rifles is tailored to generating the type of timely, actionable investigative leads needed to detect long gun trafficking schemes in real time.  First, by their very nature, multiple sales reports are effective and efficient tools for highlighting potential indicators of long gun trafficking.  For example, in lieu of reviewing countless individual sales records for trends, an ATF agent can quickly examine multiple sales reports for evidence of an unusually large sale or an unorthodox pattern of multiple sales by the same dealer.[70]  By generating simple, readily digestible sales records, ATF agents will be able to more readily detect and investigate potentially suspicious activities.

Second, a recent analysis by the OIG for the Department of Justice has revealed that a long gun sold in the United States tends to arrive at a Mexican crime scene more quickly than a handgun.[71]  Functionally, this shorter "time-to-crime"[72] suggests that at least some straw purchasers are systematically diverting long guns from legitimate commercial outlets to Mexican

---

[70] *See id.* at 36-37.

[71] *See id.* at 38.

[72] The "time-to-crime" is the time from the first retail sale to the time the gun is confiscated by the police at a crime scene. *See Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 285 (4th Cir. 2004), *cert. denied*, 543 U.S. 1052 (2005).

drug cartels. *See City of New York v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 378-79 (E.D.N.Y. 2007) ("[S]traw purchasing is a pattern of trafficking that is likely to result in crime guns with relatively short time-to-crimes.") (citations omitted).  The emerging time-to-crime data reaffirms that records of multiple sales of long guns will help generate more timely and valuable leads for detecting and interrupting firearms traffickers.

## CONCLUSION

Mexico is currently caught in the midst of a violent struggle among drug cartels that threatens the safety and security of all United States citizens.  To stem the flow of firearms that have fueled this conflict, the ATF has issued a circumscribed request to FFL dealers in southwest border states for information on multiple sales of certain rifles.  Contrary to Plaintiffs' allegations, ATF's narrowly-tailored Demand Letter falls safely within the scope of the Bureau's express authority under section 923(g)(5)(A).  Accordingly, we respectfully request that Defendant's Motion for Summary Judgment be granted.


Dated: September 27, 2011                Respectfully submitted,

                                         /s/ Steven G. Reade
                                         Steven G. Reade (D.C. Bar No. 370778 )
                                         Aarash A. Haghighat (D.C. Bar No. 997228)
                                         ARNOLD & PORTER LLP
                                         555 12th Street, N.W.
                                         Washington, D.C.  20004-1206
                                         Telephone: 202.942.5000
                                         Facsimile: 202.942.5999

                                         Michael Schissel (New York Bar)
                                         ARNOLD & PORTER LLP
                                         399 Park Avenue
                                         New York, NY 10022-4690
                                         Telephone: 212.715.1000
                                         Facsimile: 212.715.1399

Jonathan E. Lowy (D.C. Bar No. 418654)
Daniel R. Vice (D.C. Bar No. 465905)
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye St. NW, Suite 1100
Washington, D.C. 20005
Telephone: 202.289.7319
Facsimile: 202.371.9615

*Counsel for The Brady Center
 to Prevent Gun Violence*