IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC., et al. | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 11-1401-RMC (consolidated with 11-1402) |
| B. TODD JONES | ) ) | |
| Defendant | ) | |

**REPLY MEMORANDUM OF PLAINTIFFS J & G SALES, LTD. AND FOOTHILLS FIREARMS, LLC TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs J&G Sales, Ltd. and Foothills Firearms, LLC, by counsel, hereby reply to Defendant's Opposition to Plaintiffs' Cross-Motion for Summary Judgment.

The following demonstrates that, first, records of whether a person purchased more than one rifle of a given type do not constitute "record information required to be kept by this chapter" under § 923(g)(5)(a), and thus do not meet the threshold requirement for sending a demand letter. Second, the lack of any requirement to submit reports regarding records "except as expressly required by this section" would be rendered nugatory if the demand letter provision is read to authorize ATF to require records with no nexus to another provision granting it substantive authority. Third, the demand letter authority was originally designed to provide for traces in criminal investigations, and that authority did not expand with the enactment of a more explicit reporting obligation for tracing in 1994. Fourth, if the requirement that multiple handgun sales within five days must be

reported fails to express Congressional policy to the exclusion of similar policies for other firearms, then ATF could require multiple handgun sales within one year to be reported, or all rifle sales to be reported.  Fifth and finally, by limiting its allegations of firearms seized in Mexico to those that were "traced," ATF's factual claims have no meaningful basis for comparison.

### I. RECORDS OF WHETHER A PERSON PURCHASED MORE THAN ONE RIFLE OF A GIVEN TYPE DO NOT CONSTITUTE "RECORD INFORMATION REQUIRED TO BE KEPT BY THIS CHAPTER" UNDER § 923(g)(5)(A)

ATF's authority to issue a demand letter is limited to "record information required to be kept by this chapter."  18 U.S.C. § 923(g)(5)(A).[1]  Chapter 44 provides that each FFL "shall maintain such records of . . . sale, or other disposition of firearms . . . as the Attorney General may by regulations prescribe." § 923(g)(1)(A).  Regulations require a licensee to maintain a record of each sale for all types of firearms.[2]  However, no regulation requires record information to be kept of the number of days that pass between the sale of firearms in general or rifles in particular.  In both of his briefs, defendant silently assumes that what is demanded is "record information required to be kept by this chapter" when it is not.

---

[1] Section 923(g)(5)(A) provides in part: "Each licensee shall, when required by letter issued by the Attorney General, . . . submit on a form specified by the Attorney General, for periods and at the times specified in such letter, all *record information required to be kept by this chapter* or such lesser record information as the Attorney General in such letter may specify."  (Emphasis added).

[2] *See* 27 C.F.R. § 478.124 (a licensee may not sell a firearm "unless the licensee records the transaction on a firearms transaction record, Form 4473") and § 478.125(e) ("each licensed dealer shall enter into a record each receipt and disposition of firearms").

By requiring a report of multiple sales of pistols and revolvers within five consecutive business days, both Chapter 44 and a regulation require the keeping of record information of the number of days that pass between the sales of pistols and revolvers. § 923(g)(3)(A)[3]; 27 C.F.R. § 478.126a.[4]  However, neither Chapter 44 nor any regulation requires a licensee to record a multiple sale within five consecutive business days of two or more rifles.

As an example of what is required, the regulation states: "A licensee sells a pistol on Monday and sells a revolver on the following Friday to the same unlicensed person.  This is a multiple sale and must be reported not later than the close of business on Friday." 27 C.F.R. § 478.126a (Example 2).  This requires the licensee not only to maintain a record of each sale – which, as noted, is required for all types of firearms – but also to maintain an additional record of the timeline between the sales of pistols and revolvers.

Before the demand letters here, no licensee would have maintained a record of the number of days between the sale of rifles.  Moreover, some licensees only sell rifles and shotguns,[5] and thus had no occasion

---

[3] "Each licensee shall prepare a report of multiple sales or other dispositions whenever the licensee sells or otherwise disposes of, at one time or during any five consecutive business days, two or more pistols, or revolvers, or any combination of pistols and revolvers totalling two or more, to an unlicensed person." *Id*.

