IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE NATIONAL SHOOTING | ) | |
| SPORTS FOUNDATION, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:11-cv-01401 (RMC) |
| KENNETH MELSON, | ) | (consolidated with 11-cv-1402)(RMC)) |
| Acting Director, | ) | |
| BUREAU OF ALCOHOL, | ) | |
| TOBACCO, FIREARMS & EXPLOSIVES | ) | |
| | ) | |
| Defendant | ) | |

_____

## THE NATIONAL SHOOTING SPORTS FOUNDATION'S REPLY BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT
_____

The National Shooting Sports Foundation, Inc. ("NSSF") submits this reply brief in support of its cross-motion for summary judgment.

**I.      NSSF's Arbitrary and Capricious Claim Is Properly Before the Court.**

Defendant wrongly argues that NSSF raised an arbitrary and capricious claim for the first time in its opposition to defendant's motion for summary judgment.  Defendant ignores that NSSF, in its Verified Complaint, alleged that "ATF's demand for information and reports" from federally-licensed firearms dealers in Arizona, California, New Mexico and Texas was "arbitrary" because the demand was made of dealers "regardless of their proximity to the Mexican border and regardless of whether they make substantial sales of the rifles at issue, have a history of making sales of rifles recovered in Mexico or are perceived by ATF to be a target of illegal firearms traffickers". (Verfied Complaint, Dkt. 1, ¶13).  These factual allegations were prescient.  The subsequently assembled administrative record contains substantial evidence demonstrating that ATF's action was arbitrary and capricious for these very reasons.

NSSF's allegations constitute a "short and plain statement" of NSSF's arbitrary and capricious claim and provided fair notice to defendant of not only the claim but the factual bases on which the claim was premised. Fed. R. Civ. P 8(a)(2).  That NSSF did not label its claim or provide a formulaic recitation of the elements of an action under the Administrative Procedures Act does not make the pleading insufficient. *See, e.g.*, *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)("more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" are required to state a claim for relief).  Defendant's observation that NSSF did not "even cite to the APA in its complaint" is somewhat disingenuous given that defendant acknowledged at the September 1, 2011 hearing on NSSF's motion for preliminary injunction that this was a straightforward APA case. *See Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008) (citing *Twombly*, court held that complaint and subsequent filings provided "fair notice" of statutory claim even though statute was not cited in the complaint itself).

Defendant wrongly insists that because NSSF did not raise its arbitrary and capricious claim in its motion for preliminary injunction, the claim had not been pleaded.  NSSF moved for a preliminary injunction based only on its claim that ATF acted in violation of its statutory authority because, at that time, NSSF did not believe it could convince the court it was likely to succeed on the merits of the arbitrary and capricious claim in the absence of an administrative record disclosing ATF's decision making process.

Upon receipt of the administrative record, the factual basis for NSSF's arbitrary and capricious claim was more fully revealed.  NSSF promptly filed a motion for leave to pursue basic discovery on matters raised by the administrative record and argued that the discovery was needed to establish the absence of a rational connection between the evidence and the decision made by ATF to send the demand letter to all retail sellers in the four states—a common

challenge to an agency's action under the arbitrary and capricious standard.  The court denied NSSF's motion and, in its order, revealed its understanding that NSSF's case against the defendant included an arbitrary and capricious claim. (Order of Sept. 28, 2011, Dkt. 30 at p. 2) ("Thus, review of claims that an agency acted arbitrarily and capriciously under the APA is usually confined to the administrative record.").

Finally, even if defendant's claim of surprise is genuine, he had a full and fair opportunity to respond to NSSF's cross motion for summary judgment and has, in fact, done so. Defendant cannot credibly claim to have been prejudiced in his ability to defend against NSSF's arbitrary and capricious claim, particularly in light of the fact that (a) ATF has full command of all facts reflecting the decision it made to send the demand letter to all retail sellers in the four states and (b) the trace data queries on which NSSF bases its arguments have been in ATF's exclusive possession since November 2010.  Defendant's argument that NSSF's arbitrary and capricious claim should not be addressed should be rejected.[1]

## II.   ATF's Conclusion That the Demand Letter Was Necessary to "Combat the Flow of Guns Across the Border Into Mexico" Is Not Supported By the Administrative Record.

