# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE NATIONAL SHOOTING SPORTS FOUNDATION, INC., | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Action No. 11-1401 (RMC) (consolidated with 11-1402 (RMC)) |
| B. TODD JONES, Acting Director, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES,[1] | ) ) ) ) |  |
| Defendant. | ) ) ) |  |

## MEMORANDUM OPINION

The Court is asked whether ATF exceeded its authority or acted arbitrarily and capriciously when it issued a demand letter requiring certain firearms dealers to report multiple sales of specific semi-automatic rifles and answers in the negative.

The National Shooting Sports Foundation, Inc., J & G Sales, Ltd., and Foothills Firearms, LLC., seek to enjoin the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"or "Bureau") from requiring all federal firearms licensees in states bordering Mexico to report sales of more than one semi-automatic rifle to the same person at one time or during a period of five consecutive business days. Plaintiffs contend that ATF should be enjoined from requiring such reporting because Congress has indicated expressly that the federal government will not establish a national firearms registry and the reporting requirement at issue here would create just such a registry. The parties have filed cross motions for summary judgment. Because ATF's reporting

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), B. Todd Jones is substituted for his predecessor, Kenneth Melson, Acting Director of the Bureau of Alcohol, Tobacco, Firearms & Explosives.

requirement is properly limited in scope, summary judgment will be granted in favor of ATF.

## I.  FACTS

### A.  Statutory Scheme

The Gun Control Act of 1968, 18 U.S.C. § 921-931, regulates the manufacture, importation, and sale of firearms and requires persons engaged in such activity to be licensed by the Attorney General.  18 U.S.C. §§ 922(a)(1), 923(a).  ATF is the agency authorized to license and inspect federal firearms licensees ("FFLs") to ensure they comply with laws governing the sale, transfer, possession, and transport of firearms, and to ensure they maintain records in accord with federal requirements.  18 U.S.C. § 923(g)(1); 28 U.S.C. § 599A; 28 C.F.R. § 0.131.  FFLs create and maintain records on all firearms transactions, including the name, age, and residence of firearms buyers.  *See* 18 U.S.C. §§ 922(b)(5), 923(g); 27 C.F.R. § 478.125(e).  ATF also operates the National Tracing Center to process requests from Federal, State, local, and foreign law enforcement agencies for the tracing of guns associated with crimes ("crime guns") and to collect and analyze trace data. 28 C.F.R. § 0.131.

The Firearms Owners' Protection Act of 1986 ("FOPA") amended the Gun Control Act.  Congress' purpose in enacting both the Gun Control Act and FOPA was to provide support to law enforcement officials at all levels in their fight against crime and violence without placing an undue burden on law-abiding citizens with respect to the purchase, possession, or use of firearms. *United States v. Beuckelaere*, 91 F.3d 781, 784 (6th Cir. 1996); *United States v. Lam*, 20 F.3d 999, 1001 (9th Cir. 1994).  "FOPA was intended to reduce the regulatory burden on law-abiding firearms owners without incapacitating [ATF's] ability to combat violations of the firearms laws." *RSM, Inc. v. Buckles*, 254 F.3d 61, 64 (4th Cir. 2001).  FOPA specifically prohibited the federal government

from creating a national firearms registry, while maintaining the authority to examine records of firearms transactions in the course of a criminal investigation:

> The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter . . . .  No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established.   Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.

18 U.S.C. § 926(a).

FOPA also authorized ATF to issue demand letters which require FFLs to report gun sales information as specified by the demand letter.  18 U.S.C. § 923(g)(5)(A); *see* 27 C.F.R. § 478.126.  Section 923(g)(5)(A) codified an old regulation found at 33 Fed. Reg. 18,555, 18571 (Dec. 14, 1968).  In other words, ATF has had demand letter authority since 1968.  FOPA also required FFLs to report multiple hand gun sales.  It mandates that FFLs report the sale or disposition of two or more pistols or revolvers to the same person at one time or during five consecutive business days. *Id*. § 923(g)(3)(A).

Nine years after FOPA was enacted, Congress enacted 18 U.S.C. § 923(g)(7).  Section 923(g)(7) requires FFLs to provide records to ATF as requested in the course of a criminal investigation.