[4] Section 478.126a tracks the statutory language and adds, *inter alia*: "The report shall be prepared on Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers."

[5] *E.g.*, "Wal-Mart to End Sales of Handguns in Stores," http://www.nytimes.com/1993/12/23/business/wal-mart-to-end-sales-of-handguns-in-stores.html?pagewanted=all&src=pm.

even to maintain timeline records on sale of pistols and revolvers. The same would have been the case for all licensees in California, which prohibits sale of more than one handgun within 30 days.[6]

In sum, record information on the number of days between the sale of two or more rifles is not "record information required to be kept by this chapter" as provided in § 923(g)(5)(A), in that it is not required by statute or regulation. Accordingly, a demand that a licensee create such a record and submit it to ATF fails to meet the threshold requirement of § 923(g)(5)(A) and may not be required.

## II. NO REQUIREMENT EXISTS TO SUBMIT REPORTS REGARDING RECORDS "EXCEPT AS EXPRESSLY REQUIRED BY THIS SECTION"

A licensee must maintain records of sales as required by regulations, but "shall not be required to submit to the Attorney General reports and information with respect to such records and the contents thereof, except as expressly required by this section." § 923(g)(1)(A). Defendant makes two arguments that would render this provision nugatory.

First, defendant urges that its purported open-ended demand authority swallows the above "expressly required" clause: "The provision of Section 923 that 'expressly require[s]' licensed dealers to 'submit to the Attorney General reports and information with respect to such records and the content thereof' is Section 923(g)(5)(A)."

---

[6] Ca. Penal Code § 12072(a)(9)(A) ("No person shall make an application to purchase more than one handgun within any 30-day period."); § 12072(c)(6) ("No handgun shall be delivered whenever the dealer is notified by the Department of Justice that within the preceding 30-day period the purchaser has made another application to purchase a handgun").

Def. Opp. 3. He adds that "except as expressly required by 18 U.S.C. § 923 – one of the requirements of which is provided in Section 923(g)(5)(A) – FFLs are not required to submit record information." Def. Opp. 4. In other words, this circular logic goes, "it's not required unless we require it" – and anything can be required simply by demand in a letter. If the limit imposed on ATF by § 923(g)(1)(A) means anything, it surely cannot be interpreted to allow ATF to determine what the limit is.

Indeed, ATF acknowledges no limits whatever. If reports of multiple rifle sales can be required of all FFLs in four states, it can be required of all FFLs in all states, and the requirement may extend to shotguns, *i.e.*, to all firearms whatever.

Second, defendant argues that "the demand letters at issue here are directly related to ATF's exercise of two statutory powers: (1) its power to assist Federal, State, and local law enforcement by conducting firearms traces, and (2) its power to investigate criminal and regulatory violations of the Federal firearms laws." Def. Opp. 7. For (1), he cited the preamble to the Gun Control Act of 1968, which made no reference to "firearms traces."[7] For (2), he cited ATF's general authority in 28 U.S.C. § 599A(b)(1). See also Def. Opp. 9.

These two provisions are wholly irrelevant here, given that a licensee "shall not be required to submit to the Attorney General reports and information with respect to such records and the contents

---

[7] Pub. L. No. 90-618, § 101, 82 Stat. 1213 (1968), cited in Mem. in Support of Mot. for Sum. Jud. 29.

thereof, except as expressly required by *this section*." § 923(g)(1)(A). The preamble to the Gun Control Act and a provision in Title 28 are not in "this section."[8]

In sum, defendant's reading of his demand letter authority would allow him to pronounce the limitation on his authority in § 923(g)(1)(A) inapplicable at the stroke of his pen.  That reading cannot be correct.