Defendant cites to a June 2009 report by the Government Accountability Office ("GAO") as support for his position that "a large proportion of the firearms fueling the Mexican drug violence originated in the United States." (Def.'s Combined Reply, Dkt. 37 at p. 32).  Based on the GAO's assertion, defendant argues that the demand letter to all retail sellers in the four states

---

[1]    In any event, under Federal Rule of Civil Procedure 15(b)(1), the court is to "freely permit" pleadings to be amended if a party objects that evidence at trial is not within the issues raised in the pleadings "when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits." Fed. R. Civ. P 15(b)(1).  Should the court require an amended complaint, NSSF asks for a brief period of time in which to prepare an amended complaint and file a motion for leave to file an amended pleading in accordance with Local Rule 7(i).

was a "reasonable conclusion[] in its efforts to *combat the flow of firearms across the border* into Mexico." *Id*. at p. 32. (emphasis added).  Defendant's description of firearms moving across the border into Mexico is colorful advocacy, but it is not a fact found in the evidence before the court.

In its June 2009 report, the GAO stated:

> While it is impossible to know how many firearms are illegally trafficked into Mexico in a given year, around 87 percent of firearms seized by Mexican authorities and traced over the past five years originated in the United States, according to data from ATF.

(AR 0038).  GAO chose its language carefully.  It did not conclude and report that 87 percent of the firearms used by Mexican drug cartels came from the United States.  Rather, GAO simply reported that of the firearms Mexican authorities sent back to the United States for tracing, 87 percent could be successfully traced to a specific retail source in this country.  The distinction is significant but has been muted in the public discussion over the relative contribution that lawful ownership of firearms in United States has had in Mexico's drug-related crime problem.  GAO's statistic has been conveniently rounded to 90 percent and used misleadingly by members of the media, politicians, advocacy groups and the defendant here to inaccurately suggest that nearly every firearm used by the Mexican drug cartels was smuggled across the border from the United States. (AR 0018, 0649, 660 & 702).[2]

---

[2]      All firearms are not successfully traced to the retail seller and the first retail purchaser for a number of reasons according to ATF.  Some firearms submitted for tracing have obliterated serial numbers or are older guns that were manufactured before serial numbers were required.  Poor record keeping by licensees in the chain of distribution may also prevent successful tracing, and a trace that ends at an out of business retail seller, which has not submitted its records to ATF as required under §923(g)(4), will be unsuccessful.  *See* Department of the Treasury, Bureau of Alcohol, Tobacco & Firearms, *Commerce in Firearms in the United States, February 2000* at pp. 25-27.

The potentially misleading nature and use of this statistic was immediately obvious within the federal law enforcement community. The Department of Homeland Security ("DHS") reviewed a draft of the GAO's report and expressed its conclusion that the "87 percent statistic is misleading" and "unreliable." (AR 0104). DHS correctly observed that the "87 percent statistic" represented the percentage of only those firearms recovered in Mexico that were sent to the United States for tracing from 2004 to 2008 – approximately 4,000 – on which traces could be completed and the initial retail seller and purchaser were identified – 3,480. Given that approximately 30,000 firearms were seized in Mexico over the same time period, it is correct to say that slightly less than 12 percent (3,480/30,000) of the firearms seized in Mexico were proven to have originated in the United States, a statistic that belies defendant's claim that a "large proportion" of the firearms used by Mexican drug cartels come from the United States.[3]

The so-called "flow" of firearms across the Mexican border from retail sellers in the United States is refuted by additional evidence in the record. ATF determined that the typical firearm recovered in Mexico and sent to ATF for successful tracing is more than 15 years old, which means that 15 years have elapsed between the date the gun was sold at the retail level in the United States and the date the gun was recovered by Mexican authorities. (AR 0222). Any object moving at a 15-year pace can hardly be characterized as "flowing". When the evidence relating to the much smaller sub-set of firearms recovered in Mexico closer in time to their initial