> Each licensee [*e.g.*, FFL] shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Attorney General for information contained in the records required to be kept in this chapter as may be required for determining the disposition of

> 1 or more firearms in the course of a bona fide criminal investigation.
> The requested information shall be provided orally or in writing, as
> the Attorney General may require.

*Id*. § 923(g)(7); *see also* 27 C.F.R. § 478.25a.

In sum, ATF has access to the name and address of firearms purchases as retained in FFL records only as authorized by statute or regulation. When a law enforcement agency recovers a firearm from a suspect or from a crime scene, the agency can submit a trace request to ATF. *See* 18 U.S.C. § 923(g)(7) (requiring FFLs to respond to trace requests within 24 hours). ATF then can track the movement of the weapon from the manufacturer to the FFL and then to the purchaser. To determine the disposition of a firearm, ATF can, for example, (1) inspect an FFL's records without a warrant under § 923(g)(1)(B)(iii), (2) require an FFL to provide record information in writing or by telephone under § 923(g)(7); or (3) in the case of multiple sales of handguns reported to ATF under § 923(g)(3)(A), ATF may search its own records.

## B. ATF Demand Letter

The Department of Justice, of which ATF is a constituent agency, announced a new multiple sales reporting requirement for semi-automatic rifles on July 11, 2011. The next day, ATF sent a demand letter to all dealers in Arizona, California, New Mexico, and Texas. The letter stated:

> To assist in its efforts investigating and combating the illegal movement of firearms along and across the Southwest border, the ATF is requiring licensed dealers and pawnbrokers in Arizona, California, New Mexico, and Texas to submit record information concerning multiple sales of certain rifles. ATF has the authority to issue this letter to collect such record information from federal firearms licensees (FFLs) under 18 U.S.C. § 923(g)(5), and that authority has been delegated by ATF's Acting Director to the Chief of the National Tracing Center.
>
> You must submit to the [ATF] reports of multiple sales or other

> dispositions whenever, at one time or during any five consecutive business days, you sell or otherwise dispose of two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person.  You are required to report all such sales that occur on or after August 14, 2011.  You must continue reporting multiple sales for the rifles subject to this demand letter until we provide written notice to stop.

See Administrative Record ("AR") at 775-78 ("Demand Letter").

The Demand Letter grew out of ATF's determination that it needed better information for quick tracing of crime guns related to increasingly violent drug trafficking along the U.S./Mexican border.  Multiple purchases of firearms by a non-licensee provide a significant indicator of firearms trafficking.  See AR. at 63 (Government Accountability Office, Firearms Trafficking: U.S. Efforts to Combat Arms Trafficking to Mexico Face Planning and Coordination Challenges (June 2009)) ("GAO Report").[2]  Further, Mexican drug cartels "use violence to control lucrative drug trafficking corridors along the Southwest border, through which drugs flow north into the United States, while guns and cash flow south to Mexico."  AR at 250 (DOJ Office of Inspector General, Review of ATF's Project Gunrunner (Nov. 2010)) ("OIG Review").[3]  "[A] large proportion of the firearms fueling Mexican drug violence originated in the United States, including a growing number of increasingly lethal weapons."  Id. at 38 (GAO Report).  The Office of Inspector General determined:

> Because reporting multiple sales of handguns generates timely, actionable investigative leads . . . , and because long guns have become Mexican cartels' weapons of choice, we believe that the reporting of multiple sales of long guns would assist ATF in

---

[2] The entire GAO Report can be found at AR 31-113.

[3] The entire OIG Review can be found at AR 236-387.

> identifying trafficking suspects.  Our analysis shows that many long
> guns seized in Mexico have a short time-to-crime and were often part
> of a multiple purchase.  We therefore believe that mandatory
> reporting of long gun multiple sales could help ATF identify,
> investigate, and refer for prosecution individuals who illegally traffic
> long guns into Mexico.

AR at 288-89 (OIG Review).  Thus, the Office of Inspector General recommended that ATF

"explore options for seeking a requirement for reporting multiple sales of long guns," resulting in

ATF's issuance of the Demand Letter that is the subject of this case.