### III. THE DEMAND LETTER AUTHORITY, WHICH WAS DESIGNED TO PROVIDE FOR TRACES IN CRIMINAL INVESTIGATIONS, WAS NOT ENLARGED BY THE ENACTMENT OF THE EXPLICIT REPORTING OBLIGATION FOR TRACING

Defendant argues that § 923(g)(7) requires FFLs to respond to trace requests, and "therefore it would make no sense to demand by letter information that FFLs are already required to provide."  Def. Opp. 5.  He suggests that, before enactment of § 923(g)(7) in 1994, which requires a licensee to answer a trace request within 24 hours, "previously, FFL compliance with a trace request had been voluntary." Def. Opp. 9.  This misunderstands the historical development of these two provisions.

The demand letter provision began as a regulation under the Gun Control Act of 1968.  27 C.F.R. § 178.126(a); 33 F.R. 18555, 18571 (Dec. 14, 1968).  That year, ATF Director Harold Serr explained that the regulation would be used "when we become aware of violations of the law by an unscrupulous dealer," such as one who would allow purchasers to give false names.  131 Cong. Rec. S9129 (July 9, 1985).  He added

---

[8] Plaintiffs also incorporate by reference their arguments in their Opposition and Cross-Motion concerning ATF's statutory powers. See pages 19-22.

that "we have no intention of requiring law-abiding gun dealers to report their firearms transactions to us." *Id*.

Senator Hatch inserted this letter into the record to explain ATF's authority under the demand letter provision when codified in the Firearms Owners' Protection Act. *Id*. As the Senate report explained, the demand letter provision "is to clarify and ensure the Secretary's authority to conduct legitimate tracing activities in connection with bona fide criminal investigations." S. Rep. 98-583, 98th Cong., 2d Sess., 18 (1984).

Thus, the function of the demand letter provision was to require traces from licensees during criminal investigations, including those involving dishonest licensees. Given this history, defendant's claim that "previously [before 1994], FFL compliance with a trace request had been voluntary" (Def. Opp. 9) is simply incorrect.

In 1994, Congress particularized ATF's tracing authority by enacting § 923(g)(7), which set a 24-hour deadline to respond to a trace request "for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation." It further provided that the information may be required to be provided orally or in writing, and directed implementation of a system to allow the licensee, when contacted by telephone, to verify that the requester is ATF. *Id*. Thus, Congress definitively established the methodology by which ATF could conduct traces, and left no gap for ATF to fill and no room for ATF's exercise

of any discretion concerning how traces were to be conducted.

Congress could have repealed the demand letter provision when it enacted the more specific trace provision, but did not. That the two provisions overlap as a result does not render the demand letter provision nonsensical or expand its scope. Defendant simply disregards the above historical development when he argues that § 923(g)(7) requires FFLs to respond to trace requests, and "therefore it would make no sense to demand by letter information that FFLs are already required to provide." Def. Opp. 5. And the overlap in the two provisions does not warrant a newly-minted discovery of authority in the demand letter provision to allow ATF to require reporting of any and all records for any purpose.

Moreover, ATF has continued to use its demand letter authority for purposes which do not involve putting firearm purchaser information in government databases. In the first challenge to a demand letter, the district court ruled that ATF acted beyond its authority. *RSM, Inc. v. Buckles*, 94 F. Supp.2d 692 (D. Md. 2000), *rev'd*, 254 F.3d 61 (4th Cir. 2001). While the Fourth Circuit disagreed with that holding, it did not dispute the district court's factfinding based on ATF's evidence at trial:

> Specifically, prior to the passage of the FOPA in 1986, demand letters pursuant to the regulation were used to obtain information, in the context of the Annual Firearms Manufacturing and Export Report, for purposes of statistical analyses. April 4, 2000, Testimony of Walfred Nelson; Def's Exs. 5-9. In sum, demand letters pursuant to the regulation were used pursuant to the National Firearms Act of 1934, 26 U.S.C. § 5841, but not for obtaining data on firearms transactions from licensees for inclusion in a government

database. Def's Exs. 10-13.[9]

94 F. Supp.2d at 696.

ATF continues to require the filing of the Annual Firearms Manufacturing and Export Report, ATF Form 5300.11, which "is used to compile statistics on the manufacture and exportation of firearms." 76 F.R. 50497 (Aug. 15, 2011).  Manufacturers report the quantities of different types and calibers of firearms manufactured and exported, but the form requires *no* information on transactions or purchasers.  *See* http://www.atf.gov/forms/download/atf-f-5300-11.pdf (current form). The compilation is useful to the industry and has never been challenged.