---

[3]      Recovered firearms that do not bear the markings required on firearms sold in the United States under 27 C.F.R. §478.92, including a serial number, caliber, manufacturer name and city and state or country of manufacture, would be among the firearms not forwarded by Mexican authorities to the ATF for tracing because they would not have been sold in the United States and ATF tracing would be meaningless. In addition, firearms known by Mexican authorities to have been Mexican military or law enforcement firearms would not be sent to ATF because their origin is already known. These are the among the data collection and sample population problems identified by DHS that lead to its conclusion that GAO's conclusion was potentially misleading and unreliable.

retail sale in the United States is carefully examined, any conclusion that the proportion of firearms moving from the United States into Mexico is "large" is unreasonable.

The Mexico Attorney General's Office reported that in 2008, almost 30,000 firearms were seized. (AR 0051). Of that number, ATF's trace data shows that just 281 (0.94%) were rifles greater than .22 caliber that had been sold in the United States within three years of recovery in Mexico. (AR 0520-522). Using the conservative assumption that 30,000 firearms were seized by Mexican authorities in each of the following two years (2009 and 2010), just 1,823 (2.02%) of the 90,000 firearms were rifles greater than .22 caliber that had been sold in the United States within three years of recovery in Mexico. (AR 0510-519).[4]   Rifles of this type recovered in Mexico from 2008 to 2010 within one year of their retail sales in the United States were just 0.86 percent of all firearms seized in Mexico over the same period. (AR 0535-0539).

The evidence demonstrates that ATF reacted to a law enforcement problem in Mexico by wrongly concluding that Mexico's problem was caused by so-called deficiencies in United States gun laws and gaps in ATF's regulatory authority.  ATF's reaction may have been politically astute or diplomatically assuring, but it was not the product of reasoned decision making.  As a result, ATF's decision to impose multiple sales reporting requirements on all of the 8,500 retail sellers in the four states should be set aside.

### III.   ATF Has Pushed Beyond the Limits of Its Demand Letter Authority Onto a Slippery Slope Where Its Authority Will Have No Bounds.

ATF historically considered its demand letter authority to be limited.  The authority to issue demand letters began as a regulation in 1968 that would be used when ATF became "aware

---

[4]      The assumption that approximately 30,000 firearms were seized by Mexican authorities in 2009 and again in 2010 is a conservative assumption because Mexico has reportedly increased its military and law enforcement efforts in recent years to combat the drug cartels.  It is fair to assume that its increased efforts have resulted in at least a similar amount of firearm seizures.

of violations of the law by an unscrupulous dealer." 131 Cong. Rec. S9129 (July 9, 1985).  When codified in 1986, the demand letter authority was deemed necessary to "ensure the Secretary's authority to conduct legitimate tracing activities in connection with bona fide criminal investigations." S. Rep. 98-583, 98th Cong., 2d Sess. 18 (1984).  In 2000, ATF used its demand letter authority to require 41 retail sellers, who had been labeled as "uncooperative" in responding to trace requests, to submit certain records so that ATF could exercise its tracing authority. *See RSM v. Buckles*, 254 F.3d 61 (4th Cir. 2001).  Because the trace requests to which these 41 dealers did not properly respond were made in the course of bona fide criminal investigations, the demand letter they received from ATF was arguably true to the purpose that demand letter authority was intended to serve.

Soon thereafter, however, ATF and the firearms industry found themselves on the slippery slope. *See Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281 (4th Cir. 2004).  When ATF relied on its demand letter authority to require record submission by 450 dealers, who had been connected to 10 or more traced firearms in the previous year with a so-called "time-to-crime" of three years or less (*id.*), ATF expanded its authority beyond its intended limits.  None of these dealers were determined to be unscrupulous or uncooperative, and none had conducted themselves in a way that thwarted ATF's ability to trace firearms in the course of bona fide criminal investigations.   While ATF saw "fire" in the conduct of the 41 dealers (*RSM*), it acted under its demand letter authority against the 450 dealers (*Blaustein*) after only smelling "smoke".