The Demand Letter targets FFLs in states that border Mexico.  There are

approximately 8,500 FFLs in the states of  Arizona, California, New Mexico, and Texas, *see* AR

736-37, representing a small portion of the approximately 55,000 FFLs nationwide.  *Id*. at 55-56

(GAO Report).  ATF's eTrace reports indicate that over 20,000 firearms (or 87% of firearms) seized

by Mexican authorities and traced from fiscal year 2004 to fiscal year 2008 originated in the United

States, mostly from U.S. Southwest border states — 70% of these came from Texas, California, and

Arizona.  *Id*. at 50-55 (GAO Report).[4]  Between fiscal year 2008 and 2010, 5,796 long guns greater

than .22 caliber were traced from Mexico to a first retail buyer in the United States; 4,568 of these

came from the U.S./Mexico border states of Texas, Arizona, California, and New Mexico.  AR at

449 (Spreadsheet of Traces, FY 2008-10). The percentage of crime guns recovered in Mexico that

were long guns (such as rifles) increased each year, from 20% in fiscal year 2004 to 48% in fiscal

year 2009.  *Id*. at 287 (OIG Review).  "According to U.S. and Mexican government officials, these

---

[4] The eTrace data represents only gun trace requests and does not include all guns seized.
For example, in 2008 of the approximately 30,000 weapons seized by Mexican authorities, only
7,200 were submitted to ATF for tracing.  AR at 51 (GAO Report).  Even so, the eTrace data is
the only systematic data available.  It reflects the "conclusions reached by U.S. and Mexican
government and law enforcement officials involved in combating arms trafficking in Mexico."
*Id*.

firearms have been increasingly more powerful and lethal in recent years . . . [A]round 25 percent

of the firearms seized in Mexico and traced in fiscal year 2008 [were] high-caliber and high-powered

such as AK and AR-15 type semiautomatic rifles, which fire ammunition that can pierce armor often

used by Mexican police." *Id.* at 52 (GAO Report).

According to U.S. and Mexican government officials, "most guns trafficked into

Mexico are facilitated by and support operations of Mexican [drug trafficking organizations]." *Id.*

at 57 (GAO Report).  Firearms purchases at pawn and gun shops  in the United States for trafficking

to Mexico usually are made by "straw purchasers" who are paid by drug traffickers or middlemen

to buy certain guns. AR at 56 (GAO Report).  These straw purchasers are individuals without

criminal records who can be expected to pass the background check.  Because the straw purchasers

themselves are qualified to buy firearms from FFLs, it is difficult to identify them as agents of drug

organizations. *Id.*

Due to the difficulty in detecting gun trafficking into Mexico, knowing that traffickers

are using high-powered long guns with increasing frequency, and knowing that multiple gun sales

are strong indicators of illegal trafficking, ATF determined that it would be helpful to obtain

information on multiple sales of long guns and maintain this information in a searchable database.

Information that ATF obtains through demand letters and maintains in a searchable database, such

as information on particular multiple gun purchases, enables ATF to trace those firearms more

quickly if they are found at a crime scene.  *Id.* at 60 (GAO Report).  Information obtained from

tracing is most useful within the first few days after a firearm seizure partly because "the sort of

conspiracies often associated with firearms trafficking tend to change personnel frequently and, as

a result, an individual found to be responsible for the purchase of a particular firearm may no longer

have ties to the principal gun trafficker directing the scheme." *Id*. at 61 (GAO Report).

### C. Plaintiffs' Allegations

Plaintiffs contend that this Demand Letter exceeds ATF's authority and violates the law. Plaintiffs are (1) The National Shooting Sports Foundation, Inc. ("NSSF"), a nonprofit trade association based in Connecticut whose members include 6,000 federally licensed firearms manufacturers, distributors, and retailers; and (2) J & G Sales, Ltd. and Foothills Firearms, LLC., federally licensed firearms dealers located in Arizona. Plaintiffs filed their Complaints in this Court on August 3, 2011,[5] and the Court consolidated the cases. *See* Order [Dkt. # 10].

While ATF previously has required FFLs to report when certain criteria were met, such as when law enforcement asks for information in the course of a criminal investigation, *see* 18 U.S.C. § 923(g)(7), or when the FFLs have made multiple hand gun sales to the same person, *see id*. § 923(g)(3)(A)), ATF has not previously required FFLs to report multiple sales of rifles regularly. Plaintiffs assert that while Congress requires firearms dealers to maintain records, Congress never intended any national registration of firearms sales. Thus, Plaintiffs argue, by requiring reporting of multiple rifle sales, ATF has both overstepped its authority and violated the law. Plaintiffs seek review of ATF's action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 701–706.