The *RSM* district court above also mentioned the use of demand letters pursuant to the National Firearms Act (NFA), 26 U.S.C. § 5841, which provides for "a central registry of all firearms" as narrowly defined therein (e.g., machineguns).  The context of the above was that ATF had reclassified certain shotguns from being normal firearms to being NFA firearms requiring registration, and sent demand letters to dealers so that purchasers could be located and could register the reclassified firearms.  *See* ATF Ruling 2001-1, 66 F.R. 9748, 9749 (Feb. 9, 2001) ("ATF has contacted all purchasers of record of the shotguns to advise them of the classification of the weapons as destructive devices and that the weapons must be registered.").[10]

---

[9] The cited references are in the Joint Appendix, *RSM, Inc. v. Bradley A. Buckles*, No. 00-1777 (4th Cir., Aug. 31, 2000).

[10] This was beneficial to the owners of the affected shotguns in that possession of an unregistered NFA firearm is unlawful.  26 U.S.C. § 5861.

In sum, in the years 1968 to 1994, ATF used its demand letter authority to trace firearms in bona fide criminal investigations. The enactment of § 923(g)(7) in 1994 gave ATF a more particularized authority to request trace information. However, ATF continued to rely on its demand letter authority to request statistical information from manufacturers, to alert owners of certain firearms requiring registration under the NFA, and to obtain records from dealers (41 nationwide) such as in *RSM* who were not meeting their trace obligations under § 923(g)(7). Defendant is incorrect in suggesting that the demand letter provision means nothing unless interpreted to allow ATF broadly to require information on firearm purchasers without any nexus to a bona fide criminal investigation.

### IV. IF THE REQUIREMENT THAT MULTIPLE HANDGUN SALES WITHIN FIVE DAYS MUST BE REPORTED FAILS TO EXPRESS CONGRESSIONAL POLICY TO THE EXCLUSION OF SIMILAR POLICIES FOR OTHER FIREARMS, THEN ATF COULD REQUIRE REPORTS OF MULTIPLE HANDGUN SALES WITHIN ONE YEAR, OR REPORTS OF ALL RIFLE SALES

Defendant argues that the enactment of § 923(g)(3)(A), which requires multiple handgun sales within five days to be reported, "does not limit ATF's ability to obtain a different category of information (here, information about multiple sales of certain rifles) from a subset of FFLs under its independent demand letter authority." Def. Opp. 14. Yet if the demand letter authority is really "independent" of the rest of the statute, ATF could require the reporting of multiple handgun sales within one year or two years. There would be nothing to prevent it from requiring reports of *single* rifle sales. To meet any unwritten "subset" requirements into the statute, it could be limited

to licensees east of the Mississippi River.

Such reading of the statute, in the words of the perceptive Alice, gets "curiouser and curiouser"[11] when it is recalled that the demand letter provision was codified as part of the Firearms Owners' Protection Act (FOPA), a law designed more specifically to define and to limit ATF's powers.  FOPA found that "the rights of citizens" under the Second, Fourth, and other Amendments "require additional legislation to correct existing firearms statutes and enforcement policies . . . ."  P.L. 99-308, § 1, 100 Stat. 449 (1986).  FOPA was designed "to protect firearms owners' constitutional rights, civil liberties, and rights to privacy," S. Rept. 98-583, *supra*, at 1, and "will decrease regulation of law-abiding citizens who choose to own and use firearms for legitimate purposes." *Id*. at 30.