Here, ATF selected all 8,500 retail sellers in the four states without sensing flame or smoke.  To further the metaphor, these 8,500 dealers are simply the "wood pile" that ATF arbitrarily decided could catch fire solely because they are in states that share a border with Mexico.  Although from a policy perspective ATF's goal of intercepting firearms before they

cross the border is laudable, it does not have authority under §923(g)(5)(A) to require submission of firearm sale transaction records prospective to criminal investigations rather than in the course of actual, ongoing investigations.   If ATF is found to have authority under §923(g)(5)(A) to demand multiple sales reports from these 8,500 retail sellers, outside the context of any ongoing criminal investigation, its authority will be unconstrained, the express limitation on reporting in §923(g)(1)(A) will be meaningless, and the other mandatory reporting obligations found in §923 will be surplusage.

By merely expressing its desire to make firearm tracing more efficient, ATF could effectively implement wholesale revisions to the Gun Control Act through issuance of demand letters.   Retail sellers in all 50 states could be required to report multiple rifle sales.   The requirement could be expanded to other firearms that are lawfully owned in substantial numbers, including shotguns.   ATF could identify a particular type or model of lawfully-sold firearm as a firearm preferred by criminals, and demand that sales of those firearms be immediately reported to ATF.   Retail sellers doing business in high-crime areas could be required to report multiple sales of handguns to the same person during any period of time, not just during five consecutive business days.   Many more *ultra vires* demands for reporting could be offered.

This court should recognize, as other courts have recognized, that Congress intended that there be limits on ATF's demand letter authority under §923(g)(5)(A), and that in this case, unlike in other cases, ATF has pushed beyond the limits of its congressionally-conferred authority.

Dated: November 1, 2011

Respectfully submitted,

**THE NATIONAL SHOOTING**

**SPORTS FOUNDATION, INC.,**
Plaintiff

By: /s/ *James B. Vogts*_____
       One of Its Attorneys

James B. Vogts (admitted *pro hac vice*)
Andrew A. Lothson (admitted *pro hac vice*)
SWANSON, MARTIN & BELL, LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611
(312) 923-8266
jvogts@smbtrials.com
alothson@smbtrials.com

M. King Hill, III (D.C. Bar No. 462966)
Vincent E. Verrocchio (D.C. Bar No. 460429)
Venable LLP
575 7th Street, NW
Washington, DC 20004
(202) 344-4496
mkhill@Venable.com
veverrocchio@Venable.com

Lawrence G. Keane (admitted *pro hac vice*)
NATIONAL SHOOTING SPORTS FOUNDATION, INC
Flintlock Ridge Office Center
11 Mile Hill Road
Newtown, CT 06470-2359
(203)426-1320
lkeane@nssf.org

## CERTIFICATE OF SERVICE

I hereby certify on this 1st day of November, 2011, that a true and correct copy of the foregoing

**NSSF'S REPLY BRIEF IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY**

**JUDGMENT** was served via ECF, to the following:

> **Daniel Riess**
> U.S. DEPARTMENT OF JUSTICE
> 20 Massachusetts Avenue, NW
> Washington, DC 20530
> (202) 353-3098
> Fax: (202) 616-8460
> Email: daniel.riess@usdoj.gov
>
> **Lesley R. Farby**
> U.S. DEPARTMENT OF JUSTICE
> Civil Division, Federal Programs
> 20 Massachusetts Avenue, NW
> Washington, DC 20530
> (202) 514-3481
> Fax: (202) 616-8470
> Email: lesley.farby@usdoj.gov
>
> **Jessica Beth Leinwand**
> U.S. DEPARTMENT OF JUSTICE
> Federal Programs
> 20 Massachusetts Avenue, NW
> Room 7107
> Washington, DC 20001
> (202) 305-8628
> Fax: (202) 616-8470
> Email: jessica.b.leinwand@usdoj.gov

> /s/ *James B. Vogts*
> James B. Vogts