## II.  STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[5] Similar complaints were filed in the District of New Mexico and in the Western District of Texas. *See Ron Peterson Firearms, LLC v. Melson*, 1:11-cv-678 (D.N.M. filed Aug. 3, 2011); *10 Ring Precision, Inc. v. Melson*, 5:11-cv-663 (W.D. Tex. filed Aug. 5, 2011).

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.  A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252.  In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.  If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

In reviewing an administration action, the role of the district court is to "sit as an appellate tribunal" and review the case as a matter of law.  *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Such review is limited to the administrative record, and "not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *accord Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 177 (D.D.C. 2000).

## III.  ANALYSIS

### A.  ATF's Authority

The APA requires a reviewing court to set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

"An agency's power is not greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986); *see also Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992). Agency actions beyond delegated authority are *ultra vires* and should be invalidated. *Transohio*, 967 F.2d at 621. A court must look to the agency's enabling statute and subsequent legislation to determine whether it has acted within the bounds of its authority. *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Financial Responsibility & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998).

In this case, Plaintiffs challenge ATF's interpretation of the statute it is charged with administering. When reviewing an agency's interpretation of its enabling statute, a court must first determine whether "Congress has directly spoken to the precise question at issue" and if so the court must "give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007). "[W]here the words of the statute are unambiguous, the judicial inquiry is complete." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003). To decide whether Congress has addressed the precise question at issue, a court must analyze the text, purpose, and structure of the statute. *Ranbaxy Labs. Ltd. v. Leavitt*, 469 F.3d 120, 124 (D.C. Cir. 2006). If the statute is silent or ambiguous on the question, the court must proceed to the second step of the *Chevron* analysis and determine whether the agency's interpretation is based on a permissible construction of the statute. *Chevron*, 467 U.S. at 843.[6]

---

[6] In cases where an agency promulgated its interpretation through notice-and-comment rulemaking or formal adjudication, a court gives the agency's interpretation "controlling weight" so long as the interpretation is reasonable and not arbitrary or contrary to statute. *Kempthorne*, 477 F.3d at 754 (citing *United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001)). In cases where an agency enunciates its interpretation through informal action, a court accepts the

Here, the Court finds that the statute at issue, 18 U.S.C. § 928(g)(5)(A), is unambiguous; thus the Court completes its inquiry at *Chevron* step one. To determine ATF's proper scope of authority, the Court looks to the plain language of the statute. *See Pilon v. U.S.*, 73 F.3d 1111, 1119 (D.C. Cir. 1996). Section (g)(5)(A) expressly requires an FFL to produce record information when ATF issues a demand letter as follows:

> Each licensee shall, when required by letter issued by the Attorney General, and until notified to the contrary in writing by the Attorney General, submit on a form specified by the Attorney General, for periods and at the times specified in such letter, all record information required to be kept by this chapter or such lesser record information as the Attorney General in such letter may specify.

18 U.S.C. § 923(g)(5)(A).

Plaintiffs contend that the Gun Control Act protects FFLs from reporting requirements "except as expressly required by this section." 18 U.S.C. § 923(g)(1)(A). But "this section" is § 923(g), which includes § 923(g)(5)(A). Congress has unambiguously given ATF the authority to mandate reporting in the manner it has here.

The Fourth and Ninth Circuits have upheld two similar ATF demand letters issued under section (g)(5). *See J&G Sales Ltd. v. Truscott*, 473 F.3d 1043 (9th Cir. 2007) (Justice O'Connor, sitting by designation); *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281 (4th Cir. 2004); *RSM, Inc. v. Buckles*, 254 F.3d 61 (4th Cir. 2001). Although ATF's Demand Letter here is arguably broader than the letters at issue in those cases, its scope is still sufficiently narrow to pass muster, and the analysis used in those cases applies here.