The fact that § 923(g)(3)(A) directly imposes a reporting duty on licensees, as distinguished from the demand letters (which ATF uses to impose a reporting duty on licensees) is a distinction without a difference; in both cases, a reporting duty is imposed on licensees, and, if they fail to comply, their licenses can be revoked.  The issue for the court is whether, in view of Congress' enactment of § 923(g)(3)(A), it was Congress' intent to authorize ATF to impose the same requirement on firearms other than pistols and revolvers.  To suggest that Congress "'simply may not have been focusing on the point' (citation omitted)" (Def. Opp. 15) is to ignore that every other provision of § 923(g) refers to "firearms" and to ignore that Congress

---

[11] L. Carroll, *Alice in Wonderland* 18 (1982).

contemplated that the law would impose greater restrictions on handguns than on rifles/shotguns. See *e.g.*, § 922(b)(1) (rifles/shotguns may be sold to persons eighteen years of age; handguns may be sold to persons twenty-one years of age), (b)(3) (rifles/shotguns may be sold to non-residents), (x) (juveniles may not possess handguns), § 925(e) (imports).

Defendant avers that "Plaintiffs rely unduly on the Fourth Circuit's observation in *RSM*" that § 926(a), which prohibits firearm registration, "would be rendered meaningless *if* [ATF] could issue limitless demand letters under Section 923(g)(5)(A) in a backdoor effort to avoid section 926(a)'s protections for law-abiding firearms owners." Def. Opp. 19, quoting *RSM*, 254 F.3d at 67. Defendant apparently disagrees with *RSM* because it acknowledges limits to the demand letter authority. He suggests that the wholesale collection of records of multiple rifle purchasers would not be "a forbidden firearms registry" because Congress enacted such collection of records for multiple handgun sales. Def. Opp. 21. But that's the very point at issue – what Congress enacted regarding handguns it conspicuously did *not* enact regarding rifles. And the fact that *Congress* enacted the multiple handgun sale reporting requirement which results in a registry does not suggest that the *executive branch* may impose a multiple rifle sale reporting requirement which results in a registry. Indeed, it the height of hubris to suggest that, if Congress can enact a statute which results in a registry, the executive branch can issue a letter which results in a registry. Yet that is what Defendant

argues when he states that it "would be nonsensical for Congress to have prohibited ATF from creating a registry under Section 926(a), but create one itself through its codification of ATF's multiple-handgun-sales requirement."  Def. Opp. 21.  While Congress and the executive branch are co-equal branches of government, they do not have equal powers; it is for Congress to write the law and the executive branch to enforce the law.

As stated in § 926(a), Congress prohibited any post-FOPA rule or regulation "that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established." Regardless of whether the current demand letter is a rule or regulation, Congress simply did not intend the demand letter authority to be used to register firearm owners.  S. Rept. 98-583, *supra*, at 18.  Indeed, the legislative history on that point is so clear that defendant deems resort thereto be "unnecessary."  Def. Opp. 28.[12]

Applying words in their ordinary meanings, the NFA uses the term "central registry" to describe a record of the identities of the persons who possess the subset of firearms the NFA requires to be registered.  26 U.S.C. § 5841.  Defendant rejects the comparison here:

---

[12] Defendant opens and quickly shuts the door on legislative history by citing a statement in a law review article that two FOPA reports are in conflict "in certain respects."  Def. Opp. 29 n.15, quoting David T. Hardy, "The Firearms Owners' Protection Act: A Historical & Legal Perspective," 17 Cumb. L. Rev. 585, 588 (1987).  No conflict existed regarding the demand letter provision, which the article does not mention.  Moreover, Defendant does not even attempt to respond to the Supreme Court case law establishing that a statutory provision may be ambiguous because of its context, thereby allowing resort to legislative history.  See *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (ambiguity of "certain words or phrases may only become evident when placed in context.").

"§ 926(a) never states . . . that Congress has incorporated the description of this 'central registry' from a different statute . . . as a gloss on the term 'system of registration of firearms' in Section 926(a)."  Def. Opp. 21 n.9.  But § 926(a) refers to "*any* system of registration," the word "registration" means a list of identities of persons, and "any" means at least one of something.[13]  ATF's record of multiple rifle purchasers is certainly encompassed in the terms "*any* system of registration."