In the earliest case, *RSM, Inc.*, ATF issued a demand letter to 41 FFLs who had failed

---

agency's interpretation only if it is persuasive. *Id.*

to respond to a firearms trace request at least one time, failed to respond to a trace request within the requisite 24 hours, or provided inaccurate information in response to a trace request. 254 F.3d at 63. The demand letter required those particular FFLs to submit information regarding their firearms purchases and sales for the past three years and on a monthly basis going forward. *Id*. One of the FFLs, RSM Inc., filed suit alleging that ATF violated FOPA because ATF's demand letter required that firearms records be "transferred to a facility owned, managed, or controlled by the United States" in violation of 18 U.S.C. § 926(a). The district court found in favor of plaintiff; the Fourth Circuit reversed, holding that ATF had the power and authority to issue the demand letter under § 923(g)(5)(A).

The Fourth Circuit observed that there are limits to ATF's demand letter authority: "Section 926(a) would be rendered meaningless if [ATF] could issue limitless demand letters under section 923(g)(5)(A) in a backdoor effort to avoid section 926(a)'s protections for law-abiding firearms owners. Congress clearly did not intend such a result." *RSM*, 254 F.3d at 67. Nonetheless, the Fourth Circuit did not delineate the precise scope of that authority because the demand letter at issue in *RSM* was sufficiently tailored to ATF's tracing needs. The letter in *RSM* was issued to only 0.1 percent of the FFLs nationwide who had failed to comply with prior tracing requests. *Id*. The circuit concluded, "While we are not free to ascribe to section 923(g)(5)(A) an open-ended reach, neither are we at liberty to eliminate altogether its positive grant of authority." *Id*. With regard to RSM's claim that ATF was using the demand letter to create a firearms registry, the circuit court found that the tailored demand letter was a "very far cry" from the creation of a national firearms directory. *Id*. at 68. "There is no evidence that the letter served as a ruse to avoid FOPA's prohibition against the creation of a national firearms registry. In light of the narrow scope of the

-12-

demand letter and its direct relationship to [ATF's] explicit statutory duties . . . there was no statutory violation." *Id*.

The Fourth Circuit upheld another ATF demand letter in *Blaustein & Reich*.  In that case, ATF had traced to 450 FFLs ten or more guns with a "time to crime" of three years or less.  365 F.3d at 285.  "Time to crime" is the time from retail sale of the weapon to the time it is recovered at a crime scene or is traced; the average time-to-crime is six years.  *Id*.  ATF concluded that these 450 FFLs probably were also selling a high volume of secondhand guns used in crime.  Secondhand guns are weapons originally acquired from FFLs by retail buyers and then resold.  Since retail buyers are not required to maintain sales records,[7] ATF needed a way to trace such firearms.  In order to obtain information regarding secondhand sales, ATF sent a demand letter to the 450 FFLs it had identified requiring that they report purchases of secondhand firearms.  The demand letter requested only a portion of the record information that the FFLs were already required by law to maintain, and it specifically directed the FFLs not to provide the name or address of the individual from whom the FFLs purchased the secondhand firearm.  *Id*. at 287.  The Fourth Circuit held that the demand letter did not exceed ATF's authority, and specifically that it did not contravene § 926's prohibition on creating a national firearms registry.  Section 926, enacted in 1986, prohibits ATF from promulgating new rules and regulations that would create a national firearms registry, but it does not limit the rules and regulations already in effect, such as ATF's demand letter authority, which has been in effect since 1968.  *Blaustein*, 365 F.3d at 288.  Nor does it impact Congress' power to enact statutes such

---

[7] *See* AR at 61-62 ("[W]hile ATF may be able to trace a firearm to the first retail purchaser, it generally has no knowledge of any secondhand firearms purchases from gun shows or pawnshops — where many traffickers buy guns — without conducting further investigation, which may require significant additional resources and time.")

as § 923(g)(5)(A), authorizing demand letter authority.  *Id.* at 290.

The Ninth Circuit followed *RSM* and *Blaustein* in *J&G Sales*, 473 F.3d 1043, which dealt with the very same demand letter that was at issue in *Blaustein*.  Tracing records indicated that J&G Sales, Ltd. had sold 15 or more firearms with a time-to-crime of three years or less.  Thus, J&G Sales was one of the 450 FFLs who received ATF's demand letter requiring it to produce record information relating to its purchase of secondhand firearms.  The district court had held that the demand letter exceeded ATF's statutory authority, but the Ninth Circuit followed the reasoning of *RSM* and *Blaustein* and held that ATF had exercised proper authority.  "The Bureau sent the demand letter at issue to a small fraction of FFLs and sought only a limited subset of information from FFLs regarding a limited subset of firearms.  Whatever the boundaries of the Bureau's authority, the demand letter at issue falls safely within them."  473 F.3d at 1049.