Defendant notes that the appropriations rider does not include a qualification stating "except where expressly required by another statute."  Def. Opp. 24-25.  While this is true, that is inherent in any general statute because "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Toche Ross & Co.,* 426 U.S. 148, 153 (1976).  See also *Morton v. Mancari,* 417 U.S. 535, 550-551 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").  Indeed, if Defendant was correct, every time a new statute was enacted which touched upon the subject matter of an existing statute, the existing statute would be repealed by implication.  But "repeals by implication are not favored." *Posadas v. National City Bank*, 296 U.S. 497, 503 (1936).

---

[13] "Register" means "a record or list of names . . ., often kept by an official appointed to do so," and "registration" means "(1) a registering or being registered (2) an entry in a register." *Webster's New World Dictionary* 1130 (1988).  "Any" means "some, no matter how much or how little" or "even one; the least amount or number of." *Id.*

## V.   BY LIMITING ITS CLAIMS ABOUT FIREARMS IN MEXICO TO THOSE THAT WERE "TRACED," ATF'S FACTUAL ALLEGATIONS ARE MEANINGLESS

Defendant makes certain factual allegations which, while not material to whether it has legal authority for the demand letters at issue, are misleading because they include no basis of comparison. These allegations related to firearms seized in Mexico.

First, defendant states that "a large proportion of the firearms fueling the Mexican drug violence originated in the United States." Def. Opp. 32, citing A.R. 38.  However, as plaintiffs point out in their Response to Defendant's Statement of Material Facts, ¶ 14, no basis exists to say that the proportion of such U.S. origin firearms is "large" because the reference (A.R. 38) includes no comparative information on the proportion of firearms *not* originating in the United States, such as firearms illicitly transferred from corrupt members of the Mexican military and police, and firearms smuggled from Central America, Venezuela, and other countries.  In addition, the source states that some 87% of firearms seized by the Mexican government "*and traced over the past 5 years* originated in the United States." A.R. 38 (emphasis added).  It fails to state the proportion of seized firearms that are "traced" or to discuss the criteria for choosing which firearms to trace (*e.g.*, those with U.S. markings), or whether firearms without U.S. markings are even traced (or what point there would be in doing so).  It also fails to distinguish firearms with U.S. markings which were sold by U.S. FFLs from those which were sent abroad by the United States Government in connection with wars (such as Vietnam and El Salvador) or U.S.-licensed sales or foreign aid programs (such as to

the governments of Mexico and the Central American countries).

Second, defendant claims that recently "Mexican drug cartels have *increasingly* armed themselves with more powerful rifles," adding that in 2008, "approximately one quarter of firearms seized in Mexico and *traced* were 'high-caliber and highpowered such as AK and AR-15 type semiautomatic rifles' . . . ." Def. Opp. 32 (emphasis added), citing A.R. 52, 287. As plaintiffs point out in their Response to Defendant's Statement of Material Facts, ¶ 16, this fails to specify "more powerful rifles" than what? Is it suggesting that the cartels "have recently begun to arm themselves" with semiautomatic rifles, which fire only once per trigger pull, and that they prefer such rifles to fully automatic rifles or machineguns, which fire continuously as long as the trigger is pulled?[14] It also fails to account for firearms which are not traced, such as machineguns and firearms without U.S. markings, rendering the references to what cartels have "increasingly" used and the percentages seized without any basis.

At any rate, whether collecting records across the board on lawful firearm purchasers would be a good idea in light of violence in Mexico is a policy matter for Congress to make. Indeed, such policy matters, including ATF's controversial Fast and Furious program, are the subject of Congressional investigations at this time.

---

[14] *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). Ordinary firearms such as the AR-15 rifle have "traditionally have been widely accepted as lawful possessions . . . ." *Id*. at 612.

**CONCLUSION**

This Court should grant summary judgment in favor of plaintiffs and deny summary judgment to defendant.

Respectfully submitted,

J & G SALES, LTD.
FOOTHILLS FIREARMS, LLC
By Counsel

/s/
Richard E. Gardiner
D.C. Bar # 385916
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
regardiner@cox.net


/s/
Stephen P. Halbrook
D.C. Bar # 379799
Suite 403
3925 Chain Bridge Road
Fairfax, VA 22030
(703) 352-7276
(703) 359-0938 (fax)
protell@aol.com