ATF's Demand Letter in this case, while arguably somewhat broader than the letters at issue in *RSM*, *Blaustein*, and *J&G*, is still limited in scope.  It requires FFLs in Arizona, California, New Mexico, and Texas to submit record information concerning multiple sales whenever, at one time or during any five consecutive business days, they sell two or more semi-automatic rifles capable of accepting a detachable magazine and with a caliber greater than .22 (including .223/5.56 caliber) to an unlicensed person.  The Demand Letter is limited to Type 1 and 2 FFLs in the four states that border Mexico, and the FFLs in these states make up about only 16% of Type 1 and 2 FFLs nationwide.[8]  Also, the Demand Letter is limited to (1) multiple sales of (2)

---

[8] Licensees are categorized into eleven types, including Type 01 (dealers in firearms other than destructive devices) and Type 02 (pawnbrokers in firearms other than destructive devices), and ATF regulations specify the records each Type is required to keep.  *See, e.g.*, 27 C.F.R. §§ 478.124(c)(1) & (e), 478.125(e).

a certain type of firearm (3) to the same person within a few days.  The Demand Letter only requires FFLs to report record information that FFLs already are required to maintain.  There is no evidence that ATF is using the Demand Letter as a ruse to create a national gun registry.

Plaintiffs here rehash arguments rejected by the Fourth and Ninth Circuits in *J&G*, *Blaustein*, and *RSM*, contending that ATF's reporting authority under § 923(g)(5)(A) is limited by § 923(g)(1)(A) (protecting FFLs from reporting requirements "except as expressly required by this section") to the subject matters on which reporting is required under § 923(g)(1)(B), (g)(3), (g)(4), (g)(6), and (g)(7).  These subsections require FFLs to permit inspection or report record information under specific circumstances:  § 923(g)(1)(B) permits ATF to examine records without a warrant during a criminal investigation; (g)(3) requires reporting of sales of multiple handguns to the same person; (g)(4) requires FFLs that go out of business to report their records to ATF; (g)(6) requires FFLs to report loss or theft of a firearm within 48 hours; and (g)(7) requires FFLs to respond within 24 hours of a tracing request.

In rejecting this very argument, the Ninth Circuit in *J&G* explained:  "It is certainly true that § 923(g)(1)(A) limits the Bureau's ability to procure information from FFLs to the express requirements of § 923, but it does not eviscerate the content of § 923(g)(5)(A)."  *J&G*, 473 F.3d at 1049.  The Fourth Circuit further explained:  "Section 923(g)(5)(A) contains a condition precedent. It requires an FFL to submit record information to the Bureau but only if the Bureau issues a demand letter requesting it.  This condition precedent does not negate the fact that § 923(g)(5)(A) contains an *express* requirement that is provided for in § 923(g)(1)(A)."  *Blaustein*, 365 F.3d at 287 n.14 (emphasis added).  Via section 923(g)(5)(A), the statute provides broad authority to seek, by demand letter, all record information that FFLs are required to maintain.  *Id*. at 286.

In a similar vein, Plaintiffs argue that § 923(g)(7) (requiring FFLs to respond within 24 hours to tracing requests in the course of a criminal investigation) prevents ATF from demanding records unless it is engaged in a bona fide criminal investigation. Noting that § 923(g)(7) serves a distinct purpose by requiring speedy reporting during a criminal investigation and does not reference or limit demand letter authority under § 923(g)(5)(A), the Ninth Circuit refused to read such a limitation into the law that would strip (g)(5)(A) of its independent meaning. *J&G*, 473 F.3d at 1050.[9]  Likewise, the requirement that FFLs report multiple sales of handguns under § 923(g)(3) does not limit ATF's authority to seek a different subset of record information, such as multiple sales of certain rifles, via demand letter. "Simply because some provisions of § 923 impose specific duties upon FFLs to respond to certain requests within a specified time frame and to provide record information sua sponte does not mean that the Bureau is prohibited from seeking further FFL record information by demand letter." *J&G*, 473 F.3d at 1050.

Plaintiffs further argue that an appropriations rider bans the collection of firearms records. Since 1978, Congress has included an additional restriction on ATF in an annual rider to appropriations legislation. *RSM*, 254 F.3d at 67. The rider in effect at the time the Demand Letter

---

[9] *Blaustein* easily dismissed the same argument:

> Section 923(g)(7) does not expressly limit the Bureau's authority to demand information. Instead, it merely requires an FFL, when the Bureau makes a request in connection with the disposition of a firearm in the course of a criminal investigation, to produce record information within twenty-four hours. The demand letter in this case does not relate to a trace being conducted in the course of a criminal investigation and does not require [an FFL] to produce any information within twenty-four hours. Thus, § 923(g)(7) does not limit the Bureau's authority to issue [such] demand letters . . . .

365 F.3d at 287 n.13.

was issued contained a provision that prohibited the expenditure of appropriated funds "in connection with consolidating or centralizing, within the Department of Justice, the records, or any portion thereof, of acquisition and disposition of firearms maintained by [FFLs]."  Consolidated Appropriations Act of 2010, Pub. L. No. 111 -117, 123 Stat. 3034, 3128 (2009) (in effect until Sept. 30, 2011 per Continuing Appropriations Act of 2011, Pub. L. No. 112-10, 125 Stat. 38, 102-03 (2011)).  Plaintiffs suggest that the rider broadly prohibited the collection of gun sales records and that the Demand Letter violated the rider because it effectively consolidated and centralized such records.

The Fourth Circuit examined an identical appropriations rider in *RSM* and noted that the law was passed originally in response to a proposed regulation which would have required FFLs to send to ATF a quarterly report accounting for *all* firearms sales and dispositions.  *RSM*, 254 F.3d at 67.  Congress was concerned about the invasion of lawful gun owners' privacy and  wanted to prohibit such broad reporting on a national basis.  *Id*.  The Fourth Circuit determined that the appropriations rider did not serve as an all out ban on the reporting and gathering of firearms records.

> Congress has amended the Gun Control Act several times, most notably with FOPA, since it originally passed the appropriations rider. When it passed FOPA, Congress clearly envisioned some sort of collections of firearms records, so long as it was incidental to some other statutory function specifically delegated to ATF.

*Id*. at 68.  For example, ATF collects a set of records when (1) an FFL reports multiple sales of handguns under § 923(g)(3)(A) and (2) an FFL closes its business and forwards its records to ATF under § 923(g)(4).  ATF's issuance of a tailored demand letter related to ATF's tracing authority did not create the sort of national firearms registry prohibited by the appropriations rider.  *Id*.  Further,

in *Blaustein*, the court explained that the appropriations rider prohibits "consolidating and centralizing" — a large scale enterprise relating to a substantial amount of information — and the demand letter in that case required less than 1% of FFLs to report a portion of their record information.  *Blaustein*, 365 F.3d at 289.

Plaintiffs also argue that the Demand Letter improperly seeks information in a form different from the manner that the records are usually kept.  FFLs maintain sales information, but the Demand Letter requires them to determine when they have made a multiple sale of certain long guns to the same person on the same day or within five business days and to provide this information to ATF.  Contrary to the thrust of the argument, reporting of partial records is specifically authorized by § 923(g)(5)(A), which provides that "[e]ach licensee shall, when required by [demand letter], submit . . .  all record information required to be kept by this chapter *or such lesser record information as the Attorney General in such letter may specify*."  The statute anticipates the limited reporting required here.  Upon every sale or transfer of a firearm, FFLs are required to record the buyer's name, address, date and place of birth, country of citizenship, a certification that he is the actual buyer and is not prohibited from receiving or possessing the firearm, and the firearm manufacturer, type, model, gauge or caliber, and serial number.  27 C.F.R. § 478.124.  Under the terms of the Demand Letter, FFLs are required to report a subset of this information.  Section 923(g)(5)(A) does not limit ATF's demand letter authority to requests for records "in the same manner" as they currently kept.

## B.  ATF's Action Was Not Arbitrary or Capricious

In addition to arguing that ATF lacked authority to issue the Demand Letter, Plaintiffs assert that ATF acted arbitrarily and capriciously.  The APA requires a reviewing court to set aside

agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 736 (D.C. Cir. 2001).  In making this inquiry, the reviewing court "must consider whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  At a minimum, the agency must have considered relevant data and articulated an explanation establishing a "rational connection between the facts found and the choice made." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626 (1986).  As the Supreme Court has explained, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Henley v. FDA*, 77 F.3d 616, 621 (2d Cir. 1996) ("we might not have chosen the FDA's course had it been ours to chart . . . [b]ut that is hardly the point.").  Rather, agency action under review is "entitled to a presumption of regularity" and courts must consider only whether the agency decision was based on relevant factors and whether there has been a clear error of judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

In *Blaustein*, the Fourth Circuit held that a demand letter requiring the reporting of all purchases of secondhand firearms was not arbitrary and capricious.  ATF had deduced that since 450 FFLs were the original source of a disproportionate share of the new firearms that were traced, this same group might also be the source — through illegal or legal means — of a substantial percentage of secondhand firearms that were traced. 365 F.3d at 291.  The court found that this logic was reasonable. *Id.*

In the case at hand, ATF's rationale was similarly reasonable.  ATF determined that certain powerful long guns are weapons of choice of Mexican drug cartels, and that multiple sales of such guns is a strong indicator of gun trafficking.  ATF also determined that "[b]ecause long guns have become Mexican cartels' weapons of choice, multiple sales reporting [of hand guns] has become less viable as a source of intelligence to disrupt the illegal flow of weapons to Mexico."  AR at 285 (OIG Review).  Because the states bordering Mexico have been shown to be major sources of guns related to crime in Mexico, the Demand Letter targets FFLs located in those states.  As the Ninth Circuit pointed out, "The agency need not craft the perfect threshold in order to survive review, but must merely demonstrate that its threshold stems from reasoned decision making."  *J&G*, 473 F.3d at 1052.  ATF has done so here.  ATF acted rationally in targeting FFLs in states bordering Mexico and seeking reporting of multiple sales of semiautomatic rifles.  The Demand Letter bears a direct relationship to ATF's statutory duties to trace firearms recovered during criminal investigations and to investigate violations of firearms laws.  Plaintiffs have not shown that the agency's action violated any law or that it was arbitrary and capricious.

### C.  Mandamus

Plaintiffs also seeks a writ of mandamus "to compel an officer or employee of the United States to perform a duty owed to the plaintiff."  *See* NSSF Compl., 11-cv-1401 [Dkt. #1] ¶ 4.  This Court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.  Mandamus relief may be granted only where "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff."  *In re Medicare Reim. Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (citing *Power v.*

*Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).  Mandamus is inappropriate except where a public

official has violated a "ministerial duty."  *Consol. Edison Co. v. Ashcroft*, 286 F.3d 600, 605 (D.C.

Cir. 2002).  "Such a duty must be so plainly prescribed as to be free from doubt and equivalent to

a positive command."  *Id.*; *see also Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996) (ministerial

duty is one that "admits of no discretion").  Even when the legal requirements for mandamus

jurisdiction have been satisfied, a court may grant relief only in extraordinary circumstances, *i.e.*,

when the court finds "compelling . . . equitable grounds."  *In re Medicare Reim. Litig.*, 414 F.3d at

10 (citing *13th Reg'l Corp. v. U.S. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).  Plaintiffs

have not specified any particular duty that ATF owes nor have they pointed to compelling equitable

grounds.  Thus, the request for a writ of mandamus will be denied.

## IV.  CONCLUSION

Congress has effected a delicate balance between ATF's regulation of firearms and

the right to privacy held by lawful firearms owners.  ATF's Demand Letter did not disturb that

balance.  Because the Demand Letter was limited to only certain sales of certain guns in certain

states, ATF did not exceed its authority.  Further, ATF did not act arbitrarily or capriciously because

the reporting requirement set forth in the Demand Letter was based on relevant factors.  Accordingly,

the Court will grant ATF's motion for summary judgment [Dkt. # 24] and will deny Plaintiffs'

motions for summary judgment [Dkt. ## 33 & 34].


Date:  January 13, 2012                                     _____/s/_____
                                                            ROSEMARY M. COLLYER
                                                            United States District Judge